XAVIER BECERRA
Attorney General of California
PEGGY S. RUFFRA
Supervising Deputy Attorney General
JILL M. THAYER
Deputy Attorney General
State Bar No. 166428
    455 Golden Gate Avenue, Suite 11000
    San Francisco, CA  94102-7004
    Telephone:  (415) 510-3868
    Fax:  (415) 703-1234
    E-mail:  Jill.Thayer@doj.ca.gov
*Attorneys for Respondent*

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| **ESEQUIEL "PAUL" GARCIA,** | 5:16-cv-05301-BLF (PR) |
| Petitioner, | |
| v. | |
| **NEIL MCDOWELL, Warden,** | |
| Respondent. | |

# EXHIBIT 1
## (Part 1 of 7)

Exhibit 1 (Part 1 of 7) (5:16-cv-05301-BLF (PR))

**IN THE SUPERIOR COURT OF THE STATE OF CALIFORNIA**
IN AND FOR THE COUNTY OF SANTA CLARA

**THE PEOPLE,**

*PLAINTIFF AND
RESPONDENT*

**V.**

**LUCIO ESTRADA**

*DEFENDANT AND
APPELLANT*

**COURT OF APPEAL NO.:**   H036046

**VOL.**    1    of    7

**PAGES**    1    thru    190

# CLERK'S TRANSCRIPT

CLERK'S TRANSCRIPT ON APPEAL FROM THE JUDGMENT OF THE SUPERIOR COURT OF THE STATE OF CALIFORNIA, IN AND FOR THE COUNTY OF SANTA CLARA.

SUPERIOR COURT NUMBER:   **CC800985**

HONORABLE _____ **DAVID CENA** _____ , JUDGE

APPEARANCES:

ATTORNEY GENERAL
455 GOLDEN GATE AVENUE
ROOM 11000
SAN FRANCISCO, CA 94102

COUNSEL FOR PLAINTIFF
AND RESPONDENT

SIXTH DISTRICT APPELLATE PROGRAM
100 NORTH WINCHESTER BLVD, SUITE 310
SANTA CLARA, CA 95050

COUNSEL FOR DEFENDANT
AND APPELLANT

**NOTICE OF APPEAL FILED** _____ November 30, 2010 _____

**NOTICE OF COMPLETION** _____ JAN 2 8 2011 _____

| | CLERK'S TRANSCRIPT INDEX | PAGE | VOL. |
|---|---|---|---|
| | CC800985        01/26/11 | | |
| 1 | PRELIMINARY EXAMINATION VOLUME 1 | 1 | 1 |
| 2 | PRELIMINARY EXAMINATION VOLUME 2 | 191 | 2 |
| 3 | PRELIMINARY EXAMINATION VOLUME 3 | 347 | 3 |
| 4 | PRELIMINARY EXAMINATION VOLUME 4 | 573 | 4 |
| 5 | PRELIMINARY EXAMINATION VOLUME 5 | 794 | 5 |
| 6 | FELONY CASE SUMMARY | 982 | 6 |
| 7 | FELONY COMPLAINT | 983 | 6 |
| 8 | SEALED STATEMENT OF FACTS | 986 | 6 |
| 9 | SEALED ARREST WARRANT AND ARREST AFFIDAVIT | 989 | 6 |
| 10 | SEALED ORDER | 1005 | 6 |
| 11 | SECOND AMENDED FELONY COMPLAINT TO ADD FIFTH DEFENDANT | 1031 | 6 |
| 12 | THIRD AMENDED FELONY CASE SUMMARY | 1034 | 6 |
| 13 | THIRD AMENDED FELONY COMPLAINT | 1035 | 6 |
| 14 | FOURTH AMENDED FELONY CASE SUMMARY | 1038 | 6 |
| 15 | FOURTH AMENDED FELONY COMPLAINT | 1039 | 6 |
| 16 | FIFTH AMENDED FELONY CASE SUMMARY | 1041 | 6 |
| 17 | FIFTH AMENDED FELONY COMPLAINT | 1042 | 6 |
| 18 | ORDER | 1044 | 6 |
| 19 | AFFIDAVIT AND APPLICATION FOR EX PARTE ORDER SEALING STATEMENT OF FACTS | 1045 | 6 |
| 20 | MEDIA REQUEST TO PHOTOGRAPH RECORD OR BROADCAST | 1047 | 6 |
| 21 | MEDIA REQUEST TO PHOTOGRAPH RECORD OR BROADCAST | 1049 | 6 |
| 22 | MEDIA REQUEST TO PHOTOGRAPH RECORD OR BROADCAST | 1052 | 6 |
| 23 | MEDIA REQUEST TO PHOTOGRAPH RECORD OR BROADCAST | 1055 | 6 |
| 24 | MEDIA REQUEST TO PHOTOGRAPH RECORD OR BROADCAST | 1058 | 6 |

| 25 | CLERK'S MINUTES FOR 04/07/08 | 1061 | 6 |
|----|---|---|---|
| 26 | MEDIA REQUEST TO PHOTOGRAPH RECORD OR BROADCAST | 1062 | 6 |
| 27 | ARREST WARRANT | 1067 | 6 |
| 28 | CLERK'S MINUTES FOR 04/11/08 | 1071 | 6 |
| 29 | PROOF OF SERVICE | 1072 | 6 |
| 30 | DECLARATION OF SEAN WEBBY IN SUPPORT OF S.J. MERCURY NEWS' MOTION TO UNSEAL | 1075 | 6 |
| 31 | DECLARATION OF JAMES CHADWICK IN SUPPORT OF S.J. MERCURY NEWS' MOTION TO UNSEAL AFFIDAVITS IN SUPPORT OF COMPLAINT | 1081 | 6 |
| 32 | MEM. OF P&A IN SUPPORT OF MOTION TO UNSEAL AFFIDAVITS IN SUPPORT OF THE COMPLAINT | 1103 | 6 |
| 33 | EX PARTE APPLICATION OF S.J. MERCURY NEWS FOR ORDER SHORTENING TIME FOR HEARING ON MOTION TO UNSEAL | 1123 | 6 |
| 34 | ORDER GRANTING EX PARTE APPLICATION FOR ORDER SHORTENING TIME FOR HEARING FOR MOTION TO UNSEAL | 1132 | 6 |
| 35 | NOTICE OF MOTION AND MOTION OF S.J. MERCURY NEWS TO UNSEAL AFFIDAVITS IN SUPPORT OF THE COMPLAINT | 1134 | 6 |
| 36 | CLERK'S MINUTES FOR 04/18/08 | 1136 | 6 |
| 37 | REPLY TO OPPOSITION TO MOTION TO UNSEAL AFFIDAVITS IN SUPPORT OF THE COMPLAINT | 1137 | 6 |
| 38 | PEOPLE'S P&A IN OPPOSITION TO DEFENDANT'S REQUEST FOR DISCOVERY BEFORE THE PRELIMINARY HEARING | 1150 | 6 |
| 39 | CLERK'S MINUTES FOR 04/25/08 | 1162 | 6 |
| 40 | MEDIA REQUEST TO PHOTOGRAPH RECORD OR BROADCAST | 1163 | 6 |
| 41 | CLERK'S MINUTES FOR 05/02/08 | 1166 | 6 |
| 42 | CLERK'S MINUTES FOR 05/30/08 | 1167 | 6 |
| 43 | CLERK'S MINUTES FOR 07/22/08 | 1168 | 6 |
| 44 | ORDER TO ALLOW MP3 PLAYER | 1169 | 6 |
| 45 | ORDER TO ALLOW MP3 PLAYER | 1170 | 6 |
| 46 | MEDIA REQUEST TO PHOTOGRAPH RECORD OR BROADCAST | 1171 | 6 |
| 47 | CLERK'S MINUTES FOR 09/19/08 | 1174 | 6 |
| 48 | CLERK'S MINUTES FOR 10/16/08 | 1175 | 6 |
| 49 | PEOPLE'S RESPONSE TO DEFENDANT'S REQUEST FOR DISCOVERY THAT IS NOT PERMITTED BY P.C. 1054.1 | 1176 | 6 |
| 50 | CLERK'S MINUTES FOR 11/05/08 | 1187 | 6 |

| 51 | CLERK'S MINUTES FOR 11/14/08 | 1188 | 6 |
| 52 | MEDIA REQUEST TO PHOTOGRAPH RECORD OR BROADCAST | 1189 | 6 |
| 53 | CLERK'S MINUTES FOR 12/08/08 | 1192 | 6 |
| 54 | MEDIA REQUEST TO PHOTOGRAPH RECORD OR BROADCAST | 1193 | 6 |
| 55 | PRELIMINARY EXAMINATION MINUTES FOR 12/10/08 | 1196 | 6 |
| 56 | PRELIMINARY EXAMINATION MINUTES FOR 12/16/08 | 1197 | 6 |
| 57 | PRELIMINARY EXAMINATION MINUTES FOR 12/17/08 | 1198 | 6 |
| 58 | PRELIMINARY EXAMINATION MINUTES FOR 12/18/08 | 1199 | 6 |
| 59 | PRELIMINARY EXAMINATION MINUTES FOR 01/05/09 | 1200 | 6 |
| 60 | PRELIMINARY EXAMINATION MINUTES FOR 01/06/09 | 1201 | 6 |
| 61 | PEOPLE'S EXHIBITS | 1202 | 6 |
| 62 | INFORMATION SUMMARY | 1213 | 6 |
| 63 | FINGERPRINT FORM | 1218 | 6 |
| 64 | CLERK'S MINUTES FOR 01/20/09 | 1219 | 6 |
| 65 | MEDIA REQUEST TO PHOTOGRAPH RECORD OR BROADCAST | 1220 | 6 |
| 66 | CLERK'S MINUTES FOR 02/04/09 | 1223 | 6 |
| 67 | FIRST AMENDED INFORMATION SUMMARY | 1224 | 6 |
| 68 | LETTER FROM THE DISTRICT ATTORNEY TO THE JUDGE | 1228 | 6 |
| 69 | CLERK'S MINUTES FOR 03/04/09 | 1229 | 6 |
| 70 | CLERK'S MINUTES FOR 07/15/09 | 1230 | 6 |
| 71 | CLERK'S MINUTES FOR 10/30/09 | 1231 | 6 |
| 72 | CLERK'S MINUTES FOR 11/06/09 | 1232 | 6 |
| 73 | CLERK'S MINUTES FOR 11/16/09 | 1233 | 6 |
| 74 | CLERK'S MINUTES FOR 12/02/09 | 1234 | 6 |
| 74 | MEDIA REQUEST TO PHOTOGRAPH RECORD OR BROADCAST | 1235 | 6 |
| 75 | CLERK'S MINUTES FOR 02/08/10 | 1237 | 6 |

| 76 | ORDER ON MEDIA REQUEST TO PERMIT COVERAGE | 1236 | 6 |
|----|----|----|----|
| 77 | NOTICE OF MOTION PURSUANT TO P.C. 1050 | 1238 | 6 |
| 78 | CLERK'S MINUTES FOR 06/17/10 | 1242 | 6 |
| 79 | CLERK'S MINUTES FOR 06/28/10 | 1243 | 6 |
| 79 | CLERK'S MINUTES FOR 08/02/10 | 1244 | 6 |
| 80 | ORDER | 1245 | 6 |
| 81 | MEDIA REQUEST TO PHOTOGRAPH RECORD OR BROADCAST | 1246 | 6 |
| 82 | TRIAL STIPULATIONS | 1249 | 6 |
| 83 | CLERK'S MINUTES FOR 08/03/10 | 1250 | 6 |
| 84 | CLERK'S MINUTES FOR 08/10/10 | 1251 | 6 |
| 85 | COURT MINUTES FOR 08/16/10 | 1252 | 6 |
| 86 | COURT MINUTES FOR 08/17/10 | 1254 | 6 |
| 87 | COURT MINUTES FOR 08/19/10 | 1255 | 6 |
| 88 | THE PEOPLE'S MOTION IN OPPOSITION TO CHANGING THE VENUE OF THE TRIAL | 1256 | 6 |
| 89 | THE PEOPLE'S MOTION IN LIMINE TO EXCLUDE THIRD PARTY CULPABILITY EVIDENCE | 1263 | 6 |
| 90 | COURT MINUTES FOR 08/20/10 | 1274 | 7 |
| 91 | DEFENDANT MIGUEL CHAIDES MOTION IN LIMINE TO EXCLUDE STATEMENTS ALLEGEDLY MADE BY THE DEFENDANT | 1276 | 7 |
| 92 | COURT MINUTES FOR 08/23/10 | 1281 | 7 |
| 93 | COURT MINUTES FOR 08/24/10 | 1282 | 7 |
| 94 | COURT MINUTES FOR 08/24/10 | 1283 | 7 |
| 95 | COURT MINUTES FOR 08/25/10 | 1284 | 7 |
| 97 | COURT MINUTES FOR 08/26/10 | 1286 | 7 |
| 98 | COURT MINUTES FOR 08/27/10 | 1287 | 7 |
| 99 | CLERK'S MINUTES FOR 08/27/10 | 1289 | 7 |
| 100 | MEDIA REQUEST TO PHOTOGRAPH RECORD OR BROADCAST | 1290 | 7 |
| 101 | MEDIA REQUEST TO PHOTOGRAPH RECORD OR BROADCAST | 1293 | 7 |

| 102 | MEDIA REQUEST TO PHOTOGRAPH RECORD OR BROADCAST | 1296 | 7 |
|-----|---|------|---|
| 103 | COURT MINUTES FOR 08/31/10 | 1299 | 7 |
| 104 | CLERK'S MINUTES FOR 08/31/10 | 1301 | 7 |
| 105 | COURT MINUTES FOR 09/01/10 | 1302 | 7 |
| 106 | COURT MINUTES FOR 09/02/10 | 1307 | 7 |
| 107 | COURT MINUTES FOR 09/03/10 | 1311 | 7 |
| 108 | REQUEST FOR INTERPRETER | 1312 | 7 |
| 109 | COURT MINUTES FOR 09/07/10 | 1313 | 7 |
| 110 | REQUEST FOR INTERPRETER | 1318 | 7 |
| 111 | COURT MINUTES FOR 09/08/10 | 1319 | 7 |
| 112 | ORDER RE: ATTENDANCE OF OUT OF STATE WITNESS PURSUANT TO P.C. 1334 ET SEQ | 1323 | 7 |
| 113 | MEDIA REQUEST TO PHOTOGRAPH RECORD OR BROADCAST | 1327 | 7 |
| 114 | COURT MINUTES FOR 09/13/10 | 1330 | 7 |
| 115 | COURT MINUTES FOR 09/14/10 | 1333 | 7 |
| 116 | COURT MINUTES FOR 09/15/10 | 1337 | 7 |
| 117 | DECLARATION RE: REQUEST FOR ATTENDANCE OF OUT OF STATE WITNESS PURSUANT TO P.C. 1334 ET SEQ | 1339 | 7 |
| 118 | CERTIFICATE OF JUDGE OF THE REQUESTING STATE FOR ATTENDANCE OF OUT OF STATE WITNESS | 1345 | 7 |
| 119 | ORDER RE: ATTENDANCE OF OUT OF STATE WITNESS PURSUANT TO P.C. 1334 ET SEQ | 1348 | 7 |
| 120 | ORDER FOR HEARING IN THE SENDING STATE | 1349 | 7 |
| 121 | DECLARATION RE: REQUEST FOR ATTENDANCE OF OUT OF STATE WITNESS PURSUANT TO P.C. 1334 ET SEQ | 1351 | 7 |
| 122 | DECLARATION RE: REQUEST FOR ATTENDANCE OF OUT OF STATE WITNESS PURSUANT TO P.C. 1334 ET SEQ | 1363 | 7 |
| 123 | COURT MINUTES FOR 09/16/10 | 1369 | 7 |
| 124 | COURT  MINUTES FOR 09/17/10 | 1371 | 7 |
| 125 | CLERK'S MINUTES FOR 09/17/10 | 1373 | 7 |
| 126 | FAX COVER SHEET | 1374 | 7 |
| 127 | ORDER TO PRODUCE | 1375 | 7 |

| 128 | COURT MINUTES FOR 09/20/10 | 1376 | 7 |
| 129 | COURT MINUTES FOR 09/21/10 | 1379 | 7 |
| 130 | NOTIFICATION OF ARREST OR RETURN TO CUSTODY | 1382 | 7 |
| 131 | COURT MINUTES FOR 09/22/10 | 1383 | 7 |
| 132 | COURT MINUTES FOR 09/23/10 | 1387 | 7 |
| 133 | COURT MINUTES FOR 09/27/10 | 1390 | 7 |
| 134 | COURT MINUTES FOR 09/24/10 | 1393 | 7 |
| 135 | COURT MINUTES FOR 09/28/10 | 1395 | 7 |
| 136 | COURT MINUTES FOR 09/29/10 | 1399 | 7 |
| 137 | COURT MINUTES FOR 10/04/10 | 1401 | 7 |
| 138 | COURT MINUTES FOR 10/05/10 | 1402 | 7 |
| 139 | REQUEST FOR INTERPRETER | 1406 | 7 |
| 140 | COURT MINUTES 10/06/10 | 1407 | 7 |
| 141 | COURT MINUTES FOR 10/07/10 | 1411 | 7 |
| 142 | COURT MINUTES FOR 10/08/10 | 1414 | 7 |
| 143 | FAX COVER SHEET | 1416 | 7 |
| 144 | COURT MINUTES FOR 10/12/10 | 1420 | 7 |
| 145 | CLERK'S MINUTES FOR 10/13/10 | 1422 | 7 |
| 146 | COURT MINUTES FOR 10/14/10 | 1424 | 7 |
| 147 | COURT MINUTES FOR 10/15/10 | 1426 | 7 |
| 148 | COURT MINUTES FOR 10/18/10 | 1427 | 7 |
| 149 | COURT MINUTES FOR 10/19/10 | 1430 | 7 |
| 150 | JURY INSTRUCTIONS GIVEN | 1432 | 7 |
| 151 | COURT MINUTES FOR 10/20/10 | 1492 | 7 |
| 152 | COURT MINUTES FOR 10/21/10 | 1494 | 7 |
| 153 | JUROR QUESTIONS | 1496 | 7 |

| 154 | COURT MINUTES FOR 10/22/10 | 1498 | 7 |
| 155 | JUROR QUESTIONS | 1499 | 7 |
| 156 | ORDER ON MEDIA REQUEST TO PERMIT COVERAGE | 1501 | 7 |
| 157 | COURT MINUTES FOR 10/25/10 | 1503 | 7 |
| 158 | JUROR QUESTION | 1505 | 7 |
| 159 | COURT MINUTES FOR 10/26/10 | 1506 | 7 |
| 160 | CLERK'S MINUTES FOR 10/26/10 | 1508 | 7 |
| 161 | VERDICT | 1509 | 7 |
| 162 | CONTINUANCE REQUEST | 1510 | 7 |
| 163 | CLERK'S MINUTES FOR 11/18/10 | 1511 | 7 |
| 164 | PROBATION OFFICER'S REPORT | 1513 | 7 |
| 165 | CLERK'S MINUTES FOR 11/30/10 | 1529 | 7 |
| 166 | ABSTRACT OF JUDGMENT | 1530 | 7 |
| 167 | NOTICE OF APPEAL | 1532 | 7 |
| 168 | NOTICE TO COURT REPORTERS | 1533 | 7 |
| 169 | NOTICE OF FILING NOTICE OF APPEAL | 1535 | 7 |
| 170 | NOTICE OF COMPLETION | 1536 | 7 |
| 171 | CLERK'S CERTIFICATION | 1537 | 7 |

| | CLERK'S TRANSCRIPT INDEX | PAGE | VOL. |
|---|---|---|---|
| | CC800985                    01/26/11 | | |
| 1 | ABSTRACT OF JUDGMENT | 1530 | 7 |
| 2 | AFFIDAVIT AND APPLICATION FOR EX PARTE ORDER SEALING STATEMENT OF FACTS | 1045 | 6 |
| 3 | ARREST WARRANT | 1067 | 6 |
| 4 | CERTIFICATE OF JUDGE OF THE REQUESTING STATE FOR ATTENDANCE OF OUT OF STATE WITNESS | 1345 | 7 |
| 5 | CLERK'S CERTIFICATION | 1537 | 7 |
| 6 | CLERK'S MINUTES FOR 01/20/09 | 1219 | 6 |
| 7 | CLERK'S MINUTES FOR 02/04/09 | 1223 | 6 |
| 8 | CLERK'S MINUTES FOR 02/08/10 | 1237 | 6 |
| 9 | CLERK'S MINUTES FOR 03/04/09 | 1229 | 6 |
| 10 | CLERK'S MINUTES FOR 04/07/08 | 1061 | 6 |
| 11 | CLERK'S MINUTES FOR 04/11/08 | 1071 | 6 |
| 12 | CLERK'S MINUTES FOR 04/18/08 | 1136 | 6 |
| 13 | CLERK'S MINUTES FOR 04/25/08 | 1162 | 6 |
| 14 | CLERK'S MINUTES FOR 05/02/08 | 1166 | 6 |
| 15 | CLERK'S MINUTES FOR 05/30/08 | 1167 | 6 |
| 16 | CLERK'S MINUTES FOR 06/17/10 | 1242 | 6 |
| 17 | CLERK'S MINUTES FOR 06/28/10 | 1243 | 6 |
| 18 | CLERK'S MINUTES FOR 07/15/09 | 1230 | 6 |
| 19 | CLERK'S MINUTES FOR 07/22/08 | 1168 | 6 |
| 20 | CLERK'S MINUTES FOR 08/02/10 | 1244 | 6 |
| 21 | CLERK'S MINUTES FOR 08/03/10 | 1250 | 6 |
| 22 | CLERK'S MINUTES FOR 08/10/10 | 1251 | 6 |
| 23 | CLERK'S MINUTES FOR 08/27/10 | 1289 | 7 |
| 24 | CLERK'S MINUTES FOR 08/31/10 | 1301 | 7 |

| 25 | CLERK'S MINUTES FOR 09/17/10 | 1373 | 7 |
| 26 | CLERK'S MINUTES FOR 09/19/08 | 1174 | 6 |
| 27 | CLERK'S MINUTES FOR 10/13/10 | 1422 | 7 |
| 28 | CLERK'S MINUTES FOR 10/16/08 | 1175 | 6 |
| 29 | CLERK'S MINUTES FOR 10/26/10 | 1508 | 7 |
| 30 | CLERK'S MINUTES FOR 10/30/09 | 1231 | 6 |
| 31 | CLERK'S MINUTES FOR 11/05/08 | 1187 | 6 |
| 32 | CLERK'S MINUTES FOR 11/06/09 | 1232 | 6 |
| 33 | CLERK'S MINUTES FOR 11/14/08 | 1188 | 6 |
| 34 | CLERK'S MINUTES FOR 11/16/09 | 1233 | 6 |
| 35 | CLERK'S MINUTES FOR 11/18/10 | 1511 | 7 |
| 36 | CLERK'S MINUTES FOR 11/30/10 | 1529 | 7 |
| 37 | CLERK'S MINUTES FOR 12/02/09 | 1234 | 6 |
| 38 | CLERK'S MINUTES FOR 12/08/08 | 1192 | 6 |
| 39 | CONTINUANCE REQUEST | 1510 | 7 |
| 40 | COURT  MINUTES FOR 09/17/10 | 1371 | 7 |
| 41 | COURT MINUTES 10/06/10 | 1407 | 7 |
| 42 | COURT MINUTES FOR 08/16/10 | 1252 | 6 |
| 43 | COURT MINUTES FOR 08/17/10 | 1254 | 6 |
| 44 | COURT MINUTES FOR 08/19/10 | 1255 | 6 |
| 45 | COURT MINUTES FOR 08/20/10 | 1274 | 7 |
| 46 | COURT MINUTES FOR 08/23/10 | 1281 | 7 |
| 47 | COURT MINUTES FOR 08/24/10 | 1282 | 7 |
| 48 | COURT MINUTES FOR 08/24/10 | 1283 | 7 |
| 49 | COURT MINUTES FOR 08/25/10 | 1284 | 7 |
| 50 | COURT MINUTES FOR 08/26/10 | 1286 | 7 |

| 51 | COURT MINUTES FOR 08/27/10 | 1287 | 7 |
| 52 | COURT MINUTES FOR 08/31/10 | 1299 | 7 |
| 53 | COURT MINUTES FOR 09/01/10 | 1302 | 7 |
| 54 | COURT MINUTES FOR 09/02/10 | 1307 | 7 |
| 55 | COURT MINUTES FOR 09/03/10 | 1311 | 7 |
| 56 | COURT MINUTES FOR 09/07/10 | 1313 | 7 |
| 57 | COURT MINUTES FOR 09/08/10 | 1319 | 7 |
| 58 | COURT MINUTES FOR 09/13/10 | 1330 | 7 |
| 59 | COURT MINUTES FOR 09/14/10 | 1333 | 7 |
| 60 | COURT MINUTES FOR 09/15/10 | 1337 | 7 |
| 61 | COURT MINUTES FOR 09/16/10 | 1369 | 7 |
| 62 | COURT MINUTES FOR 09/20/10 | 1376 | 7 |
| 63 | COURT MINUTES FOR 09/21/10 | 1379 | 7 |
| 64 | COURT MINUTES FOR 09/22/10 | 1383 | 7 |
| 65 | COURT MINUTES FOR 09/23/10 | 1387 | 7 |
| 66 | COURT MINUTES FOR 09/24/10 | 1393 | 7 |
| 67 | COURT MINUTES FOR 09/27/10 | 1390 | 7 |
| 68 | COURT MINUTES FOR 09/28/10 | 1395 | 7 |
| 69 | COURT MINUTES FOR 09/29/10 | 1399 | 7 |
| 70 | COURT MINUTES FOR 10/04/10 | 1401 | 7 |
| 71 | COURT MINUTES FOR 10/05/10 | 1402 | 7 |
| 72 | COURT MINUTES FOR 10/07/10 | 1411 | 7 |
| 73 | COURT MINUTES FOR 10/08/10 | 1414 | 7 |
| 74 | COURT MINUTES FOR 10/12/10 | 1420 | 7 |
| 74 | COURT MINUTES FOR 10/14/10 | 1424 | 7 |
| 75 | COURT MINUTES FOR 10/15/10 | 1426 | 7 |

| 76 | COURT MINUTES FOR 10/18/10 | 1427 | 7 |
| 77 | COURT MINUTES FOR 10/19/10 | 1430 | 7 |
| 78 | COURT MINUTES FOR 10/20/10 | 1492 | 7 |
| 79 | COURT MINUTES FOR 10/21/10 | 1494 | 7 |
| 79 | COURT MINUTES FOR 10/22/10 | 1498 | 7 |
| 80 | COURT MINUTES FOR 10/25/10 | 1503 | 7 |
| 81 | COURT MINUTES FOR 10/26/10 | 1506 | 7 |
| 82 | DECLARATION OF JAMES CHADWICK IN SUPPORT OF S.J. MERCURY NEWS' MOTION TO UNSEAL AFFIDAVITS IN SUPPORT OF COMPLAINT | 1081 | 6 |
| 83 | DECLARATION OF SEAN WEBBY IN SUPPORT OF S.J. MERCURY NEWS' MOTION TO UNSEAL | 1075 | 6 |
| 84 | DECLARATION RE: REQUEST FOR ATTENDANCE OF OUT OF STATE WITNESS PURSUANT TO P.C. 1334 ET SEQ | 1339 | 7 |
| 85 | DECLARATION RE: REQUEST FOR ATTENDANCE OF OUT OF STATE WITNESS PURSUANT TO P.C. 1334 ET SEQ | 1351 | 7 |
| 86 | DECLARATION RE: REQUEST FOR ATTENDANCE OF OUT OF STATE WITNESS PURSUANT TO P.C. 1334 ET SEQ | 1363 | 7 |
| 87 | DEFENDANT MIGUEL CHAIDES MOTION IN LIMINE TO EXCLUDE STATEMENTS ALLEGEDLY MADE BY THE DEFENDANT | 1276 | 7 |
| 88 | EX PARTE APPLICATION OF S.J. MERCURY NEWS FOR ORDER SHORTENING TIME FOR HEARING ON MOTION TO UNSEAL | 1123 | 6 |
| 89 | FAX COVER SHEET | 1374 | 7 |
| 90 | FAX COVER SHEET | 1416 | 7 |
| 91 | FELONY CASE SUMMARY | 982 | 6 |
| 92 | FELONY COMPLAINT | 983 | 6 |
| 93 | FIFTH AMENDED FELONY CASE SUMMARY | 1041 | 6 |
| 94 | FIFTH AMENDED FELONY COMPLAINT | 1042 | 6 |
| 95 | FINGERPRINT FORM | 1218 | 6 |
| 97 | FIRST AMENDED INFORMATION SUMMARY | 1224 | 6 |
| 98 | FOURTH AMENDED FELONY CASE SUMMARY | 1038 | 6 |
| 99 | FOURTH AMENDED FELONY COMPLAINT | 1039 | 6 |
| 100 | INFORMATION SUMMARY | 1213 | 6 |
| 101 | JUROR QUESTION | 1505 | 7 |

| | | | |
|---|---|---|---|
| 102 | JUROR QUESTIONS | 1496 | 7 |
| 103 | JUROR QUESTIONS | 1499 | 7 |
| 104 | JURY INSTRUCTIONS GIVEN | 1432 | 7 |
| 105 | LETTER FROM THE DISTRICT ATTORNEY TO THE JUDGE | 1228 | 6 |
| 106 | MEDIA REQUEST TO PHOTOGRAPH RECORD OR BROADCAST | 1047 | 6 |
| 107 | MEDIA REQUEST TO PHOTOGRAPH RECORD OR BROADCAST | 1049 | 6 |
| 108 | MEDIA REQUEST TO PHOTOGRAPH RECORD OR BROADCAST | 1052 | 6 |
| 109 | MEDIA REQUEST TO PHOTOGRAPH RECORD OR BROADCAST | 1055 | 6 |
| 110 | MEDIA REQUEST TO PHOTOGRAPH RECORD OR BROADCAST | 1058 | 6 |
| 111 | MEDIA REQUEST TO PHOTOGRAPH RECORD OR BROADCAST | 1062 | 6 |
| 112 | MEDIA REQUEST TO PHOTOGRAPH RECORD OR BROADCAST | 1163 | 6 |
| 113 | MEDIA REQUEST TO PHOTOGRAPH RECORD OR BROADCAST | 1171 | 6 |
| 114 | MEDIA REQUEST TO PHOTOGRAPH RECORD OR BROADCAST | 1189 | 6 |
| 115 | MEDIA REQUEST TO PHOTOGRAPH RECORD OR BROADCAST | 1193 | 6 |
| 116 | MEDIA REQUEST TO PHOTOGRAPH RECORD OR BROADCAST | 1220 | 6 |
| 117 | MEDIA REQUEST TO PHOTOGRAPH RECORD OR BROADCAST | 1235 | 6 |
| 118 | MEDIA REQUEST TO PHOTOGRAPH RECORD OR BROADCAST | 1246 | 6 |
| 119 | MEDIA REQUEST TO PHOTOGRAPH RECORD OR BROADCAST | 1290 | 7 |
| 120 | MEDIA REQUEST TO PHOTOGRAPH RECORD OR BROADCAST | 1293 | 7 |
| 121 | MEDIA REQUEST TO PHOTOGRAPH RECORD OR BROADCAST | 1296 | 7 |
| 122 | MEDIA REQUEST TO PHOTOGRAPH RECORD OR BROADCAST | 1327 | 7 |
| 123 | MEM. OF P&A IN SUPPORT OF MOTION TO UNSEAL AFFIDAVITS IN SUPPORT OF THE COMPLAINT | 1103 | 6 |
| 124 | NOTICE OF APPEAL | 1532 | 7 |
| 125 | NOTICE OF COMPLETION | 1536 | 7 |
| 126 | NOTICE OF FILING NOTICE OF APPEAL | 1535 | 7 |
| 127 | NOTICE OF MOTION AND MOTION OF S.J. MERCURY NEWS TO UNSEAL AFFIDAVITS IN SUPPORT OF THE COMPLAINT | 1134 | 6 |

| 128 | NOTICE OF MOTION PURSUANT TO P.C. 1050 | 1238 | 6 |
| 129 | NOTICE TO COURT REPORTERS | 1533 | 7 |
| 130 | NOTIFICATION OF ARREST OR RETURN TO CUSTODY | 1382 | 7 |
| 131 | ORDER | 1044 | 6 |
| 132 | ORDER | 1245 | 6 |
| 133 | ORDER FOR HEARING IN THE SENDING STATE | 1349 | 7 |
| 134 | ORDER GRANTING EX PARTE APPLICATION FOR ORDER SHORTENING TIME FOR HEARING FOR MOTION TO UNSEAL | 1132 | 6 |
| 135 | ORDER ON MEDIA REQUEST TO PERMIT COVERAGE | 1236 | 6 |
| 136 | ORDER ON MEDIA REQUEST TO PERMIT COVERAGE | 1501 | 7 |
| 137 | ORDER RE: ATTENDANCE OF OUT OF STATE WITNESS PURSUANT TO P.C. 1334 ET SEQ | 1323 | 7 |
| 138 | ORDER RE: ATTENDANCE OF OUT OF STATE WITNESS PURSUANT TO P.C. 1334 ET SEQ | 1348 | 7 |
| 139 | ORDER TO ALLOW MP3 PLAYER | 1169 | 6 |
| 140 | ORDER TO ALLOW MP3 PLAYER | 1170 | 6 |
| 141 | ORDER TO PRODUCE | 1375 | 7 |
| 142 | PEOPLE'S EXHIBITS | 1202 | 6 |
| 143 | PEOPLE'S P&A IN OPPOSITION TO DEFENDANT'S REQUEST FOR DISCOVERY BEFORE THE PRELIMINARY HEARING | 1150 | 6 |
| 144 | PEOPLE'S RESPONSE TO DEFENDANT'S REQUEST FOR DISCOVERY THAT IS NOT PERMITTED BY P.C. 1054.1 | 1176 | 6 |
| 145 | PRELIMINARY EXAMINATION MINUTES FOR 01/05/09 | 1200 | 6 |
| 146 | PRELIMINARY EXAMINATION MINUTES FOR 01/06/09 | 1201 | 6 |
| 147 | PRELIMINARY EXAMINATION MINUTES FOR 12/10/08 | 1196 | 6 |
| 148 | PRELIMINARY EXAMINATION MINUTES FOR 12/16/08 | 1197 | 6 |
| 149 | PRELIMINARY EXAMINATION MINUTES FOR 12/17/08 | 1198 | 6 |
| 150 | PRELIMINARY EXAMINATION MINUTES FOR 12/18/08 | 1199 | 6 |
| 151 | PRELIMINARY EXAMINATION VOLUME 1 | 1 | 1 |
| 152 | PRELIMINARY EXAMINATION VOLUME 2 | 191 | 2 |
| 153 | PRELIMINARY EXAMINATION VOLUME 3 | 347 | 3 |

| 154 | PRELIMINARY EXAMINATION VOLUME 4 | 573 | 4 |
| 155 | PRELIMINARY EXAMINATION VOLUME 5 | 794 | 5 |
| 156 | PROBATION OFFICER'S REPORT | 1513 | 7 |
| 157 | PROOF OF SERVICE | 1072 | 6 |
| 158 | REPLY TO OPPOSITION TO MOTION TO UNSEAL AFFIDAVITS IN SUPPORT OF THE COMPLAINT | 1137 | 6 |
| 159 | REQUEST FOR INTERPRETER | 1312 | 7 |
| 160 | REQUEST FOR INTERPRETER | 1318 | 7 |
| 161 | REQUEST FOR INTERPRETER | 1406 | 7 |
| 162 | SEALED ARREST WARRANT AND ARREST AFFIDAVIT | 989 | 6 |
| 163 | SEALED ORDER | 1005 | 6 |
| 164 | SEALED STATEMENT OF FACTS | 986 | 6 |
| 165 | SECOND AMENDED FELONY COMPLAINT TO ADD FIFTH DEFENDANT | 1031 | 6 |
| 166 | THE PEOPLE'S MOTION IN LIMINE TO EXCLUDE THIRD PARTY CULPABILITY EVIDENCE | 1263 | 6 |
| 167 | THE PEOPLE'S MOTION IN OPPOSITION TO CHANGING THE VENUE OF THE TRIAL | 1256 | 6 |
| 168 | THIRD AMENDED FELONY CASE SUMMARY | 1034 | 6 |
| 169 | THIRD AMENDED FELONY COMPLAINT | 1035 | 6 |
| 170 | TRIAL STIPULATIONS | 1249 | 6 |
| 171 | VERDICT | 1509 | 7 |

1

```
 1        IN THE SUPERIOR COURT OF THE STATE OF CALIFORNIA

 2              SANTA CLARA COUNTY JUDICIAL DISTRICT

 3        BEFORE THE HONORABLE RODNEY J. STAFFORD, JUDGE

 4                        DEPARTMENT 34

 5                         ---oOo---            ORIGINAL

 6   STATE OF CALIFORNIA,

 7            PLAINTIFF,            CASE NO. CC800985

 8

 9   VS.

10   PAUL GARCIA, MIGUEL CHAIDEZ AND        FILED

11   LUCIO ESTRADA                       JAN 0 8 2009

12            DEFENDANTS.              DAVID H. YAMASAKI
                                    Chief Executive Officer/Clerk
                                 Superior Court of CA County of Santa Clara
13   _____/   BY_____ DEPUTY

14             REPORTER'S TRANSCRIPT OF PROCEEDINGS

15                   DECEMBER 10, 2008

16               PRELIMINARY EXAMINATION

17                      VOLUME 1

18   APPEARANCES:

19   FOR THE PEOPLE:             JEFF ROSEN

20                               DEPUTY DISTRICT ATTORNEY

21   FOR DEFENDANT GARCIA:       HARRY ROBERTSON,

22                               ATTORNEY AT LAW

23   FOR DEFENDANT CHAIDEZ:      OSCAR PEREZ,

24                               ATTORNEY AT LAW

25   FOR DEFENDANT ESTRADA:      CHARLIE GILLAN,

26                               DEPUTY PUBLIC DEFENDER

27   OFFICIAL SHORTHAND REPORTER:  JILL PETTENGILL,

28                               C.S.R. LICENSE C#5285
```

2

INDEX OF WITNESSES

FOR THE PEOPLE

| | DIRECT | CROSS | RE DIRECT | RE CROSS | VOIR DIRE |
|---|---|---|---|---|---|
| WILLIAM WONNELL | 11 | | | | |
| BY MR. PEREZ | | 25 | | | |
| BY MR. GILLAN | | 29 | | | |
| BY MR. ROBERTSON | | 30 | | | |
| KALIPO KAUWELOA | 32 | | 59 | | |
| BY MR. PEREZ | | 49 | | 61 | |
| BY MR. GILLAN | | 54 | | | |
| BY MR. ROBERTSON | | 54 | | | |
| EDWARD WHITFIELD | 63 | | 90 | | |
| BY MR. PEREZ | | 76 | | 90 | |
| BY MR. GILLAN | | 78 | | | |
| BY MR. ROBERSON | | 80 | | | |
| LAURIE BABULA | 91 | | | | |
| BY MR. PEREZ | | 101 | | | |
| BY MR. GILLAN | | 106 | | | |
| JOE COLONNA | 108 | | 140 | | |
| BY MR. PEREZ | | 118 | | | |
| BY MR. GILLAN | | 123 | | | |
| BY MR. ROBERTSON | | 135 | | | |
| ALMA FUENTES | 144 | | | | |
| BY MR. GILLAN | | 160 | | | |
| BY MR. ROBERTSON | | 169 | | | |

3

```
1
2
3                          INDEX OF EXHIBITS
4     PEOPLE'S
5                                               IDENT.   EVID.
6
7     EXHIBITS 1 - 26      PHOTOGRAPHS          ***
8     EXHIBIT 27              DIAGRAM           ***
9     EXHIBIT 28          DEATH CERTIFICATE     ***
10    EXHIBIT 29          IMAGE OF VICTIM       ***
11    EXHIBIT 31          BASEBALL CAP          ***
12    EXHIBIT 32 & 33     BASEBALL GLOVES       ***
13    EXHIBIT 34          BLACK JACKET          ***
14    EXHIBIT 35 - 57     PHOTOGRAPHS           ***
15    EXHIBIT 58             DIAGRAM            ***
16    EXHIBIT 59          BLACK BASEBALL CAP    70
17    EXHIBIT 60          KENNETH COLE BAG      72
18    EXHIBIT 60-A,B & C     BOOKS              72
19    EXHBIT 61 & 62       CELL PHONES          75
20    EXHIBIT 63             PHOTOGRAPH         ***
21    EXHIBIT 64          PHOTO LINEUP          ***
22    EXHIBIT 65             DIAGRAM            ***
23    EXHIBIT 66          MUGSHOT PHOTO         ***
24    EXHIBIT 67          AERIAL PHOTO - VIEW   ***
25    EXHIBIT 68          DOCUMENT              ***
26    EXHIBIT 69          AERIAL PHOTO          ***
27
28    ***  = PRE-MARKED
```

4

| | |
|---|---|
| 1 | SAN JOSE, CALIFORNIA                    DECEMBER 10, 2008 |
| 2 | PROCEEDINGS |
| 3 | THE COURT:  ALL RIGHT.  ON THE GARCIA, CHAIDEZ |
| 4 | AND ESTRADA MATTERS.  YOUR APPEARANCES, PLEASE. |
| 5 | MR. GILLAN:  MR. ESTRADA IS REPRESENTED BY THE |
| 6 | PUBLIC DEFENDER'S OFFICE, CHARLIE GILLAN, G-I-L-L-A-N, ON |
| 7 | HIS BEHALF.  HE'S NOT PRESENT YET. |
| 8 | MR. PEREZ:  OSCAR PEREZ ON BEHALF OF MR. |
| 9 | CHAIDEZ.  HE'S IN CUSTODY. |
| 10 | MR. ROBERTSON:  HARRY ROBERTSON ON BEHALF OF |
| 11 | MR. ESEQUIEL PAUL GARCIA.  HE'S NOT BROUGHT OUT YET.  I'D |
| 12 | ASK HE NOT BE BROUGHT OUT YET.  I'D LIKE TO ADDRESS THE |
| 13 | COURT. |
| 14 | THE COURT:  OKAY.  GO AHEAD. |
| 15 | MR. ROSEN:  JEFF ROSEN FOR THE PEOPLE. |
| 16 | MR. ROBERTSON:  YOUR HONOR, I PREVIOUSLY FILED |
| 17 | A MOTION EARLY ON, IT WAS A COMBINED MOTION WHICH |
| 18 | ADDRESSED NON-SHACKELING AND THE DRESS-OUT ORDER.  I DID |
| 19 | ADDRESS THAT WITH THE HONORABLE JEROME NADLER DOWNSTAIRS. |
| 20 | HE SAID WE NEEDED TO ADDRESS THAT TO YOU. |
| 21 | I THINK THE CASE LAW IS CLEAR ON THE |
| 22 | NON-SHACKELING.  I BELIEVE IN THIS CASE THAT'S MANDATORY |
| 23 | AND I BELIEVE THERE'S CASE LAW AUTHORITY, GIVEN THE |
| 24 | NATURE OF THIS CASE, THAT THE CLIENT SHOULD BE DRESSED |
| 25 | OUT.  THERE IS CLOTHING READILY AVAILABLE TO DO THAT.  I |
| 26 | ASK THAT HAPPEN GIVEN THE NATURE OF THE CASE AND THE |
| 27 | AMOUNT OF PRETRIAL PUBLICITY THAT'S OCCURRED ALREADY. |
| 28 | THE COURT:  ANY COMMENTS, MR. ROSEN? |

1          MR. ROSEN:   PEOPLE DON'T HAVE ANY POSITION ON
2    THAT.
3          THE COURT:   ALL RIGHT.   WELL, FIRST OF ALL,
4    WITH REGARD -- HE'S CERTAINLY ENTITLED TO HAVE HIS HANDS
5    UNSHACKLED SO THAT HE CAN ASSIST COUNSEL DURING THE
6    COURSE OF HEARING TESTIMONY.
7          WITH REGARD TO DRESS-OUT, FIRST OF ALL, WE DON'T
8    HAVE ANY CAMERAS OR ANY VIDEO EQUIPMENT IN THE COURTROOM
9    TODAY, SO IT'S NOT GOING TO BE A SITUATION WHERE IT'S
10   GOING TO BE ANY PUBLICITY ABOUT HIS STATUS TODAY.   I'M
11   THE TRIER OF FACT AT THE PRELIMINARY EXAMINATION AND,
12   QUITE FRANKLY, IT MAKES NO DIFFERENCE TO ME WHETHER HE'S
13   DRESSED-OUT OR NOT DRESSED-OUT, SO FAR AS THE FINDINGS
14   THAT I HAVE TO MAKE.   SO THE MOTION FOR DRESS-OUT WILL BE
15   DENIED.
16         MR. ROBERTSON:   I HAVE AN ADDITIONAL REQUEST,
17   YOUR HONOR.   AND THAT HAS TO DO WITH THE PRESENCE OF THE
18   VIDEO SCREEN IN THE COURTROOM.   I'D ASK THAT BEFORE ANY
19   EXHIBITS ARE DISPLAYED OR SHOWN UP THERE, THAT THEY BE
20   GIVEEN TO US, WE HAVE A CHANCE TO LOOK AT THEM BEFORE
21   THEY'RE PUBLISHED EITHER TO THE COURT OR PUT ON THE
22   SCREEN.
23         THE COURT:   OKAY.   DO YOU HAVE -- DO YOU HAVE
24   THE ABILITY TO SHOW THEM TO COUNSEL BEFORE THEY GO UP ON
25   THE SCREEN, MR. ROSEN?
26         MR. ROSEN:   YEAH, ABSOLUTELY.   THEY ARE IN
27   FRONT OF YOUR CLERK.   AND I'M HAPPY TO, ONCE THEY'RE
28   MARKED, TO SHOW THEM TO COUNSEL EVEN BEFORE I SHOW THEM

6

1   TO THE WITNESS.  THAT IS FINE.

2            THE COURT:  THAT'S FINE.  OKAY.

3            MR. ROBERTSON:  PART OF DISCOVERY, YOUR HONOR,

4   SO THE COURT -- I HAVE PREVIOUSLY MADE A DISCOVERY MOTION

5   FOR CERTAIN ITEMS WHICH WAS DENIED BY THE COURT NOT THAT

6   LONG AGO, SO I -- I TRULY DO NOT KNOW SOME OF THE

7   MATERIAL THAT MAY BE OFFERED TODAY AND I WANT TO SEE IT

8   BEFORE IT COMES UP.

9            THE COURT:  ALL RIGHT.

10           MR. ROBERTSON:  THAT'S THE REASON FOR IT.

11           THE COURT:  WE WILL ATTEMPT TO ACCOMODATE THAT

12   THE BEST WE CAN.

13           MR. ROBERTSON:  OKAY.  THANK YOU.

14           THE COURT:  MR. ROSEN, I HAVE THE FOURTH

15   AMENDED FELONY COMPLAINT.  IS THAT THE CURRENT ONE?

16           MR. ROSEN:  ONE MOMENT, YOUR HONOR.  ACTUALLY

17   FOR THESE DEFENDANTS, THE THIRD AMENDED IS APPROPRIATE.

18   THERE WERE FOURTH AND FIFTH AMENDMENTS FOR CO-DEFENDANTS

19   THAT ARE NO LONGER IN THIS CASE.

20           THE COURT:  OKAY.

21           MR. ROSEN:  THE THIRD IS THE ONE THAT APPLIES

22   TO THESE THREE DEFENDANTS.

23           THE COURT:  LET THE RECORD SHOW THAT ALL THE

24   DEFENDANTS ARE CURRENTLY PRESENT.

25      BEFORE WE GET STARTED, THERE'S ONE THING WE HAVE TO

26   ADDRESS.  AND THAT IS THE SCHEDULING ON THIS MATTER.  AS

27   I INDICATED TO COUNSEL MONDAY DOWN IN DEPARTMENT 24, I'M

28   NOT AVAILABLE TO HEAR THIS MATTER ON FRIDAY OR MONDAY.

7

```
 1    WE HAVE OTHER MATTERS THAT ARE ON FOR FRIDAY, AND I'M
 2    FILLING IN FOR JUDGE CENA ON MONDAY TO DO THE ARRAIGNMENT
 3    CALENDAR AND THE MASTER TRIAL CALENDAR.  SO, WE NEED TO
 4    ADDRESS THE ISSUE OF WHETHER THERE'S GOING TO BE A WAIVER
 5    OF CONTINUOUS PRELIMINARY EXAMINATION, FIRST OF ALL.
 6            MR. GILLAN:  YOUR HONOR, AS I INDICATED ON
 7    MONDAY ON THE MASTER TRIAL CALENDAR, I'M CURRENTLY
 8    ENGAGED IN TRIAL NEXT DOOR IN 35, AND WITNESSES WILL
 9    RESUME TESTIFYING TOMORROW MORNING AT 9:00 A.M., AND
10    THAT'S THE PROSECUTION'S WITNESSES THAT ARE BEING FLOWN
11    OUT FROM COLORADO.  AND WE ARE SCHEDULED TO BE IN TRIAL
12    BOTH THURSDAY AND FRIDAY AND THEN THE FOLLOWING WEEK ON
13    THE 19TH WE ARE SCHEDULE TO BE IN TRIAL.  SO I THINK THIS
14    HAS BEEN MADE CLEAR TO MR. ROSEN AND MR. ROBERTSON AND
15    ALL PARTIES.  AND I THINK THAT'S SORT OF THE
16    UNDERSTANDING WHEN THIS WAS SET, AND I THINK THAT'S WHY
17    IN THE DEPARTMENT IN 23 ALL OF THE DEFENDANTS WAIVED
18    CONTINUOUS PRELIM.
19            THE COURT:  OKAY.  THAT HAS -- I DIDN'T SEE
20    THAT IN THE FILE.  SO THAT HAS BEN DONE?
21            MR. ROBERTSON:  I THINK THERE WAS SOME
22    QUESTION OF WHETHER OR NOT WE HAD TO DO IT HERE TODAY,
23    BUT WE ARE CERTAINLY WILLING TO DO THAT.  AND I'M IN
24    FAVOR OF THAT, FRANKLY, BECAUSE MR. ROSEN KINDLY PROVIDED
25    ME WITH SOME SUBSTANTIAL DISCOVERY AND I NEED TO BE ABLE
26    TO SORT IT OUT.  SO THIS IS GOING TO ACCOMODATE US, AS
27    WELL.  IT'S PART OF THE REASON I DIDN'T MAKE A MOTION FOR
28    CONTINUANCE.
```

8

```
1            MR. PEREZ:  ALSO ON BEHALF OF MR. CHAIDEZ,
2   THERE WILL BE AN AGREEMENT FOR A CONTINUOUS PRELIMINARY
3   HEARING.
4            THE COURT:  ALL RIGHT.  SO IT WOULD BE -- IT
5   WOULD BE MY INTENTION TO HEAR THE MATTER TODAY, THAT
6   WOULD BE DECEMBER 10, AND THEN BE IN RECESS ON THIS
7   MATTER UNTIL TUESDAY, THE 16TH, AND THEN GO THROUGH THE
8   16TH, 17, 18, AND IF THERE'S ANY SCHEDULING DATES AFTER
9   THAT, THEN WE CAN SET THAT, I SUPPOSE, ON THE 18TH.  IT
10  WOULD BE SOMETIME DURING THE FOLLOWING WEEK.
11           MR. ROSEN:  IF WE NEED THE FOLLOWING WEEK.  I
12  DON'T KNOW WHAT COUNSEL'S SCHEDULES ARE FOR THE FOLLOWING
13  WEEK.  SO I DON'T KNOW IF --
14           MR. ROBERTSON:  WE HAD DISCUSSED WE'D TRY AND
15  ACCOMODATE VACATION, CHRISTMAS PLANS WITH FAMILIES, AND I
16  NOTE COURT MAY WANT TO TAKE SOME TIME AS WELL.
17           THE COURT:  YEAH, THE 25TH.  WELL, LIKE I SAY,
18  IF WE GO BEYOND TODAY AND THE THREE DAYS NEXT WEEK,
19  TUESDAY, WEDNESDAY AND THURSDAY, THE 16TH, 17TH AND 18TH,
20  WE CAN ADDRESS ANY FURTHER DATES THAT ARE NEEDED ON THE
21  18TH.  IT WOULD BE WITHIN A SHORT PERIOD OF TIME,
22  OBVIOUSLY, OF THE 18TH.
23      OKAY.  JUST SO WE HAVE AN UNDERSTANDING THAT'S ON
24  THE RECORD.  START WITH MR. GARCIA.
25      MR. GARCIA -- WELL, ACTUALLY LET ME ADDRESS ALL
26  THREE OF THE DEFENDANTS.
27      GENTLEMEN, DO YOU UNDERSTAND THAT YOU HAVE THE RIGHT
28  TO A CONTINUOUS PRELIMINARY EXAMINATION.  IN OTHER WORDS,
```

9

1    THAT MEANS ONCE THE PRELIMINARY EXAMINATION STARTS, IT

2    GOES FROM DAY-TO-DAY CONSECUTIVE DAYS UNTIL THE

3    PRELIMINARY EXAMINATION IS COMPLETED.

4         WHAT THE COURT HAS PROPOSED, AND WHAT COUNSEL SEEM

5    TO AGREE WITH, IS THAT WITH YOUR CONSENT, OBVIOUSLY, THAT

6    WE WILL HEAR THE PRELIMINARY EXAMINATION TODAY; WE WILL

7    BE IN RECESS ON THIS MATTER UNTIL NEXT TUESDAY.  WE WILL

8    HEAR THAT ON TUESDAY, WEDNESDAY AND THURSDAY OF NEXT

9    WEEK.  IF THERE'S ANY ADDITIONAL DAYS THAT ARE NEEDED

10   AFTER THAT, THE NEXT THURSDAY WE WOULD DETERMINE WHAT

11   THOSE DAYS ARE.

12        MR. GARCIA, DID YOU UNDERSTAND WHAT I JUST

13   INDICATED?

14             DEFENDANT GARCIA:  YES.

15             THE COURT:  MR. ESTRADA?

16             DEFENDANT ESTRADA:  YES, YOUR HONOR.

17             THE COURT:  AND MR. CHAIDEZ?

18             DEFENDANT CHAIDEZ:  YES, YOUR HONOR.

19             THE COURT:  IF YOU GIVE UP YOUR RIGHT TO A

20   CONTINUOUS PRELIMINARY EXAMINATION, THAT MEANS IT WON'T

21   BE A CONTINUOUS -- IT WON'T BE DAY-TO-DAY UNTIL

22   COMPLETED.

23        DO YOU UNDERSTAND THAT, MR. GARCIA?

24             DEFENDANT GARCIA:  YES.

25             THE COURT:  MR. ESTRADA?

26             DEFENDANT ESTRADA:  YES.

27             THE COURT:  MR. CHAIDEZ?

28             DEFENDANT CHAIDEZ:  YES, YOUR HONOR.

10

```
 1          THE COURT:  AND, MR. GARCIA, DO YOU GIVE UP
 2   YOUR RIGHT TO HAVE A CONTINUOUS PRELIMINARY EXAMINATION
 3   IN THIS MATTER?
 4          DEFENDANT GARCIA:  YES.
 5          THE COURT:  AND DO YOU GIVE UP YOUR RIGHT TO
 6   HAVE A CONTINUOUS PRELIMINARY EXAMIANTION IN THIS MATTER,
 7   MR. ESTRADA?
 8          DEFENDANT ESTRADA:  YES.
 9          THE COURT:  AND, MR. CHAIDEZ, DO YOU GIVE UP
10   YOUR RIGHT TO HAVE A CONTINUOUS PRELIMINARY EXAMINATION
11   IN THIS MATTER?
12          DEFENDANT CHAIDEZ:  YES, YOUR HONOR.
13          THE COURT:  VERY GOOD.
14      MR. ROSEN, READY TO PROCEED?
15          MR. ROSEN:  YES.  I JUST WANT TO BRING TO THE
16   COURT'S ATTENTION WE HAVE TWO INVESTIGATING OFFICERS,
17   SERGEANT MATT FRISBY AND SERGEANT MIKE D'ANTONIO FROM THE
18   LOS GATOS POLICE DEPARTMENT.  AND WE WOULD MOVE TO
19   EXCLUDE ALL WITNESSES.  I DON'T BELIEVE THERE ARE ANY
20   WITNESSES IN THE COURTROOM, BUT THAT'S OUR MOTION.
21          THE COURT:  OKAY.  AND USUALLY IF WE HAVE
22   ANYBODY THAT COMES IN, THE DEPUTIES WILL CHECK DURING
23   TESTIMONY TO SEE IF THEY ARE WITNESSES, AND ASK THEM TO
24   STEP OUTSIDE.
25          MR. ROSEN:  OKAY.  THANK YOU.
26          THE COURT:  MR. ROBERTSON.
27          MR. ROBERTSON: I JOIN IN THAT MOTION, ALSO.
28   PRESENT WITH ME IS ANN FIELD.  SHE'S A LICENSED PRIVATE
```

```
 1  INVESTIGATOR WHO'S BEEN ASSISTING IN THE CASE.  I'LL HAVE
 2  HER WITH ME AT MY SIDE.
 3            THE COURT:  VERY WELL.
 4            MR. ROSEN:  WE ARE READY TO CALL OUR FIRST
 5  WITNESS.
 6            THE COURT:  GO AHEAD.
 7            MR. ROSEN:  AT THIS TIME, THE PEOPLE CALL
 8  OFFICER WONNELL TO THE STAND.
 9                 WILLIAM SAM WONNELL,
10  HAVING BEEN CALLED AS A WITNESS ON BEHALF OF THE PEOPLE,
11  BEING FIRST DULY SWORN TO TELL THE TRUTH, TESTIFIED AS
12  FOLLOWS:
13            THE COURT:  GOOD MORNING.  COULD YOU PLEASE
14  STATE YOUR FULL NAME AND SPELL YOUR FULL NAME.
15            THE WITNESS:  YES, SIR.  WILLIAM SAM WONNELL,
16  W-O-N-N-E-L-L.
17            THE COURT:  THANK YOU.  GO AHEAD.
18                 DIRECT EXAMINATION
19  Q   (BY MR. ROSEN)  THANK YOU.  GOOD MORNING, OFFICER
20  WONNELL.
21  A   MORNING.
22  Q   HOW LONG HAVE YOU BEEN A POLICE OFFICER?
23  A   OVER 28 YEARS.
24  Q   ALL WITH THE CITY OF LOS GATOS?
25  A   NO.  I'VE BEEN WITH THE CITY OF LOS GATOS FOR OVER
26  21 YEARS.
27  Q   WHAT AGENCY WERE YOU WITH BEFORE?
28  A   I WAS WITH THE CITY OF SAN JOSE, AIRPORT POSITION.
```

12

1  Q    AS A LOS GATOS POLICE OFFICER, IN THE COURSE OF

2  YOUR CAREER, COULD YOU TELL US JUST KIND OF GENERALLY

3  WHAT YOUR DUTIES HAVE BEEN?

4  A    UM, DUTIES FROM EVIDENCE TEAM, I'VE BEEN A SWAT

5  MEMBER.  I'VE BEEN ON A MOTORCYCLE, ACCIDENT

6  INVESTIGATION, CANINE HANDLER, SCHOOL RESOURCE OFFICER,

7  FIELD TRAINING OFFICER.  UM, ACTING SUPERVISOR.

8  Q    IS THERE ANYTHING WRONG WITH YOUR WRIST?

9  A    YEAH, I SHATTERED IT A WEEK AGO SUNDAY.

10  Q    WERE YOU ON DUTY ON MARCH 14, 2008, AT ABOUT 12:21

11  P.M.?

12  A    I WAS CALLED AT MY RESIDENCE TO COME INTO WORK.

13  Q    WHERE DID YOU RESPOND TO?

14  A    I RESPONDED TO THE AREA OF 18400 OVERLOOK.

15  Q    IS THAT IN LOS GATOS?

16  A    IN LOS GATOS.

17  Q    WHAT WAS THE PURPOSE OF YOUR RESPONDING TO THAT

18  LOCATION?

19  A    MY MAIN PURPOSE WAS TO PHOTOGRAPH A CRIME SCENE AND

20  ASSIST IN COLLECTING THE EVIDENCE.

21  Q    DID YOU TAKE A NUMBER OF PHOTOGRAPHS OF THE CRIME

22  SCENE AT 18400 OVERLOOK ROAD?

23  A    YES, I DID.

24  Q    OFFICER, IN A FEW MOMENTS I'M GOING TO SHOW YOU

25  SOME PHOTOS AND ASK IF YOU RECOGNIZE THEM AS PHOTOGRAPHS

26  THAT YOU TOOK, PHOTOGRAPHS OF THE SCENE AT 18400

27  OVERLOOK.  THAT WILL JUST TAKE A MOMENT.

28  A    SURE.

1       MR. ROBERTSON:  YOUR HONOR, I'VE SEEN THEM,

2   THANK YOU.

3       THE COURT:  OKAY.

4   Q    (BY MR. ROSEN)  OFFICER WONNELL, MAYBE YOU COULD

5   STEP OFF THE WITNESS STAND.  I'M GOING TO PUT SOME PHOTOS

6   ON THE SCREEN.

7       MR. ROBERTSON:  YOUR HONOR, I HAVE SEEN THEM.

8   I DON'T PARTICULARLY HAVE AN OBJECTION TO THE USE OF THE

9   DISPLAY.  I THINK THAT MAYBE IT WILL BE DIFFICULT FOR

10  SOME OF THE PEOPLE HERE TO SEE THE PHOTOGRAPHS, AND I

11  JUST WANT TO BE ADVISED OF THAT BEFORE THEY FLASH UP ON

12  THE SCREEN.

13      MR. ROSEN:  THANK YOU.

14      THE COURT:  OKAY.  WELL, IF I CAN'T SEE THEM,

15  I'LL LET YOU KNOW.

16      MR. ROSEN:  THAT'S WHY WE HAVE THE SCREEN.

17      THE COURT:  SURE.

18  Q    (BY MR. ROSEN)  OFFICER WONNELL, SHOWING YOU

19  PHOTOGRAPH NUMBER 1, DO YOU RECOGNIZE THAT?

20  A    YES, I DO.

21  Q    WHAT IS THAT?

22  A    THAT IS A DESCRIPTIVE OF THE VICTIM'S DRIVER'S

23  LICENSE.

24  Q    THE DRIVER'S LICENSE THAT WAS FOUND ON THE VICTIM'S

25  BODY?

26  A    YES.  I'M SORRY.

27  Q    SHOWING YOU PEOPLE'S 2, CAN YOU DESCRIBE WHAT'S

28  DEPICTED HERE?

14

```
 1    A     THIS IS A PHOTO OF THE SCENE LOOKING IN A NORTHERN
 2    DIRECTION FROM LAUREL AVENUE.
 3    Q     PEOPLE'S 3?
 4    A     THAT'S APPROXIMATELY TEN STEPS -- TEN TO FIFTEEN
 5    STEPS FURTHER NORTH, NOW LOOKING IN A NORTHWESTERN
 6    DIRECTION, CARPORT AREA.
 7    Q     PEOPLE'S 4?
 8    A     A LITTLE CLOSER VIEW, SAME DIRECTION.
 9    Q     OKAY.  PEOPLE'S 5?
10    A     THAT IS THE -- THE CRIME SCENE LOOKING IN A WESTERN
11    DIRECTION.
12    Q     I'M USING A LASER POINTER.  THIS KIND OF A TARP OR
13    TENT THAT'S HERE, IS THAT SOMETHING THAT WAS PUT UP BY
14    THE POLICE DEPARTMENT?
15    A     YES, IT WAS.
16    Q     AND YELLOW HERE, WHAT'S THAT COVERING?
17    A     THAT IS COVERING THE VICTIM.
18    Q     PEOPLE'S 6, DO YOU RECOGNIZE WHAT THAT IS?
19    A     THAT IS A PHOTO LOOKING WEST FROM THE STEPS OF THE
20    RESIDENCE, NUMBER 36.
21    Q     PEOPLE'S 7?
22    A     AND THAT'S LOOKING SOUTHWEST.
23    Q     PEOPLE'S 8?
24    A     A FEW MORE STEPS BACK LOOKING SOUTHWEST.
25    Q     PEOPLE'S 9?
26    A     SCENE LOOKING SOUTH ON THE DRIVEWAY.
27    Q     OKAY.  PEOPLE'S 10?
28    A     SAME DIRECTION, STEPS BACK -- APPROXIMATELY TEN
```

15

1   STEPS BACK.

2   Q      SEEMS LIKE EVERY APPROXIMATELY TEN STEPS OR SO

3   YOU'RE WALKING SOUTH AND THEN TAKING A PHOTO OF WHAT YOU

4   SEE?

5   A      CORRECT.

6   Q      OKAY.  NOW, PEOPLE'S 11, DESCRIBE WHAT WE SEE HERE.

7   A      UM, THAT WAS PAST -- THAT WAS NORTH OF THE SCENE

8   LOOKING IN A NORTHERN DIRECTION OF THE ROADWAY, PATHWAY,

9   THAT LEADS OUT OF THE COMPLEX ONTO OVERLOOK.

10  Q      IS THERE SOME KIND OF WALKWAY IN THIS AREA?

11  INDICATING THE MIDDLE OF THE DIAGRAM, FOR THE RECORD.

12  A      YES, THERE IS.  THERE'S A WALKWAY THAT LEADS

13  DOWN -- PATHWAY THAT LEADS DOWN TO THE RESIDENCE.

14  Q      SHOWING YOU PEOPLE'S 12, WHAT'S DEPICTED HERE?

15  A      THAT IS FROM THE CRIME SCENE LOOKING EAST TOWARDS

16  THE RESIDENCE, NUMBER 36, WITH THE OPEN DOOR.

17  Q      SO, 36, INDICATING WITH THE LASER POINTER TO THE

18  MIDDLE OF THE SCREEN, THAT'S 36?

19  A      YES, SIR.

20  Q      DO YOU KNOW WHAT THE UNIT NUMBER HERE NEXT TO IT

21  IS?

22  A      I BELIEVE THAT'S 34, 35.  I'M NOT --

23  Q      OKAY.  PEOPLE'S 13, WHAT'S DEPICTED HERE?

24  A      THAT'S LOOKING AT THE SCENE LOOKING WEST FROM THE

25  STEPS LEADING DOWN TO THE FRONT DOOR OF THE RESIDENCE,

26  NUMBER 36.

27  Q      AND THEN UP IN THE MIDDLE LEFT OF THE SCREEN,

28  THAT'S THE BLACK BMW THAT WE SEE?

16

```
1    A    YES, SIR.
2    Q    PEOPLE'S 14, WHAT IS DEPICTED HERE?
3    A    THAT IS THE FRONT ENTRY DOOR TO RESIDENCE NUMBER
4    36, 18400 OVERLOOK, AND YELLOW TAPE.
5    Q    PEOPLE'S 15, WHAT IS HERE?
6    A    THOSE ARE THE STEPS LEADING FROM THE FRONT DOOR OF
7    THE RESIDENCE 36 UP TO THE CARPORT AREA AND ROADWAY TO
8    WHERE THE SCENE -- CRIME SCENE IS.
9    Q    PEOPLE'S 16, WHAT IS HERE?
10   A    THIS IS AFTER THE INITIAL WALK-THROUGH OF THE SCENE
11   AND THEN AFTER ITEMS OF EVIDENCE WAS LOCATED AND MARKED.
12   THE YELLOW TAB SHOWS THE ITEMS OF EVIDENCE.
13   Q    THESE TAGS, I'M CIRCLING NUMBER 6, NUMBER 20,
14   NUMBER 9, DO THOSE TAGS THEN CORRESPOND TO A PARTICULAR
15   PIECE OF EVIDENCE THAT'S NOTED SOMEWHERE IN THE REPORT?
16   A    YES, SIR.
17   Q    SHOWING YOU PEOPLE'S 17, WHAT'S DEPICTED HERE?
18   A    MORE PIECES OF EVIDENCE, ARTICLES OF EVIDENCE THAT
19   WERE CIRCLED AND TAGGED AND PHOTOGRAPHED AS THEY WERE
20   LOCATED.
21   Q    THE CLOTHING THAT'S HERE, THAT HAS A NUMBER 12 NEAR
22   IT, IS THIS THE CLOTHING THE VICTIM WAS WEARING?
23   A    I CAN'T -- THAT WAS SOME CLOTHING.  I CAN'T SAY IT
24   WAS FROM THE VICTIM.
25   Q    OKAY.  BECAUSE YOU GOT THERE --
26   A    AFTER.
27   Q    -- A LITTLE BIT LATER?
28   A    YES.
```

1  Q    SHOWING YOU PEOPLE'S 18, WHAT IS DEPICTED HERE?

2  A    ON THAT ONE IS A PAIR OF SHOES, THERE 7, 8 AND 9

3  ARE SPENT CASINGS AND BULLETS.  TWELVE THE CLOTHES, 14

4  AND 13 AND 15 BACK THERE IS A HAT AND SOME MORE BULLET

5  CASINGS.

6  Q    SHOWING YOU PEOPLE'S 19, AGAIN THESE ARE DIFFERENT

7  ANGLES OF SOME OF THE EVIDENCE THAT WAS MARKED THERE?

8  A    YES.

9  Q    OKAY.  AND THEN PEOPLE'S 20, A CLOSE-UP ON 7 AND 8.

10  WHAT ARE 7 AND WHAT IS 8?

11  A    SEVEN IS A SPENT CASING FROM A .380 CALIBER PISTOL

12  AND NUMBER 8 IS A SPENT ROUND FROM A PISTOL.

13  Q    WHAT IS THE DIFFERENCE BETWEEN WHAT YOU DESCRIBE AS

14  A SPENT ROUND AND THE CASING?

15  A    THE CASING IS WHAT THE AMMUNITION IS STORED IN, THE

16  POWDER, AND THE BULLET.  AND NUMBER 8 IS THE ACTUAL

17  BULLET WHICH COMES OUT OF THE CASING WHEN A FIRING PIN

18  HITS THE PRIMER THAT SHOOTS OUT THE BULLET.

19  Q    SO THE BULLET COMES OUT OF THE GUN AND THEN WHERE

20  DOES THE CARTRIDGE CASE COME FROM?

21  A    IT GETS EJECTED FROM THE -- FROM THE GUN.

22  Q    THEN PEOPLE'S 21, THIS LOOKS LIKE EVIDENCE ITEM 9,

23  WHAT IS THAT?

24  A    THAT WOULD BE A BULLET CASING.

25  Q    WHY DON'T YOU HAVE A SEAT FOR JUST A MOMENT.

26         MR. ROSEN:   YOUR HONOR, I THINK THAT THERE

27  WOULD BE A STIPULATION AT THIS TIME BETWEEN THE PEOPLE

28  AND ALL OF THE DEFENSE LAWYERS, THAT IF ERIC BARLOEWEN

1    WERE CALLED TO TESTIFY, HE IS A CRIMINALIST AT THE SANTA

2    CLARA COUNTY CRIME LABORATORY, AN EXPERT IN FIREARMS, AND

3    HE WOULD TESTIFY THAT THE CARTRIDGE CASINGS THAT WERE

4    FOUND AT THE SCENE CAME BACK TO A GUN THAT WAS FOUND AT

5    THE SCENE, WHICH WE ARE GOING TO TALK ABOUT IN JUST A

6    MOMENT.  I THINK THAT'S THE STIPULATION ALL COUNSEL WOULD

7    ENTER INTO.

8              THE COURT:  MR. ROBERTSON?

9              MR. ROBERTSON:  IT IS, YOUR HONOR, WITH THE

10   UNDERSTANDING THE STIPULATION IS FOR THE PURPOSES OF THE

11   PRELIMINARY EXAMINATION ONLY.  AND THAT AS IT RELATES TO

12   THIS OFFICER'S TESTIMONY, IT, TOO, IS OFFERED FOR

13   PURPOSES OF THE PRELIMINARY EXAMINATION ONLY.  AND BASED

14   ON THAT, WE ARE GOING TO BE LIMITING OUR CROSS

15   EXAMINATION TO JUST A FEW QUESTIONS.

16             THE COURT:  ALL RIGHT.  MR. GILLAN, YOU AGREE

17   WITH THE STIPULATION?

18             MR. GILLAN:  YES.

19             THE COURT:  MR. PEREZ?

20             MR. PEREZ:  YES, FOR PURPOSES OF THE

21   PRELIMINARY HEARING.

22             THE COURT:  NOTED.  THAT'S UNDERSTOOD.  IF

23   THERE'S ANY STIPULATION, IT'S JUST FOR PURPOSES OF THIS

24   PRELIMINARY HEARING UNLESS OTHERWISE STATED.

25        COURT WILL ACCEPT THE STIPULATION.

26   Q    (BY MR. ROSEN)  OFFICER WONNELL, WE WILL -- NOW WE

27   ARE GOING TO TALK A LITTLE BIT ABOUT THE GUN.  ON MARCH

28   14 (SIC) OF 2008, THE DAY AFTER THE 14TH, DID YOU GO BACK

```
 1   TO THE CRIME SCENE TO SEARCH FOR EVIDENCE WITH SOME OTHER
 2   OFFICERS?
 3   A     YES.
 4   Q     WERE --
 5             MR. ROBERTSON:   I'M SORRY, DID YOU SAY MARCH
 6   14 OR 15?
 7             MR. ROSEN:   FIFTEEN
 8   Q     (BY MR. ROSEN)   WHEN YOU WENT BACK ON MARCH 15,
 9   WERE YOU AND THE OTHER OFFICERS -- WERE ONE OF THE ITEMS
10   YOU AND THE OTHER OFFICERS WERE SPECIFICALLY LOOKING FOR
11   A HANDGUN?
12   A     YES.
13   Q     APPROXIMATELY WHAT TIME DID YOU AND THE OTHER
14   OFFICERS START THE SEARCH ON MARCH 15?
15   A     AT APPROXIMATELY 10:00 A.M.
16   Q     WHERE DID YOU START THE SEARCH?
17   A     WE STARTED AT THE LOCATION OF THE CORNER OF
18   CHESTNUT AND HERNANDEZ.
19   Q     WERE YOU AND THE OTHER OFFICERS WORKING YOUR WAY
20   BACK TOWARDS 18400 OVERLOOK?
21   A     YES, WE WERE.
22   Q     AT APPROXIMATELY NOON DID YOU ENTER 18400
23   OVERLOOK?
24   A     YES.
25   Q     AT ABOUT 12:25 P.M. WHAT HAPPENED?
26   A     AT APPROXIMATELY 12:25 P.M., I WAS TALKING TO A
27   RESIDENT, AND ONE OF THE MEMBERS OF THE TEAM I WAS
28   DIRECTING CAME UP AND INFORMED ME THAT ANOTHER MEMBER HAD
```

```
 1   LOCATED AN ITEM OF INTEREST.
 2   Q     DID YOU GO TO THAT AREA WHERE THE OFFICER TOLD YOU
 3   AN ITEM OF INTEREST WAS FOUND?
 4   A     YES, I DID.
 5   Q     WHERE WAS THAT AREA?
 6   A     THAT WAS NEAR A PARKING STALL IN FRONT OF RESIDENCE
 7   NUMBER 5 AND 6.  NO, I'M SORRY, IF I CAN REFER TO MY
 8   REPORT.
 9   Q     SURE.
10   A     NUMBER 5 AND 6.
11            MR. ROBERTSON:  YOUR HONOR, IF THE WITNESS IS
12   REFERRING TO DOCUMENTS ON THE STAND, MAY I APPROACH AND
13   SEE WHAT HE'S LOOKING AT, PLEASE?
14            THE COURT:  ALL RIGHT.
15            MR. ROSEN:  SURE.
16   Q     (BY MR. ROSEN)  IT WAS UNIT 5 AND 6?
17   A     YES, IT WAS.
18   Q     WHAT IF ANYTHING WAS ONE OF THE OFFICER'S USING TO
19   ASSIST THEM IN FINDING THIS ITEM?
20   A     THEY HAD A HAND-HELD METAL DETECTOR.
21   Q     DID YOU GO OVER AND SEE WHAT WAS FOUND?
22   A     YES, I DID.
23   Q     WHAT WAS FOUND?
24   A     LYING IN SOME IVY NEAR THE EDGE OF THE PARKING WAS
25   A GUN.  A HANDGUN.
26   Q     DID YOU PHOTOGRAPH THE HANDGUN?
27   A     I DID.
28   Q     WHAT KIND OF HANDGUN WAS IT?
```

21

1  A    IT WAS A LORCIN .380 CALIBER, SEMI-AUTOMATIC
2  PISTOL, BLUE STEEL.
3  Q    AFTER YOU -- WHAT IS BLUE STEEL?  I MEAN, WHAT
4  COLOR IS THAT?
5  A    THAT'S A BLUE-BLACK, BLUE COLOR RATHER THAN LIKE A
6  STAINLESS STEEL OR METAL SILVER, SHINEY.
7  Q    DID YOU PHOTOGRAPH WHERE THE GUN WAS FOUND AND BOOK
8  IT INTO EVIDENCE?
9  A    YES, I DID.
10  Q    OFFICER WONNELL, COULD YOU STEP OFF THE WITNESS
11  STAND.  I WANT TO SHOW YOU A FEW MORE PHOTOS.
12        MR. ROBERTSON:  ARE THESE THE ONES WE HAVE
13  SEEN ALREADY?
14        MR. ROSEN:  NO, THESE ARE NEW PHOTOS.
15        MR. ROBERTSON:  YOUR HONOR, WE HAVEN'T BEEN
16  PROVIDED WITH THESE YET THAT I KNOW OF.  I'M GOING TO
17  TAKE JUST A MOMENT, PLEASE.
18        THE COURT:  ALL RIGHT.
19        MR. ROSEN:  JUST FOR THE RECORD, EVERY EXHIBIT
20  THAT THE PEOPLE ARE SHOWING, UNLESS STATED OTHERWISE, THE
21  PEOPLE BELIEVE THEY HAVE TURNED OVER.  WE JUST WANT THAT
22  ON THE RECORD.
23        THE COURT:  ALL RIGHT.  JUST AS A PRACTICAL
24  MATTER, WHENEVER WE TAKE A BREAK, MR. ROSEN, IF YOU KNOW
25  THAT YOU HAVE GOT, IN THE UPCOMING HOUR OR SO, SOME
26  DOCUMENTS, MAYBE YOU COULD JUST SORT OF SHOW THEM DURING
27  THE BREAK AND THEN --
28        MR. ROSEN:  THAT'S GREAT, YOUR HONOR.

22

```
 1              THE COURT:  --  MOVE THINGS ALONG.
 2              MR. ROSEN:  I AGREE.
 3              MR. ROBERTSON:  YOUR HONOR, I APOLOGIZE IF I
 4    TAKE THE TIME.  ONE OF MY PROBLEMS IS THAT THE DOCUMENTS
 5    THE OFFICER HAS ON THE STAND THAT ARE BATE STAMPED, DON'T
 6    MATCH THE BATE STAMPS THAT WE HAVE.  THEY'RE NUMBERED
 7    DIFFERENTLY, SO IT'S CAUSING A PROBLEM FOR ME TO TRY AND
 8    TRACK SOME OF THEM.
 9              THE COURT:  BATE'S A COMMON NAME.
10              MR. ROBERTSON:  BATES REFERRING TO THE
11    MANUFACTURER OF THE STAMP THAT NUMBERS PAGES NUMERICALLY
12    AND WE RECEIVED THEM SOMETIMES NUMBERED THREE DIFFERENT
13    WAYS, SO IT'S A LITTLE FRUSTRATING.
14              THE COURT:  NO, I UNDERSTAND.
15    Q    (BY MR. ROSEN)  OFFICER WONNELL, SHOWING YOU WHAT
16    WE HAVE MARKED AS PEOPLE'S 22, COULD YOU DESCRIBE WHAT IS
17    DEPICTED HERE?
18    A    THAT IS THE PARKING STALL AND IVY IN FRONT OF
19    APARTMENTS NUMBER 5 AND 6.
20    Q    ON THIS PHOTO THERE'S AN ORANGE CONE.  CAN YOU TELL
21    US ABOUT THAT?
22    A    I PLACED THAT CONE THERE.  THAT'S APPROXIMATELY THE
23    LOCATION WHERE THE GUN WAS LOCATED, JUST OFF TO THE IVY
24    TO THE RIGHT OF IT.
25    Q    SO THE CONE IS PLACED THERE AFTER THE GUN WAS
26    FOUND?
27    A    YES.
28    Q    SHOWING YOU PEOPLE'S 23, COULD YOU DESCRIBE THIS?
```

23

```
 1    A      THAT'S THE SAME CONE THAT WAS DEPICTED IN THE OTHER
 2   PHOTO, AND WITH THE -- SHOWING PISTOL TO THE RIGHT OF THE
 3   CONE.
 4    Q      INDICATING FOR THE RECORD.
 5           PEOPLE'S 24, WHAT IS DEPICTED HERE?
 6    A      THAT IS A PHOTO OF THE PISTOL LOCATED IN THE IVY.
 7    Q      THAT'S THE .380 LORCIN THAT YOU DESCRIBED?
 8    A      YES.
 9    Q      SHOWING YOU PEOPLE'S 25.
10    A      THAT'S LOOKING EAST FROM WHERE I TOOK THE PHOTO.
11   THE FIRST PHOTO WAS TAKEN FROM THE REAR BUMPER OF THE
12   POLICE CAR.  THIS PHOTO IS TAKEN SHOOTING THE OPPOSITE
13   DIRECTION, SHOWING THE FRONT OF APARTMENTS 5 AND 6.
14    Q      OKAY.  PEOPLE'S 26, WHAT DIRECTION IS THIS PHOTO?
15    A      THAT DIRECTION IS IN A NORTHEASTERN DIRECTION.  OUT
16   IN THE FAR DISTANCE IS OVERLOOK ROAD.
17    Q      OFFICER, I'M SHOWING YOU WHAT WE HAVE MARKED AS
18   PEOPLE'S EXHIBIT NUMBER 30.  INSIDE THE BOX.  DO YOU
19   RECOGNIZE THIS ITEM?  FIRST OF ALL, WHY DON'T YOU TAKE A
20   LOOK AT THE BOX FOR A MOMENT.  I'LL HOLD IT FOR YOU,
21   BECAUSE IT SEEMS LIKE YOU NEED A HAND.
22    A      YES, I RECOGNIZE THAT.  THOSE ARE MY MARKINGS ON
23   THE TAG.
24    Q      AND IS THIS THE GUN THAT WAS FOUND IN THE IVY
25   THERE?
26    A      MAY I TAKE IT?
27    Q      YEAH, SURE.
28    A      YES, THAT APPEARS TO BE THE SAME.
```

24

1    Q     OKAY.   THANK YOU.   JUST STAY UP HERE FOR A MOMENT,

2    OFFICER WONNELL.

3           I'D LIKE TO SHOW YOU ONE OTHER THING.   OFFICER

4    WONNELL, I'M SHOWING YOU NOW WHAT WE HAVE MARKED AS

5    PEOPLE'S 27.   THIS DIAGRAM.   CAN YOU SEE THAT?

6    A     YES.

7    Q     OKAY.   DOES THAT SORT OF ACCURATELY DEPICT, FIRST

8    OF ALL, THE STREETS AROUND 18400 OVERLOOK?

9    A     YES, IT DOES.

10   Q     THE DIAGRAM HAS SOME MARKINGS HERE.   NUMBER 36 ALSO

11   HAS A VICTIM RESIDENCE, ALSO A MARKING VICTIM BODY HERE.

12   DO THOSE MARKINGS OF THE RESIDENCE, UNIT 36, AND THE

13   BODY, APPEAR TO YOU TO ROUGHLY CORRESPOND TO WHERE YOU

14   SAW THE BODY ON MARCH 14, 2008, AND WHERE YOU SAW UNIT 36

15   ON 2008?

16   A     YES, IT IS.

17   Q     AND ALSO IN THE LOWER LEFT OR THE LEFT PART OF THIS

18   DIAGRAM THERE'S A LABEL, PISTOL.   DOES THAT APPEAR TO

19   REPRESENT WHERE THE .380 LORCIN WAS FOUND ON MARCH 15,

20   2008?

21   A     YES, IT DOES.

22   Q     AND MAYBE YOU CAN ESTIMATE FOR US, IF YOU CAN,

23   APPROXIMATELY WHAT THE DISTANCE IS FROM WHERE THE PISTOL

24   WAS FOUND TO WHERE THE VICTIM'S BODY WAS, IF YOU CAN GIVE

25   US AN ESTIMATE.

26   A     UM, I WOULD SAY IT WAS OVER 200 FEET.

27   Q     SOMEWHERE OVER 200 FEET.   OKAY.   YOU CAN HAVE A

28   SEAT.

25

```
1  A     THANK YOU.
2           MR. ROSEN:  THE OTHER TWO ITEMS THAT THE
3  PEOPLE HAVE MARKED.  PEOPLE'S 29 IS A CERTIFIED IMAGE OF
4  MARK ACHILLI, AND FINALLY, PEOPLE'S 28 IS THE CERTIFIED
5  DEATH CERTIFICATE FOR MARK ACHILLI, SHOT BY OTHERS.
6        AND LET ME SEE IF I HAVE ANY MORE QUESTIONS FOR
7  OFFICER WONNELL AT THIS TIME.
8        I DON'T HAVE ANY MORE QUESTIONS FOR HIM AT THIS
9  TIME.
10        THANK YOUR HONOR.
11           THE COURT:  MR. PEREZ, YOU WANT TO START.
12           MR. PEREZ:  YES, THANK YOU.
13                CROSS EXAMINATION
14  Q    (BY MR. PEREZ)  I JUST HAVE A COUPLE OF QUESTIONS.
15  ON THE 14TH, WHAT TIME DID YOU START YOUR -- DID YOU
16  ARRIVE AT THE SCENE?
17  A     AT APPROXIMATELY 2:25 P.M.
18  Q     AND OTHER OFFICERS HAD BEEN THERE BEFORE YOU?
19  A     OH, YES.
20  Q     NOW, YOU CONDUCTED A SEARCH ON THE 14TH, CORRECT,
21  OF THE AREA?
22  A     I DIDN'T REALLY CONDUCT A SEARCH.  THE AREA HAD
23  ALREADY BEEN SEARCHED.  MY JOB ON THE 14TH WAS MORE
24  PHOTOGRAPHING THE SCENE.
25  Q     OKAY.  DO YOU HAPPEN TO KNOW -- WELL, OTHER
26  OFFICERS DID SEARCH THE AREA?
27  A     YES.
28  Q     AND DO YOU HAPPEN TO KNOW WHY THEY DID NOT SEARCH
```

26

```
 1   THE AREA WHERE THE GUN WAS FOUND?
 2   A     I BELIEVE THEY DID.
 3   Q     AND YOU SAY THAT ON THE 15TH, WHEN THEY FOUND THE
 4   GUN, THERE WAS EQUIPMENT USED, LIKE DETECTING METAL?
 5   A     A METAL DETECTOR, YES.
 6   Q     ON THE 14TH, DO YOU HAPPEN TO KNOW WHETHER A METAL
 7   DETECTOR WAS USED IN THAT AREA?
 8   A     I CAN'T SAY THAT.  I WASN'T, I -- ON THE 14TH, I
 9   STAYED PRETTY MUCH IN THE AREA, THE CLOSE PROXIMITY OF
10   THE SCENE.  I DIDN'T GO OUTSIDE WHERE THE YELLOW TAPE WAS
11   ON THE -- DEPICTED, SO I CAN'T TESTIFY TO THAT.
12   Q     OKAY.  NOW ON THE 15TH, WERE YOU -- YOU SAY YOU
13   WERE ACCOMPANIED BY OTHER OFFICERS OR OTHER WORKERS OF
14   YOUR UNIT?
15   A     WE HAD MEMBERS FROM THE DEPARTMENT, YES.
16   Q     POLICE OFFICERS?
17   A     NO.
18   Q     WHAT WERE THEY?
19   A     THEY WERE CIVILIAN.  THEY WERE WHAT WE CONSIDER
20   DART TEAM MEMBERS, WHICH IS DISASTER AND AID RESPONSE
21   TEAMS.
22   Q     AND THEY ARE EMPLOYEES OF THE --
23   A     THEY'RE VOLUNTEERS.
24   Q     VOLUNTEERS.  AND IS THAT BASICALLY ON A MURDER
25   INVESTIGATION WHAT YOUR DEPARTMENT DOES, SEND VOLUNTEERS
26   TO LOOK FOR EVIDENCE?
27   A     YES.
28   Q     THE PERSON -- DO YOU HAPPEN TO KNOW WHO ACTUALLY
```

27

```
 1    DETECTED -- FOUND THE GUN?
 2    A     YES, I DO.
 3    Q     WAS IT ONE PERSON OR MORE THAN ONE PERSON?
 4    A     IT WAS ONE PERSON.
 5    Q     DO YOU HAPPEN TO KNOW WHETHER THAT PERSON HAD BEEN
 6    A VOLUNTEER AT YOUR UNIT BEFORE?
 7    A     YES.
 8    Q     WHEN YOU SEND OUT PEOPLE VOLUNTEERS LIKE THIS, DO
 9    YOU INSTRUCT THEM, GIVE THEM INSTRUCTIONS?
10    A     YES.
11    Q     THESE PEOPLE HAVE BEEN TRAINED TO LOOK FOR
12    EVIDENCE?
13    A     YES, THEY HAVE.
14    Q     DO YOU HAPPEN TO KNOW WHAT THAT TRAINING CONSISTS
15    OF?
16    A     I COULDN'T TESTIFY TO THE TRAINING.
17    Q     THIS PERSON THAT ACTUALLY FOUND THE GUN, YOU HAVE
18    PERSONAL KNOWLEDGE THAT HE HAD BEEN TRAINED BY YOUR
19    DEPARTMENT TO LOOK FOR EVIDENCE?
20    A     I BELIEVE SO.  I DON'T KNOW WHAT HIS RECORDS ARE.
21    Q     OKAY.  UM, THE PERSON THAT FOUND THE GUN, THE FIRST
22    PERSON THAT FOUND THE GUN, YOU HAPPEN TO KNOW WHETHER HE
23    TOUCHED IT?
24    A     NO, HE DID NOT.
25    Q     AND THAT'S BECAUSE HE HAS INSTRUCTIONS NOT TO
26    TOUCH IT?
27    A     YES.  HE INFORMED ME HE HAD INSTRUCTIONS NOT TO
28    TOUCH ANYTHING.  THEY ALL HAD INSTRUCTIONS NOT TO TOUCH
```

28

```
 1   ANYTHING.  AND HE ADVISED ME THAT HE DID NOT TOUCH
 2   ANYTHING.
 3        I WAS OUT OF HIS VIEW FOR APPROXIMATELY NO MORE
 4   THAN FIVE MINUTES.
 5   Q     OKAY.
 6   A     FROM THE TIME HE LOCATED IT TO THE TIME I
 7   RESPONDED.
 8   Q     AND THESE INSTRUCTIONS NOT TO TOUCH ANY ITEM WAS
 9   GIVEN TO YOU BEFORE THEY STARTED THIS -- THE SEARCH ON
10   THE 15TH?
11   A     YES, I GAVE THOSE.  I GAVE THEM THOSE INSTRUCTIONS.
12   Q     OKAY.  DO YOU HAPPEN TO KNOW WHETHER THEY WERE
13   WEARING GLOVES, THE PEOPLE?
14   A     YES, THEY WERE.
15   Q     OKAY.
16   A     I BELIEVE.  I HAVE TO BACK UP.  SOME WERE, SOME
17   WEREN'T.  I CAN'T RECALL EXACTLY.
18   Q     UM, ONCE -- AT WHAT TIME DO YOU THINK THE GUN WAS
19   ACTUALLY FOUND?
20   A     I DON'T RECALL.  FROM MY REPORT --
21   Q     IF I MAY, I BELIEVE YOU TESTIFIED THAT YOU STARTED
22   AT 12:25?
23   A     WE STARTED OUR SEARCH AT TEN A.M.  WE GOT UP TO THE
24   AREA OF 18400 OVERLOOK AT ABOUT NOON.  THE WEAPON WAS
25   LOCATED ABOUT 12:35 P.M.
26   Q     OKAY.  AND, OFFICER, DO YOU HAPPEN TO KNOW A DAY
27   BEFORE AT WHAT TIME ANY SEARCH THAT WAS CONDUCTED WAS
28   STOPPED?  IN OTHER WORDS, FINALIZED?
```

29

```
 1  A      I DON'T HAVE -- I DON'T HAVE THAT INFORMATION.
 2  Q      SO, THAT EVENING, IN THE EVENING ON THE 14TH, DO
 3  YOU THINK ANYBODY -- ANYBODY FROM YOUR DEPARTMENT WAS
 4  CONDUCTING A SEARCH OF THE AREA?
 5  A      OH, YES.
 6  Q      THEY WERE?
 7  A      YES.
 8  Q      INCLUDING NIGHT TIME?  I MEAN AT NIGHT.
 9  A      I DON'T KNOW WHAT TIME THEY STOPPED.  I CAN'T SAY,
10  BUT THE AREA WAS SEARCHED FROM OTHER MEMBERS OF THE
11  POLICE DEPARTMENT.
12  Q      OKAY.  AND THE GUN THAT YOU FOUND, YOU SAY IT'S
13  A -- IT WAS A SEMIAUTOMATIC?
14  A      YES.
15          MR. PEREZ:  THANK YOU, OFFICER.  NOTHING
16  FURTHER.
17          THE COURT:  MR. GILLAN.
18              CROSS EXAMINATION
19  Q      (BY MR. GILLAN)  OFFICER WONNELL, WHEN YOU
20  RECOVERED THE HANDGUN, THE MAGAZINE WAS INSIDE THE
21  HANDGUN?
22  A      YES, IT WAS.
23  Q      DID YOU PERSONALLY TAKE CUSTODY OF THE HANDGUN?
24  A      YES, I DID.
25  Q      AND DID YOU REMOVE THE MAGAZINE TO SEE IF THERE
26  WERE ANY ROUNDS IN THE MAGAZINE?
27  A      YES, I DID.
28  Q      THERE WERE NO ROUNDS IN THE MAGAZINE?
```

30

```
 1   A    NO, THERE WAS NOT.
 2   Q    AND THERE WASN'T A ROUND IN THE CHAMBER OF THE
 3   GUN?
 4   A    NO, THERE WAS NOT.
 5   Q    DID YOU TAKE -- WELL, YOU PHOTOGRAPHED THE CASINGS
 6   ON THE GROUND BY THE -- BY WHERE THE VICTIM'S BODY WAS;
 7   IS THAT RIGHT?
 8   A    YES.
 9   Q    AND DID YOU, AFTER PHOTOGRAPHING THE CASINGS, DID
10   YOU BOOK THOSE INTO EVIDENCE?
11   A    NO, I DID NOT.
12   Q    DID YOU SEE WHO -- DID YOU SEE HOW THOSE WERE
13   PRESERVED?  THE CASINGS, I'M REFERRING TO.
14   A    UM, NOT EXACTLY.
15   Q    WERE YOU WEARING GLOVES WHEN YOU REMOVED THE
16   MAGAZINE FROM THE HANDGUN?
17   A    YES, I WAS.
18   Q    WAS THE MAGAZINE SUBMITTED TO THE CRIME LAB FOR
19   ANALYSIS?
20   A    I'M SURE IT WAS.  I JUST -- THAT WASN'T PART OF
21   MY --
22   Q    OKAY.
23             MR. GILLAN:  THAT'S ALL I HAVE.
24             THE COURT:  MR. ROBERTSON.
25                    CROSS EXAMINATION
26   Q    (BY MR. ROBERSTON)  OFFICER WONNELL, THE
27   PHOTOGRAPHS THAT WE WERE SHOWN HERE TODAY HAD YELLOW TAGS
28   ON THEM.  WAS THERE ALSO A SET WITHOUT YELLOW TAGS?
```

```
 1   A     YES.

 2   Q     DID YOU TAKE THOSE?

 3   A     YES.

 4   Q     WHEN THERE'S A CRIME SCENE SET UP, SOMETIMES

 5   OFFICERS ARE DESIGNATED AS A PHOTOGRAPHER, A FINDER,

 6   SEARCHER, THAT TYPE OF THING.  DO YOU AGREE WITH THAT?

 7   A     YES.

 8   Q     WHAT WAS YOUR CAPACITY ON THIS PARTICULAR DAY?

 9   A     I WAS THE PHOTOGRAPHER, THAT WAS MY MAIN

10   FUNCTION.

11   Q     I'M -- THE NEXT QUESTION ISN'T IN ANY WAY INTENDED

12   TO EMBARRASS YOU.  BUT IT SOUNDS LIKE YOU HAD A MAJOR

13   INJURY TO YOUR BODY.  ARE YOU TAKING ANY PAIN MEDS THAT

14   WOULD AFFECT YOU TODAY?

15   A     NO, I AM NOT.

16             MR. ROBERTSON:  YOU'VE GOT GUTS.

17        NOTHING FURTHER.

18             THE COURT:  ALL RIGHT.  ANY REDIRECT?

19             MR. ROSEN:  NO, YOUR HONOR.

20             THE COURT:  ALL RIGHT.  YOU CAN STEP DOWN.

21   THANK YOU, OFFICER.

22             THE WITNESS:  THANK YOU.

23             THE COURT:  INCIDENTALLY, MY USUAL PRACTICE,

24   UNLESS I STATE ON THE RECORD THAT THE WITNESS IS EXCUSED,

25   THEY'RE SUBJECT TO RECALL, UNLESS THERE'S SOME PROBLEM.

26             MR. ROSEN:  THANK YOU, YOUR HONOR.

27        OUR NEXT WITNESS WILL BE IN IN JUST A MOMENT, YOUR

28   HONOR.
```

32

```
1              THE COURT:  ALL RIGHT.
2              MR. ROSEN:  THANK YOUR HONOR.  AT THIS TIME
3    THE PEOPLE CALL OFFICER KALIPO KAUWELOA.
4              THE COURT:  OKAY.
5                   KALIPO KAUWELOA,
6    HAVING BEEN CALLED AS A WITNESS ON BEHALF OF THE PEOPLE,
7    BEING FIRST DULY SWORN TO TELL THE TRUTH, TESTIFIED AS
8    FOLLOWS:
9              THE COURT:  HAVE A SEAT UP HERE, PLEASE.
10             THE WITNESS:  THANK YOU, YOUR HONOR.
11             THE COURT:  COULD YOU PLEASE STATE YOUR FULL
12   NAME AND SPELL YOUR FULL NAME.  AND DO IT SLOW, THAT WAS
13   THE REQUEST.
14             THE WITNESS:  KALIPO KAUWELOA.  FIRST NAME
15   K-A-L-I-P, AS IN PAUL, O-N, AS IN NORA, A.  LAST NAME
16   KAUWELOA, K-A-U-W-E-L-O-A.
17             THE COURT:  GO AHEAD.
18             MR. ROBERTSON:  COULD I HAVE A MOMENT.  I HAVE
19   NOT SEEN THESE PHOTOGRAPHS BEFORE.
20             THE COURT:  ALL RIGHT.
21             MR. ROSEN:  JUST TAKE A MINUTE.  WE WILL LOOK
22   AT SOME PHOTOS AND THEN I'LL ASK YOU SOME QUESTIONS,
23   OFFICER.
24                   DIRECT EXAMINATION
25   Q    (BY MR. ROSEN)  GOOD MORNING.
26   A    GOOD MORNING.
27   Q    HAVE YOU STATED YOUR FIRST AND LAST NAME FOR THE
28   RECORD?
```

33

```
1    A    I HAVE.

2    Q    OKAY.  YOU SPELLED IT?

3    A    YES.

4    Q    THANK YOU.  HOW MANY YEARS HAVE YOU BEEN A LOS

5    GATOS POLICE OFFICER?

6    A    THREE YEARS.

7    Q    WERE YOU A POLICE OFFICER WITH ANY OTHER AGENCY

8    BEFORE THAT?

9    A    YES.

10   Q.   WHAT AGENCY WERE YOU AN OFFICER WITH?

11   A    EAST BAY REGIONAL PARKS.

12   Q    FOR HOW LONG -- WERE YOU A PEACE OFFICER FOR

13   THEM?

14   A    YES.

15   Q    FOR HOW LONG WERE YOU A PEACE OFFICER FOR THE

16   PARKS?

17   A    JUST SHORT OF THREE YEARS.

18   Q    DURING THE COURSE OF YOUR CAREER AS A LOS GATOS

19   POLICE OFFICER, JUST GENERALLY WHAT HAVE YOUR DUTIES

20   BEEN?

21   A    PATROL, PART OF THE CRIME SCENE INVESTIGATION TEAM,

22   CORPORAL, WHICH IS A SUPERVISOR POSITION.

23   Q    WHAT DOES IT MEAN TO BE PART OF A CRIME SCENE

24   EVIDENCE COLLECTION TEAM?

25   A    THE CRIME SCENE OR THE CRIME SCENE INVESTIGATION

26   TEAM ATTENDS A POST CERTIFIED CLASS IN THE COLLECTION AND

27   PRESERVATION OF EVIDENCE AT THE CRIME SCENE.  THEN WE GO

28   THROUGH CATALOGUING IT AND BOOKING THE EVIDENCE FOR
```

1    COURT.

2    Q     HOW MANY OCCASIONS BEFORE THIS CASE THAT WE ARE

3    HERE ON HAD YOU COLLECTED EVIDENCE AT CRIME SCENES?

4    A     OH, GOSH.  HUNDREDS.

5    Q     LET'S TALK ABOUT MARCH 14, 2008.  ON MARCH 14,

6    2008, AT ABOUT 11:40 A.M., DID YOU RESPOND TO A

7    PARTICULAR LOCATION?

8    A     YES, I DID.

9    Q     WHERE DID YOU RESPOND TO?

10   A     THE CORNER OF PENNSYLVANIA AND WISSAHICKON.

11   Q     WHAT WAS THE REPORT THAT CAUSED YOU TO RESPOND

12   THERE?

13   A     THERE WAS A REPORT OF SHOTS FIRED IN THE AREA NEAR

14   OVERLOOK.

15   Q     EN ROUTE TO THAT AREA, WERE YOU NOTIFIED OF

16   ANYTHING?

17   A     YEAH.  THE SHOTS FIRED AND THERE WAS A MAN DOWN.

18   MAN WAS SHOT.

19   Q     WHEN YOU ARRIVED, DID YOU ARRIVE AT 18400 OVERLOOK

20   SOON THEREAFTER?

21   A     YES, JUST TOOK ME A COUPLE MINUTES TO GET THERE AND

22   I WAS EAST OF THE LOCATION, MAYBE A HUNDRED YARDS.

23   Q     WHEN YOU ARRIVED THERE, WHAT WERE YOU INITIALLY

24   ASSIGNED TO DO?

25   A     I ESTABLISHED A PERIMETER AT PENNSYLVANIA AND

26   WISSAHICKON TO ENCLOSE ANYBODY OR ANYTHING WITHIN THAT

27   PERIMETER.

28   Q     WHEN YOU SAY THAT YOU SET UP A PERIMETER, WHAT DOES

35

1  THAT MEAN?

2  A     GENERALLY FIRST RESPONDING OFFICERS WILL ARRIVE

3  DIRECTLY TO THE -- TO THE SCENE OF THE INCIDENT AND THEN

4  A PERIMETER OR A -- USUALLY A RECTANGLE, SOME SORT OF

5  SQUARES IS ESTABLISHED AROUND THAT CRIME SCENE TO ISOLATE

6  ANYTHING THAT'S EITHER GOING TO CONTROL ACCESS TO THE

7  CRIME SCENE, CONTROL ACCESS GOING OUT OF THE CRIME SCENE.

8  Q     AS PART OF YOUR -- APPROXIMATELY HOW LONG WERE YOU

9  ESTABLISHING AND MAINTAINING THE PERIMETER OF THE CRIME

10 SCENE?

11 A     I WAS AT THAT PERIMETER LOCATION FOR ABOUT AN HOUR

12 AND-A-HALF, TO AROUND 2:00.

13 Q     AFTER 2:00, DID YOU THEN BEGIN DOING SOMETHING

14 ELSE?

15 A     YES, I DID.

16 Q     WHAT DID YOU BEGIN DOING THEN?

17 A     I BEGAN COLLECTING WHAT WE BELIEVED TO BE EVIDENCE

18 ALONG CHESTNUT.

19 Q     YOU KNOW, I'M GOING TO MAYBE TILT THE MICROPHONE

20 JUST A TAD.

21     SO, WHEN YOU BEGAN TO LOOK FOR EVIDENCE, WAS THERE

22 ANY OTHER OFFICERS OR INDIVIDUALS HELPING YOU WITH

23 THAT?

24 A     YES, THERE WAS.

25 Q     WHO WERE THE OTHER -- WERE THEY OFFICERS?  WERE

26 THEY MEMBERS OF THE DART TEAM?  WHO WERE THEY?

27 A     I RECALL SEEING SERGEANT FISHBACK AND OFFICER

28 CARIZOZA (PHONETIC).  AND THEN AFTER I GOT THERE, THERE

1   WAS MANY MORE OFFICERS.

2   Q     WITHIN A FEW BLOCKS OF THE MURDER SCENE, DID YOU

3   FIND ITEMS WHICH APPEARED TO BE EVIDENCE IN THE CASE?

4   A     YES, VERY SHORT DISTANCE.

5   Q     ALL RIGHT.  WHAT'S -- WHAT'S THE FIRST ITEM THAT

6   YOU FOUND THAT YOU BELIEVED TO BE OF EVIDENTIARY

7   SIGNIFICANCE?

8   A     THAT WOULD BE THE BLACK BASEBALL CAP AND THE BLACK

9   JACKET.

10  Q     I'M GOING TO SHOW YOU EACH OF THESE ITEMS AS YOU

11  DESCRIBE WHAT YOU FOUND.  I'LL SHOW THEM TO YOU AND THEN

12  A LITTLE LATER I HAVE SOME MAPS AND STUFF THAT I'LL ASK

13  YOU SOME QUESTIONS ABOUT.

14       SO, INITIALLY YOU SAID YOU FOUND A BLACK BASEBALL

15  CAP.  SHOWING YOU WHAT WE HAVE MARKED AS PEOPLE'S 31, WHY

16  DON'T YOU TAKE A LOOK AT THIS ITEM AND THE WAY IT'S

17  PACKAGED, AND TELL US IF YOU RECOGNIZE THAT ITEM?

18       MR. ROBERTSON:  I'M GOING TO APPROACH IF THE

19  COURT DOESN'T MIND.  I HAVEN'T SEEN IT YET.

20       THE COURT:  ALL RIGHT.

21       THE WITNESS:  YES, THIS LOOKS LIKE THE

22  BASEBALL CAP.

23  Q     (BY MR. ROSEN)  SURE.  ARE THERE ANY MARKINGS ON

24  THE ITEM WHICH INDICATE TO YOU THAT IT'S AN ITEM THAT YOU

25  FOUND AND BOOKED?

26  A     THE LOGO ON THE FRONT, THE BLACKED OUT LOGO, LA,

27  AND THEN ON THE -- ON THE INSIDE I WAS ABLE TO RECORD THE

28  SIZE AND MANUFACTURE INFORMATION.

1   Q    APPROXIMATELY WHERE DID YOU FIND THAT?

2   A    IT WAS ON CHESTNUT AVENUE.  I HAVE TO LOOK AT MY --

3   I MEASURED EVERYTHING OUT.  I HAVE TO LOOK AT MY REPORT

4   TO GIVE YOU THE EXACT MEASUREMENTS.  IT WAS PROBABLY

5   HALFWAY DOWN CHESTNUT, A HUNDRED YARDS BETWEEN CHESTNUT

6   AND HERNANDEZ.

7   Q    WAS IT ON THE STREET, WAS IT TO THE SIDE?  WHERE

8   WAS IT?

9   A    IT WAS ON THE SIDE OF THE ROADWAY, ON EAST SIDE OF

10   THE ROADWAY, DIRT SHOULDER.

11   Q    SURE.  WHAT'S THE NEXT ITEM THAT YOU FOUND?

12   A    THE JACKET, BLACK JACKET.  EXCUSE ME.

13   Q    SURE.

14           MR. ROSEN:  COUNSEL, HERE IS THE ITEMS AND

15   BEFORE I SHOW THEM TO THE OFFICER, YOU'RE WELCOME TO COME

16   AND LOOK AT THEM.  THAT'S WHERE THEY ARE.  THAT'S WHAT

17   I'M GOING TO SHOW HIM, AND I'LL GIVE YOU A FEW MINUTES TO

18   LOOK AT THEM.

19           MR. ROBERTSON:  THANK YOU.

20           MR. ROSEN:  WE WILL LEAVE THE BOTTOM LIKE THAT

21   FOR A SECOND.

22   Q    (BY MR. ROSEN) OFFICER KAUWELOA, I'M SHOWING YOU

23   WHAT WE HAVE MARKED AS PEOPLE'S 34.  COULD YOU TAKE A

24   LOOK AT THIS ITEM AND TELL US IF YOU RECOGNIZE IT AS A

25   BLACK JACKET THAT YOU FOUND.

26   A    YES.  IT SHOULD BE LARGE SIZE AND THAT'S MY

27   PACKAGING.  THAT'S MY PACKAGING AND THE JACKET I PLACED

28   IN THE BAG.

```
1    Q     GREAT.  WHERE DID YOU FIND THE BLACK JACKET?
2    A     IT WAS A SHORT DISTANCE FROM THE BASEBALL CAP AND
3    NEXT TO A TREE ON THE SIDE OF THE ROAD.
4    Q     ALSO ON CHESTNUT?
5    A     YES, SIR.
6    Q     SHOWING YOU WHAT WE HAVE MARKED AS PEOPLE'S 32 AND
7    33, THESE BLACK AND WHITE GLOVES, CAN YOU TELL US IF YOU
8    RECOGNIZE THOSE ITEMS?
9    A     YES, I DO.
10   Q     HOW DO YOU RECOGNIZE THEM?
11   A     BECAUSE I FOUND THESE GLOVES ON HERNANDEZ IN SOME
12   BUSHES OFF THE ROADWAY.
13   Q     DO THEY ALSO HAVE ANY MARKINGS FROM YOU ON THEM
14   THAT YOU FOUND AND COLLECTED THEM?
15   A     ANY MARKINGS THAT I PUT ON THEM?
16   Q     NO.  NO.  IN OTHER WORDS, THAT YOU FILLED OUT ON
17   ANY OF THE EVIDENCE TAGS OR ANYTHING?
18   A     YES, MY INITIALS ON BOTH PACKAGES.
19   Q     THANK YOU.  SO, WE HAVE MENTIONED THE BLACK HAT,
20   THE BLACK JACKET, THE TWO GLOVES.  WHAT ARE THE OTHER
21   ITEMS THAT YOU FOUND?
22   A     THERE WAS A GUN CLOTH, SEVERAL CANDY WRAPPERS,
23   CARTRIDGE TO A -- EXCUSE ME.  A MAGAZINE TO A FIREARM.
24   Q     LET ME STOP YOU THERE.  FIRST, WHERE WAS THE GUN
25   CLOTH FOUND?
26   A     THE GUN CLOTH WAS FOUND NEAR THE JACKET NEAR A TREE
27   OFF THE SIDE OF THE ROADWAY ON CHESTNUT.
28   Q     YOU MENTIONED A GUN MAGAZINE.
```

```
 1    A     A GUN MAGAZINE WAS FOUND IN, LIKE, A WATER CULVERT,
 2  LIKE A SEWER PIPE AT THE CORNER OF CHESTNUT AND
 3  HERNANDEZ.
 4    Q     IN ADDITION, BESIDES THE MAGAZINE IN THE PIPE, WAS
 5  THERE ALSO A BRASS CASE FOR A .380?
 6    A     YES, THERE WERE -- THERE WERE CARTRIDGES OR BULLETS
 7  INSIDE THE PIPE.
 8    Q     WAS THERE ALSO A BLACK AND WHITE PHOTO OF AN
 9  INDIVIDUAL THAT YOU FOUND?
10    A     YES.
11    Q     WHERE DID YOU FIND THAT?
12    A     I FOUND TWO TORN UP PIECES OF PAPER ON CHESTNUT AND
13  WHEN THE TWO PIECES OF PAPER WERE PUT TOGETHER, IT WAS A
14  PICTURE OF THE VICTIM.
15    Q     MARK ACHILLI?
16    A     YES.
17    Q     DID YOU ALSO FIND SOMETHING THAT APPEARED TO BE
18  DIRECTIONS PRINTED OUT FROM A COMPUTER?
19    A     YES.  NEAR THE AREA OF THE PHOTO OF THE VICTIM I
20  FOUND A MAP.  IT WAS A GOOGLE DIRECTIONS FROM SOMEWHERE
21  IN SOUTHERN CALIFORNIA TO 18400 OVERLOOK.
22    Q     THESE DIFFERENT ITEMS THAT YOU FOUND, THAT YOU
23  DESCRIBED TO US, DID YOU INDICATE SOMEWHERE SORT OF
24  PRECISELY WHERE YOU FOUND THEM, IN TERMS OF THE FEET AND
25  INCHES?
26    A     YES.  AS I CATALOGUED THE ITEMS, I HAD AN OFFICER
27  STAND WITH ME AND USING A ROLL-A-TAPE, WHICH IS A COMMON
28  TOOL USED IN MEASURING FOR THE LAW ENFORCEMENT, I HAD THE
```

40

```
 1   ITEMS MEASURED USING TWO ACCESS POINTS.
 2   Q     LET ME HAVE YOU STEP OFF THE STAND AND STAND OVER
 3   HERE.
 4         I'M GOING TO SHOW YOU SOME PHOTOS AND ASK IF YOU
 5   RECOGNIZE THESE PHOTOGRAPHS AND WHAT THEY DEPICT.  WE
 6   WILL TAKE A MOMENT.
 7         OFFICER KAUWELOA, I'D LIKE TO SHOW YOU SOME
 8   PHOTOGRAPHS THAT WE HAVE JUST MARKED.  STARTING WITH ITEM
 9   35, PEOPLE'S 35, CAN YOU DESCRIBE TO US WHAT'S DEPICTED
10   HERE?
11   A     THAT'S THE AREA WHERE THE BASEBALL CAP WAS FOUND.
12   Q     AND THAT'S THE CAP ITSELF?
13   A     YES.
14   Q     SHOWING YOU PEOPLE'S 36, WHAT IS DEPICTED HERE?
15   A     THAT'S A WIDER PORTRAIT AREA OF WHERE THE BASEBALL
16   CAP WAS FOUND.
17   Q     I'M JUST GOING TO HAND YOU THE LASER POINTER, MAYBE
18   YOU CAN JUST POINT US TO AND GIVE US AN APPROXIMATE IDEA
19   WHERE THE HAT IS.
20   A     IT'S TUCKED OFF THE ROADWAY HERE.  AS IF IT WAS
21   THROWN OFF THE ROADWAY.
22   Q     INDICATING TO THE CENTER PART OF THE DIAGRAM.
23         SHOWING YOU PEOPLE'S 37, WHAT IS DEPICTED HERE?
24   A     DEPICTED A LOOK OF -- PORTRAIT OF THE SAME AREA
25   FACING SOUTH.
26   Q     CAN YOU SEE THE HAT HERE?  IF YOU NEED TO LOOK DOWN
27   AT THE PHOTO FIRST BEFORE THE SCREEN.
28   A     RIGHT IN THIS AREA HERE.  RIGHT ABOUT THERE.
```

```
 1    Q     SO, FOR THE RECORD, LEFT CENTER PORTION OF THE
 2  SCREEN.
 3        SO THAT WAS THE BLACK BASEBALL CAP.  THEN SHOWING
 4  YOU PEOPLE'S 38, WHAT IS DEPICTED HERE?
 5    A     THAT'S THE SHRUBBERY WHICH INCLUDED THE BLACK
 6  JACKET.
 7    Q     PEOPLE'S 39, IS THAT A CLOSE-UP OF THE JACKET?
 8    A     CLOSE-UP SHOT OF THE JACKET, YES.
 9    Q     SURE.  AND THEN PEOPLE'S 40, WHAT'S DEPICTED
10  HERE?
11    A     THIS IS PRIMARILY TAKEN FOR THE ADDRESS LOCATION OF
12  THE HOUSE WHERE THE ARTICLES WERE FOUND, AND THIS
13  PARTICULAR TREE WHERE OTHER EVIDENCE WAS FOUND.
14    Q     OKAY.  FOR THE RECORD, CENTER RIGHT PORTION OF THE
15  SCREEN.
16        AND WHAT IS THE ADDRESS OF THIS HOUSE?
17    A     21.
18    Q     21 WHAT STREET?
19    A     21 CHESTNUT, EXCUSE ME.
20    Q     I'M SHOWING YOU PEOPLE'S 41.  IS THIS MORE OF A
21  CLOSE-UP OF 21 CHESTNUT?
22    A     YES, IT IS A CLOSE-UP OF CHESTNUT.
23    Q     IS THIS TREE THE ONE THAT HAS THE BLACK JACKET IN
24  IT?
25    A     YES.
26    Q     CAN YOU INDICATE WHERE IT IS, FOR THE RECORD?
27    A     IT WAS CONTRAST.  IN THIS AREA RIGHT HERE.
28    Q     INDICATING FOR THE RECORD, THE LOWER RIGHT PART OF
```

42

```
 1    THE SCREEN.
 2          THEN YOU'D MENTIONED IN YOUR TESTIMONY THAT THERE
 3    WAS ALSO A PIECE OF PAPER WITH DIRECTIONS FOUND.  SHOWING
 4    YOU PEOPLE'S 42, DO YOU SEE THE DIRECTIONS HERE?
 5    A     LOWER LEFT CORNER THERE ARE THE DIRECTIONS.
 6    Q     THERE'S A STOP SIGN IN THIS PHOTO AND THERE'S AN
 7    INTERSECTION OF TWO STREETS.  WHAT ARE THE TWO STREETS?
 8    A     THE INTERSECTION HERE IS OVERLOOK AND THIS IS
 9    CHESTNUT.
10    Q     SO THE STREET THAT THESE DIRECTIONS ARE FOUND ON IS
11    CHESTNUT?
12    A     YES.
13    Q     SHOWING YOU PEOPLE'S 43, WHAT IS DEPICTED HERE?
14    A     THIS IS THE DIRECTIONS FROM THE STARTING ADDRESS OF
15    SOMEWHERE IN SOUTHERN CALIFORNIA, DUARTE AREA, ALL THE
16    WAY TO 18400 OVERLOOK IN LOS GATOS.
17    Q     SHOWING YOU PEOPLE'S 44, WHAT PIECE OF EVIDENCE IS
18    DEPICTED HERE?
19    A     THIS IS THE TREE, THE GUN CLOTH IS RIGHT HERE.
20    Q     IS THIS ALSO THE TREE IN FRONT OF 21 CHESTNUT
21    AVENUE?
22    A     YES.
23    Q     SHOWING YOU PEOPLE'S 45, WHAT IS DEPICTED HERE?
24    A     THAT'S THE PACKAGING FOR THE GUN CLOTH.  THIS IS
25    THE BASE OF THE TREE.
26    Q     SHOWING YOU PEOPLE'S 46, WHAT PIECE OF EVIDENCE IS
27    DEPICTED HERE?
28    A     THAT'S ONE OF THE PIECES OF PAPER OF THE PICTURE OF
```

43

1   THE VICTIM, MARK ACHILLI.

2   Q     SHOWING YOU PEOPLE'S 56, DO YOU RECOGNIZE WHAT'S

3   DEPICTED THERE?

4   A     YES.  WHEN I PUT THE TWO PIECES OF PAPER TOGETHER,

5   THERE'S A RIP SOMEWHERE IN THIS FASHION RIGHT HERE, AND

6   PUTTING THE TWO TOGETHER MADE THE FACE OF THE VICTIM,

7   MARK ACHILLI.

8         THE COURT:  EXCUSE ME.  DID YOU SAY 56?

9         MR. ROSEN:  YES, WE JUMPED A LITTLE OUT OF

10  ORDER.

11        THE COURT:  THAT'S FINE.

12  Q     (BY MR. ROSEN)  AND IN 57, WHAT IS DEPICTED HERE?

13  A     THAT'S A CLOSE-UP SHOT OF THE VICTIM STANDING IN

14  FRONT OF ONE OF THE CLUBS THAT HE WAS ASSOCIATED WITH,

15  WHICH IS CLUB 180 IN LOS GATOS.

16  Q     WHERE -- WHAT STREET WAS THIS PHOTO FOUND?

17  A     THIS PHOTO WAS FOUND ON CHESTNUT AVENUE.

18  Q     LET ME SHOW YOU WHAT WE HAVE MARKED AS PEOPLE'S 48.

19  WHAT IS DEPICTED IN THIS PHOTO?

20  A     THE OFFICER HERE IS POINTING TO THE LOCATION WHERE

21  THE TWO GLOVES WERE FOUND BACK OFF THE ROADWAY.  HERE IN

22  THIS AREA.

23  Q     ARE YOU IN THIS PHOTO AS WELL?

24  A     I AM.  RIGHT THERE.

25  Q     OKAY.  THANK YOU.  THEN, SHOWING YOU PEOPLE'S 47,

26  WHAT IS DEPICTED HERE?

27  A     THIS IS A CLOSER SHOT OF THE SHRUBBERY WHERE THE

28  GLOVES WERE FOUND ON HERNANDEZ.

1   Q      NOW, I'D LIKE TO SHOW YOU WHAT WE HAVE MARKED AS

2   PEOPLE'S 49.  WHAT IS DEPICTED HERE?

3   A      THIS IS THE CORNER OF CHESTNUT AND HERNANDEZ.  THE

4   VEHICLES ARE PARKED ON CHESTNUT.  THIS IS THE -- IS YOUR

5   DRAIN WHERE THE MAGAZINE AND THE CARTRIDGES WERE FOUND.

6   Q      SHOWING YOU PEOPLE'S 51, WHAT IS DEPICTED HERE?

7   A      THAT'S INSIDE THE -- INSIDE THE PIPE, AND THAT'S

8   GOING TO BE THE MAGAZINE.

9   Q      SHOWING YOU PEOPLE'S 52, IS THAT A SHOT OF THE

10  MAGAZINE ITSELF?

11  A      YES.  AFTER IT WAS REMOVED FROM THE PIPE, THAT'S

12  THE MAGAZINE.

13  Q      APPROXIMATELY HOW MANY ROUNDS DID THAT MAGAZINE

14  HOLD?

15  A      I BELIEVE IT WAS FIVE.  HOW MANY DID IT HOLD?

16  Q      DO YOU KNOW HOW MANY IT HOLDS?

17  A      ABOUT TWELVE, I THINK IT WAS.

18  Q      APPROXIMATELY HOW MANY ROUNDS WERE FOUND IN IT?

19  A      FIVE.

20  Q      SHOWING YOU PEOPLE'S 50, WHAT IS DEPICTED HERE?

21  A      THERE'S TWO CARTRIDGES, ONE HERE AND ONE HERE.

22  Q      WHERE WERE THOSE FOUND?

23  A      THEY WERE FOUND WITHIN THE PIPE ON THE CORNER OF

24  HERNANDEZ AND CHESTNUT, AND IT WAS -- THE MAGAZINE IS

25  BACK HERE.

26  Q      OKAY.  INDICATING THE TOP PART, FOR THE RECORD.

27         A FEW MORE PHOTOS.  SHOWING YOU PEOPLE'S 53, WHAT

28  IS BEING DEPICTED HERE, IF YOU CAN TELL?

45

1  A     CAN I SEE THE PICTURE?

2  Q     YEAH, SURE.

3  A     WELL, THIS LOOKS LIKE THE AREA WHERE THE PIECES OF

4  PAPER WERE FOUND, THE -- I BELIEVE IT'S THE PAPER, THE

5  PICTURE OF MARK ACHILLI.

6  Q     OKAY.  AND IS THAT ALSO WHAT WE ARE SEEING IN

7  PEOPLE'S 54?

8  A     YES, A CLOSER UP SHOT.

9  Q     AND THEN THIS AREA DEPICTED IN PEOPLE'S 55, WHAT IS

10  THIS MEANT TO BE SHOWING?

11  A     THAT'S LIKE A PORTRAIT SHOT OF THE BUSH AREA WHERE

12  IT WAS FOUND.  WHERE THE PAPERS WERE FOUND.

13  Q     OKAY.  CAN YOU GIVE US AN ESTIMATE OF APPROXIMATELY

14  HOW LONG YOU AND OTHER OFFICERS WERE SEARCHING ON MARCH

15  14, 2008, WHEN YOU FOUND THESE ITEMS THAT YOU HAVE JUST

16  DESCRIBED?

17  A     WELL, THE JACKET AND HAT WERE FOUND RIGHT WHEN I

18  ARRIVED ON SCENE, ABOUT 2:00, TO THE CHESTNUT OVERLOOK

19  AREA.  AFTER THAT, I WOULD SAY THE PAPERS, WHICH WOULD

20  INCLUDE THE PHOTOGRAPH OF THE VICTIM AND THE MAP, WERE

21  FOUND PRIOR TO 4:00.  THE GLOVES AND GUN WERE AROUND THE

22  SAME TIME, PRIOR TO 4:00.

23  Q     HOW LONG DID THE SEARCHING GO ON UNTIL?

24  A     UNTIL DARK THAT DAY.  AND -- AND CARRIED ON THE

25  NEXT DAY.

26  Q     I'D LIKE TO SHOW WHAT WE HAVE MARKED AS PEOPLE'S

27  58.  FIRST OF ALL, DOES THIS DIAGRAM ACCURATELY DEPICT

28  THE AREA AROUND 18400 OVERLOOK?

46

```
 1   A      YES, IT DOES.

 2   Q      NOW, ON THIS PARTICULAR DIAGRAM, THERE ARE A NUMBER

 3   OF ITEMS MARKED.  SO LET'S START WITH THE DIRECTIONS THAT

 4   YOU DESCRIBED, THAT PIECE OF PAPER.  DOES THIS MAP

 5   ACCURATELY SHOW WHERE THE DIRECTIONS WERE FOUND ON

 6   CHESTNUT?

 7   A      YES, IT DOES.

 8   Q      JUST A MORE GENERAL QUESTION.  SEEING THE PHOTO OF

 9   THE VICTIM, GUN CLOTH, BLACK JACKET, BASEBALL CAP, GUN

10   MAGAZINE CARTRIDGE AND GLOVES, DOES THE PLACEMENT OF

11   THOSE ITEMS ON THIS DIAGRAM APPEAR TO YOU TO CORRESPOND

12   TO WHERE YOU FOUND THOSE ITEMS ON MARCH 14, 2008?

13   A      YES, IT DOES.

14   Q      NOW, YOU MENTIONED ON SOME OF THE PHOTOS YOU SHOWED

15   US, ONE OF THEM WAS OF 21 CHESTNUT AVENUE.  DO YOU RECALL

16   TAKING A FEW PHOTOS OF THAT RESIDENCE OUTSIDE OF THAT

17   RESIDENCE?

18   A      NO, I WASN'T DIRECTLY INVOLVED WITH TAKING THE

19   PICTURES.  WE HAD -- I HAD THE STAFF OF PEOPLE.

20   Q      I UNDERSTAND.  THIS IS WHAT, PEOPLE'S 41, THIS IS

21   WHAT THE RESIDENCE IN FRONT OF CHESTNUT AVENUE LOOKED

22   LIKE ON MARCH 14, 2008; IS THAT CORRECT?

23   A      YES.

24   Q      DID YOU ACTUALLY TALK TO THE RESIDENTS OF THIS

25   HOUSE WHERE SOME OF THE EVIDENCE ITEMS THAT -- THE BLACK

26   JACKET AND GUN CLOTH WERE FOUND?

27   A      YES.

28   Q      WHAT WERE THE NAMES OF THOSE PEOPLE?
```

47

```
 1        YOU CAN HAVE A SEAT.  IF YOU NEED TO REFER TO YOUR
 2   REPORT, LET US KNOW.
 3   A     MR. AND MRS. SIMMONS.
 4   Q     WHAT DID YOU ASK --
 5            MR. ROBERTSON:  YOUR HONOR, THE OFFICER SEEMED
 6   TO JUST READ FROM THE REPORT.  MAY I APPROACH AND SEE
 7   WHAT HE'S LOOKING AT, PLEASE?
 8            THE COURT:  OKAY.
 9   Q    (BY MR. ROSEN)  OFFICER, YOU TALKED TO MARGO AND
10   BOB SIMMONS?
11   A     YES, I DID.
12   Q     WHAT DID YOU ASK THEM?
13   A     I ASKED THEM WHETHER OR NOT THEY HAD WATERED THEIR
14   YARD AROUND THE AREA OR WATERED THEIR YARD AT THE TIME OR
15   ABOUT THE TIME OF THE COLLECTION OF EVIDENCE.
16   Q     WHEN DID YOU TALK TO THEM?
17   A     IT WAS A FEW DAYS AFTER.  MAY I REFER?
18   Q     YEAH, SURE.  IS THAT THE SAME REPORT YOU LOOKED AT
19   BEFORE?
20   A     YES, IT IS.  I WENT TO THEIR RESIDENCE ON MARCH 30.
21   Q     AND WHY WERE YOU GOING TO TALK TO THEM?
22   A     I WANTED TO CONFIRM THAT WHEN I FOUND THE PIECES OF
23   PAPER, THE MAP AND THE PHOTOS, WHEN I FOUND THEM THEY
24   WERE DRY AND THERE WAS NO DEBRI COVERING THEM.  THEY
25   LOOKED LIKE THEY WERE FRESHLY DISCARDED.  SO I WANTED TO
26   CHECK WITH MRS. SIMMONS AND MR. SIMMONS TO DETERMINE HOW
27   THEY MANICURED THEIR YARD AND THEY WERE VERY
28   METICULOUS.
```

48

```
 1   Q     DID MISS SIMMONS TELL YOU WHAT SHE WOULD DO IF SHE
 2   EVER SAW TRASH OR RUBBISH IN THE AREA OF HER YARD?
 3   A     YES.  MISS SIMMONS SAYS SHE WOULD HAVE DISPOSED OF
 4   THAT RUBBISH.
 5   Q     DID IT APPEAR THAT HER YARD WAS WELL MANICURED TO
 6   YOU?
 7   A     VERY WELL MANICURED.
 8   Q     OKAY.
 9            MR. ROSEN:  I DON'T HAVE ANY FURTHER QUESTIONS
10   FOR THIS OFFICER.  BUT I BELIEVE THAT THIS WOULD BE A
11   GOOD TIME FOR A STIPULATION.
12            THE COURT:  ALL RIGHT.
13            MR. ROSEN:  THAT IF CRIMINALIST RYAN VASHON
14   WERE TO TESTIFY, HE WOULD QUALIFY AS AN EXPERT IN DNA
15   ANALYSIS AND HE WOULD TESTIFY THAT HE EXAMINED THE BLACK
16   JACKET, THE BLACK LA BASEBALL CAP, THE LEFT HANDED GLOVE,
17   THE RIGHT HANDED GLOVE, AND AS WELL AS SWABS FROM THE GUN
18   THAT WE MARKED IN EVIDENCE; AND HE WOULD TESTIFY THAT
19   LUCIO ESTRADA IS THE SOURCE OF THE MAJOR DNA PROFILE ON
20   THE BLACK JACKET, BLACK BASEBALL CAP AND RIGHT HANDED
21   GLOVE.
22       HE WOULD FURTHER TESTIFY THAT MIGUEL CHAIDEZ, CEASAR
23   CHAIDEZ, MANUAL ESTRADA AND ROBERT JACOME ARE EXCLUDED AS
24   CONTRIBUTORS TO THE DNA ON THOSE ITEMS.
25            THE COURT:  OKAY.  ONE MORE TIME, MR. ROSEN,
26   THE DNA WAS AS TO WHICH ITEMS FOR MR. LUCIO ESTRADA?
27            MR. ROSEN:  RYAN VASHON WOULD TESTIFY THAT DNA
28   FOUND ON PEOPLE'S 34 WAS LUCIO ESTRADA'S.  THE DNA FOUND
```

1    ON THE INTERIOR BILL OF THE BLACK BASEBALL CAP, WHICH HAS

2    BEEN MARKED AS PEOPLE'S 31, WAS LUCIO ESTRADA'S.  AND HE

3    WOULD TESTIFY THAT ON THE RIGHT-HANDED GLOVE, WHICH HAS

4    BEEN MARKED AS PEOPLE'S 32, THAT THE DNA ON THE

5    RIGHT-HANDED GLOVE WAS ALSO LUCIO ESTRADA'S.

6              THE COURT:  OKAY.  VERY WELL.  THANK YOU.

7              MR. ROSEN:  AND THAT STIPULATION WOULD JUST BE

8    FOR THE PURPOSES OF THIS PRELIMINARY HEARING, YOUR

9    HONOR.

10             THE COURT:  AGREED, MR. ROBERTSON?

11             MR. ROBERTSON:  IT IS, YOUR HONOR.  INCLUDING

12   THE LANGUAGE THAT THE PEOPLE WERE EXCLUDED.

13             MR. ROSEN:  YES.  I SHOULD ADD THAT IN

14   ADDITION TO THE PEOPLE THAT I MENTIONED THAT WERE

15   EXCLUDED, PAUL GARCIA IS ALSO EXCLUDED, IN TERMS OF HIS

16   DNA NOT FOUND ON THOSE ITEMS.

17             MR. ROBERTSON:  YES.

18             THE COURT:  MR. GILLAN?

19             MR. GILLAN:  YES.

20             THE COURT:  MR. PEREZ?

21             MR. PEREZ:  YES.

22             THE COURT:  COURT WILL ACCEPT THAT

23   STIPULATION.

24             MR. ROSEN:  I DON'T HAVE ANY FURTHER

25   QUESTIONS.

26             THE COURT:  MR. PEREZ?

27                    CROSS EXAMINATION

28   Q    (BY MR. PEREZ)  GOOD MORNING, OFFICER.

50

```
1   A      GOOD MORNING.
2   Q      ONE OF THE QUESTIONS ON DIRECT I BELIEVE YOU WERE
3   ASKED AT SOME POINT IN TIME, WAS THAT IS THIS WHERE YOU
4   FOUND A GLOVE AND GUN.   AND I DIDN'T HEAR GUN MAGAZINE, I
5   SHOULD HAVE OBJECTED.   BUT DID YOU FIND A GUN?
6   A      NO, SIR.
7   Q      SO WHEN YOU ANSWERED THAT QUESTION, GLOVE AND GUN,
8   YOU MEANT GLOVE AND GUN MAGAZINE, MOST LIKELY?
9   A      YES, SIR.   TO DEPICT MAGAZINE AS A JOURNAL.
10  Q      NOW, SOME OF THESE ITEMS THAT YOU FOUND, YOU FOUND
11  THEM -- WELL, STRIKE THAT.
12         DID YOU FIND ALL THESE ITEMS THAT YOU MENTIONED
13  PERSONALLY OR OTHER OFFICERS FOUND THEM AND GAVE THEM TO
14  YOU?
15  A      NOT ALL OF THEM.
16  Q      THE --
17         MR. ROBERTSON:   I'M SORRY.
18  Q      (BY MR. PEREZ)   THE PAPERS, THE DOCUMENTS --
19         MR. ROBERTSON:   OBJECTION, NONRESPONSIVE TO
20  THE QUESTION.
21         THE COURT:   I THINK THE QUESTION IS A LITTLE
22  VAGUE.   WHY DON'T YOU REASK THE QUESTION OR REPHRASE AS
23  TO WHETHER HE FOUND THEM PERSONALLY.
24  Q      (BY MR. PEREZ)   YOU DIDN'T FIND ALL THE ITEMS THAT
25  YOU TESTIFIED TO PERSONALLY, CORRECT?
26  A      NO.
27  Q      SOME OF THE ITEMS WERE FOUND BY OTHER OFFICERS?
28  A      YES.
```

51

```
 1   Q     OKAY.  NOW, REGARDING THE MAP AND SOME OTHER
 2   DOCUMENTS THAT YOU FOUND, WERE THEY, LIKE, FOLDED OR --
 3   WELL, STRIKE THAT.
 4         THE MAP THAT YOU FOUND, THE DIRECTIONS?
 5   A     YES.
 6   Q     WAS THAT ITEM WHEN YOU FOUND -- DID YOU FIND
 7   PERSONALLY THAT ITEM?
 8   A     YES, I DID.
 9   Q     WHEN YOU FOUND IT, WAS IT FOLDED, CRUMPLED UP OR
10   WAS IT LAID OUT?
11   A     CRUMPLED UP.
12   Q     IT WAS IN SOME AREA WHERE THERE WAS TREES,
13   SHRUBBERY, THINGS LIKE THAT?
14   A     IT WAS ON THE DIRT SHOULDER OF THE ROADWAY.
15   Q     AND THIS PLACE WHERE YOU FOUND IT, WAS THERE A --
16   THE ROAD, WAS IT A DIRT ROAD OR PAVEMENT?
17   A     THE ROAD WAS ASPHALT.
18   Q     AND DID YOU LOOK FOR ANY FOOTPRINTS, SHOE PRINTS?
19   A     NO, I DID NOT.
20   Q     OKAY.  WAS THERE SOME DIRT AREA WHERE THERE COULD
21   HAVE BEEN SOME FOOTPRINTS?
22   A     THERE WAS A DIRT SHOULDER, BUT IT -- THERE WAS, YOU
23   KNOW, HEDGES THERE.
24   Q     DO YOU RECALL HOW THE WEATHER WAS THAT DAY?  WAS
25   THERE ANY WIND AT ALL?
26   A     NO WIND THAT I RECALL.
27   Q     OKAY.  THE PICTURE THAT YOU FOUND, WAS IT ALSO A
28   TYPE OF PAPER, THIN PAPER?
```

52

```
 1    A    I'M SORRY?
 2    Q    YOU FOUND A PICTURE OF THE VICTIM?
 3    A    YES.
 4    Q    AND WAS THAT ALSO FOLDED UP OR --
 5    A    CRUMPLED UP.
 6    Q    WHERE DID YOU FIND -- WHERE YOU FOUND THAT ONE, WAS
 7    THERE SHRUBBERY AND TREES LIKE THAT?
 8    A    YES.
 9    Q    AND WAS IT LIKE HIDDEN UNDERNEATH THE SHRUBBERY OR
10    JUST LAID ON TOP OF THE SHRUBBERY?
11    A    IT LOOKED LIKE SOMEBODY THREW IT THERE.
12    Q    NOW, ARE YOU FAMILIAR WITH OTHER ASPECTS OF THIS
13    INVESTIGATION, OFFICER?  FOR EXAMPLE, WHERE THE GUN WAS
14    FOUND?
15    A    YES.
16    Q    DO YOU KNOW WHERE THE GUN WAS FOUND?
17    A    I HAVE AN IDEA.
18    Q    YOUR PERIMETER THAT YOU SAT ON THE 14TH, DID THAT
19    INCLUDE THAT AREA WHERE THE GUN WAS FOUND?
20    A    YES.
21    Q    DO YOU HAPPEN TO KNOW WHETHER YOU OR ANY OF THE
22    OTHER PEOPLE THERE WITH YOU SEARCHED THAT AREA WHERE THE
23    GUN WAS FOUND ON THAT DAY, ON THE 14TH?
24    A    I'M NOT DIRECTLY SURE.
25    Q    THE BLACK CAP THAT YOU FOUND, YOU KNOW THE SIZE OF
26    IT?
27    A    THE SIZE?
28    Q    YEAH.
```

53

```
 1   A     I BELIEVE IT WAS A SEVEN AND -- I'D HAVE TO LOOK AT
 2   THE PICTURE, BUT SEVEN AND A QUARTER, SEVEN AND-A-HALF.
 3   Q     HOW ABOUT THE GLOVES?
 4   A     I BELIEVE THEY WERE LARGE.
 5   Q     DO YOU HAPPEN TO KNOW WHETHER THEY WERE BASEBALL
 6   GLOVES OR SOFTBALL --
 7   A     THEY LOOKED LIKE BASEBALL GLOVES.
 8   Q     YOU FOUND THOSE PERSONALLY, TOO?
 9   A     YES, I DID.
10   Q     WERE THEY CLOSE TOGETHER OR SEPARATED?
11   A     THEY WERE SEPARATED.
12   Q     AND ALSO WAS THERE, LIKE, A SHRUBBERY AREA,
13   TREES?
14   A     LOW SHRUBS, SIMILAR TO JASMINE.  ABOUT TWELVE TO
15   FOURTEEN INCHES TALL.
16   Q     ALSO A -- WAS THERE DIRT AROUND THAT AREA, DIRT
17   AREA OR ALL PAVEMENT?
18   A     I WOULD SAY NO DIRT OR LOSE SOILAGE.
19   Q     YOU DIDN'T LOOK FOR ANY FOOTPRINTS THERE?
20   A     NO.
21   Q     THE MAGAZINE THAT YOU FOUND, DO YOU HAPPEN TO KNOW
22   IF -- IT HAD BULLETS IN THE MAGAZINE, RIGHT?
23   A     YES, IT DID.
24         MR. PEREZ:  I HAVE NOTHING FURTHER.
25         THE COURT:  MR. GILLAN, BEFORE WE GET TO YOUR
26   CROSS EXAMINATION, LET'S TAKE A BREAK FOR ABOUT TEN
27   MINUTES.
28         WE'LL BE IN RECESS.
```

54

```
 1              (RECESS TAKEN.)
 2              THE COURT:  ALL RIGHT.  THE RECORD WILL SHOW
 3   ALL DEFENDANTS ARE PRESENT, ALL COUNSEL ARE PRESENT.
 4        MR. GILLAN, CROSS EXAMINATION.  AND THE WITNESS IS
 5   BACK ON THE STAND.
 6                     CROSS EXAMINATION
 7   Q    (BY MR. GILLAN)  OFFICER, I NOTED IN YOUR PAGE 2 OF
 8   YOUR POLICE REPORT THAT ITEMS 1, 3 AND 4 WERE
 9   INADVERTENTLY MARKED IN A DIFFERENT LOCATION THAN THEY
10   WERE ACTUALLY FOUND, IS THAT ACCURATE?
11   A    YES.
12   Q    HOW DID THAT HAPPEN?
13   A    COMPASS DIRECTION OF EAST AND WEST.  I HAD
14   INADVERTENTLY PUT EAST VERSUS WEST OF THE CURB LINE.
15   Q    ALL RIGHT.
16              MR. GILLAN:  THAT'S ALL.
17              THE COURT:  MR. ROBERTSON.
18                     CROSS EXAMINATION
19   Q    (BY MR. ROBERTSON)  OFFICER, ON THE DATE OF THE
20   HOMICIDE, WHICH IS ON THE 14TH, DID YOU PERSONALLY
21   PARTICIPATE IN A PHYSICAL CANVASSING OF THE AREA TO LOOK
22   FOR EVIDENCE?
23   A    YES, I DID.
24   Q    WHERE THE LORCIN WAS ULTIMATELY FOUND, WAS THAT AN
25   AREA THAT YOU LOOKED?
26   A    I'M SORRY, WHERE THE?
27   Q    THE LORCIN.  I BELIEVE THE WEAPOAN IS A LORCIN
28   .380.  DO YOU REMEMBER THAT?  LET ME REPHRASE IT.
```

1        DO YOU REMEMBER THE BRAND NAME OF THE WEAPON THAT

2   WAS FOUND?

3   A    NO.

4   Q    OKAY.  DID YOU SEE IT AT ITS LOCATION WHERE IT WAS

5   FOUND?

6   A    NO.

7   Q    WHERE IT WAS FOUND, WHERE YOU LEARNED THAT WAS

8   FOUND, IS THAT AN AREA WHERE YOU WALKED BY YOURSELF

9   SEARCHING FOR PHYSICAL EVIDENCE THE DATE OF THE

10  HOMICIDE?

11  A    I WAS PROBABLY NORTH OF THAT LOCATION.

12  Q    OKAY.  THE PHOTOGRAPHS OF THE WEAPON SHOW THAT IT

13  APPEARS TO BE COVERED WITH RAIN OR PERHAPS WATER FROM A

14  GARDENING SYSTEM.  I SAY THAT BY BACKGROUND.  DO YOU

15  RECALL IF THERE HAD BEEN ANY RAIN DURING THE PRIOR 24

16  HOURS?

17  A    NO.

18  Q    WAS THERE RAIN IN THE PRIOR 24 HOURS?

19  A    NOT THAT I REMEMBER.  NO.

20  Q    AND THEN YOU INDICATED WHEN THE ITEMS WERE FOUND --

21  YOU ARRIVED AROUND 11:40; IS THAT RIGHT?

22  A    YES, TO THE PERIMETER.

23  Q    AND THEN YOU WERE RELEASED FROM THAT PERIMETER AT

24  SOME POINT?

25  A    YES.

26  Q    WHEN YOU WERE RELEASED SOME OF THESE ITEMS THAT YOU

27  HAD REFERRED TO HAD ALREADY BEEN FOUND BY OTHER PEOPLE,

28  CORRECT?

56

```
 1   A      SIMULTANEOUS TO MY ARRIVAL AT CHESTNUT AND
 2   HERNANDEZ.  EXCUSE ME, CHESTNUT AND OVERLOOK.
 3   Q      DO YOU KNOW AN OFFICER CARIZOZA?
 4   A      I DO.
 5   Q      IS HE THE ONE WHO TOLD YOU THAT A BLACK JACKET AND
 6   BASEBALL CAP HAD BEEN FOUND ON CHESTNUT AVENUE?
 7   A      INITIALLY I PROBABLY HEARD IT OVER THE RADIO AND
 8   THEN HE WAS WITHIN EYESIGHT OF ME.
 9   Q      DO YOU REMEMBER TALKING WITH HIM ABOUT WHERE THEY
10   WERE LOCATED?
11   A      YES.
12   Q      AND I KNOW THAT YOU -- DID YOU TAKE PHOTOGRAPHS OF
13   WHERE THEY WERE FOUND?
14   A      THE -- NO.
15   Q      AND I UNDERSTAND THAT ANOTHER OFFICER HAD ALREADY
16   PUT THESE ARTICLES IN PAPER BAGS, CORRECT?
17   A      YES.
18   Q      AND THEN HE SHOWED YOU WHERE THEY WERE FOUND?
19   A      YES.  HE WAS STILL IN THAT AREA.  I HAD WALKED TO
20   HIM.
21   Q      I JUST WANT -- I WANT TO MAKE SURE IN TERMS OF
22   BEING THE ACTUAL FINDER.  BY THE TIME YOU GOT TO THESE --
23   SOME OF THESE ITEMS, THEY HAD ALREADY BEEN FOUND AND
24   BAGGED UP BY ANOTHER OFFICER?
25   A      TWO OF THE ITEMS I DESIGNATED MYSELF AS
26   FINDER-COLLECTOR TO HELP CONTROL OF THE EVIDENCE.
27   Q      WHICH TWO ITEMS WERE THOSE?
28   A      THE JACKET AND HAT.
```

57

1   Q       THE ONES FOUND HERE, THE ONES PRESENT HERE?

2   A       THE ONES FOUND HERE.   THE ONES PRESENTED HERE IN

3   COURT, YES.

4   Q       AND ALTHOUGH YOU DESIGNATED YOURSELF THE

5   FINDER-KEEPER, YOU DIDN'T ACTUALLY FIND THEM YOURSELF?

6   A       NOT THOSE TWO ITEMS.   I DESIGNATED MYSELF AS THE

7   FINDER-COLLECTOR.

8   Q       WHY DID YOU DO THAT, INSTEAD OF HAVING THE OFFICER

9   WHO ACTUALLY FOUND THEM AND COLLECTED THEM BE THE PERSON

10  ON RECORD WHO FOUND AND COLLECTED THEM?

11  A       ON AN INCIDENT TO THIS EXTREME, THE CRIME AND

12  NUMBER OF PIECES OF EVIDENCE THAT COULD BE AVAILABLE,

13  IT'S MORE INTEGRAL TO HAVE ONE PERSON IN CHARGE OF THE

14  COLLECTION AND CATEGORY OF EVIDENCE THAN MULTIPLE

15  PEOPLE.

16  Q       WAS THE -- IT HAD BEEN SOME TIME -- WELL, STRIKE

17  THAT.

18          DID THIS PARTICULAR INCIDENT PUT A SIGNIFICANT TAX

19  ON THE TIME OF THE ON-DUTY OFFICERS?

20  A       IT DIDN'T SEEM SO, BUT IT DID REDUCE OUR RESOURCES.

21  Q       NOW, THE CLIP THAT WAS FOUND IN THE CULVERT AREA,

22  ON ONE OF THE PHOTOGRAPHS IT LOOKS LIKE THERE MIGHT HAVE

23  BEEN SOME DEBRIS CLEARED AWAY.   DO YOU KNOW WHETHER THAT

24  WAS DONE?

25  A       THE CLIPPING, THE MAGAZINE?

26  Q       YES, SIR.

27  A       AND YOU'RE -- CAN YOU RESTATE YOUR QUESTION.

28  Q       SURE.   I'LL BRING UP THE PHOTOGRAPH.   CAN YOU SEE

58

1    THE PHOTOGRAPH FROM WHERE YOU ARE?

2    A    YES, I CAN.

3    Q    OFFICER, THE PHOTOGRAPH THAT I AM REFERRING TO IS

4    EXHIBIT NUMBER 49.  AND THAT'S THE CULVERT YOU'RE

5    REFERRING TO, CORRECT?

6    A    YES.

7    Q    AND IN THE AREA AROUND IT, AND I CAN'T TELL WHETHER

8    IT'S BECAUSE OF THE CONFIGURATION OR WHAT IT IS, BUT IT

9    LOOKS LIKE IT'S ACTUALLY BEEN BRUSHED CLEAN.

10   A    NO.

11   Q    WAS THAT THE WAY IT WAS WHEN YOU ARRIVED THERE?

12   A    YES.

13   Q    WHEN YOU SEE THAT PHOTOGRAPH, DO YOU HAVE ANY

14   UNDERSTANDING AS TO WHY THE AREA AROUND THE CULVERT

15   DOESN'T HAVE ANY DEBRIS ON IT?

16   A    I CAN SPECULATE.

17   Q    WELL, IS IT ANGELED DIFFERENT THAN THE STREET?

18   A    IT'S A DIRT SURFACE TO AN ASPHALT SURFACE, SO THE

19   ASPHALT IS PROBABLY RAISED, STOPPING THE LEAVES NORTH OR

20   SOUTH OF THE PIPE, AND THEN AS THE WIND GOES OVER THE

21   ASSAULT, IT DROPS THE LEAVES ON THE OTHER SIDE OF THE

22   PIPE.

23   Q    YOU WERE ASKED QUESTIONS EARLIER ABOUT AREAS OF

24   DIRT VERSUS ASPHALT.  AS WE LOOK ON THIS PHOTOGRAPH IN

25   THE AREA NEXT TO THE SIGN POST THERE, IS THAT ASPHALTIC

26   OR IS IT DIRT?

27   A    THE POINT WHERE YOU USED THE LASER POINTER WAS --

28   Q    IN THIS AREA HERE?

59

```
 1   A      -- DIRT.
 2   Q      OKAY.  NOW, THERE'S A PHOTOGRAPH OF A -- I CALLED
 3   IT A CLIP, IT ACTUALLY IS A MAGAZINE THAT INSERTS INTO
 4   THE BUTT OF A WEAPON, CORRECT?
 5   A      INTO THE HAND GRIP, YES.
 6   Q      YES.  DIFFERENT GENERATION.
 7          THE MAGAZINE HERE THAT WE SEE ON THE BAG, WHEN YOU
 8   GOT THERE WAS IT IN THAT BAG?
 9   A      NO.  IT WAS IN THE PIPE.
10   Q      YOU FOUND IT ACTUALLY IN THE PIPE YOURSELF?
11   A      YES.
12   Q      WERE THERE ANY MARKINGS ON IT AS TO BRAND; ANYTHING
13   LIKE THAT?
14   A      NOT THAT I CAN RECALL.
15   Q      ARE THOSE IN FACT .380 CARTRIDGES?
16   A      YES.
17              MR. ROBERTSON:  THANK YOU.  I HAVE NO FURTHER
18   QUESTIONS.
19              THE COURT:  REDIRECT?
20              MR. ROSEN:  YES, YOUR HONOR.
21                  REDIRECT EXAMINATION
22   Q      (BY MR. ROSEN)  OFFICER KAUWELOA, COULD YOU EXPLAIN
23   TO US ON MARCH 14, 2008, IN THE AFTERNOON, WHAT YOUR ROLE
24   WAS AS PART OF THE SEARCH FOR EVIDENCE AND THE ROLES OF
25   OTHER OFFICERS.
26   A      YES.  I DESIGNATED MYSELF AS FINDER-COLLECTOR TO
27   THE EVIDENCE THAT SPANNED OVERLOOK AND CHESTNUT TO
28   CHESTNUT AND HERNANDEZ.
```

60

```
 1   Q      WHAT DOES THAT MEAN, FINDER-COLLECTOR?
 2   A      ESSENTIALLY IT KEEPS THE CASE MORE INTEGRAL WHEN
 3   THERE'S ONE COLLECTOR-FINDER VERSUS HAVING MULTIPLE
 4   OFFICERS FINDING MULTIPLE PIECES OF EVIDENCE.  I
 5   BASICALLY TOOK RESPONSIBILITY FOR THOSE PIECES OF
 6   EVIDENCE, CATALOGUED THEM AND DESIGNATED OTHER OFFICERS
 7   TO ASSIST ME IN THAT INVESTIGATION.
 8   Q      DID YOU ALSO HAVE SOME DART OFFICERS WORKING WITH
 9   YOU?
10   A      YES, WE HAD SEVERAL DART -- DART OFFICERS.
11   Q      COULD YOU EXPLAIN WHAT DART STANDS FOR?
12   A      DART STANDS FOR DISASTER AID RESPONSE TEAM.
13   Q      WHO ARE DART TEAM MEMBERS?
14   A      DART TEAM MEMBERS ARE VOLUNTEER MEMBERS THAT
15   AUGMENT THE DEPARTMENT IN TIMES OF NEED.  THEY'RE MANY
16   TIMES PUT THROUGH THE SAME TRAINING THAT THE POLICE
17   OFFICERS ARE PUT THROUGH.
18   Q      DO YOU HAVE ANY EXPERIENCE WORKING WITH THE DART
19   TEAM OFFICERS?
20   A      YES, I VOLUNTEERED WITH THE TEAM FOR EIGHT YEARS
21   AND I COMMANDED THE TEAM FOR FOUR YEARS.
22   Q      WHAT ARE THEIR RESPONSIBILITIES -- WHAT WERE THEIR
23   RESPONSIBILITIES ON MARCH 14, 2008?
24   A      THEIR RESPONSIBILITIES, THEY HAD HELPED IN THE GRID
25   SEARCH OF COLLECTION OF EVIDENCE.
26   Q      DO THEY, AS WELL AS THE UNIFORMED POLICE OFFICERS,
27   UNDERSTAND THAT SINCE YOU'RE THE FINDER AND COLLECTOR, IF
28   YOU FIND ANYTHING OF EVIDENTIARY VALUE, THEY SHOULD LEAVE
```

61

1  IT WHERE IT IS TILL YOU'RE ABLE TO COLLECT IT?

2  A    YES.  THEY ARE TRAINED IN EVIDENCE COLLECTION.

3  Q    I'D ASKED YOU SOME QUESTIONS BEFORE ABOUT A

4  RESIDENCE ON CHESTNUT AVENUE WHERE THE SIMMONS LIVED,

5  MARGO AND ROB SIMMONS.  CAN YOU RECALL FOR US WHAT THE

6  ADDRESS WAS?

7  A    YES, IT'S 29 (SIC) CHESTNUT.

8  Q    WHAT WAS -- WHAT WERE THE EVIDENTIARY ITEMS THAT

9  WERE FOUND IN THEIR YARD?

10  A    THE TWO PIECES OF PAPER WHICH MATCHED UP TO BE THE

11  PICTURE OF THE VICTIM AND THE MAP.

12  Q    IN ADDITION, I HAD PREVIOUSLY SHOWN YOU A PHOTO

13  MARKED AS PEOPLE'S 46, WHICH I'M GOING TO HAND TO YOU

14  AGAIN.  TAKING A CLOSE LOOK AT THAT ITEM, WHAT APPEARS TO

15  YOU TO BE DEPICTED IN THAT ITEM?

16  A    UPON CLOSER LOOK, IT'S THE GLOVE.  A GLOVE.

17  Q    REFERRING TO WHAT WAS COLLECTED AS PEOPLE'S 32 OR

18  33; IS THAT CORRECT?

19  A    YES, SIR.

20  Q    OKAY.

21          MR. ROSEN:  I DON'T HAVE ANY MORE QUESTIONS.

22  THANK YOU.

23          THE COURT:  ANY FOLLOW-UP?

24          MR. PEREZ:  REAL BRIEFLY, YOUR HONOR.

25                  RECROSS EXAMINATION

26  Q    (BY MR. PEREZ)  OFFICER, YOU REVIEWED YOUR REPORT

27  TODAY?

28  A    I DID.

62

```
1    Q     OKAY.  AND IN THAT REPORT YOU STATED THAT YOU WERE
2    RELIEVED BY DART MEMBERS, CORRECT?
3    A     YES.
4    Q     AND THAT MEANS THAT YOU STOPPED WORKING AND THEY
5    TOOK OVER?
6    A     NO.
7    Q     WHAT DOES IT MEAN WHEN YOU SAY RELIEVED BY?
8    A     THAT THEY REPLACED ME ON THAT POSITION AND I WENT
9    TO A DIFFERENT TASK.
10   Q     AND THEY REPLACED YOUR POSITION OF SEARCHING FOR
11   EVIDENCE?
12   A     NO.
13   Q     OF SECURING THE PERIMETER?
14   A     YES.
15   Q     DART MEMBERS, THEY'RE THE VOLUNTEERS, RIGHT?
16   A     YES.
17   Q     AND THEY'RE AUTHORIZED TO SECURE AN AREA, A
18   PERIMETER?
19   A     FOR THIS PARTICULAR -- AT THE TIME, YES.
20   Q     SO, WHEN YOU STARTED YOUR ESTABLISHING YOUR
21   PERIMETER, DID YOU HAVE DART MEMBERS WITH YOU?
22   A     NO.
23            MR. PEREZ:  NOTHING FURTHER.
24            THE COURT:  MR. GILLAN, ANY FOLLOW-UP?
25            MR. GILLAN:  NO.
26            THE COURT:  MR. ROBERTSON, ANY ADDITIONAL
27   QUESTIONS?
28            MR. ROBERTSON:  I DO NOT HAVE ANY MORE
```

1  QUESTIONS AT THIS TIME, YOUR HONOR.  THANK YOU.

2      THE COURT:  ALL RIGHT.  YOU CAN STEP STEP

3  DOWN.  THANK YOU, OFFICER.

4      MR. ROSEN:  WE WILL CALL OUR NEXT OFFICER.

5      THE COURT:  ALL RIGHT.

6      MR. ROSEN:  YOUR HONOR, AT THIS TIME, PEOPLE

7  CALL OFFICER ED WHITFIELD TO THE WITNESS STAND.

8      THE COURT:  STEP UP HERE, PLEASE.

9          EDWARD WHITFIELD,

10  HAVING BEEN CALLED AS A WITNESS ON BEHALF OF THE PEOPLE,

11  BEING FIRST DULY SWORN TO TELL THE TRUTH, TESTIFIED AS

12  FOLLOWS:

13      THE COURT:  HAVE A SEAT.  MORNING.  AND COULD

14  YOU PLEASE STATE YOUR FULL NAME AND SPELL YOUR FULL

15  NAME.

16      THE WITNESS:  EDWARD SHAYNE WHITFIELD.

17  E-D-W-A-R-D S-H-A-Y-N-E W-H-I-T-F-I-E-L-D.

18      THE COURT:  THANK YOU.  GO AHEAD.

19          DIRECT EXAMINATION

20  Q   (BY MR. ROSEN)  GOOD MORNING, OFFICER.

21  A   MORNING.

22  Q   WHAT DO YOU DO FOR A LIVING?

23  A   I WORK FOR THE CALIFORNIA HIGHWAY PATROL AS A PEACE

24  OFFICER.

25  Q   FOR HOW LONG HAVE YOU WORKED FOR THE CALIFORNIA

26  HIGHWAY PATROL AS A PEACE OFFICER?

27  A   APPROXIMATELY 13 AND-A-HALF YEARS.

28  Q   ARE YOU CURRENTLY ASSIGNED ELSEWHERE?

```
1    A      I'M CURRENTLY ASSIGNED TO THE SANTA CLARA COUNTY
2    SPECIALIZED ENFORCEMENT TEAM.
3    Q      AS A -- FIRST AS A HIGHWAY PATROL OFFICER, JUST
4    GENERALLY, WHAT HAVE YOUR DUTIES BEEN?
5    A      UM, I'VE WORKED ROUTINE PATROL FOR SEVERAL YEARS,
6    THE GRAVEYARD SHIFT.  I WORKED ALSO AS A DETECTIVE FOR
7    ABOUT THREE YEARS.  I'VE WORKED IN A CAMP PROGRAM, A
8    MARIJUANA ERADICATION PROGRAM FOR A SUMMER.  SO, IT'S
9    KIND OF VARIED.
10   Q      HOW LONG HAVE YOU BEEN WITH SCCSET?
11   A      UM, APPROXIMATELY TWO AND-A-HALF YEARS.
12   Q      THAT'S THE ABBREVIATION FOR THE SANTA CLARA COUNTY
13   SPECIAL ENFORCEMENT TEAM?
14   A      THAT'S CORRECT.
15   Q      WHAT HAVE YOUR DUTIES BEEN WITH SCCSET?
16   A      I'M AN AGENT ASSIGNED TO THEM.  THE MAJORITY OF THE
17   CASES WE WORK DEAL WITH NARCOTICS.  WE HAVE WORKED
18   IDENTITY THEFT CASES.  YOU JUST KIND OF -- IF YOU'RE
19   GIVEN A CASE OR YOU WORK A CASE, YOU'RE THE CASE AGENT OF
20   THAT CASE AND YOU WRITE REPORTS, MAKE ARRESTS, AND JUST
21   BASICALLY CONDUCT INVESTIGATIONS.
22   Q      ARE YOU BASED OUT OF SANTA CLARA COUNTY?
23   A      THAT IS CORRECT.
24   Q      LET'S TALK ABOUT MARCH 29 OF 2008.  FIRST, HAVE YOU
25   HAD A CHANCE TO REVIEW A POLICE REPORT THAT YOU PREPARED
26   ABOUT WHAT YOU DID ON MARCH 29, 2008?
27   A      YES, I HAVE.
28   Q      DID REVIEWING THAT REPORT HELP REFRESH YOUR MEMORY
```

65

```
 1   ABOUT SOME OF THE DETAILS THAT YOU DID THAT DAY?
 2   A    YES, IT DID.
 3   Q    ON MARCH 28 (SIC), 2008, YOU WERE THE
 4   FINDER-COLLECTOR FOR THE SEARCH WARRANT THAT WAS
 5   CONDUCTED IN SOUTHERN CALIFORNIA?
 6             MR. ROBERTSON:  MARCH 29?
 7             MR. ROSEN:  I'M SORRY.  MARCH 29, 2008.
 8             THE WITNESS:  MARCH 29, CORRECT.
 9   Q    (BY MR. ROSEN)  WHERE WERE YOU?  WHERE WAS THE
10   SEARCH WARRANT BEING EXECUTED THAT YOU WERE THE
11   FINDER-COLLECTER ON, THE ADDRESS?
12   A    IT WAS IN THE CITY OF BURBANK, CALIFORNIA.
13   Q    OKAY.  DO YOU NEED TO REFER TO YOUR REPORT TO GET
14   THE PARTICULAR STREET ADDRESS AND APARTMENT NUMBER?
15   A    I BELIEVE IT'S 1725 GRISMER, APARTMENT 105.
16   Q    WHAT DOES IT MEAN THAT YOU'RE THE
17   FINDER-COLLECTOR?
18   A    BASICALLY I'M THE ONE THAT'S GOING TO BE COLLECTING
19   ALL THE EVIDENCE.  BEFORE WE DO THAT, IT'S ALL
20   PHOTOGRAPHED, DOCUMENTED IN IT'S RESPECTIVE PLACE.  I
21   KIND OF TALLY DOWN EACH ITEM THAT WE ARE GOING TO SEIZE
22   ON A FORM.  LIKE I SAY, PRIOR TO DOING THAT, TAKE A
23   PHOTOGRAPH OF IT, TALLY IT DOWN AND COLLECT IT AND GATHER
24   IT.
25   Q    WERE THERE OTHER OFFICERS WORKING WITH YOU AS YOU
26   AND OTHERS GATHERED EVIDENCE IN THIS APARTMENT?
27   A    YES, THERE WERE.
28   Q    DO THE OTHER OFFICERS KNOW THAT IF THEY FIND
```

66

1    SOMETHING OF EVIDENTIARY VALUE THEY SHOULD LEAVE IT WHERE

2    IT IS, NOTE IT'S LOCATION AND BRING YOUR ATTENTION TO

3    IT?

4    A    THAT'S CORRECT.

5    Q    COULD YOU DESCRIBE THE APARTMENT NUMBER 105 AT 1725

6    GRISMER?

7    A    IT'S A SMALL APARTMENT.  IT'S A ONE BEDROOM UNIT.

8    WHEN YOU ENTER THE APARTMENT, IMMEDIATELY TO YOUR LEFT IS

9    THE KITCHEN.  TO THE RIGHT IS A LITTLE DINING ROOM.  IT

10   IS -- AS YOU CONTINUE THROUGH THE DINING ROOM, THERE'S NO

11   SEPARATION, AND THAT'S THE LIVING ROOM.  IF YOU MAKE A

12   LEFT, YOU'RE GOING TO ENTER RIGHT INTO A BEDROOM, AND A

13   BATHROOM THAT'S INSIDE THE BEDROOM THERE.

14   Q    DID YOU HAVE AN OPPORTUNITY TO SEARCH IN THE DINING

15   ROOM CABINET SHELF?

16   A    YES.

17   Q    DID YOU FIND ANY INDICIA TO ANYONE IN THE DINING

18   ROOM CABINET SHELF?

19   A    UM, YES, THERE WERE SEVERAL ITEMS OF INDICIA.

20   Q    OKAY.  WERE THERE SOME INSURANCE PAPERS?

21   A    YES, THERE WERE.

22   Q    WHO WAS THE PERSON LISTED ON THOSE PAPERS?

23   A    LUCIO ESTRADA.

24   Q    DID YOU SEE ANYTHING THAT LOOKED TO BE OF

25   EVIDENTIARY VALUE ON THE LIVING ROOM END TABLE?

26   A    YES, WE DID.

27   Q    WHAT DID YOU SEE THERE THAT APPEARED TO BE OF

28   EVIDENTIARY VALUE?

```
1   A      THERE WAS NARCOTICS, THERE WAS A COUPLE BLACK BAGS
2   THAT CONTAINED SOME FIREARMS.  ONE OF THEM HAD A
3   FIREARM.
4   Q      WHEN YOU SAY THERE WERE SOME NARCOTICS, WHAT KIND
5   OF DRUGS?
6   A      I BELIEVE IT WAS MARIJUANA AND COCAINE.
7   Q      WAS THERE ANY KIND OF FACE MASK?
8   A      INSIDE A BAG, BLACK BAG, THERE WAS A GREEN FACE
9   MASK.
10  Q      THE WEAPON THAT WAS FOUND, WHAT KIND OF WEAPON WAS
11  IT?
12  A      IT WAS A .45 CALIBER HANDGUN.  I BELIEVE IT WAS A
13  SMITH AND WESSON.
14  Q      WAS IT LOADED?
15  A      YES, IT WAS.
16  Q      WAS IT IN A HOLSTER?
17  A      YES, IT WAS.
18  Q      WAS THERE ALSO A BOOKING SHEET AND PHOTO OF LUCIO
19  ESTRADA?
20  A      YES, THERE WAS.
21  Q      THAT BOOKING SHEET AND PHOTO THAT YOU FOUND IN THAT
22  APARTMENT, DO YOU SEE THE PERSON DEPICTED IN THAT BOOKING
23  SHEET IN COURT TODAY?
24  A      YES, I DO.
25  Q      CAN YOU JUST POINT HIM OUT FOR US?
26  A      HE'S WEARING THE BROWN AND THE ORANGE SHIRT, TWO --
27  NEXT TO HIS LAWYER, I PRESUME.
28              MR. ROSEN:   YOUR HONOR, LET THE RECORD
```

1   REFLECT THE WITNESS HAS IDENTIFIED THE DEFENDANT, LUCIO

2   ESTRADA.

3           THE COURT:  WELL, WE HAVE TWO WITH BROWN

4   SHIRTS AND ORANGE.

5           THE WITNESS:  THE -- ON THE LEFT SIDE.

6           THE COURT:  ON THE LEFT FROM YOU?  NOTED.

7           MR. ROSEN:  THANK YOU.

8   Q    (BY MR. ROSEN)  DID YOU ALSO FIND -- WHAT DID YOU

9   FIND IN THE LIVING ROOM ITSELF?

10  A    THERE WAS -- OTHER THAN WHAT WE TALKED ABOUT, THERE

11  WAS INDICIA TO LUCIO LYING ON THE FLOOR NEAR THE COUCH.

12  Q    WHAT KIND OF INDICIA?

13  A    I BELIEVE THERE WAS, LIKE, A CHECK STUB.  SOMETHING

14  TO THAT EFFECT.

15  Q    WAS THERE A BACKPACK IN THE LIVING ROOM AS WELL?

16  A    YES, THERE WAS A NIKE BACKPACK.

17  Q    WHAT COLOR WAS IT?

18  A    BLACK.

19  Q    WHAT WAS FOUND INSIDE OF IT?

20  A    INSIDE THE BACKPACK, I BELIEVE SOME OF THE

21  NARCOTICS WERE FOUND INSIDE THERE.  THERE WAS SOME

22  MARIJUANA.  THERE WAS A PURPLE BINDER, LIKE A NOTE

23  BINDER.

24  Q    DID YOU HAVE A CHANCE TO LOOK THROUGH THAT BINDER

25  AT ALL?

26  A    BRIEFLY, YES, I DID.

27  Q    DID YOU SEE ANY NAMES IN THAT BINDER THAT YOU NOTED

28  BECAUSE YOU THOUGHT IT WAS SIGNIFICANT?

1    A      YES.

2    Q      WHAT NAME DID YOU SEE?

3    A      THE NAME OF CHAIDEZ.

4    Q      YOU DIDN'T SEE -- DID YOU SEE A FIRST NAME OR JUST

5    CHAIDEZ?

6    A      JUST THE LAST NAME.

7    Q      OKAY.  YOU MENTIONED ALSO IN THE LIVING ROOM A

8    PAYROLL CHECK.  WAS THAT FOR LUCIO ESTRADA?

9    A      THAT'S CORRECT.

10   Q      DID YOU LOOK IN THE KITCHEN COUNTER?

11   A      YES, I DID.

12   Q      WERE THERE SOME COMPUTER HARD DRIVES ON THE KITCHEN

13   COUNTER?

14   A      YES, THERE WERE TWO.

15   Q      DID YOU HAVE A CHANCE TO LOOK -- YOU SAID IT WAS A

16   ONE BEDROOM.  DID YOU HAVE A CHANCE TO SEARCH IN THAT

17   BEDROOM?

18   A      YES, I DID.

19   Q      WHAT DID YOU FIND HANGING ON THE BACK SIDE OF THE

20   BEDROOM DOOR?

21   A      THERE WAS A BLACK BALL CAP.

22   Q      LET ME SHOW YOU SOMETHING.

23          MR. ROSEN:  MARK THIS AS PEOPLE'S NEXT IN

24   ORDER.

25          THE COURT:  58, I THINK.

26          THE CLERK:  59.

27          THE COURT:  59.

28          (WHEREUPON, PEOPLE'S EXHIBIT NUMBER 59 WAS

1   MARKED FOR IDENTIFICATION.)

2   Q   (BY MR. ROSEN)  OFFICER WHITFIELD, I'M SHOWING YOU

3   WHAT WE MARKED AS PEOPLE'S 59.  COULD YOU TAKE A LOOK AT

4   THIS ITEM AND SEE IF YOU RECOGNIZE THAT AS THE HAT THAT

5   YOU FOUND HANGING ON THE BACK OF THE BEDROOM DOOR IN

6   APARTMENT 105.

7   A   YES, IT IS.

8   Q   SHOWING YOU AN ITEM THAT WE PREVIOUSLY MARKED AS

9   PEOPLE'S 31, DO THEY LOOK TO BE THE SAME KIND OF HAT?

10   A   YES, THEY APPEAR TO BE.

11   Q   WAS THERE A DRESSER IN THAT BEDROOM?

12   A   YES, THERE WAS.

13   Q   DID YOU HAVE A CHANCE TO LOOK THROUGH THE

14   DRESSER?

15   A   YES, I DID.

16   Q   IN THE TOP DRAWER OF THE DRESSER IS THERE A BOOK

17   THAT YOU FOUND THAT YOU THOUGHT HAD SOME EVIDENTIARY

18   SIGNIFICANCE?

19   A   YES, THERE WAS.

20   Q   WHAT BOOK WAS THAT?

21   A   I BELIEVE THE TITLE WAS -- COULD I REFER TO THE

22   REPORT?

23   Q   YEAH.  JUST LET US KNOW WHAT PAGE YOU'RE ON.  I'D

24   REFER YOU TO EVIDENCE ITEM 18.

25   A   THE TITLE IS -- IT WAS A NOVEL, A SNIPER'S

26   JOURNEY.

27   Q   IN ADDITION, DID YOU FIND ANYTHING ELSE IN THAT

28   DRESSER THAT YOU THOUGHT WAS SIGNIFICANT BESIDES THE

71

```
 1   BOOK?
 2   A     I BELIEVE IN THE SECOND DRAWER WAS A MAGAZINE WITH
 3   30 LIVE ROUNDS.  IT WAS A LARGE MAGAZINE.
 4   Q     IN ADDITION TO THAT LARGE MAGAZINE IN THE SECOND
 5   DRESSER DRAWER, WAS THERE ANOTHER PIECE OF INDICIA?
 6   A     I BELIEVE THERE WAS A TAX INFORMATION FOR LUCIO
 7   ESTRADA.
 8   Q     IN ADDITION, WAS THERE ANYTHING FOUND UNDER THE BED
 9   IN THAT BEDROOM THAT WAS SIGNIFICANT TO YOU?
10   A     YES.  THERE WAS A BLACK BAG OR POUCH THAT CONTAINED
11   TWO FIREARMS, SEVERAL MAGAZINES AND AMMUNITION.
12   Q     DID IT ALSO HAVE A CLEANING CLOTH?
13   A     YES, IT DID.
14   Q     DID YOU LOOK IN THE BEDROOM CLOSET?
15   A     YES, I DID.
16   Q     DID YOU FIND ANY BOOKS IN THE BEDROOM CLOSET?
17   A     THERE WERE SEVERAL BOOKS FOUND IN A BOX INSIDE THE
18   BEDROOM CLOSET.
19   Q     DO YOU RECALL THE TITLES OF SOME OF THOSE BOOKS
20   THAT ATTRACTED -- THAT YOU SEIZED AS EVIDENCE?
21   A     IF I REFER TO MY REPORT, THERE'S THREE.
22   Q     SURE.  LET US KNOW WHAT PAGE YOU'RE LOOKING AT OF
23   YOUR REPORT.
24   A     IT'S THE SAME PAGE, PAGE 4, THE VERY BOTTOM.
25   SURGICAL SPEED SHOOTING, HOW TO ACHIEVE SPEED MARKMENSHIP
26   IN A GUN FIGHT.  AND ANOTHER BOOK TITLED DRUG LORD.  AND
27   ANOTHER BOOK, GUN DIGEST BOOK OF COMBAT HANDGUNNERY, THE
28   FIFTH EDITION.
```

1   Q      DID YOU ALSO FIND A NOTEBOOK THAT SOMEONE WRITES IN

2   WITH A LOT OF NOTES?

3   A      YES, I DID.

4   Q      WAS THERE ANY INDICIA TO LUCIO ESTRADA ASSOCIATED

5   WITH THAT?

6   A      I BELIEVE THERE WAS, YEAH.

7   Q      WAS THERE ALSO ANOTHER -- A BLACK KENNETH COLE BAG

8   FOUND IN THAT CLOSET?

9   A      YES, THERE WAS.

10          MR. ROSEN:  I'D LIKE TO HAVE MARKED AS

11   PEOPLE'S EXHIBIT NUMBER 60, BLACK KEN COLE BAG.

12          (WHEREUPON, PEOPLE'S EXHIBIT NUMBER 60 WAS

13   MARKED FOR IDENTIFICATION.)

14          MR. ROSEN:  THERE'S THREE BOOKS IN THE BAG.

15   I'M WONDERING IF WE MIGHT MARK THOSE AS A, B AND C.

16          THE COURT: 60 A, B AND C.

17          MR. ROSEN:  THANK YOU.

18          (WHEREUPON, PEOPLE'S EXHIBITS NUMBERS 60-A, B

19   AND C WERE MARKED FOR IDENTIFICATION.)

20          MR. ROSEN: 60-A IS THE FINAL MISSION, SPOOKY

21   8.  60-B IS HOW TO MAKE A SILENCER FOR A .45.  AND 60-C

22   IS HIT MAN, A TECHNICHAL MANUAL FOR INDEPENDENT

23   CONTRACTORS.

24          THE COURT:  ALL RIGHT.

25          MR. ROSEN:  PERHAPS WE COULD MARK AS 60-D, A

26   SMALL BLACK POUCH INSIDE THAT BAG THAT'S BEEN MARKED AS

27   60.

28          (WHEREUPON, PEOPLE'S EXHIBIT NUMBER 60-D WAS

```
 1 | MARKED FOR IDENTIFICATION.)
 2 | Q     (BY MR. ROSEN)  OFFICER WHITFIELD, I WANT TO GO
 3 | THROUGH SOME OF THESE ITEMS WITH YOU THAT WE MARKED.
 4 | STARTING WITH PEOPLE'S 60, THIS BLACK KEN COLE REACTION
 5 | BAG.  DO YOU RECOGNIZE THIS?
 6 | A     YES, I DO.
 7 | Q     WHERE WAS THIS FOUND?
 8 | A     IN THE CLOSET.
 9 | Q     INSIDE ARE THREE BOOKS.  60-A, 60-B AND 60-C, WERE
10 | THOSE THREE BOOKS FOUND INSIDE THIS KEN COLE REACTION
11 | BAG?
12 | A     YES.  IN THE CENTER POCKET.
13 | Q     SHOWING YOU PEOPLE'S 60-D, DO YOU RECOGNIZE THAT
14 | ITEM?
15 | A     YES, I DO.
16 | Q     IS THAT THE POUCH THAT WAS -- SMALL POUCH FOUND
17 | INSIDE OF THIS LARGER BAG?
18 | A     YES.  CORRECT.
19 | Q     WAS THERE ANYTHING FOUND INSIDE OF THIS POUCH?
20 | A     TWO THOUSAND DOLLARS IN CASH.
21 | Q     WAS THAT MONEY SEIZED AND SEPARATELY BOOKED INTO
22 | EVIDENCE?
23 | A     YES, IT WAS.
24 | Q     IN THAT CLOSET, WAS THERE ANOTHER BLACK CANVAS
25 | HANDBAG FOUND?
26 | A     YES, THERE WAS.
27 | Q     WAS THERE A MAGAZINE AND AMMUNITION IN THERE?
28 | A     THAT'S CORRECT.
```

74

1  Q     WAS THERE A FIVE GALLON WHITE KRISPY KREME BUCKET

2  FOUND AS WELL?

3  A     YES, THERE WAS.

4  Q     WHAT WAS FOUND INSIDE THAT BUCKET?

5  A     MISCELLANEOUS GUN PARTS.

6  Q     WAS THERE ANOTHER KIND OF ASSAULT WEAPON ALSO FOUND

7  IN THE BEDROOM CLOSET?

8  A     YES, THERE WAS.

9  Q     WHAT WAS THAT?

10  A     IT WAS A COBRE.  I DON'T REMEMBER THE EXACT MODEL,

11  BUT IT'S AN ASSAULT WEAPON FOUND INSIDE A SILVER CASE

12  WITH AN EMPTY CLIP OR MAGAZINE.

13  Q     WHAT IS IT -- LIKE WHAT'S THE DIFFERENCE BETWEEN,

14  SAY, AN ASSAULT WEAPON AND THE KINDS OF HANDGUNS THAT YOU

15  HAVE DESCRIBED?

16  A     IT'S CAPABLE OF THE CAPACITY OF AMMUNITION, IT

17  COULD HANDLE LIKE A LARGE MAGAZINE LIKE THAT ONE.  I

18  BELIEVE IT COULD CONTAIN 30 LIVE ROUNDS.

19  Q     DID YOU ALSO CONDUCT A SEARCH ON MARCH 30, 2008, IN

20  THE MORNING?  DID YOU SEARCH A CAR?

21  A     YES, I DID.

22  Q     WHAT WAS THE KIND OF CAR THAT YOU SEARCHED ON MARCH

23  30, 2008?

24  A     A CADILLAC CATERA.

25  Q     IS THAT THE CAR THAT LUCIO ESTRADA WAS ARRESTED IN

26  THE PREVIOUS DAY?

27  A     I WASN'T THERE FOR THAT, BUT THAT'S WHAT I WAS

28  INFORMED, YES.

75

```
 1    Q      BY OTHER OFFICERS?
 2    A      THAT'S CORRECT.
 3    Q      DID YOU FIND ANY CELL PHONES IN THAT SILVER
 4    CADILLAC?
 5    A      I DID.  I FOUND TWO.
 6    Q      WHERE DID YOU FIND THEM?
 7    A      ONE WAS -- WAS UNDERNEATH THE DRIVER'S SEAT ON THE
 8    VEHICLE.  THE OTHER ONE WAS IN BETWEEN THE DRIVER'S SEAT
 9    AND THE CENTER CONSOLE AREA.
10    Q      DID YOU ALSO FIND ANY INDICIA IN THAT CAR THAT
11    INDICATED WHO THE CAR BELONGED TO?
12    A      YES.  THERE WAS PAPER OF INDICIA TO LUCIO ESTRADA,
13    I BELIEVE IN THE GLOVE COMPARTMENT.
14    Q      WAS THAT AN INSURANCE NOTICE?
15    A      I BELIEVE SO, YES.
16    Q      WAS THERE ALSO A CASSETTE COVER THAT YOU FOUND IN
17    THE GLOVE BOX AS WELL?
18    A      YES, THERE WAS.
19    Q      WHAT WAS DEPICTED?  DID YOU KNOW WHAT WAS DEPICTED
20    ON THAT CASSETTE COVER?
21    A      I BELIEVE IT WAS AN INDIVIDUAL HOLDING LIKE A
22    FIREARM.
23    Q      I WANT TO SHOW YOU A COUPLE OF PHONES IN JUST A
24    SEC, HERE.  I'D LIKE TO MARK AS PEOPLE'S 61, A BROWN
25    ENVELOPE CONTAINING A PHONE.  AND PEOPLE'S 62, A PAPER
26    BAG CONTAINING A PHONE.
27             (WHEREUPON, PEOPLE'S EXHIBITS NUMBERS 61 AND
28    62 WERE MARKED FOR IDENTIFICATION.)
```

76

1   Q   (BY MR. ROSEN)  OFFICER WHITFIELD, SHOWING YOU WHAT

2  WE HAVE MARKED AS PEOPLE'S 61, COULD YOU TAKE A LOOK AT

3  THAT ITEM AND TELL US IF YOU RECOGNIZE THAT AS ONE OF THE

4  PHONES YOU FOUND?

5  A   YES, I DO.  I BELIEVE THIS IS THE PHONE THAT WAS IN

6  BETWEEN THE DRIVER'S SEAT AND THE CENTER CONSOLE.

7  Q   WHY DON'T YOU PUT THAT BACK IN THE BAG.  THANK YOU.

8       SHOWING YOU WHAT WE HAVE MARKED AS PEOPLE'S 62,

9  COULD YOU TAKE A LOOK AT THAT ITEM AND THE PHONE INSIDE

10  AND TELL US IF YOU RECOGNIZE THAT AS WELL.

11  A   YES, I BELIEVE IT IS -- THIS IS THE ONE THAT WAS

12  FOUND UNDERNEATH THE DRIVER'S SEAT.

13  Q   GREAT.  THANK YOU, VERY MUCH, OFFICER WHITFIELD.

14       MR. ROSEN:  I DON'T HAVE ANY FURTHER QUESTIONS

15  AT THIS TIME.

16       THE COURT:  MR. PEREZ.

17       MR. PEREZ:  THANK YOU.

18          CROSS EXAMINATION

19  Q   (BY MR. PEREZ)  GOOD MORNING.

20  A   GOOD MORNING.

21  Q   YOU SAY YOU'RE A CALIFORNIA HIGHWAY PATROLMAN?

22  A   THAT IS CORRECT.

23  Q   HOW LONG HAVE YOU BEEN A CALIFORNIA HIGHWAY

24  PATROLMAN?

25  A   THIRTEEN AND-A-HALF YEARS.

26  Q   AND YOU GOT SELECTED TO PARTICIPATE -- TO BE A

27  MEMBER OF THIS SANTA CLARA -- WELL, THIS SCCSET UNIT?

28  A   THAT IS CORRECT.

77

```
1    Q     HOW LONG HAVE YOU BEEN IN THAT UNIT?
2    A     APPROXIMATELY TWO AND-A-HALF YEARS.
3    Q     OKAY.  NOT BEING FROM THIS AREA, IS LOS GATOS PART
4    OF SANTA CLARA COUNTY?
5    A     YES.
6    Q     THE CITY OF LOS GATOS, DOES IT BELONG TO THE COUNTY
7    OF SANTA CLARA?
8    A     YES, IT DOES.
9    Q     NOW, YOU ARE -- YOU SAID THAT YOU HAVE BEEN A
10   MEMBER OF THIS SPECIAL TASK FOR THE LAST SIX MONTHS,
11   CORRECT?
12   A     APPROXIMATELY TWO AND-A-HALF YEARS.
13   Q     I'M SORRY, TWO AND-A-HALF YEARS.  AND SO THOSE TWO
14   AND-A-HALF YEARS YOU HAVE NOT BEEN EXECUTING YOUR DUTIES
15   AS A CALIFORNIA HIGHWAY PATROLMAN AT ALL?
16   A     I DIDN'T SAY THAT.
17         THERE ARE TIMES THAT I STILL RECEIVE CALLS TO ASSIST
18   THE HIGHWAY PATROL WITH CERTAIN CASES.
19   Q     OKAY.  AND IN THIS SPECIAL UNIT, YOU ARE INVOLVED
20   IN, BASICALLY NARCOTICS, I.D. CASES, THINGS LIKE THAT?
21   A     TO THAT NATURE, YES.
22   Q     IS THIS YOUR FIRST INVOLVEMENT IN A MURDER CASE
23   SINCE YOU HAVE BEEN A MEMBER OF THIS UNIT?
24   A     I'VE WORKED SEVERAL MANSLAUGHTER CASES MYSELF.
25   Q     AS A CALIFORNIA HIGHWAY PATROLMAN, WOULD IT BE FAIR
26   TO SAY THAT YOU -- YOU DON'T EXECUTE SEARCH WARRANTS ON
27   TOO MANY OCCASIONS, CORRECT?
28   A     PRIOR TO WORKING ON THIS TEAM, I WAS A DETECTIVE
```

78

```
 1   BASICALLY OF THE HIGHWAY PATROL, SO I HAVE WORKED ON
 2   SEVERAL SEARCH WARRANTS.
 3   Q     HOW LONG WERE YOU A -- HAVE THE TITLE OF DETECTIVE
 4   OF THE CALIFORNIA HIGHWAY PATROL?
 5   A     APPROXIMATELY THREE YEARS.
 6   Q     OKAY.
 7             MR. PEREZ:  NOTHING FURTHER.
 8             THE COURT:  MR. GILLAN.
 9             MR. GILLAN:  THANK YOU.
10                    CROSS EXAMINATION
11   Q     (BY MR. GILLAN)  ON MARCH 29, 2008, YOU ENTERED THE
12   1725 GRISMER RESIDENCE AT ABOUT 10:30 P.M.
13   A     THAT'S CORRECT.
14   Q     AND THE HOME HAD BEEN SECURED BY OTHER OFFICERS
15   SINCE ABOUT 6:00 P.M. THAT EVENING; IS THAT RIGHT?
16   A     THAT IS CORRECT.
17   Q     AND IT WAS PART OF YOUR UNIT -- THE HOUSE WAS
18   SECURED, AS I UNDERSTAND IT, AND THEN YOUR UNIT GOT THE
19   SEARCH WARRANT; IS THAT ACCURATE?
20   A     THE HOUSE WAS SECURED AND THEY WAITED FOR OUR UNIT
21   TO RESPOND TO BASICALLY DO THE FINDING AND COLLECTING.
22   Q     OKAY.  SO IT'S YOUR UNDERSTANDING THAT NOTHING WAS
23   DISTURBED UNTIL YOUR UNIT ARRIVED?
24   A     THAT IS CORRECT.
25   Q     WHEN YOU ARRIVED, WAS IT YOUR DUTY TO CATALOGUE THE
26   ITEMS OR TO ACTUALLY FIND THE ITEMS?
27   A     WHEN YOU SAY CATALOGUE, DO YOU MEAN LIKE JOT THEM
28   DOWN, DOCUMENT THEM?
```

1   Q      YEAH, DOCUMENT THEM.  OR WAS IT YOUR DUTY TO FIND

2   THEM?

3   A      IT WAS MY DUTY FOR BOTH.

4   Q      DID YOU DO BOTH?

5   A      THAT IS CORRECT.

6   Q      DID YOU PHOTOGRAPH THE ITEMS?

7   A      YES, I DID.

8   Q      AND HOW MANY PEOPLE WERE IN THE UNIT?

9   A      FROM MY TEAM, THERE WAS MY COMMANDER AND ANOTHER

10  AGENT.  AND THEN THERE WERE SEVERAL OFFICERS FROM THE

11  BURBANK POLICE DEPARTMENT.

12  Q      AND BURBAK WASN'T INVOLVED IN SEARCHING THE

13  RESIDENCE?

14  A      UM, THEY DIDN'T ACTUALLY DO ANY SEARCHING, THEY

15  JUST KIND OF -- WE DIDN'T KNOW IF PEOPLE WERE GOING TO

16  ARRIVE AT THE RESIDENCE, SO THEY JUST KIND OF, YOU KNOW,

17  HELPED US WITH BASICALLY SECUREMENT OF THE RESIDENCE.

18  Q      WERE THERE ANY CIVILIANS OR OCCUPANTS OF THAT

19  RESIDENCE PRESENT WHILE THE SEARCH WAS BEING CONDUCTED?

20  A      I DON'T BELIEVE SO, NO.

21  Q      AND DURING THE SEARCH, DID YOU -- DO YOU RECALL ANY

22  PHONES GOING OFF IN THE HOUSE?

23  A      I DON'T RECALL, TO BE HONEST WITH YOU.

24  Q      WHEN YOU RECOVERD THE TWO CELL PHONES, WERE THEY IN

25  AN ON POSITION OR WERE THEY TURNED OFF?

26  A      THE CELL PHONES WERE THE NEXT DAY, SO THEY WERE IN

27  THE VEHICLE.  I BELIEVE THEY WERE TURNED OFF.

28  Q      OKAY.

80

```
 1              MR. GILLAN:  I GUESS THAT'S ALL I HAVE.
 2              THE COURT:  MR. ROBERTSON.
 3                     CROSS EXAMINATION
 4    Q    (BY MR. ROBERTSON)  WHERE WAS THE BASEBALL CAP
 5   BETWEEN MARCH 29 AND APRIL 2?
 6    A    THE BASEBALL CAP THAT I FOUND AT THE RESIDENCE?
 7    Q    YES.  THAT'S THE ONLY BASEBALL CAP YOU FOUND,
 8   RIGHT?
 9    A    THAT'S CORRECT.
10    Q    WHERE WAS IT?
11    A    HANGING ON THE BACK SIDE OF THE BEDROOM DOOR.
12    Q    FOR THREE DAYS?
13         I'M ASKING WHERE WAS IT BETWEEN MARCH 29 AND APRIL
14   2.
15    A    UM, IT WAS -- ONCE WE COLLECTED IT, I BELIEVE THAT
16   NEXT DAY WE FLEW BACK AND IT WAS AT OUR OFFICE.
17    Q    WHEN YOU COLLECTED IT, WHAT DID YOU DO WITH IT?
18         BY COLLECTION, I MEAN -- LET ME GO BACK.  WHEN YOU
19   WENT TO THAT RESIDENCE IT WAS FOR THE SPECIFIC PURPOSE OF
20   LOCATING WHATEVER FORMS OF EVIDENCE YOU COULD FIND
21   RELATING TO THE HOMICIDE OF MARK ACHILLI, CORRECT?
22    A    BASICALLY THE ITEMS LISTED VISIBLE UNDER THE SEARCH
23   WARRANT.
24    Q    AND YOU UNDERSTOOD THAT THOSE WERE RELATED TO THE
25   DEATH OF MARK ACHILLI?
26    A    COULD BE, YES.
27    Q    THAT WAS YOUR PURPOSE, WAS IT NOT, TO TRY AND
28   GATHER EVIDENCE THAT MIGHT BE RELEVANT IN THE CASE?
```

81

1   A     THAT WAS MY PURPOSE, YES.

2   Q     AND BY THE TIME THAT YOU WENT DOWN THERE, HAD YOU

3   HEARD THE NAME OF PAUL GARCIA?

4   A     I'M SURE I HAD.  I DON'T RECALL EXACTLY WHEN I

5   HEARD THE NAME OF PAUL GARCIA.

6   Q     NOW, WHEN YOU WENT TO THAT RESIDENCE AND YOU WENT

7   IN THE FRONT DOOR, WAS THERE SOMEBODY IN CHARGE?

8   A     THERE WAS.

9   Q     WHO WAS THAT?

10   A     I BELIEVE IT WAS OFFICER STOHL FROM THE BURBANK

11   POLICE DEPARTMENT.

12   Q     ALL RIGHT.  NOW, DID OFFICER STOHL DIRECT YOU WHERE

13   TO SEARCH AND WHAT ITEMS TO PICK UP?

14   A     NO, HE DID NOT.

15   Q     OKAY.  WHO MADE THE DECISION WHERE THE SEARCH WAS

16   TO BE CONDUCTED WITHIN THE RESIDENCE?

17   A     MY COMMANDER WAS IN CHARGE, IF THAT'S WHAT YOU'RE

18   ASKING.

19   Q     IT'S NOT THE QUESTION I ASKED, BUT I ASKED WHO MADE

20   THE DECISION AS TO WHAT AREAS WITHIN THE RESIDENCE WOULD

21   BE SEARCHED.

22   A     THE SEARCH WARRANT WAS FOR ALL AREAS OF THE

23   RESIDENCE.

24   Q     HOW MANY OFFICERS WERE ACTIVELY INVOLVED IN THE

25   SEARCH?

26   A     THREE.  TWO OFFICERS AND MY COMMANDER.

27   Q     WHO WERE THE OFFICERS DIRECTLY INVOLVED IN THE

28   SEARCH?

82

1    A    MYSELF, AGENT RIMPLE AND COMMANDER MECIR.

2    Q    OKAY.  WHO FOUND THE BLACK BASEBALL CAP THAT WAS

3    IDENTIFIED HERE IN COURT?

4    A    I COLLECTED IT.

5    Q    WHAT DID YOU DO WITH IT BETWEEN MARCH 29 AND APRIL

6    2?

7    A    THE SAME THING WITH THE REST OF THE EVIDENCE.  IT

8    WAS GATHERED, COLLECTED, AND THE NEXT DAY IT WAS BROUGHT

9    BACK TO OUR OFFICE.

10   Q    WHEN YOU COLLECTED IT, HOW DID YOU COLLECT IT?

11   A    UM, I PUT IT IN A BAG OR ONE OF THE BAGS THAT WE

12   HAD.

13   Q    DO YOU REMEMBER WHAT YOU DID WITH IT?

14   A    SPECIFICALLY WHAT TYPE OF CONTAINER I PUT IT IN?

15   Q    YES.

16   A    NO, I DO NOT.

17   Q    DO YOU REMEMBER WHETHER IT WAS PUT IN WITH OTHER

18   ITEMS OF EVIDENCE, LUMPED ALL IN ONE BAG?

19   A    I DON'T REMEMBER, TO BE EXACT.

20        MR. ROBERTSON:  MAY I APPROACH, YOUR HONOR?

21        THE COURT:  YOU MAY.

22   Q    (BY MR. ROBERTSON)  WELL, I'D LIKE TO SHOW YOU A

23   PAPER BAG AND ASK YOU TO TAKE A LOOK AT THAT PAPER BAG.

24   DO YOU RECOGNIZE THAT BAG?

25   A    UM, NOT SPECIFICALLY, NO.

26   Q    DO YOU RECOGNIZE ANY OF THE HANDWRITING ON THE

27   BAG?

28   A    NO, I DO NOT.

```
 1   Q      HOW DO YOU KNOW THAT'S THE SAME HAT THAT YOU PICKED
 2   UP FROM GRISMER?
 3   A      IT RESEMBLES THE SAME HAT.  IT'S SEVEN AND A
 4   QUARTER.  I LOOKED AT THE SIZE.  IT'S THE SAME COLOR AND
 5   SAME MARKINGS ON THE FRONT.
 6   Q      HOW MANY BLACK HATS THAT ARE SEVEN AND A QUARTER
 7   WITH LA IN BLACK ON THE FRONT EXIST IN THE STATE OF
 8   CALIFORNIA?
 9              MR. ROSEN:  OBJECTION, RELEVANCE.
10              THE COURT:  SUSTAINED.
11   Q      (BY MR. ROBERTSON)  NOW, WHAT'S THE DATE ON THAT
12   ENVELOPE, THE BAG IN FRONT OF YOU?
13   A      THE THREE LABELS, WHICH ONE ARE YOU REFERRING TO?
14   Q      THE EARLIEST IN TIME.
15   A      DECEMBER 4, 2008.
16   Q      AND THE OLDEST IN TIME?
17   A      APRIL 2, 2008.
18   Q      OKAY.  IS THERE ANY CHAIN OF EVIDENCE ATTACHED TO
19   THAT, ANYTHING TO INDICATE WHERE IT WAS FROM MARCH 29 TO
20   APRIL 2?
21   A      NOT SPECIFICALLY, NO.
22   Q      WHEN YOU WERE AT THE RESIDENCE AND YOU FOUND THE
23   VARIOUS ITEMS WE HAVE TALKED ABOUT, LET'S START WITH THE
24   CAP, WHAT DID YOU DO WITH IT?
25   A      IT WAS GATHERED, COLLECTED AND THEN --
26   Q      YOU GATHERED THIS?  YOU GATHERED THE HAT
27   YOURSELF?
28   A      YES.  ALL THE ITEMS FROM THE HOUSE WERE GATHERED BY
```

```
 1   ME AND COLLECTED BY ME.
 2   Q      AT THE TIME THAT YOU GATHERED THEM, YOU HAVE BEEN
 3   TRAINED IN HOW TO HANDLE ITEMS OF EVIDENCE, CORRECT?
 4   A      THAT'S CORRECT.
 5   Q      AND WHEN YOU GATHER AN ITEM OF EVIDENCE, IT'S
 6   SUPPOSED TO BE TAKEN IN, IDENTIFIED AND LOGGED,
 7   CORRECT --
 8   A      THAT IS CORRECT.
 9   Q      -- AT THE MOMENT THAT IT'S LOGGED, SO THAT WHEN YOU
10   TAKE IT IN THERE'S SOME PHYSICAL ACTIVITY YOU ENGAGE IN
11   TO IDENTIFY THAT AND KEEP A RECORD?
12   A      IT WAS THE ONLY BLACK HAT THAT WAS MATCHING THAT,
13   SO I WASN'T WORRIED ABOUT MIXING IT UP WITH ANY OTHER
14   HATS FROM THE RESIDENCE.
15           MR. ROBERTSON:  OBJECTION, MOTION TO STRIKE.
16   NONRESPONSIVE.
17           THE COURT:  I'LL SUSTAIN THE OBJECTION.
18           MR. ROBERTSON:  CAN WE HAVE THE QUESTION
19   REREAD, YOUR HONOR.
20           (RECORD READ BY THE REPORTER.)
21           THE WITNESS:  THAT IS CORRECT.
22   Q      (BY MR. ROBERTSON)  WHAT DID YOU DO?
23   A      I JOT DOWN ON A DOCUMENT OF WHAT THE ITEM IS.
24   Q      OKAY.  NOW, EARLIER TODAY WHEN YOU WERE BEING
25   EXAMINED BY THE OTHER ATTORNEYS, INCLUDING MR. ROSEN, YOU
26   REFERRED TO YOUR POLICE REPORT.  IN FACT, YOU SAID YOU
27   HAD TO FOR CERTAIN INFORMATION.  DO YOU STILL HAVE THAT
28   IN FRONT OF YOU?
```

85

1    A      YES, I DO.

2    Q      WHAT DOCUMENTS DID YOU REFER TO BEFORE YOU CAME TO

3    COURT IN PREPARATION FOR TESTIMONY?

4    A      MY POLICE REPORT, PHOTOGRAPHS.

5    Q      DO YOU HAVE THOSE IN FRONT OF YOU?

6    A      I DO.

7           MR. ROBERTSON:  MAY I APPROACH, YOUR HONOR.

8           THE COURT:  YOU MAY.

9    Q      (BY MR. ROBERTSON)  COULD I SEE WHAT YOU'RE LOOKING

10   AT, PLEASE.

11          WHICH PHOTOGRAPH DID YOU LOOK AT?

12   A      I HAVEN'T LOOKED AT ANY PHOTOGRAPHS, BUT I HAVE

13   QUITE A FEW HERE.

14   Q      I APOLOGIZE.  PERHAPS I MISHEARD.

15          WHEN I ASKED YOU WHAT YOU REFERRED TO, WHAT YOU

16   LOOKED AT IN PREPARATION FOR YOUR TESTIMONY, I THOUGHT

17   YOU SAID PHOTOGRAPHS.

18   A      PRIOR TO MY TESTIMONY TODAY?

19   Q      YES.  WHAT DID YOU -- BEFORE YOU CAME TO COURT, YOU

20   TOOK STEPS TO BE ABLE TO PREPARE TO TESTIFY, CORRECT?

21   A      THAT IS CORRECT.

22   Q      AND YOU LOOKED AT CERTAIN THINGS TO HELP REFRESH

23   YOUR MEMORY, CORRECT?

24   A      THAT IS CORRECT.

25   Q      AND THOSE INCLUDED YOUR POLICE REPORT AND

26   PHOTOGRAPHS, CORRECT?

27   A      THAT IS CORRECT.

28   Q      DO YOU HAVE THE PHOTOGRAPHS WITH YOU?

1    A      YES, I DO.

2    Q      MAY I SEE THEM, PLEASE.   THANK YOU.

3           IN THE COURSE AND SCOPE OF YOUR DUTIES, I NOTE ON

4    YOUR POLICE REPORT THERE IS AN I.D. NUMBER.   DO YOU USE

5    THE I.D. NUMBER -- DO YOU USE THE I.D. NUMBER 63?

6    A      THAT'S ASSIGNED WHEN I WRITE A REPORT, YES.

7    Q      DO YOU HAVE A HIGHWAY PATROL STAR NUMBER?

8    A      YES, I DO.

9    Q      WHAT IS THAT?

10   A      14313.

11   Q      AND YOU SAID THAT YOU HAVE BEEN INVOLVED -- I'M

12   SORRY.

13          COUNSEL ASKED YOU IF THIS WAS A FIRST MURDER CASE

14   AND YOU RESPONDED YOU HAVE BEEN INVOLVED IN SOME

15   MANSLAUGHTERS.   WERE YOU REFERRING TO THE TYPICAL KINDS

16   OF VEHICULAR HOMICIDE MANSLAUGHTER THAT A HIGHWAY PATROL

17   OFFICER MIGHT OFTEN FIND HIMSELF HAVING TO BE DEALING

18   WITH?

19   A      THEY'RE ALSO APPREHENDING THE SUSPECTS ON

20   INVESTIGATIONS, WHERE WE HAVE TO LOOK FOR THE SUSPECTS

21   AND FIND THE SUSPECTS, STUFF LIKE THAT.   SO NOT JUST

22   SOMETHING WHERE YOU GO TO A SCENE AND THERE'S A

23   MANSLAUGHTER CASE.

24   Q      WERE YOU INVOLVED IN WITH SCCSET IN AN ARREST AT

25   THE COURTYARD BY MARRIOTT?

26                MR. ROSEN:   OBJECTION, RELEVANCE.

27                THE COURT:   MR. ROBERTSON.

28                MR. ROBERTSON:   IT'S BACKGROUND AND

1   EXPERIENCE.  THE ANSWER IS SIMPLY A YES OR NO.

2           MR. ROSEN:  I BELIEVE IT'S SOME OTHER

3   INVESTIGATION THAT HE'S TALKING ABOUT THAT'S UNRELATED TO

4   THIS CASE.

5           THE COURT:  OBJECTION SUSTAINED.

6   Q   (BY MR. ROBERTSON)  DID YOU FIND INDICIA TO ANYONE

7   ELSE AT THE RESIDENCE?

8   A   YES, I DID.

9   Q   WHO DID YOU FIND INDICIA TO?

10  A   TO A MALE AND A FEMALE.

11  Q   AND IS THAT -- WOULD YOU SPELL THAT FOR THE RECORD,

12  PLEASE.

13  A   CAN I REFER TO MY REPORT FOR THAT?  CAN I REFER TO

14  MY REPORT FOR THAT?

15  Q   ABSOLUTELY.  I'M SORRY, YOU DON'T NEED TO ASK ME

16  FOR PERMISSION.  YOU CAN LOOK AT WHATEVER YOU NEED TO TO

17  REFRESH YOUR RECOLLECTION.

18  A   MANNUEL ESTRADA, M-A-N-U-E-L.  LAST OF

19  E-S-T-R-A-D-A.  AND FRANCISCA GONZALEZ, F-R-A-N-C-I-S-C-A

20  G-O-N-Z-A-L-E-Z.

21  Q   I NOTICE IN SOME OF THE PHOTOGRAPHS THERE WERE

22  PICTURES OF WHAT APPEARED TO BE PILL BOTTLES, THAT KIND

23  OF THING.  DO YOU REMEMBER SEEING THOSE THERE?

24  A   YES, I REMEMBER SEEING A PHOTOGRAPH LIKE THAT.

25  Q   DO YOU KNOW -- DO YOU REMEMBER SEEING THE PILL

26  BOTTLES?

27  A   YES.

28  Q   DO YOU KNOW WHICH NAME WAS ASSOCIATED WITH THOSE?

1  A    I DON'T RECALL.

2  Q    WHEN WE ARE TALKING ABOUT AN ASSAULT WEAPON, BY

3  DEFINITION AN ASSAULT WEAPON IS A SPECIALIZED TYPE OF --

4  USUALLY A LONG RIFLE THAT HAS TO HAVE FOUR OR FIVE

5  INDICIA TO QUALIFY AS AN ASSAULT RIFLE, CORRECT?

6  A    UM, IN MY OPINION, NOT NECESSARILY SO.

7  Q    DO YOU KNOW WHAT THE LAW SAYS ABOUT WHAT AN ASSAULT

8  RIFLE IS OR IS NOT?

9          MR. ROSEN:  OBJECTION, RELEVANCE.

10         MR. ROBERTSON:  I THINK IT'S ABSOLUTELY

11 RELEVANT WHEN HE'S TESTIFYING AND CHARACTERIZING A

12 WEAPON.

13         THE COURT:  I'LL ALLOW IT.  OVERRULED.

14         THE WITNESS:  WHAT IS THE QUESTION?

15 Q    (BY MR. ROBERTSON)  DO YOU KNOW WHAT THE STATUTORY

16 REQUIREMENTS ARE FOR A WEAPON TO QUALIFY AS AN ASSAULT

17 RIFLE?

18 A    UM, NOT SPECIFICALLY, NO.

19 Q    REALLY.  DO YOU KNOW WHETHER OR NOT IT HAS TO HAVE

20 A PISTOL GRIP?

21 A    I DON'T RECALL.

22 Q    FLASH SUPPRESSOR?  DO YOU KNOW WHAT A FLASH

23 SUPPRESSOR IS?

24 A    YES, I DO.

25 Q    OFFICER, YOU SEIZED SOMETHING IDENTIFIED AS A

26 SILVER METAL BOTTLE OPENER WITH A PHOTO AND THE NAME

27 MALVERDE LOCATED ON THE KEY CHAIN; CORRECT?

28 A    THAT IS CORRECT.

```
 1   Q      DO YOU HAVE THAT WITH YOU HERE TODAY?

 2   A      I'M NOT SURE IF WE DO OR NOT.

 3   Q      IS THERE A PICTURE OF IT IN THE PHOTOGRAPHS THAT

 4   YOU BROUGHT WITH YOU?

 5   A      I HAVE TO REFER TO MY PHOTOGRAPHS.

 6              THE COURT:  AT THIS POINT, WE WILL GO AHEAD --

 7   YOU CAN LOOK FOR THAT OVER THE LUNCH HOUR.  WE WILL BE IN

 8   RECESS UNTIL 1:30.  TAKE OUR LUNCH BREAK AT THIS POINT.

 9         (LUNCH RECESS TAKEN.)

10              THE COURT:  ALL THE DEFENDANTS ARE PRESENT.

11   ALL COUNSEL ARE PRESENT.  THE WITNESS IS BACK ON THE

12   STAND.

13         MR. ROBERTSON, GO AHEAD.

14              MR. ROBERTSON:  FIRST ITEM, YOUR HONOR, I TOLD

15   MR. ROSEN AS SOON AS I GOT BACK, WE MAY HAVE SOME OF THE

16   PHOTOS THAT WE DIDN'T RECOGNIZE WHAT THEY WERE WHEN THEY

17   CAME IN.  THEY WEREN'T CLASSIFIED BY US AS SUCH, SO I DID

18   LOOK AT THAT.  IT WOULDN'T EFFECT ANYTHING TODAY.  BUT I

19   DID WANT TO ACKNOWLEDGE THAT THERE IS THE POSSIBILITY WE

20   DO HAVE SOME OF THOSE THAT I DIDN'T THINK WE HAVE.

21              THE COURT:  OKAY.

22              MR. ROBERTSON:  AND I DON'T HAVE -- ACTUALLY

23   WE RESOLVED ONE ISSUE ABOUT THE PICTURES.

24   Q      (BY MR. ROBERTSON)  YOU DON'T HAVE THAT PHOTOGRAPH,

25   CORRECT?

26   A      NO, I DON'T.

27   Q      WHEN YOU DID COME BACK WITH THE EVIDENCE -- AND YOU

28   FLEW BACK TO SAN JOSE?
```

1   A      DROVE BACK.

2   Q      DROVE BACK.

3           MR. ROBERTSON:   NOTHING FURTHER.

4           THE COURT:   ALL RIGHT.   ANY REDIRECT?

5           MR. ROSEN:   YES.   BRIEFLY.

6                   REDIRECT EXAMINATION

7   Q      (BY MR. ROSEN)   I'M GOING TO SHOW OFFICER WHITFIELD

8   WHAT I'VE MARKED AS PEOPLE'S EXHIBIT 63.   CAN YOU SEE

9   FROM WHERE YOU ARE?

10  A      YES, I CAN.

11  Q      OKAY.   DO YOU RECOGNIZE THAT?

12  A      YES, I DO.

13  Q      WHAT IS THAT?

14  A      THE -- DEPICTED AS THE HAT THAT WAS ON THE BACK OF

15  THE DOOR INSIDE THE RESIDENCE.

16  Q      IS THAT HOW THE HAT LOOKED ON THE DOOR OF THE

17  RESIDENCE ON MARCH 29, 2008?

18  A      YES, IT IS.

19           MR. ROSEN:   THANK YOU.   I DON'T HAVE ANY

20  FURTHER QUESTIONS.

21           THE COURT:   MR. PEREZ, ANY FOLLOW-UP?

22           MR. PEREZ:   YES.

23                   RECROSS EXAMINATION

24  Q      (BY MR. PEREZ)   OFFICER, THAT PHOTO THAT WAS JUST

25  SHOWN TO YOU, IT SHOWED A BLUE-ISH KIND OF A COLOR.   IS

26  THE HAT BLUE OR BLACK THAT YOU FOUND?   THE ONE THAT YOU

27  FOUND?

28  A      CLOSER TO BLACK, I WOULD SAY.   COULD BE A DARK

1  BLUE.

2          MR. PEREZ:  NOTHING FURTHER.

3          THE COURT:  MR. GILLAN?

4          MR. GILLAN:  NO QUESTIONS.

5          THE COURT:  OKAY.  ALL RIGHT.  YOU CAN STEP

6  DOWN.

7          MR. ROSEN:  WE WILL CALL OUR NEXT WITNESS,

8  YOUR HONOR.

9      YOUR HONOR, AT THIS TIME THE PEOPLE CALL LAURIE

10  BABULA TO THE WITNESS STAND

11          THE COURT:  ALL RIGHT.  PLEASE STEP UP HERE,

12  PLEASE.

13                  LAURIE BABULA,

14  HAVING BEEN CALLED AS A WITNESS ON BEHALF OF THE PEOPLE,

15  BEING FIRST DULY SWORN TO TELL THE TRUTH, TESTIFIED AS

16  FOLLOWS:

17          THE COURT:  HAVE A SEAT, PLEASE.  IF YOU COULD

18  SCOOT THAT CHAIR OVER TOWARD THE MICROPHONE.

19          THE WITNESS:  OKAY.  CAN YOU HEAR ME?

20          THE COURT:  YES. IF YOU COULD PLEASE STATE

21  YOUR FULL NAME AND SPELL YOUR FULL NAME.

22          THE WITNESS:  LAURIE ANNE BABULA.  L-A-U-R-I-E

23  A-N-N-E B-A-B-U-L-A.

24          THE COURT:  OKAY.  GO AHEAD.

25                  DIRECT EXAMINATION

26  Q    (BY MR. ROSEN)  GOOD AFTERNOON, MA'AM.

27  A    HI.

28  Q    ARE YOU CURRENTLY WORKING?

```
 1    A    YES.

 2    Q    WHAT DO YOU DO FOR A LIVING?

 3    A    I'M A SELF-EMPLOYED REAL ESTATE BROKER.

 4    Q    FOR HOW LONG HAVE YOU BEEN DOING THAT?

 5    A    I'VE BEEN LICENSED SINCE 1991.

 6    Q    AND YOU HAVE BEEN WORKING AS A REAL ESTATE BROKER

 7    PRETTY MUCH SINCE 1991?

 8    A    ON AND OFF.

 9    Q    WHERE DO YOU CURRENTLY LIVE?

10    A    I LIVE IN LOS GATOS.

11    Q    DO YOU LIVE AT 18400 OVERLOOK ROAD?

12    A    I DO NOT LIVE THERE NOW.

13    Q    WERE YOU LIVING THERE ON MARCH 14, 2008?

14    A    YES.

15    Q    ON MARCH 14, 2008, WERE YOU LIVING IN UNIT OR

16    RESIDENCE NUMBER 8 OF 18400 OVERLOOK ROAD?

17    A    CORRECT.

18    Q    COULD YOU DESCRIBE HOW MANY FLOORS RESIDENCE NUMBER

19    8 HAD?

20    A    TWO.

21    Q    HOW MANY BEDROOMS DID IT HAVE?

22    A    THREE BEDROOMS.

23    Q    HAVE YOU HAD A CHANCE TO REVIEW SOME STATEMENTS

24    THAT YOU MADE TO THE POLICE ON MARCH 14, 2008, OR WITHIN

25    A FEW WEEKS AFTER, BEFORE COMING TO COURT TODAY?

26    A    YES.

27    Q    DID REVIEWING THOSE REPORTS HELP TO REFRESH YOUR

28    MEMORY ABOUT SOME OF THE DETAILS OF WHAT YOU SAW?
```

A      YES.

Q      DO YOU HAVE A PRETTY GOOD RECOLLECTION OF WHAT YOU
SAW THAT MORNING?

A      YES.

Q      SO LET'S SAY MARCH 14, 2008, AT ABOUT 7:30 THAT
MORNING, WHAT WERE YOU DOING?

A      I WAS BLOW-DRYING MY HAIR UPSTAIRS.

Q      AS YOU WERE BLOW-DRYING YOUR HAIR UPSTAIRS, DID YOU
LOOK OUT YOUR WINDOW?

A      YES.

Q      WHEN YOU LOOKED OUT YOUR WINDOW, WHAT DID YOU
SEE?

A      I SAW A GENTLEMAN DOWN IN THE PARKING LOT RIGHT
BELOW ME.

Q      APPROXIMATELY HOW FAR WOULD YOU ESTIMATE YOU WERE
AWAY FROM THAT MAN?

A      HE WAS DIRECTLY BELOW ME, SO, I DON'T KNOW.
FIFTEEN, 20 FEET.

Q      IS THERE ANYTHING ABOUT HOW THIS MAN LOOKED THAT
STRUCK YOU AS ODD?

A      IT STRUCK ME AS ODD THAT THERE WOULD BE SOMEONE IN
THE PARKING LOT DRESSED AS HE WAS DRESSED.

Q      WE WILL TALK ABOUT THAT IN A MINUTE.

A      OKAY.  DRESSED IN HIS MANNER AND STANDING PRETTY
MUCH IN THE MIDDLE OF THE ROAD.

Q      HAD YOU EVER SEEN THIS MAN BEFORE?

A      NO.

Q      DID THE MAN APPEAR TO BE LOOKING FOR ANYTHING?

94

```
 1   A     HE APPEARED TO BE LOOKING OR GOING SOMEWHERE, BUT
 2   NOT IN A DETERMINED WAY.
 3   Q     WHAT DID YOU THEN DO?
 4   A     I CONTINUED BLOW-DRYING MY HAIR.
 5   Q     DID YOU SEE THE MAN WALK AWAY?
 6   A     NO.
 7   Q     AT SOME POINT DID YOU GO BACK AND LOOK OUT THE
 8   WINDOW AND THE MAN WASN'T THERE?
 9   A     I LEFT THE HOUSE RIGHT THERE, WALKED RIGHT OUT MY
10   DOOR IN THE SAME AREA, GOT IN MY CAR, GOT MY CHILDREN IN
11   THE CAR, AND HE WAS NOT THERE.
12   Q     SO THE PLACE THAT -- THE AREA WHERE YOU SAW THE MAN
13   STANDING OUTSIDE YOUR WINDOW IS AN AREA THAT YOU THEN
14   WALKED?
15   A     I CROSSED DIRECTLY OVER IT.
16   Q     AS YOU DROVE YOUR CHILDREN TO SCHOOL, DID YOU SEE
17   THE SAME MAN A LITTLE LATER THAT MORNING?
18   A     YES.
19   Q     ABOUT WHAT TIME WOULD YOU SAY?
20   A     I WOULD SAY NO LATER THAN 8:05-ISH.
21   Q     SO, A LITTLE MORE THAN A HALF HOUR AFTER YOU SAW
22   HIM IN THE PARKING LOT, YOU SEE HIM AGAIN, CORRECT?
23   A     CORRECT.
24   Q     WHERE DID YOU SEE HIM THE SECOND TIME?
25   A     I SAW HIM AT A CORNER WHERE THERE'S A STOP SIGN
26   THAT I TURN TO DO MY CARPOOL, CORNER OF HERNANDEZ.
27   THERE'S A GROUP HOME RIGHT THERE.  ELLENWOOD, I THINK.
28   Q     WHAT WAS THE MAN DOING WHEN YOU SAW HIM THIS
```

1  TIME?

2  A    HE WAS DRESSED THE SAME AND HE WAS LOOKING AT A

3  PIECE OF PAPER.  I THINK HE WAS LOOKING AT IT IN A

4  LANDSCAPE FASHION, THE LONG WAY.

5  Q    LIKE A MAP OR SOMETHING?

6  A    SOMETHING.  HE WAS DEFINITELY STUDYING SOMETHING.

7  AND THE LOOK ON HIS FACE, HE WOULD PROBABLY BE RIGHT

8  THERE AND WE'D -- AND I WAS TURNING LEFT, SO I WAS

9  TURNING INTO HIM.

10  Q    SO, HOW CLOSE WOULD YOU SAY YOU GOT TO HIM AS HE

11  WAS STANDING THERE AND LOOKING AT SOMETHING?

12  A    SO, I'M A LITTLE BIT BAD ON THAT.  I WOULD SAY FROM

13  HERE TO THAT WALL.

14  Q    SO --

15  A    THAT'S 15 -- I DON'T KNOW.  IS THAT 15 FEET, TEN

16  FEET.  I DON'T KNOW.

17  Q    I'D SAY --

18        MR. ROBERTSON:  FIFTEEN TO 18 FEET.

19        THE WITNESS:  I'D SAY 15, MAX.

20  Q    (BY MR. ROSEN)  OKAY.  THIS THING THAT THE MAN WAS

21  LOOKING AT, WAS IT SOME KIND OF PIECE OF PAPER?

22  A    YES.

23  Q    DID YOU SEE WHAT DIRECTION THE MAN STARTED WALKING

24  THEN?

25  A    I DID NOT SEE THE DIRECTION HE STARTED WALKING,

26  HOWEVER, MY INDICATION WAS THAT HE WAS GOING BACK WHERE I

27  HAD ORIGINALLY SEEN HIM.

28  Q    WHY DID YOU THINK THAT?

96

1   A    BECAUSE I HAD COME FROM THAT DIRECTION; THE BODY

2   WAS TILTED THAT DIRECTION, AND MY FIRST INCLINATION WAS

3   TO CALL MY HUSBAND AND SAY YOU SHOULD PROBABLY LOCK THE

4   DOOR.

5   Q    WHEN YOU SAY THE BODY WAS TILTED THAT DIRECTION,

6   YOU'RE TALKING ABOUT THE MAN THAT YOU SAW?

7   A    UP A HILL, YEAH.

8   Q    HIS BODY --

9   A    HIS BODY.

10  Q    -- WAS TILTED TOWARD THE DIRECTION OF WHERE YOU

11  LIVED?

12  A    CORRECT.

13  Q    OKAY.  THAT CONCERNED YOU?

14  A    IT WAS ODD.

15  Q    DID YOU RETURN TO THAT AREA, HERNANDEZ AND

16  ELLENWOOD, AROUND NINE O'CLOCK THAT MORNING?

17  A    YES.

18  Q    WAS THAT, LIKE, ON THE WAY BACK FROM DROPPING THE

19  KIDS OFF OR SOMETHING?

20  A    YES.

21  Q    WAS THE MAN THERE?

22  A    NO.

23  Q    COULD YOU DESCRIBE THE MAN?  FIRST QUESTION, WHITE,

24  ASIAN, HISPANIC, BLACK?

25  A    HISPANIC.

26  Q    APPROXIMATELY HOW OLD?

27  A    TWENTIES.

28  Q    WHAT KIND OF BUILD?

```
 1   A     VERY THIN.
 2   Q     WHAT COLOR WAS THE CLOTHING THAT THE MAN WAS
 3   WEARING?
 4   A     ALL BLACK.
 5   Q     DID THE MAN HAVE ANY KIND OF HAT ON?
 6   A     YES.
 7   Q     WHAT KIND OF HAT?
 8   A     BLACK BASEBALL CAP.
 9   Q     WHAT KIND OF -- DID THE MAN HAVE A JACKET ON?
10   A     KIND OF A FLEECE JACKET, BLACK.
11   Q     WAS THERE ANYTHING THAT THE MAN WAS CARRYING?
12   A     HE WAS CARRYING WHAT YOU CALL A MESSENGER BAG
13   STRAPPED TO THE SIDE.
14   Q     WHAT COLOR WAS THAT?
15   A     BLACK.
16   Q     I WANT TO SHOW YOU A COUPLE ITEMS THAT WE HAVE IN
17   COURT.  THE FIRST ITEM IS WHAT WE HAVE MARKED AS PEOPLE'S
18   31.  IT'S A BLACK HAT.  TAKING A LOOK -- CAN YOU SEE THAT
19   HAT?
20   A     YES.
21   Q     DOES THAT HAT LOOK LIKE THE HAT HE WAS WEARING, NOT
22   LOOK LIKE THE HAT HE WAS WEARING?  WHAT'S YOUR SENSE?
23   A     IT LOOKS SIMILAR TO THE HAT IN THAT IT'S ALL
24   BLACK.
25   Q     SHOWING YOU WHAT WE HAVE MARKED AS PEOPLE'S 34,
26   UNFORTUNATELY YOU CAN'T OPEN IT UP, BUT MY QUESTION TO
27   YOU IS, DOES THIS LOOK SIMILAR, NOT SIMILAR, OR CAN YOU
28   NOT TELL, TO THE JACKET THAT YOU SAW THE MAN WEARING?
```

98

1   A    IT LOOKS SIMILAR.  BLACK.

2   Q    BUT YOU CAN'T SAY FOR SURE THIS IS THE JACKET HE

3  WAS WEARING?

4   A    NO.

5   Q    AND THE SAME WITH THE HAT, THIS HAT LOOKS SIMILAR,

6  BUT YOU CAN'T SAY FOR SURE THIS IS THE HAT HE WAS

7  WEARING?

8   A    CORRECT.

9   Q    WERE YOU SHOWN SOME TIME IN MARCH -- PARDON ME.

10  WERE YOU SHOWN A COUPLE WEEKS LATER, ON APRIL 2, A PHOTO

11  LINEUP BY A POLICE OFFICER?

12   A    YES.

13   Q    WHEN YOU WERE SHOWN THE PHOTO LINEUP BY A POLICE

14  OFFICER, WAS THE IMAGE OF THIS MAN THAT YOU SAW

15  RELATIVELY FRESH IN YOUR MIND?

16   A    YES.

17   Q    WHEN YOU LOOKED AT THAT PHOTO LINEUP, IS WHAT YOU

18  SAID A TRUE REFLECTION OF WHAT YOUR OPINION WAS AT THE

19  TIME?

20   A    YES.

21   Q    OKAY.  I'D LIKE TO SHOW YOU WHAT WE HAVE MARKED

22  PEOPLE'S 64.  IT'S A SET OF DOCUMENTS.  IF YOU COULD JUST

23  KIND OF FLIP THROUGH IT A LITTLE BIT.

24   A    DO I NEED TO READ IT?  SHOULD I HAVE GLASSES ON?

25   Q    IT DOESN'T HURT.  YOU KNOW A LOT OF PEOPLE WEAR

26  GLASSES.  ARE THESE YOUR GLASSES?

27   A    STRICTLY READING.

28   Q    FOR READING.  OKAY.  MS. BABULA, DOES THAT LOOK

99

```
 1   LIKE PHOTOCOPIES AT LEAST OF THE PHOTO LINEUP YOU WERE
 2   SHOWN APRIL 2, 2008?
 3   A      YES.
 4   Q      WHEN YOU WERE SHOWN THAT PHOTO LINEUP, WERE YOU
 5   ABLE TO IDENTIFY ONE OF THE NUMBERS OF INDIVIDUALS AS THE
 6   PERSON THAT YOU SAW ON THE MORNING OF MARCH 14, 2008?
 7   A      YES.
 8   Q      WHICH NUMBER PHOTO WAS THAT?
 9   A      FOUR.
10   Q      WHAT IS IT ABOUT NUMBER 4 THAT YOU -- WHEN YOU
11   LOOKED AT THAT PHOTO YOU THOUGHT, THAT'S THE GUY?
12   A      IT WAS A COMBINATION OF, I WOULD SAY, BONE
13   STRUCTURE.  I WOULD SAY COMPLEXION.  I WOULD SAY EYES.
14   Q      LOOKING AROUND THE COURTROOM, DO YOU SEE IN COURT
15   THE MAN THAT YOU SAW THAT MORNING ON MARCH 14, 2008?
16   A      I DO.
17   Q      CAN YOU JUST POINT HIM OUT SOMEWHERE IN THE
18   COURTROOM, PLEASE.  SO, AT THIS TABLE?
19   A      YES.
20   Q      TO THE LEFT.  OKAY.  AND THERE'S -- SO FROM THE
21   RIGHT, WHICH PERSON OVER?
22   A      I WOULD SAY THE GENTLEMEN TWO IN.
23          MR. ROSEN:  YOUR HONOR, LET THE RECORD REFLECT
24   THE WITNESS HAS IDENTIFIED THE DEFENDANT.
25          THE COURT:  NOTED.
26          MR. ROSEN:  THANK YOU.
27   Q      (BY MR. ROSEN)  I HAVE A DIAGRAM THAT I'D LIKE TO
28   SHOW YOU.
```

1        MS. BABULA, LET ME SHOW YOU WHAT WE MARKED AS

2   PEOPLE'S 65 AND THEN I'LL PUBLISH IT FOR A MOMENT.

3        JUST TAKE A LOOK AT THAT YOURSELF AND THEN I'LL PUT

4   IT UP ON THE SCREEN.

5   A    GIVE ME A SECOND.

6   Q    SURE.  YOU HAVE TAKEN A LOOK AT IT.  OKAY.  I'M

7   GOING TO PUT IT UP ON THE SCREEN.

8   A    OKAY.

9   Q    AND ASK YOU A COUPLE QUESTIONS ABOUT IT.

10       MS. BABULA, SHOWING YOU WHAT WE HAVE MARKED AS

11  PEOPLE'S 65, FIRST QUESTION, THIS MAP, DOES THIS

12  ACCURATELY REFLECT THE STREETS AROUND OVERLOOK IN LOS

13  GATOS?

14  A    YES.

15  Q    CAN YOU SEE THE WHOLE DIAGRAM?

16  A    UH-HUH.  I'M FINE.

17  Q    WHAT'S MARKED ON THE DIAGRAM HERE, UNKNOWN SUBJECT

18  SEEN BY BABULA ABOUT 7:30, AND THERE'S A LITTLE ARROW

19  HERE.  DOES THAT APPROXIMATELY DEPICT WHERE YOU SAW THE

20  MAN THAT MORNING?

21  A    YES.

22  Q    AND THEN OVER HERE AT THE CORNER OF HERNANDEZ AND

23  ELLENWOOD, DOES THIS SHOW WHERE YOU SAW THE SAME MAN AT

24  AROUND 8:05, 8:06 IN THE MORNING?

25  A    IT'S ON THE CORNER.

26  Q    OKAY.  SO WHICH --

27  A    WHERE IT SAYS ELLENWOOD, YEAH, THAT'S IT.

28  Q    SO, ACTUALLY A LITTLE BIT MORE TOWARDS WHERE IT

101

```
 1   SAYS ELLENWOOD, AND I'M INDICATING THAT FOR THE RECORD.
 2   A     RIGHT THERE.
 3   Q     THANK YOU.  IN FACT, WHY DON'T WE GIVE YOU THE
 4   DIAGRAM AND I'LL GIVE YOU A PEN.
 5   A     I THINK THERE'S ONE HERE.
 6   Q     YEAH, BUT THAT WILL -- JUST TAKE THIS BALL POINT
 7   PEN, AND MAYBE WITH AN X, PUT ON THE DIAGRAM THE CORNER
 8   THAT YOU SAW THE INDIVIDUAL ON.
 9   A     (INDICATING.)
10   Q     AND THEN WHY DON'T YOU JUST SIGN THE BOTTOM OF THE
11   DIAGRAM LEGIBLY SO WE KNOW IT'S YOU.  THANK YOU.
12              MR. ROSEN:  I DON'T HAVE ANY MORE QUESTIONS
13   FOR YOU.  THANK YOU, MS. BABULA.  THERE WILL BE SOME
14   OTHER QUESTIONS FOR YOU.
15              THE COURT:  MR. PEREZ.
16                    CROSS EXAMINATION
17   Q     (BY MR. PEREZ)  GOOD AFTERNOON, MA'AM.
18   A     HI.
19   Q     THE WINDOW THAT YOU SAW THIS INDIVIDUAL, WAS IT
20   OPEN OR CLOSED WHEN YOU PEEKED THROUGH THE WINDOW?
21   A     IT'S ACTUALLY SLIDING GLASS DOORS UP ONTO A
22   BALCONY.
23   Q     SO IT'S NOT A WINDOW?
24   A     IT'S TWO FULL SIZED WINDOWS, WHICH THEY'RE SLIDING
25   GLASS DOORS, SURE.
26   Q     SO IF YOU OPEN THE DOOR YOU -- IS THERE LIKE A
27   BALCONY THERE?
28   A     YES.
```

102

```
 1    Q     DID YOU DO THAT OR YOU JUST STOOD INSIDE?

 2    A     NO, I JUST STOOD INSIDE.

 3    Q     SO YOU NEVER OPENED AND THEN LOOKED AT THE

 4    INDIVIDUAL.   YOU NEVER --

 5    A     OPENED THE WINDOW OR THE DOOR?

 6    Q     YES.

 7    A     NO.

 8    Q     OKAY.   AND YOU SAY THAT YOU WERE DRYING YOUR

 9    HAIR?

10    A     CORRECT.

11    Q     ACTUALLY WHEN YOU WERE LOOKING THROUGH THE WINDOW,

12    WERE YOU ACTUALLY DRYING YOUR HAIR?

13    A     NO.   NO.

14    Q     SO YOU STOPPED DRYING YOUR HAIR, WALKED --

15    A     NOT WALKED.   IT'S DRYING MY HAIR, DOOR.

16    Q     OKAY.

17    A     THAT CLOSE.

18    Q     SO YOU STOPPED DRYING YOUR HAIR AND YOU PEEKED OUT

19    AND SAW AN INDIVIDUAL?

20    A     RIGHT.

21    Q     ALL RIGHT.   ANY CURTAIN OR ANYTHING ON THE SLIDING

22    DOOR WINDOW?

23    A     THERE'S BLINDS.

24    Q     WERE THE BLINDS OPEN?

25    A     I OPENED THEM.

26    Q     YOU OPENED THEM?

27    A     RIGHT.

28    Q     THAT'S WHEN YOU SAW THE INDIVIDUAL?
```

103

```
 1   A      RIGHT.
 2   Q      SO THEY WERE CLOSED AND YOU OPENED THEM?
 3   A      CORRECT.
 4   Q      OKAY.  YOU WEAR GLASSES?
 5   A      I DO NOT WEAR GLASSES.  IF I NEED TO READ, I WEAR
 6   GLASSES, BUT I DO NOT WEAR THEM ON A DAILY BASIS UNLESS
 7   I'M READING UP CLOSE.
 8   Q      AT THAT MOMENT WHEN YOU PEEKED THROUGH THE WINDOW,
 9   YOU DID NOT HAVE YOUR GLASSES?
10   A      I WOULDN'T BE ABLE TO SEE WITH GLASSES FAR.
11   Q      I'M SORRY.  AND YOU SAY THAT YOU SAW AN INDIVIDUAL
12   DIRECTLY UNDERNEATH YOU?
13   A      DIRECTLY IN THE STREET BENEATH ME.
14   Q      BELOW YOU?
15   A      CORRECT.
16   Q      AND YOU HAD A CLEAR VIEW, NOTHING WAS --
17   A      NO.
18   Q      IT WAS -- THIS WAS IN MARCH.  IT WAS ALREADY CLEAR
19   AT 7:00 IN THE MORNING?
20   A      7:30 PLUS, YES.
21   Q      YOU SAY THAT -- WHO WAS IN THE HOUSE WITH YOU AT
22   THAT TIME, AT 7:30?
23   A      MY FAMILY.
24   Q      YOU MENTIONED THAT LATER ON YOU CALL YOUR
25   HUSBAND?
26   A      I SAID I THOUGHT, UM, I SHOULD CALL MY HUSBAND.
27   Q      YOU SHOULD CALL.  I'M SORRY.
28   A      YEAH.
```

104

```
1    Q    AND YOUR HUSBAND WAS AT HOME?
2    A    AT HOME.
3    Q    AND YOU DIDN'T MENTION TO HIM THERE'S AN INDIVIDUAL
4    DOWNSTAIRS?
5    A    NO.
6    Q    NO.  OKAY.  YOU DIDN'T SEE A NEED, THAT DIDN'T
7    WORRY YOU, SEEING THAT INDIVIDUAL DOWNSTAIRS?
8    A    I THOUGHT IT WAS ODD.  I JUST THOUGHT HE WAS ODD.
9             THE COURT:  OKAY.  COUNSEL, IF YOU'LL LET HER
10   FINISH.  LET HER FINISH HER ANSWER AND THEN START ANOTHER
11   QUESTION.
12            MR. PEREZ:  SURE.
13            THE COURT:  PAUSE FOR A SECOND.
14   Q    (BY MR. PEREZ)  YOU TESTIFIED THAT YOU SAW HIM
15   WEARING A BASEBALL CAP, CORRECT?
16   A    CORRECT.
17   Q    WERE YOU ABLE TO SEE ANY LOGO ON THE BASEBALL
18   CAP?
19   A    NO.
20   Q    YOU SAW HIM WEARING A SHIRT OR A JACKET?
21   A    WHAT APPEARED TO ME TO BE A JACKET.
22   Q    DID YOU SEE ANY LOGO ON THE JACKET?
23   A    NO.
24   Q    AND WOULD IT BE FAIR TO SAY THAT YOU COULDN'T SEE
25   BECAUSE YOU WERE TOO FAR AWAY OR YOU WERE NOT PAYING
26   ATTENTION TO SOMETHING LIKE THAT OR WHAT?
27   A    DIDN'T STRIKE ME AS IMPORTANT.
28   Q    YOU SAY -- DESCRIBED THE INDIVIDUAL AS HISPANIC?
```

105

```
1    A      CORRECT.
2    Q      AND THE REASON WHY YOU TOLD THE POLICE THAT HE
3    APPEARED TO BE HISPANIC WAS WHAT?  IS WHAT?
4    A      I BELIEVE THE SKIN COLOR, FEATURES.
5    Q      DID THE INDIVIDUAL HAVE GLASSES THAT YOU SAW, DARK
6    GLASSES?
7    A      I DID NOT SEE THAT.
8    Q      OKAY.  AND YOU WERE NOT ABLE TO SEE HIS HAIR,
9    RIGHT, BECAUSE HE HAD A HAT ON?
10   A      I COULD SEE A LITTLE BIT OF HAIR.
11   Q      LITTLE BIT OF HAIR.  CAN YOU DESCRIBE THE LITTLE
12   BIT OF HAIR THAT YOU SAW?  WAS IT CREW CUT SHORT OR
13   LENGTHY, LONG, DO YOU KNOW?
14   A      I THINK THERE WAS A LITTLE BIT OF HAIR PEEKING OUT,
15   BUT IT WAS A HAT, SO.
16   Q      YOU ALSO -- DID YOU TELL THE POLICE THE HEIGHT OF
17   THIS INDIVIDUAL, BY ANY CHANCE, HOW TALL?
18   A      I DIDN'T -- WELL, I'M FIVE-ONE, SO THAT'S HARD.  I
19   DON'T REMEMBER SAYING.  I DON'T THINK HE WAS A BIG MAN.
20   Q      AND WOULD THE SIX FEET BE A BIG MAN FOR YOU OR
21   SMALL OR AVERAGE?
22   A      PROBABLY BIGGER THAN AVERAGE.
23   Q      YOU ALSO SAY THAT HE WAS THIN.
24   A      UH-HUH.
25   Q      YOU SAID VERY THIN?
26   A      UH-HUH.
27   Q      WHAT DO YOU MEAN BY VERY THIN?
28   A      THE SATCHEL THAT HE WAS WEARING, THE MESSENGER BAG,
```

```
 1   WEIGHED DOWN ON THE JACKET AND I SAID HE'S A THIN GUY.
 2                  MR. PEREZ:  THANK YOU VERY MUCH.
 3                  THE COURT:  MR. GILLAN.
 4                  MR. GILLAN:  THANK YOU.
 5                        CROSS EXAMINATION
 6   Q    (BY MR. GILLAN)  MA'AM, YOU FIRST SAW THE MAN IN
 7   BLACK ABOUT 7:30 IN THE MORNING?
 8   A    CORRECT.
 9   Q    THEN YOU SAW HIM AGAIN ABOUT 8:06 ON THE WAY TO
10   DROPPING YOUR CHILDREN OFF?
11   A    CORRECT.
12   Q    THEN YOU RETURNED HOME ABOUT NINE A.M.; IS THAT
13   RIGHT?
14   A    CORRECT.
15   Q    AND AFTER THAT 8:30 IN THE MORNING YOU NEVER SAW
16   THE MAN IN BLACK AGAIN?
17   A    CORRECT.
18   Q    WERE YOU AT HOME BETWEEN THE HOURS OF 11:00 A.M.
19   AND NOON ON THE 14TH?
20   A    I WAS NOT.
21   Q    DID YOU LEAVE AGAIN FROM YOUR RESIDENCE AFTER YOU
22   RETURNED HOME AT NINE?
23   A    YES, I DID.
24   Q    OKAY.  SO, YOU WEREN'T AROUND BETWEEN ELEVEN AND
25   NOON?
26   A    NO, I WAS NOT.
27   Q    WHEN DID YOU ARRIVE HOME THAT EVENING?
28   A    I ACTUALLY ARRIVED HOME AROUND 12:15, 12:30.
```

1  Q    THAT AFTERNOON?

2  A    CORRECT.

3  Q    AND AFTER YOU RETURNED HOME AT NINE, WHEN DID YOU

4  LEAVE AGAIN?

5  A    PROBABLY SOMETIME AFTER ELEVEN.  I WAS GOING BACK

6  TO PICK UP CHILDREN.

7  Q    SO WHEN YOU LEFT AROUND ELEVEN THAT MORNING, YOU

8  DIDN'T SEE THE GUY IN BLACK AGAIN?

9  A    NO.

10 Q    AND DID YOU -- DID YOU LEAVE AROUND THE SAME ROUTE

11 THAT YOU LEFT TO DROP OFF YOUR CHILDREN?

12 A    YES.

13 Q    OKAY.

14         MR. GILLAN:  I GUESS THAT'S ALL I HAVE.

15         THE COURT:  MR. ROBERTSON.

16         MR. ROBERTSON:  NO QUESTIONS.

17         THE COURT:  ANY REDIRECT?

18         MR. ROSEN:  NO, YOUR HONOR.

19         THE COURT:  YOU CAN STEP DOWN.  THANK YOU,

20 MA'AM.

21     IF YOU'LL STEP UP HERE ON THE WITNESS STAND AND

22 RAISE YOUR RIGHT HAND TO BE SWORN.

23              JOE COLONNA,

24 HAVING BEEN CALLED AS A WITNESS ON BEHALF OF THE PEOPLE,

25 BEING FIRST DULY SWORN TO TELL THE TRUTH, TESTIFIED AS

26 FOLLOWS:

27         THE COURT:  HAVE A SEAT.  GOOD AFTERNOON.

28 COULD YOU SCOOT THAT CHAIR UP A LITTLE BIT AND COULD YOU

1   STATE YOUR FULL NAME AND SPELL YOUR YOUR FULL NAME.

2         THE WITNESS:  MY NAME IS JOE COLONNA.  J-O-E

3   C-O-L-O-N-N-A.

4         THE COURT:  GO AHEAD.

5         MR. ROSEN:  ONE MOMENT, MR. COLONNA.

6          DIRECT EXAMINATION

7   Q   (BY MR. ROSEN)  GOOD AFTERNOON.  WHAT DO YOU DO FOR

8   A LIVING?

9   A   I HAVE A HOUSE CLEANING BUSINESS.

10   Q   WHAT'S THE NAME OF IT?

11   A   EJ&E CLEANING SERVICES.

12   Q   HOW LONG HAVE YOU RUN THAT BUSINESS?

13   A   SIXTEEN YEARS.

14   Q   WHERE DOES THE BUSINESS CONDUCT ITS OPERATIONS?

15   A   ALL OVER THE SOUTH BAY.

16   Q   INCLUDING LOS GATOS?

17   A   YES, SIR.

18   Q   AND DO YOU EMPLOY OTHERS TO CLEAN RESIDENCES?

19   A   THEY WORK WITH ME.

20   Q   APPROXIMATELY HOW MANY PEOPLE DO YOU EMPLOY?

21   A   A COUPLE.

22   Q   I'M GOING TO ASK YOU SOME QUESTIONS ABOUT MARCH 14,

23   2008.  DID YOU HAVE A CHANCE TO REVIEW ANY STATEMENTS

24   THAT YOU MADE TO THE POLICE?

25   A   I CAN REMEMBER EVERYTHING.

26   Q   ON MARCH 14, 2008, THAT MORNING, DID YOU TAKE SOME

27   EMPLOYEES TO 18400 OVERLOOK?

28   A   YES, SIR.

```
1    Q    APPROXIMATELY WHAT TIME DID YOU ARRIVE?
2    A    AROUND 11:30.
3    Q    HAD YOU DROPPED OFF ANY EMPLOYEES BEFORE THEN AND
4    THEN COME BACK.
5    A    EXACTLY.
6    Q    OKAY.  SO LET'S START WITH ABOUT WHAT TIME DID YOU
7    DROP THE EMPLOYEES OFF?
8    A    I'D SAY AROUND TEN SOMETHING.
9    Q    MR. COLONNA, I WANT TO SHOW YOU A REPORT AND JUST
10   ASK YOU TO TAKE A LOOK AT IT AND SEE IF IT REFRESHES YOUR
11   MEMORY.
12        FOR COUNSEL, IT'S SUPPLEMENTAL REPORT NUMBER 1, AND
13   IT'S LOS GATOS POLICE REPORTS 584 THROUGH 585.
14            MR. ROSEN:  MAY I APPROACH THE WITNESS, YOUR
15   HONOR?
16            THE COURT:  YOU MAY.
17   Q    (BY MR. ROSEN)  MR. COLONNA, WHY DON'T YOU JUST
18   TAKE A LOOK FOR A MOMENT AT THIS SECOND PARAGRAPH.  JUST
19   READ IT TO YOURSELF FOR A MINUTE AND THEN I'LL ASK YOU A
20   COUPLE QUESTIONS.
21   A    OKAY.
22   Q    DOES READING THAT REFRESH YOUR MEMORY ABOUT WHAT
23   TIME YOU MIGHT HAVE DROPPED THEM OFF?
24   A    I SAID TEN.  THAT'S CLOSE ENOUGH, 9:25, 10:00.  HOW
25   CLOSE DO YOU WANT TO BE.
26   Q    AS CLOSE AS YOU CAN BE.
27   A    THAT'S RIGHT.
28   Q    SO, WHO DID YOU DROP OFF AT THAT ADDRESS TO DO SOME
```

110

1    CLEANING?

2    A    ALMA.

3    Q    WAS THERE ANOTHER WOMAN YOU DROPPED OFF AS WELL?

4    A    YEAH.

5    Q    AVIA DELOYA, DOES THAT SOUND FAMILIAR?

6    A    WHO?

7    Q    AVIA DELOYA.

8    A    THAT'S RIGHT.

9    Q    IS SHE STILL WORKING WITH YOU?

10   A    NO.

11   Q    IS ALMA STILL WORKING WITH YOU?

12   A    NO.

13   Q    WHAT PARTICULAR RESIDENCE WAS ALMA AND AVIA TO

14   CLEAN THAT MORNING?

15   A    APARTMENT -- I MEAN CONDOMINIUM NUMBER 34.

16        34 OR 33, ONE OF THE TWO.  IT'S RIGHT THERE.

17   Q    OKAY.  AFTER YOU DROPPED ALMA AND AVIA OFF THAT

18   MORNING, WHERE DID YOU GO BEFORE YOU CAME BACK TO PICK

19   THEM UP?

20   A    WENT ON TOP OF THE HILL.  THERE'S A HOUSE THAT WE

21   CLEAN UP ON THE MOUNTAIN.

22   Q    ALSO ON OVERLOOK ROAD OR A DIFFERENT ROAD?

23   A    OFF OVERLOOK ROAD.

24   Q    WAS IT PART OF THAT TOWNHOUSE COMPLEX?

25   A    NO, IT WAS ANOTHER ONE.

26   Q    AFTER YOU FINISHED CLEANING THAT OTHER RESIDENCE

27   THAT YOU WENT TO ON THE TOP OF THE MOUNTAIN, DID YOU COME

28   BACK TO WHERE ALMA AND AVIA WERE?

1    A      EXACTLY.  ELEVEN, AROUND 11:30.

2    Q      DID YOU PARK THE VAN AS YOU --

3    A      IN FRONT OF THE PLACE ON THE DRIVEWAY.

4           MR. PEREZ:  OBJECTION, YOUR HONOR,

5    NONRESPONSIVE.

6           THE COURT:  OVERRULED.  MR. COLONNA, IF YOU'LL

7    JUST PAUSE FOR JUST A MINUTE BEFORE YOU -- MAKE SURE THAT

8    THE QUESTION IS FULLY ASKED BEFORE YOU START TO ANSWER.

9           THE WITNESS:  I'M SORRY.

10   Q      (BY MR. ROSEN)  NO PROBLEM.  IT'S OKAY.

11   AFTER YOU PARKED THE VAN, DID YOU SEE A MAN WALKING

12   BETWEEN THE BUILDINGS?

13   A      YES, I DID.

14   Q      COULD YOU DESCRIBE WHAT YOU SAW THIS MAN DOING?

15   A      STANDING SUSPICIOUSLY.

16   Q      WHY DO YOU SAY SUSPICIOUSLY?

17   A      BECAUSE HE WAS JUST -- ALMA TOLD ME THAT THE PERSON

18   WAS --

19   Q      LET ME STOP YOU FOR A SECOND.

20          MR. PEREZ: YOUR HONOR, EXCUSE ME.  THERE WILL

21   BE AN OBJECTION AS TO THE ANSWER SUSPICIOUSLY.  CALLS FOR

22   A CONCLUSION ON --

23          THE COURT:  THERE HASN'T BEEN AN ANSWER YET.

24          MR. ROBERTSON:  ACTUALLY, YOUR HONOR --

25          THE COURT:  START OF AN ANSWER.

26          MR. ROBERTSON:  THERE WAS TWO PARTS.  IT WAS A

27   STATEMENT, HOW WAS HE SUSPICIOUSLY, AND THEN WHY DID YOU

28   THINK IT WAS SUSPICIOUS.  SO I WOULD JOIN IN THE MOTION

112

1   TO STRIKE THE FIRST ANSWER, SUSPICIOUS, AND THEN WAIT FOR

2   THE REMAINDER OF THE SECOND.

3           THE COURT:  OVERRULED.

4   Q    (BY MR. ROSEN)  WITHOUT TELLING US WHAT ALMA OR

5   AVIA MAY HAVE TOLD YOU, IS THERE ANYTHING ABOUT HOW THE

6   MAN WAS ACTING THAT YOU SAW THAT LOOKED SUSPICIOUS TO

7   YOU?

8   A    LOOKING AROUND.  JUST LOOKING AROUND.

9   Q    I WANT TO SHOW YOU A PHOTOGRAPH.  I WANT TO SHOW

10  YOU A PHOTO.  WE HAVE MARKED THIS AS PEOPLE'S EXHIBIT

11  NUMBER 11.  JUST DISREGARD THE PEOPLE THAT ARE IN THIS

12  PHOTO, JUST TAKE A LOOK AT THAT FOR A MOMENT.

13          FIRST, DOES THAT AREA LOOK FAMILIAR TO YOU?

14  A    YES, IT DOES.

15  Q    OKAY.  DOES THAT LOOK LIKE THE AREA OF 18400

16  OVERLOOK ROAD, THE COMPLEX THERE?

17  A    IT DOES, YEAH.

18  Q    DOES THAT PHOTO APPEAR TO SHOW THE AREA WHERE THIS

19  MAN WAS WALKING AND LOOKING AROUND SUSPICIOUSLY?

20  A    RIGHT WHERE THE PEOPLE ARE STANDING, SIR.

21  Q    LET ME PUT THAT UP ON THE DIAGRAM AND WE WILL JUST

22  SHOW EVERYBODY.

23          SHOWING WHAT WE MARKED AS PEOPLE'S EXHIBIT 11, THE

24  PLACE WHERE YOU SAW THE MAN WALKING AND LOOKING AROUND

25  SUSPICIOUSLY IS THIS AREA, AND I'M CIRCLING THE THREE

26  INDIVIDUALS THAT ARE STANDING THERE.  IS THAT CORRECT?

27  A    THAT'S CORRECT, SIR.

28  Q    OKAY.  I'D LIKE TO SHOW YOU UP CLOSE HERE WHAT WE

113

1   MARKED AS PEOPLE'S 67.  WHY DON'T YOU TAKE A LOOK AT THIS

2   DIAGRAM FOR A MINUTE OR SO, AND THEN I'LL ASK YOU A

3   COUPLE QUESTIONS ABOUT IT.

4        MR. COLONNA, DOES THAT DIAGRAM LOOK LIKE IT -- OR

5   THAT PHOTO APPEAR TO ACCURATELY DEPICT THE AREA OF 18400

6   OVERLOOK AND THE SURROUNDSING STREETS?

7   A    YES, SIR.

8   Q    THERE IS A PART ON THAT DIAGRAM THAT INDICATES

9   UNKNOWN MAN SEEN BY COLONNA.  DOES THAT LOOK TO BE AN

10  ACCURATE LOCATION ON THAT DIAGRAM OF WHERE YOU SAW THE

11  MAN?

12  A    I THINK SO, SIR.  THAT'S EXACTLY WHAT I SAW.

13  Q    OKAY.  SHOWING YOU WHAT WE HAVE MARKED AS PEOPLE'S

14  67, ROUGHLY THIS GREEN, DOES THIS APPEAR TO BE THE AREA

15  BETWEEN THE BUILDINGS THAT YOU SAW THE MAN LOOKING,

16  QUOTE, SUSPICIOUS?  YOU HAVE TO SAY YES OR NO.

17  A    YES, SIR.

18  Q    ALL RIGHT.  APPROXIMATELY HOW FAR WOULD YOU SAY YOU

19  WERE AWAY FROM THIS MAN WHEN YOU SAW HIM?

20  A    ABOUT TWENTY YARDS.

21  Q    WAS THERE ANYTHING OBSTRUCTING YOUR VIEW OF HIM?

22  A    NOTHING.

23  Q    ABOUT HOW OLD WOULD YOU SAY THE MAN WAS?

24  A    TWENTY-FIVE YEARS OLD.

25  Q    ROUGHLY HOW TALL WOULD YOU SAY HE WAS?

26  A    FIVE FOOT SEVEN.

27  Q    HOW WOULD YOU DESCRIBE HIS BUILD?

28  A    THIN.

114

```
 1   Q    WHAT ABOUT SKIN TONE?  HOW WOULD YOU DESCRIBE
 2   THAT?
 3   A    LIKE LIGHT COMPLEXION, LIKE UNSHAVEN FACE.
 4   Q    MIGHT HAVE HAD SOME KIND OF --
 5   A    HAD A HAT ON.
 6   Q    WHAT COLOR WAS THE HAT?
 7   A    BLACK.
 8   Q    HOW WOULD YOU DESCRIBE HIS CHEEK BONES?
 9   A    UM, THEY WERE -- I DIDN'T REALLY LOOK AT THEM THAT
10   DEEP.
11   Q    WAS THE MAN CARRYING SOMETHING?
12   A    HE WAS CARRYING A LITTLE BRIEFCASE LIKE THING.
13   BLACK CASE.
14   Q    SO --
15   A    BAG OR SOMETHING.
16   Q    DID YOU SEE HOW THE MAN WAS CARRYING IT?
17   A    JUST WALKING WITH IT.
18   Q    IN OTHER WORDS, WHEN I SAY -- EXACTLY, BUT HOW?
19   A    HE WAS CARRYING IT WITH HIS HANDS.
20   Q    OKAY.  WAS IT HUNG OVER HIS SHOULDER OR --
21   A    JUST ON THE SIDE.
22   Q    AFTER YOU SAW THAT MAN AND -- FOR APPROXIMATELY HOW
23   LONG WOULD YOU SAY YOU SAW HIM BEFORE YOU THEN WENT AND
24   DID SOMETHING?
25   A    I SAW HIM FOR, LIKE, MAYBE TWO AND-A-HALF TO
26   THREE -- MAYBE TWO AND-A-HALF SECONDS, THREE SECONDS.
27   LONG ENOUGH TO JUST DRIVE BY HIM.
28   Q    SO AFTER YOU DROVE BY HIM, WHAT DID YOU THEN DO?
```

115

1  A    I GOT OUT OF THE CAR, WALKED INTO THE PLACE WE WERE

2  CLEANING, CHECKED THE PERSON'S WORK.   JUST THEN I HEARD

3  SOME GUNSHOTS.   THAT'S ALL.

4  Q    APPROXIMATELY HOW MANY GUNSHOTS DID YOU HEAR?

5  A    IT SOUNDED LIKE SOMEONE UNLOADED A GUN.

6  Q    SO A LOT?

7  A    QUITE A BIT, YEAH.

8  Q    AFTER YOU HEAR THE GUNSHOTS, WHAT DID YOU THEN DO?

9  A    I JUST GOT UP AND LEFT.

10  Q    DID ANYONE COME WITH YOU?

11  A    MY EMPLOYEE, YEAH.   WE JUST TOOK OFF.

12  Q    WHEN YOU SAY YOU GUYS LEFT, DID YOU GET BACK INTO

13  THE VAN?

14  A    GOT INTO THE VAN AND LEFT.

15  Q    WHICH DIRECTION DID YOU DRIVE AWAY?

16  A    WE WENT -- IT WAS THE DIRECTION THAT I WAS GOING,

17  WHERE I WAS GOING, SO IT WOULD BE, I THINK IT WAS LIKE

18  SOUTH, SOUTHEAST OR SOMETHING LIKE THAT.   THE

19  DIRECTION --

20  Q    IF I -- YOU THINK IF I SHOW YOU THE DIAGRAM AND I

21  GIVE YOU A PEN, YOU COULD MAYBE --

22  A    I CAN TELL YOU EXACTLY WHERE IT IS.

23  Q    THAT'S GREAT.   ACTUALLY, WHY DON'T I HAVE YOU --

24  WHY DON'T YOU STAND UP AND WE WILL JUST DO IT UP HERE.

25        SO, FIRST, IF I GIVE YOU MY PEN, WHY DON'T YOU JUST

26  MARK ON HERE THE DIRECTION THAT YOU GUYS LEFT.

27  A    OKAY.

28  Q    WHY DON'T YOU JUST WRITE YOUR NAME ON THE BOTTOM.

```
 1          STAND UP HERE WITH ME FOR ONE SECOND.
 2          PEOPLE'S 67, ON THIS DIAGRAM, THE WITNESS HAS
 3   MARKED TWO ARROWS IN THE LOWER LEFT PART OF THE SCREEN,
 4   AND THE ARROWS HAVE A DIRECTION AND THAT'S SHOWING THE
 5   DIRECTION THAT YOU DROVE OUT OF THE TOWNHOUSE COMPLEX
 6   AFTER YOU HEARD THE GUNSHOTS?
 7   A    ACTUALLY, I WAS INSIDE THE PLACE AND LEFT AFTER WE
 8   HEARD THE GUNSHOTS.  EXACTLY.
 9   Q    AND SO AFTER HEARING THE GUNSHOTS AND THEN GETTING
10   INTO THE VAN, THE DIRECTION THE VAN DROVE AWAY, IS WHAT'S
11   DEPICTED BY THE ARROW?
12   A    EXACTLY.
13   Q    GREAT.  HAVE A SEAT.  AS YOU AND YOUR EMPLOYEES
14   DROVE AWAY, DID YOU SEE THE MAN THAT YOU HAD SEEN JUST A
15   FEW MINUTES EARLIER?
16   A    NO, WE DID NOT SEE HIM ANYMORE.
17   Q    AS YOU DROVE OUT OF THE TOWNHOUSE COMPLEX, WHAT'S
18   THE FIRST THING YOU DID AFTER YOU GOT OUT OF THE
19   COMPLEX?
20   A    WELL, THERE WAS A MAN THAT STOPPED US.  HE WAS A
21   NEIGHBOR AND HE CAME AND TALKED TO US AND THEN WE SAID WE
22   HEARD SOME GUNSHOTS AND HE ALSO HEARD SOME GUNSHOTS.
23   THERE WAS A POLICE OFFICER THAT WAS INSIDE OF HIS CAR.
24   AND THEN WE GOT HIS ATTENTION, AND HE CAME.  THAT'S THE
25   FIRST OFFICER THAT WAS ON THE SCENE.
26   Q    YOU TOLD THE OFFICER WHAT YOU HEARD?
27   A    EXACTLY.
28   Q    I WANT TO SHOW YOU WHAT WE HAVE MARKED AS PEOPLE'S
```

117

```
1    EXHIBIT 12.  AND JUST ASK YOU FIRST IF THIS AREA LOOKS
2    FAMILIAR TO YOU, WHAT'S DEPICTED HERE?
3    A    NOW, WHAT DO YOU WANT ME TO ANSWER?
4    Q    FIRST, DOES THAT LOOK LIKE THE TOWNHOUSE COMPLEX?
5    A    THAT'S IT.  THAT'S IT.
6    Q    THAT IS.  ALL RIGHT.
7         YOU'RE NOT SURE IF THE UNIT THAT YOU GUYS WERE
8    WORKING IN WAS 33 OR 34?
9    A    NO, IT WAS 33.
10   Q    OKAY.  GREAT.  THANK YOU.
11        DO YOU THINK YOU GOT A GOOD ENOUGH LOOK AT THE MAN
12   FROM ABOUT 20 YARDS AWAY TO BE ABLE TO IDENTIFY HIM
13   AGAIN?
14   A    UH-HUH.
15   Q    DO YOU SEE HIM IN COURT?
16   A    THAT MAN RIGHT THERE.
17   Q    COULD YOU JUST POINT HIM OUT SO WE KNOW FOR THE
18   RECORD.
19   A    RIGHT THERE.
20        MR. ROSEN:   YOUR HONOR, THE WITNESS IS
21   INDICATING THE DEFENDANT, LUCIO ESTRADA.
22        THE WITNESS:  THE GENTLEMAN WITH THE SANTA
23   CLARA DEPARTMENT OF CORRECTIONS, ON THE LEFT HAND SIDE.
24        THE COURT:  OKAY.
25        THE WITNESS:  THERE'S TWO MEN RIGHT THERE.
26   ONE ON THE RIGHT, AND ONE ON THE LEFT.
27        THE COURT:  OKAY.
28        THE WITNESS:  THE ONE ON THE LEFT.
```

1          THE COURT:  OKAY.  NOTED.  IDENTIFICATION OF

2     MR. ESTRADA.

3          MR. ROSEN:  I DON'T HAVE ANY MORE QUESTIONS

4     FOR YOU AT THIS TIME.  SOME OTHER ATTORNEYS WILL ASK SOME

5     QUESTIONS.

6          THE COURT:  ALL RIGHT.  MR. PEREZ.

7                    CROSS EXAMINATION

8     Q     (BY MR. PEREZ)  GOOD AFTERNOON, MR. COLONNA.

9     A     GOOD AFTERNOON, SIR.

10    Q     I'M A LITTLE BIT CONFUSED.  WHEN YOU -- WHEN YOU

11    GOT TO THAT TOWNHOUSE COMPLEX, YOU DROPPED SOME OF YOUR

12    EMPLOYEES OFF THERE?

13    A     EXACTLY.

14    Q     AND THAT WOULD BE A PERSON BY THE NAME OF ALMA?

15    A     THAT'S RIGHT, SIR.

16    Q     AND YOU DROPPED HER OFF AND SHE WAS GOING TO GO TO

17    WORK AT UNIT NUMBER 33?

18    A     THAT'S RIGHT, SIR.

19    Q     AND THEN YOU WENT ELSEWHERE, CORRECT?

20    A     EXACTLY.

21    Q     YOU WENT TO SOME TOP OF THE HILL?

22    A     THAT'S RIGHT, SIR.

23    Q     AND HOW LONG WERE YOU AT THE TOP -- SO YOU LEFT

24    ALMA BY HERSELF; CORRECT?

25    A     EXACTLY.

26    Q     AND THEN YOU WENT TO THE TOP OF THE HILL.  HOW LONG

27    WERE YOU AT THE TOP OF THE HILL?

28    A     WHEN I -- I ARRIVED BACK, IT WAS AROUND 11:25 A. M.

119

```
 1   Q     AND WHEN YOU CAME BACK TO UNIT 33, WERE YOU BY
 2   YOURSELF OR WITH SOMEBODY ELSE?
 3   A     I HAD SOME OTHER PEOPLE WITH ME.
 4   Q     SOME OTHER PEOPLE.  AND THOSE OTHER PEOPLE THAT
 5   WERE WITH YOU, DO YOU KNOW IF THEY WERE INTERVIEWED BY
 6   THE POLICE, IF YOU KNOW?
 7   A     NO.
 8   Q     WERE THEY THERE WITH YOU WHEN --
 9   A     THEY WERE IN THE CAR.
10   Q     WAS IT A CAR OR A VAN?
11   A     IN THE VAN.
12   Q     THE VAN?
13   A     IN THE VAN.
14   Q     SO, HOW LONG -- YOU HAVE A CONTRACT WITH THE PEOPLE
15   IN COMPLEX -- IN UNIT NUMBER 33 TO CLEAN THEIR UNIT?
16   A     AT THAT TIME WE JUST STARTED, PROBABLY A COUPLE
17   MONTHS ONLY.
18   Q     DID YOU CLEAN ANY OTHER UNITS FOR THAT COMPLEX?
19   A     NO, SIR.
20   Q     OKAY.  DO YOU KNOW THAT THERE WAS A DECEASED PERSON
21   IN THIS CASE?
22   A     AT THE TIME THAT THAT HAPPENED, I DIDN'T KNOW AT
23   THE MOMENT THAT IT HAPPENED, BUT AFTER THAT EVENING I
24   FOUND OUT.
25   Q     OKAY.  DO YOU HAPPEN TO KNOW THE INDIVIDUAL PERSON
26   PERSONALLY?
27   A     NO, I DO NOT, SIR.  NEVER MET HIM IN MY LIFE.
28   Q     OKAY.  SO, YOU GOT TO -- DID YOU GET OFF YOUR VAN
```

```
 1   AND ACTUALLY WALK TO UNIT 33?

 2   A     EXACTLY, SIR.

 3   Q     AND LIKE YOU SAY THERE, YOU TESTIFIED --

 4   A     EXACTLY.

 5   Q     -- TO CHECK AND SEE IF -- TO CHECK THE WORK?

 6   A     MAKE SURE, EXACTLY.

 7   Q     AND WHEN YOU WENT UP THERE, ALMA WAS STILL THERE?

 8   A     SHE WAS -- SHE CAME OUTSIDE AND THEN I TOLD HER

 9   LET'S GO INSIDE AND CHECK YOUR WORK.  SHE WAS READY TO

10   GET IN THE CAR TO GO, BUT I ALWAYS CHECK EVERYTHING WHEN

11   WE FINISH A JOB.

12   Q     IS THAT WHEN YOU HEARD THE --

13   A     WHEN WE WERE INSIDE MAKING SURE THE DOORS WERE ALL

14   LOCKED AND EVERYTHING IS SECURE, THEN I HEARD WHAT I

15   SAID.  EXACTLY.

16   Q     SO ALMA WAS WITH YOU?

17   A     SHE WAS INSIDE WITH ME.  EXACTLY, SIR.

18   Q     AND YOU TESTIFIED THAT YOU SAW AN INDIVIDUAL --

19   A     THE WALKWAY, EXACTLY.

20   Q     -- PRIOR TO YOU GOING TO 33, RIGHT?

21   A     EXACTLY SIR.

22   Q     NOW, WAS ALMA WITH YOU?

23   A     SHE WAS -- SHE WAS --

24              THE COURT:  EXCUSE ME, MR. COLONNA.

25              THE WITNESS:  SORRY.

26              THE COURT:  YOU CAN ONLY TALK ONE AT A TIME.

27              THE WITNESS:  I UNDERSTAND.  THANK YOU.

28              THE COURT:  BUT YOU CAN ONLY TALK ONE AT A
```

```
 1    TIME.
 2              THE WITNESS:  ALL RIGHT.  SO WE CAN TAKE IT
 3    ONE AT A TIME.
 4              THE COURT:  I WAS WAITING FOR YOU TO FINISH.
 5              THE WITNESS:  ALL RIGHT.
 6              THE COURT:  YOU CAN ONLY TALK ONE AT A TIME,
 7    BECAUSE SHE CAN ONLY TAKE DOWN ONE PERSON.  SO WAIT UNTIL
 8    THE ANSWER IS FULLY ANSWERED BEFORE YOU START.
 9    Q    (BY MR. PEREZ)  LET ME SEE IF I REMEMBER THE LAST
10    QUESTION.
11         WAS ALMA WITH YOU WHEN YOU SAW THE INDIVIDUAL THAT
12    YOU DESCRIBED STANDING AROUND?
13    A    SHE WAS WAITING OUT FRONT OF THE APARTMENT.
14    Q    YOU ALREADY HAD DROPPED HER OFF?
15    A    EARLIER IN THE MORNING.
16    Q    YES.
17    A    I WAS JUST GOING BACK.
18    Q    OKAY.
19              MR. PEREZ:  MAY I HAVE A MOMENT, YOUR HONOR.
20              THE COURT:  YES.
21    Q    (BY MR. PEREZ)  WHEN YOU WENT UP TO UNIT 33 TO
22    CHECK THE WORK, THE OTHER EMPLOYEES STAYED IN THE VAN?
23    A    YES, SIR.
24    Q    HOW MANY WERE THERE, IF YOU REMEMBER?  ABOUT ONE,
25    TWO?
26    A    THREE.
27    Q    THREE.  SO, TOTAL THERE WAS FOUR, THREE PLUS ALMA
28    AND YOURSELF?
```

122

1    A    THAT'S CORRECT.

2    Q    AND UNIT 33 WAS ONLY CLEANED BY ONE PERSON, ALMA?

3    A    TWO PEOPLE, SIR.

4    Q    TWO PEOPLE.  WHO WAS THE OTHER PERSON?

5    A    SOME LADY NAMED ALVA.  JUST -- SHE WORKED FOR JUST,

6    FOR, LIKE, ONE MONTH ONLY.

7    Q    SO THERE WAS ALMA.  THAT'S A-L-M-A?

8    A    YEAH.

9    Q    AND THEN ANOTHER PERSON BY THE NAME --

10   A    ALVA.

11   Q    ALVA, A-L-V-A?

12   A    A-L-V-A, CORRECT.

13   Q    OKAY.  AND WAS SHE ALSO THERE AT THE SAME TIME WHEN

14   YOU WENT WITH ALMA, WHEN YOU WENT OUT THERE?

15   A    SHE STAYED IN THE CAR.  SHE STAYED IN THE VAN.  I

16   MEAN SHE STAYED INSIDE THE VAN.

17   Q    SHE DIDN'T GO UP TO CLEAN UNIT 33?

18   A    SHE WAS THERE WORKING INSIDE THE UNIT, BUT THEN

19   WHEN I GOT BACK TO THE JOB, THEY WERE ALREADY FINISHED.

20   Q    OKAY.

21   A    SO SHE GOT IN THE VAN IMMEDIATELY AND WAITED

22   OUTSIDE.

23   Q    BUT ALMA DID NOT DO THAT?

24   A    ALMA STAYED OUTSIDE BECAUSE I SAID LET'S GO INSIDE

25   AND CHECK YOUR WORK.

26   Q    SIR, DO YOU WEAR GLASSES?

27   A    NO, SIR, I DON'T.

28   Q    OKAY.

123

```
 1              MR. PEREZ:  NOTHING FURTHER.
 2              THE COURT:  MR. GILLAN.
 3              MR. GILLAN:  THANK YOU.
 4                    CROSS EXAMINATION
 5    Q     (BY MR. GILLAN)  MR. COLONNA, YOU ARRIVED AT THE
 6    UNIT 33 AROUND 9:25 A.M.?
 7    A     SOMETHING LIKE THAT, YEAH.
 8    Q     AND YOU DROPPED A CREW OF TWO PEOPLE OFF TO CLEAN
 9    THE RESIDENCE; IS THAT RIGHT?
10    A     THAT'S RIGHT.
11    Q     WAS ONE OF THE PERSONS NAME WAS ALMA MELLO; IS THAT
12    RIGHT?
13    A     THAT'S RIGHT, SIR.
14    Q     WAS THE OTHER PERSON'S NAME AVIA ERISMELDI
15    (PHONETIC) DELOYA?
16    A     YES, SIR.
17    Q     AND THEN YOU LEFT THE AREA OF THE RESIDENCE TO DO
18    SOME OTHER WORK; IS THAT RIGHT?
19    A     YES, SIR.
20    Q     WHEN YOU ARRIVED AT 9:25, DID YOU SEE THE GENTLEMAN
21    WEARING BLACK?
22    A     AT 9:25, NO, SIR, I DID NOT.
23    Q     DID YOU NOTICE ANYONE ELSE AROUND AT 9:25 A.M.?
24    A     NO, I DID NOT.
25    Q     HOW OFTEN ARE YOU IN THAT AREA?
26    A     EVERY WEEK.
27    Q     ARE THERE USUALLY PEOPLE OUT AND ABOUT THAT TIME OF
28    THE MORNING?
```

124

1   A    PEOPLE THAT MOW LAWNS AND SERVICE COMPANIES, THAT'S

2  WHO ARE AROUND THERE.  AND HOMEOWNERS.

3   Q    OKAY.  DO YOU -- DO YOU NORMALLY SEE THEM OUT AND

4  ABOUT THAT TIME IN THE MORNING WHEN YOU ARRIVE, ABOUT THE

5  9:25?

6   A    I JUST -- PEOPLE THAT YOU NORMALLY SEE.  I DON'T

7  KNOW ANYBODY THAT I NORMALLY SEE.  ALL I SEE IS PEOPLE

8  THAT ARE SERVICE COMPANIES.  I DON'T KNOW ANYBODY IN

9  PARTICULAR.

10   Q    OKAY.  DO YOU NORMALLY TAKE NOTE OF PEOPLE THAT ARE

11  AROUND OR --

12   A    I CAN REMEMBER PRETTY GOOD.

13   Q    DID YOU SEE ANYONE ELSE THAT DAY AROUND THAT --

14   A    I SEEN A LOT OF PEOPLE THAT DAY, BUT NOT ANYBODY IN

15  PARTICULAR.

16   Q    OKAY.  THE PERSON THAT YOU DESCRIBE AND YOU HAVE

17  IDENTIFIED AS THE PERSON SITTING NEXT TO ME, WAS THE --

18  WAS THE PERSON YOU SAW RIGHT BEFORE YOU HEARD THE

19  GUNSHOTS; IS THAT RIGHT?

20   A    THAT'S RIGHT, SIR.

21   Q    THAT PERSON, DID YOU EVER SEE THAT PERSON WITH A

22  GUN IN HIS HAND?

23   A    I DIDN'T SEE HIM WITH A GUN IN HIS HAND, SIR.

24   Q    YOU NEVER SAW ANYONE ACTUALLY SHOOT A GUN, DID

25  YOU?

26   A    I JUST HEARD THE SHOTS, SIR.

27   Q    FROM THE SOUND OF THE GUNSHOTS, DID IT SOUND LIKE

28  THAT WAS PRETTY CLOSE TO WHERE YOU WERE?

125

```
 1   A    IT SOUNDED LIKE IT WAS RIGHT THERE.  I WAS RIGHT
 2  THERE.  I MEAN IF YOU WERE GONNA SHOOT A GUN AND YOU WERE
 3  GONNA SHOOT ONE FROM HERE TO THE CLOCK, YOU CAN HEAR IT
 4  PRETTY WELL.
 5   Q    SO YOU HAVE HAD EXPERIENCE LISTENING TO GUNSHOTS?
 6   A    YEAH, I HUNT.
 7   Q    SO THE GUNSHOTS WERE FAIRLY CLOSE TO WHERE YOU
 8  WERE?
 9   A    YOU COULD TELL THEY WERE RIGHT THERE, YEAH.
10   Q    WHEN YOU HEARD THE GUNSHOTS, YOU WERE INSIDE
11  APARTMENT -- OR I'M SORRY, CONDOMINIUM NUMBER 33?
12   A    I WAS IN NUMBER 33.
13   Q    AND YOU'RE WITH ALMA MELLO INSIDE --
14   A    YES, SIR.
15   Q    -- 33?
16   A    33.
17   Q    IF I TALK TOO SLOW FOR YOU, JUST RAISE YOUR HAND
18  INSTEAD OF CUTTING ME OFF, OKAY?
19   A    I'M SORRY.
20   Q    IT'S OKAY.
21   A    OKAY.
22   Q    UM, YOU SAID THAT YOU SAW THE PERSON, THE PERSON IN
23  BLACK, FOR A COUPLE SECONDS, JUST ENOUGH TO DRIVE BY HIM;
24  IS THAT RIGHT?
25   A    I DROVE -- YOU CAN ONLY GO LIKE 20 MILES AN HOUR IN
26  THAT AREA, SO YOU'RE DRIVING REALLY SLOW, BECAUSE THERE'S
27  A LOT OF LITTLE KIDS RUNNING AROUND THERE.  YOU DON'T
28  WANT TO DRIVE FAST.  YOU GOT TO DRIVE SLOW, SO YOUR ARE
```

126

```
 1   BARELY MOVING.
 2   Q     AT 9:25 THAT MORNING, DID YOU SEE ANY KIDS
 3   AROUND?
 4   A     NO, SIR.
 5   Q     OTHER THAN THE PERSON WEARING BLACK, DID YOU SEE
 6   ANYONE AROUND?
 7   A     AT THAT TIME, I DIDN'T SEE HIM, SIR.
 8   Q     AT 9:25, YOU DIDN'T SEE HIM?
 9   A     I DIDN'T SEE THE GENTLEMAN THAT I'M TALKING ABOUT
10   AT 9:25 A.M..
11   Q     WHEN DID YOU SEE THAT PERSON?
12   A     WHEN I ARRIVED BACK AGAIN, SIR.
13   Q     WASN'T THAT -- I'M SORRY.  11:25.
14   A     11:25, THAT'S RIGHT.
15   Q     THAT WAS MY FAULT.  WHEN YOU SAW THE PERSON AT
16   11:25, WERE THERE OTHER PEOPLE AROUND?
17   A     UM, NO, SIR, HE WAS THE ONLY ONE THERE, SIR.
18   Q     IS THERE ANYONE IN THE CARPORT?
19   A     I DIDN'T SEE ANYBODY ELSE, SIR.
20   Q     DID YOU HAVE TO DRIVE BY A CARPORT?
21   A     YES, SIR.  YOU KNOW, I DID REMEMBER SOMEBODY COMING
22   BACK.  THERE WAS A GENTLEMAN THAT CAME BACK IN A CAR.
23   AND THEN HE CROSSED THE CARPORT, AND I THINK IT WAS -- IT
24   COULD HAVE BEEN -- I DON'T REMEMBER EXACTLY WHAT HE
25   LOOKED LIKE, BUT HE WAS -- BECAUSE I DIDN'T REALLY -- IT
26   WAS A DISTANCE VIEW.  WHEN I -- BECAUSE WHEN I PULLED UP,
27   SOMEBODY ELSE CAME HOME, AND IT WAS RIGHT THERE WHERE I
28   WAS GOING.  COULD HAVE BEEN A NEIGHBOR THAT JUST
```

```
 1   ARRIVED.
 2   Q    OKAY.
 3   A    IT WAS A MALE FIGURE.
 4   Q    WAS THIS ON OVERLOOK DRIVE THAT YOU WERE DRIVING?
 5   A    EXACTLY, SIR.
 6   Q    SO YOU SAW A PERSON ARRIVE AT THEIR CARPORT RIGHT
 7   BEFORE YOU GOT TO THAT LOCATION?
 8   A    HE CROSSED THE -- I'M DRIVING FORWARD, HE CAME IN,
 9   PARKED AND WALKED OUT.  SO IT MUST HAVE BEEN RIGHT BEFORE
10   I GOT THERE.  COULD HAVE BEEN THE GENTLEMAN THAT GOT HIT.
11   Q    DID YOU SEE THE PERSON WALK ACROSS THE DRIVING --
12   A    I SAW HIM WALK IN BEFORE I GOT THERE.
13   Q    I WASN'T QUITE FINISHED.
14   A    OKAY.
15   Q    DID YOU SEE HIM WALK ACROSS THE CARPORT AND DOWN
16   THE STEPS INTO HIS RESIDENCE?
17   A    I SAW HIM JUST WALK ACROSS, BECAUSE I DIDN'T PAY
18   ATTENTION TO WHERE HE WAS GOING.  IT'S NONE OF ANY
19   BUSINESS.
20   Q    DID THE PERSON WALK ALL THE WAY ACROSS THE CARPORT
21   BEFORE YOU PROCEEDED THROUGH?
22   A    EXACTLY.  YES, SIR.
23   Q    AT THE TIME THE PERSON WALKED ACROSS THE CARPORT,
24   DID YOU SEE THIS PERSON IN BLACK?
25   A    BEFORE, WHEN I DROVE UP, RIGHT WHEN I GOT TO THAT
26   POINT, I EVEN -- I EVEN WENT LIKE THIS, JUST GESTURED,
27   BECAUSE IT WAS GREET PEOPLE, SAY HI.  I SAID HI TO THE
28   MAN, TOO.  I SAID HI TO HIM LIKE THIS.  HI, JUST LIKE
```

1    THAT.

2        HI, YOU KNOW, JUST LIKE IF YOU SEE SOMEBODY IN THE

3    STREET THAT YOU NEVER MET BEFORE AND YOU, LIKE, SAY

4    HELLO, HOW YOU DOING.  THAT'S WHAT I DID.  I DIDN'T SAY

5    IT VERBALLY, BUT I JUST LIKE THAT.

6    Q    OKAY.  I THINK I'M LOST.  LET ME BACK UP.  YOU'RE

7    DRIVING YOUR VAN?

8    A    OKAY.

9    Q    YOU SEE A CAR PULL INTO THE CARPORT; IS THAT RIGHT?

10   ARE WE ON THE SAME PAGE?

11   A    NO, WE ARE NOT.  BECAUSE YOU ASKED ME -- I THINK

12   YOU ASKED ME, WHEN I PULLED IN, WHAT DID I SEE FIRST, AND

13   I SAW -- OKAY.  THEN I MISUNDERSTOOD WHAT YOU WERE

14   ASKING --

15   Q    YOU'RE DRIVING BACK TO PICK UP YOUR GALS, RIGHT?

16   A    UH-HUH.

17   Q    ARE YOU WITH ME THUS FAR?

18   A    YES, SIR.

19   Q    THERE'S A CAR THAT YOU SEE IN FRONT OF YOU THAT

20   PULLS INTO A CARPORT; IS THAT RIGHT?

21   A    YES, SIR.

22   Q    YOU SEE A PERSON ACTUALLY GET OUT OF HIS CAR AND

23   THEN CROSS THE -- CROSS THE PARKING AREA?

24   A    YEAH.

25   Q    IS THAT RIGHT?

26   A    YES, SIR.

27   Q    YOU DO -- YOU MAKE LIKE A FRIENDLY NOD TO THIS

28   PERSON?

129

1   A    NO, I DO NOT, SIR.

2   Q    OKAY.  SO THIS PERSON ACTUALLY CROSSES IN FRONT OF

3 YOUR VAN BEFORE YOU PROCEED TO UNIT 33; IS THAT RIGHT?

4   A    YES, SIR.

5   Q    AND THEN WHEN YOU GET TO UNIT 33, YOU SEE THE GUY

6 IN BLACK; IS THAT RIGHT?

7   A    UM, WHEN I GET TO UNIT 33, I DIDN'T SEE THE GUY IN

8 BLACK, SIR.  I WAS PASSING BY HIM.

9   Q    OKAY.  SO YOU PASS BY THE GUY IN BLACK AND THEN YOU

10 PARKED CLOSE TO UNIT 33; IS THAT RIGHT?

11   A    I PASS THE GUY IN THE BLACK, OKAY, ON THE LEFT-HAND

12 SIDE, AND THEN I -- AS I'M DRIVING UP, I SAW THIS CAR

13 PULL UP.  OKAY.  AND THE GUY GOT OUT OF THE CAR.  AND HE

14 WENT INSIDE HIS PLACE, BEFORE I GOT THERE.  BECAUSE IT'S

15 STILL A DISTANCE AWAY TO GET THERE.

16   Q    OKAY.  SO YOU SAW THIS GUY IN BLACK BEFORE YOU SAW

17 THE GUY IN THE CARPORT?

18   A    SURE, THAT'S EXACTLY WHAT HAPPENED.

19   Q    MY CONFUSION.

20   A    OKAY.

21   Q    SO, IF I UNDERSTAND CORRECTLY, YOU DRIVE INTO UNIT

22 33, YOU SEE A GUY IN BLACK AND YOU GIVE HIM A NOD; IS

23 THAT RIGHT?

24   A    THAT'S RIGHT.

25   Q    DOES HE RESPOND TO YOUR NOD?

26   A    HE'S MINDING HIS OWN BUSINESS, I DIDN'T THINK

27 NOTHING OF IT.  IT'S OKAY WITH ME.  JUST GO AHEAD, I'M

28 JUST GOING BY ANYWAY.

130

```
 1   Q     IS HE WALKING IN ANY PARTICULAR DIRECTION?

 2   A     JUST STANDING THERE.   THAT'S ALL.

 3   Q     DOES HE HAVE ANYTHING IN HIS HANDS?

 4   A     A LITTLE CASE.   A LITTLE BAG.

 5   Q     YOU SAID HE'S LOOKING AROUND?

 6   A     THAT'S RIGHT.

 7   Q     ANYTHING ELSE?

 8   A     THAT'S ALL.

 9   Q     SO YOU PASS THIS GUY AND YOU SAY YOU SAW HIM FOR A

10   COUPLE SECONDS?

11   A     YEAH, ABOUT TWO OR THREE SECONDS.   THAT'S ALL.   GO

12   ONE THOUSAND ONE, ONE THOUSAND TWO, ONE THOUSAND THREE,

13   THAT'S HOW LONG.

14   Q     WHEN YOU NODDED AT HIM, DID HE NOD BACK?

15   A     NO, SIR.

16   Q     NOTHING?

17   A     NO.

18   Q     DID HE MAKE EYE CONTACT WITH YOU?

19   A     YES, HE DID.

20   Q     NOTHING?

21   A     YES, HE DID.

22   Q     NO, I MEAN HE DIDN'T RESPOND IN ANY WAY?

23   A     NO.

24   Q     NO SMILE, NO NOD?

25   A     NO, BUT IF YOU'RE GOING TO DO SOMETHING LIKE THAT,

26   YOU'RE GOING TO BE -- YOU'RE GOING TO BE FOCUSED ON WHAT

27   YOU'RE DOING ONLY.   SO YOU DON'T HAVE TO -- PAY ATTENTION

28   TO ONLY WHAT YOU GOT TO DO.   THAT'S IT.
```

131

1    Q    JUST ASKING YOU WHETHER HE DID ANYTHING --

2    A    THAT'S RIGHT.

3    Q    -- IN YOUR DIRECTION?

4    A    THAT'S RIGHT.

5    Q    DID HE DO ANYTHING IN YOUR DIRECTION?

6    A    HE DIDN'T DO NOTHING IN MY DIRECTION.

7    Q    OKAY.  AS YOU PASSED HIM, DID YOU EVER LOOK BACK IN

8    THE REARVIEW MIRROR TO SEE WHAT HE WAS DOING?

9    A    NO, BECAUSE I DIDN'T THINK NOTHING OF IT, SIR.

10   Q    SO AT THIS POINT THEN, THEN THIS IS WHEN YOU SEE

11   THE CAR PULL INTO THE CARPORT; IS THAT RIGHT, AFTER YOU

12   SEE THIS?

13   A    AFTER I SAW THE GENTLEMAN THERE.

14   Q    AND THEN THE PERSON GETS OUT OF THE CAR AND WALKS

15   IN FRONT OF YOUR VAN; IS THAT RIGHT?

16   A    YEAH, BUT YOU STILL GOT A -- ALSO THERE'S A WAYS TO

17   GET THERE.  IT'S PROBABLY AT LEAST 45 YARDS --

18   Q    OKAY.

19   A    -- FROM THERE.

20   Q    DID YOU MAKE EYE CONTACT WITH THE GUY THAT GOT OUT

21   OF THE CARPORT?

22   A    NO, SIR, I DIDN'T MAKE ANY EYE CONTACT.

23   Q    ABOUT HOW CLOSE DID YOU GET TO THE GUY GETTING OUT

24   OF CARPORT?

25   A    ABOUT 45 YARDS, SIR.

26   Q    45 YARDS.

27   A    (WITNESS NODS HEAD.)

28   Q    BY THE TIME YOU GOT TO HIS LOCATION, WAS HE

1  ALREADY -- HAD HE ALREADY WALKED ACROSS THE CARPORT?

2  A    HE WALKED ACROSS.

3  Q    SO THEN YOU GET TO THE AREA OF NUMBER 33; IS THAT

4  RIGHT?

5  A    THAT'S RIGHT, SIR.

6  Q    AND AT THAT POINT YOU DIDN'T THINK THERE WAS

7  ANYTHING UNUSUAL ABOUT THE DAY; IS THAT RIGHT?

8  A    THAT'S RIGHT, SIR.

9  Q    YOU HAD -- YOU SAW YOUR WORKERS OUTSIDE OF THE

10  RESIDENCE; IS THAT RIGHT?

11  A    THAT'S RIGHT.

12  Q    AND THEN I GUESS YOU WALKED UP AND GREETED BOTH OF

13  THEM?

14  A    UH-HUH.

15  Q    RIGHT?

16  A    THAT'S CORRECT.

17  Q    AVIA THEN WENT TO YOUR VAN; IS THAT WHAT YOU'RE

18  SAYING?

19  A    THAT'S RIGHT.

20  Q    AND THEN ALMA WENT INSIDE THE RESIDENCE WITH YOU?

21  A    SHE GREETED ME OUTSIDE FIRST.  SHE TOLD ME THERE'S

22  A GUY WALKING AROUND.

23  Q    WITHOUT --

24  A    SHE'S THE ONE THAT -- WHEN YOU -- WHEN SHE COMES IN

25  HERE, YOU CAN ASK HER MORE QUESTIONS THAN ME.  SHE'S THE

26  ONE.  SHE WAS THE -- SHE SAW MORE THAN ME.

27  Q    OKAY.  I WILL ASK HER SOME QUESTIONS WHEN SHE COMES

28  IN, BUT I'M JUST INTERESTED IN WHAT YOU HAVE TO SAY AT

1    THIS POINT.

2    A    OKAY.

3    Q    SO YOU AND ALMA GO INSIDE THE RESIDENCE?

4    A    THAT'S RIGHT.

5    Q    ABOUT HOW LONG -- HOW MUCH TIME PASSES BETWEEN THE

6    TIME YOU GREET ALMA AND THE TIME THAT YOU GET IN THE

7    RESIDENCE?   ABOUT HOW MUCH TIME PASSES IN THAT INSTANCE?

8    A    MAYBE THREE OR FOUR MINUTES.

9    Q    OKAY.   AND THEN FROM THE TIME THAT YOU -- HOW MUCH

10   TIME DID YOU SPEND INSIDE THE RESIDENCE BEFORE YOU HEARD

11   THE GUNSHOTS?

12   A    OH, I THOUGHT YOU SAID HOW LONG WAS I INSIDE THE

13   APARTMENT.

14   Q    NO.   HOW LONG DID YOU SPEND WITH ALMA BEFORE YOU

15   WENT INSIDE.

16   A    MAYBE A COUPLE SECONDS ONLY.   BECAUSE LONG ENOUGH

17   TO TELL HER, LET'S GO INSIDE AND LOOK AT YOUR WORK.

18   Q    OKAY.   AND ONCE INSIDE THE RESIDENCE, HOW LONG

19   BEFORE YOU HEARD THE GUNSHOTS?

20   A    UM, LIKE THREE TO FOUR MINUTES.

21   Q    OKAY.   WHEN YOU'RE IN THE -- IN THE APARTMENT, OR

22   WHEN YOU'RE IN THE CONDO, DO YOU REMEMBER WHAT PARTICULAR

23   LOCATION YOU WERE AT WHEN YOU HEARD THE GUNSHOT?

24   A    RIGHT BY THE DOOR, INSIDE THE DOOR.

25   Q    JUST ONE STEP TO GET OUT OF THE DOOR?

26   A    ABOUT THREE OR FOUR STEPS IN.

27   Q    OKAY.   THAT'S THE FRONT DOOR?

28   A    THE FRONT DOOR.

134

| | |
|---|---|
| 1 | Q     AND YOU HEARD NUMEROUS SHOTS; IS THAT RIGHT? |
| 2 | A     LIKE I SAID, LIKE SOMEBODY UNLOADED A GUN. |
| 3 | Q     OKAY.  AND WOULD THAT BE SIX SHOTS? |
| 4 | A     SIX OR SEVEN, SOMETHING LIKE THAT.  YOU KNOW, LIKE |
| 5 | THEY HAVE DIFFERENT CALIBERS, DIFFERENT MAGAZINE -- |
| 6 | Q     JUST ASKING. |
| 7 | A     -- CAPACITIES. |
| 8 | Q     I'M JUST ASKING WHAT YOU RECALL. |
| 9 | A     THEY JUST LIKE BOOM, BOOM, BOOM, BOOM, BOOM, BOOM, |
| 10 | BOOOM.  THAT'S IT. |
| 11 | Q     AND DID YOU WAIT UNTIL THE LAST ROUND WAS FIRED |
| 12 | BEFORE YOU EXITED? |
| 13 | A     IT UNLOADED PRETTY QUICK, SO BY THE TIME YOU UNLOAD |
| 14 | IT, COULDN'T TAKE A STEP. |
| 15 | Q     WHEN YOU WENT OUT TO YOUR VAN, DID YOU SEE ANYTHING |
| 16 | IN THE SURROUNDING AREA? |
| 17 | A     NO.  I JUST SAW MYSELF WALKING OUT THE DOOR. |
| 18 | Q     DID YOU SEE -- DID YOU SEE ANY PERSON THAT WAS |
| 19 | SHOT? |
| 20 | A     NO. |
| 21 | Q     AND YOU DIDN'T SEE ANYONE RUNNING? |
| 22 | A     I WASN'T GOING TO LOOK FOR ANYTHING LEAVING THE |
| 23 | PLACE.  I WAS JUST GONNA LOOK FOR MY CAR, AND GET IN MY |
| 24 | CAR AND GO. |
| 25 | Q     I APPRECIATE THAT, BUT I'M ASKING WHETHER OR NOT |
| 26 | YOU DID. |
| 27 | A     I DID NOT SEE ANYTHING. |
| 28 | Q     OKAY.  WHEN YOU LEFT THAT AREA, YOU DIDN'T GO BACK |

1  THE WAY YOU CAME, DID YOU?

2  A    NO, I WENT THE OPPOSITE DIRECTION.

3  Q    AND ABOUT HOW FAR DID YOU GET BEFORE YOU STOPPED TO

4  TALK WITH ANOTHER RESIDENT IN THE AREA?

5  A    LOOK AT THE DIAGRAM.  AT THE END OF THE DRIVEWAY

6  WHERE IT MEETS THE STREET, RIGHT THERE.  THERE'S SOMEONE

7  WALKING THIS WAY ALREADY FROM THE STREET.  THEY'RE

8  WALKING TO SEE WHAT'S GOING ON.  AND I ASKED HIM -- I

9  TOLD HIM THERE'S SOMEBODY SHOOTING OVER HERE, AND HE SAYS

10  YEAH.  AND HE SAID IT SOUNDS LIKE SOMEONE SHOOTING INTO

11  SOMETHING.  THAT'S EXACT WORDS THAT HE SAID.  AND THEN HE

12  SAID THERE'S A POLICE OFFICER OVER THERE.  AND THAT'S

13  WHERE WE WENT.

14  Q    SO YOU WENT AND REPORTED THIS TO THE OFFICER?

15  A    RIGHT.  YEAH.

16  Q    FAIR ENOUGH.

17          MR. GILLAN:  I GUESS THAT'S ALL I HAVE.  THANK

18  YOU VERY MUCH.

19          THE COURT:  MR. ROBERTSON?

20                  CROSS EXAMINATION

21  Q    (BY MR. ROBERTSON)  MR. COLONNA, MY NAME IS HARRY

22  ROBERTSON.  I HAVE SOME BRIEF QUESTIONS FOR YOU.

23      WHEN YOU WALK OUT THE FRONT DOOR OF NUMBER 33,

24  YOU -- LET ME BACK UP.

25      AT SOME POINT YOU LEARNED THAT THE INDIVIDUAL HAD

26  BEEN SHOT AND KILLED IN THAT SAME COMPLEX AREA,

27  CORRECT?

28  A    THAT'S RIGHT, SIR.

1  Q     DID YOU LEARN WHERE THAT OCCURRED, AT WHICH UNIT IT

2  WAS?

3  A     YES, SIR.

4  Q     AS YOU WALK OUT THE FRONT DOOR FROM NUMBER 33, WAS

5  THE LOCATION WHERE THE PERSON WAS SHOT TO YOUR LEFT OR

6  YOUR RIGHT?

7  A     TO YOUR RIGHT, SIR, IF YOU WALK OUT THE DOOR.

8  Q     AND AS YOU -- AS YOU LEFT, DID YOU EXIT TO THE

9  LEFT?

10  A     I EXITED STRAIGHT, RIGHT UP THE STAIRS AND TO MY

11  TRUCK, AND WENT THE OTHER DIRECTION.  TO THE LEFT.  THEIR

12  PLACE TO THE RIGHT.  I WENT UP AND TO THE LEFT AND OUT OF

13  THERE.  I DIDN'T LOOK TO THE RIGHT OR TO THE LEFT, JUST

14  WENT STRAIGHT TO THE VAN AND GOT OUT.

15  Q     ALL RIGHT.

16          MR. ROBERTSON:  MAY I HAVE A MOMENT, YOUR

17  HONOR.

18          THE COURT:  ALL RIGHT.

19  Q     (BY MR. ROBERTSON)  IT LOOKS LIKE YOU HAVE BEEN

20  READING FROM SOME PAPERS IN FRONT OF YOU.  YOU HAVE BEEN

21  LOOKING AT SOME PAPERS.  IS THAT WHAT YOU WERE GIVEN TO

22  REFRESH YOUR MEMORY WITH?

23  A     WELL, I WAS JUST LOOKING THERE, BECAUSE I WAS JUST

24  MAKING SURE IT'S THE SAME PAPER THAT HE GAVE ME.

25  Q     WHO'S HE?

26  A     THE GENTLEMAN RIGHT THERE.

27  Q     THIS MAN RIGHT HERE?

28  A     YEAH.

1   Q    THAT'S MR. ROSEN?

2   A    EXACTLY.

3   Q    AND YOU MET WITH HIM?

4   A    RIGHT.  WE WERE RIGHT THERE TALKING RIGHT NOW,

5   RIGHT.

6   Q    YES.  I'M SORRY, BUT WHEN MR. ROSEN FIRST STARTED

7   ASKING YOU QUESTIONS, MR. COLONNA, I THINK HE ASKED IF

8   YOU -- THEY GAVE YOU SOME PAPERS TO LOOK AT, PERHAPS THE

9   STATEMENT TO READ.

10  A    THAT'S RIGHT, SIR.

11  Q    IS THAT WHAT YOU HAVE?

12  A    THAT'S WHAT I HAVE RIGHT HERE.

13          MR. ROBERTSON:  MAY I SEE WHAT HE'S LOOKING

14  AT, YOUR HONOR?

15          THE COURT:  YES, GO AHEAD.

16  Q    (BY MR. ROBERTSON)  MR. COLONNA, YOU SPEAK SPANISH,

17  CORRECT?

18  A    I SPEAK IT.

19  Q    AND YOU UNDERSTAND IT?

20  A    YES, SIR.

21  Q    WHEN -- STRIKE THAT.

22      THE PIECE OF PAPER THAT YOU WERE GIVEN THERE

23  INDICATES, I THINK THAT YOU TALKED TO THE POLICE OFFICER

24  ON THAT REPORT QUITE A FEW DAYS AFTER THE OCCURRENCE,

25  CORRECT?

26  A    YES.  IT MUST HAVE BEEN A COUPLE DAYS AFTERWARDS,

27  SIR.

28  Q    NOW, ON THE VERY FIRST DAY THAT THESE EVENTS

138

1  OCCURRED, THAT IS YOU HEARD THE GUNFIRE, AND YOU SPOKE

2  WITH A POLICE OFFICER RIGHT AFTER, HE ASKED FOR A

3  DESCRIPTION OF WHAT ANYBODY HAD SEEN, CORRECT?

4  A    THAT'S RIGHT.  THEY CALLED US ON THE TELEPHONE.

5  Q    I'M TALKING ABOUT WHILE YOU'RE IN THE VAN.  WHILE

6  YOU'RE IN THE VAN, DID YOU NOT SPEAK WITH A POLICE

7  OFFICER RIGHT THEN?

8  A    HE JUST ASKED US A QUESTION, WHERE IS IT AT, AND WE

9  POINTED OUT THE DIRECTION WHERE IT WAS AT.

10  Q    DID YOU LOOK AT ANY OTHER PAPERS RELATING TO

11  STATEMENTS YOU MAY HAVE MADE TO THE POLICE?

12  A    WHERE WOULD THAT BE, SIR?

13  Q    YOU HAVEN'T THEN, I'M ASSUMING?

14  A    OKAY.  NO, BECAUSE WHEN I SAID SOMETHING, I DON'T

15  HAVE TO LOOK BACK AT WHAT I SAID ON THE PAPER.  I'M JUST

16  LOOKING FROM MY MEMORY.  I SHOULDN'T HAVE TO LOOK AT A

17  PIECE OF PAPER TO REMEMBER WHAT I SAID OR WHAT I SAW.

18       THAT'S WHY I SAID -- SORRY FOR INTERRUPTING YOU,

19  BUT WHEN I SAID TEN O'CLOCK --

20            THE COURT:  MR. COLONNA, THERE'S NO QUESTION

21  PENDING.

22            THE WITNESS:  I'M SORRY.

23            THE COURT:  IF THEY WANT TO ASK ABOUT THE

24  TIME, THEY WILL.

25  Q    (BY MR. ROBERTSON)  WHAT DOES THE PHRASE NEGRO MEAN

26  IN SPANISH?

27  A    BLACK, SIR.

28  Q    AND DID YOU HEAR HIM DESCRIBE -- THIS PERSON

139

```
1   DESCRIBED AS NEGRO?
2   A    NO, I DIDN'T HEAR THAT, SIR.
3   Q    A POLICE OFFICER DID WALK UP TO THE VEHICLE,
4   CORRECT?
5   A    POLICE OFFICER WALK UP TO WHAT VEHICLE?
6   Q    THE VAN THAT YOU WERE IN ON THE FIRST DAY.
7   A    THE VAN.  HE -- HE DROVE UP TO IT.
8   Q    YES.  AND THERE WAS A DIALOGUE BETWEEN THE POLICE
9   OFFICER IN THE CAR AND THE PEOPLE IN YOUR VAN?
10  A    OKAY.
11  Q    CORRECT?
12  A    WE -- I THINK WITH ME ONLY.
13  Q    DO YOU REMEMBER BEING ASKED FOR A DESCRIPTION?
14  A    I THINK SO.
15  Q    AND DO YOU REMEMBER THE LADY WITH YOU DESCRIBING
16  THE PERSON AS NEGRO?
17  A    SHE PROBABLY WOULD HAVE SAID BLACK CLOTHES, IF
18  ANYTHING.  SAID BLACK PERSON, BECAUSE OBVIOUSLY THE
19  PERSON WAS NOT BLACK, SIR.
20  Q    THAT WASN'T THE QUESTION I ASKED, THOUGH.  YOU'RE
21  SAYING THAT NOW --
22  A    BUT YOU'RE SAYING -- YOU SAID NEGRO, BUT OF COURSE,
23  WHY WOULD YOU BRING UP NEGRO.
24  Q    WELL, I DON'T WANT TO GET INTO A COLLOQUY WITH YOU.
25  THE WAY THIS WORKS HERE IS I ASK YOU QUESTIONS --
26  A    OKAY.
27  Q    -- AND IF YOU CAN, YOU ANSWER THEM.
28  A    OKAY, SIR.
```

1  Q     SO, MY QUESTION IS, WHEN THE OFFICER ASKED FOR A

2  DESCRIPTION, THE FIRST TIME --

3  A     OKAY.

4  Q     -- DO YOU REMEMBER ANYTHING ABOUT HOW THIS PERSON

5  WAS DESCRIBED?

6  A     WAS IN BLACK CLOTHES.

7  Q     ANYTHING ELSE?

8  A     UM, THAT'S PROBABLY IT, BLACK CLOTHES, AND THE SAME

9  DESCRIPTION THAT WE GAVE EARLIER.

10 Q     DO YOU REMEMBER THE PERSON BEING DESCRIBED AS

11 WHITE?

12 A     WOULD BE MORE LIKE A SPANISH, YOU KNOW, LIGHT

13 COMPLEXION.

14 Q     BUT MY QUESTION IS, DO YOU REMEMBER THE PERSON AS

15 BEING DESCRIBED AS WHITE?

16 A     LIKE A WHITE, WHITE, WHITE, WHITE PERSON, NO.

17 WHITE, WHITE, NO.

18 Q     JUST DO YOU REMEMBER THE WORDS BEING USED THAT THE

19 PERSON WAS WHITE?

20 A     UM, NOT WHITE.  GENERALLY LIKE SPEAKING WHITE, LIKE

21 PALE WHITE, NO.

22        MR. ROBERTSON:  NO FURTHER QUESTIONS.

23        THE COURT:  ANY REDIRECT?

24        MR. ROSEN:  YEAH.  COUPLE FOLLOW-UP QUESTIONS.

25                  REDIRECT EXAMINATION

26 Q     (BY MR. ROSEN)  MR. COLONNA, I WANTED TO SHOW YOU

27 THE DIAGRAM THAT WE MARKED AS PEOPLE'S 67.

28        MAYBE JUST USE A PEN.  TRY THIS ONE.  YOU

1   PREVIOUSLY PUT SOME ARROW ON HERE INDICATING THE

2   DIRECTION THAT YOUR VAN DROVE WHEN YOU LEFT AFTER HEARING

3   THE GUNSHOTS.  AND I WONDER IF YOU CAN JUST PUT SOME

4   ARROWS HERE INDICATING THE DIRECTION YOUR VAN WAS

5   TRAVELING WHEN YOU FIRST SAW THE MAN IN THE WALKWAY.

6   A     RIGHT HERE.  RIGHT THERE.

7   Q     OKAY.  OKAY.  I'M GOING TO SHOW THIS, FOR THE

8   RECORD --

9   A     THAT'S EXACTLY WHERE, AND THE GUY WAS GETTING

10  OUT --

11  Q     SPEAK UP.

12  A     WHEN THE -- WHEN THE GUY WAS GETTING OUT OF THE

13  CAR, I WAS PROBABLY RIGHT HERE WHERE THE STAR IS AND HE

14  CROSSED RIGHT THERE.

15  Q     OKAY.  AND SO, I'M GOING TO PUT THIS ON THE SCREEN

16  IN JUST A SECOND.

17        SO IT'S FAIR TO SAY THE DIRECTION THAT YOU WERE

18  TRAVELING WHEN YOU FIRST SAW THE GUY IN THE WALKWAY, WAS

19  THE SAME DIRECTION THAT YOU WERE TRAVELING AFTER YOU

20  HEARD THE GUNSHOTS AND DROVE AWAY?

21  A     THAT'S CORRECT.

22  Q     IN OTHER WORDS, YOU DIDN'T DRIVE BACK IN THE

23  DIRECTION YOU CAME FROM, YOU KEPT GOING OUT?

24  A     THAT'S RIGHT.

25  Q     ALL RIGHT.  SO, YOU CAN JUST HAVE A SEAT THERE.

26        PEOPLE'S 67, WHAT YOU HAVE INDICATED WAS AN ARROW

27  HERE FOR THE DIRECTION THAT YOU WERE TRAVELING WHEN YOU

28  FIRST SAW THE MAN IN THE WALKWAY LOOKING SUSPICIOUS.

1          YOU PUT A LITTLE STAR HERE INDICATING WHERE YOU

2     WERE WHEN YOU SAW A DIFFERENT MAN WHO HAD PARKED IN THE

3     CARPORT AND THEN WALKED INTO A RESIDENCE.

4          AND YOU INDICATED THAT WITH A LITTLE MARKING HERE.

5     AND I'M JUST GOING TO CIRCLE THIS, THAT ROUGHLY IN THIS

6     AREA WHERE THE CIRCLE IS, IS WHERE AFTER THE MAN PARKED,

7     HE THEN WALKED INTO A RESIDENCE; IS THAT CORRECT?

8     A     THAT'S CORRECT.

9     Q     AND DID THE RESIDENCE THAT THE MAN APPEARED TO WALK

10    INTO, APPEAR TO BE SOMEWHAT CLOSE TO THE UNIT THAT YOUR

11    EMPLOYEES WERE CLEANING?

12    A     IT SEEMED TO BE BEFORE THAT.

13    Q     OKAY.  A LITTLE --

14    A     BECAUSE I PASSED THE AREA WHERE HE -- WHERE THAT

15    GUY WALKED ACROSS, I WENT PAST IT.

16    Q     SO, IT APPEARED TO BE A LITTLE BIT BEFORE ONE WOULD

17    GET TO UNIT 33?

18    A     EXACTLY.

19    Q     AND FINALLY, AFTER HEARING THE GUNSHOT, WHEN YOU

20    WERE INSIDE THE RESIDENCE, AND THEN YOU LEFT THE

21    RESIDENCE AND GOT INTO THE VAN, AS YOU LEFT THE RESIDENCE

22    AND GOT IN THE VAN, YOU DIDN'T, LIKE, LOOK AROUND?  YOU

23    JUST GOT IN AND DROVE AWAY?

24    A     THAT'S RIGHT.

25          MR. ROSEN:  OKAY.  I DON'T HAVE ANY MORE

26    QUESTIONS.

27          THE COURT:  MR. PEREZ.

28          MR. PEREZ:  NO, YOUR HONOR.

143

```
 1              THE COURT:  MR. GILLAN?

 2              MR. GILLAN:  NO, YOUR HONOR.

 3              THE COURT:  MR. ROBERTSON.

 4              MR. ROBERTSON:  NO, YOUR HONOR.  THANK YOU.

 5              THE COURT:  YOU CAN STEP DOWN.  THANK YOU,

 6    VERY MUCH.  WE'LL BE IN RECESS ABOUT TEN MINUTES.

 7              (RECESS TAKEN.)

 8              THE COURT:  RECORD WILL SHOW ALL THE

 9    DEFENDANTS AND ALL COUNSEL ARE PRESENT.

10         MR. ROSEN, YOUR NEXT WITNESS.

11              MR. ROSEN:  YES, YOUR HONOR.  THE PEOPLE ARE

12    GOING TO CALL ALMA MELLO TO THE WITNESS STAND.

13              THE COURT:   OKAY.

14              MR. ROSEN:  SHE HAS AN INTERPRETER.

15              THE COURT:  ALL RIGHT.

16              MR. ROSEN:   YOUR HONOR, THE PEOPLE CALL ALMA

17    MELLO TO THE WITNESS STAND.

18              THE COURT:  MISS MELLO, WILL YOU COME UP HERE

19    TO THE WITNESS STAND AND RAISE YOUR RIGHT HAND AND THE

20    CLERK WILL SWEAR YOU IN.

21                        ALMA FUENTES,

22    HAVING BEEN CALLED AS A WITNESS ON BEHALF OF THE PEOPLE,

23    BEING FIRST DULY SWORN TO TELL THE TRUTH, TESTIFIED AS

24    FOLLOWS:

25              THE COURT:  HAVE A SEAT.  COULD YOU PLEASE

26    STATE YOUR FULL NAME AND SPELL YOUR FULL NAME.

27              THE WITNESS:  ALMA FUENTES.

28              THE COURT:  OKAY.  SPELL IT, PLEASE.
```

144

```
 1              THE WITNESS:  IN SPANISH?
 2              THE COURT:  YES.
 3              THE WITNESS:  A-L-M-A  F-U-E-N-T-E-S.
 4              THE COURT:  THANK YOU.  GO AHEAD.
 5                    DIRECT EXAMINATION
 6    Q    (BY MR. ROSEN)  DO YOU PREFER ME TO CALL YOU MISS
 7    MELLO OR MISS FUENTES?
 8    A    MISS FUENTES.
 9              MR. PEREZ:  YOUR HONOR --
10              THE COURT:  YES.
11              MR. PEREZ:  CAN I ASK THE WITNESS TO -- HER
12    TESTIMONY IN SPANISH TO BE LOUD ENOUGH SO WE CAN HEAR IT,
13    RATHER THAN JUST WHISPERING TO THE INTERPRETER.
14              THE COURT:  MA'AM, YOU CAN -- ACTUALLY, COULD
15    YOU SCOOT UP A LITTLE BIT TOWARD THE MICROPHONE ALSO,
16    MA'AM.  MAYBE KIND OF SHARE THAT.  THANK YOU.
17    Q    (BY MR. ROSEN)  GOOD AFTERNOON.
18    A    GOOD AFTERNOON.
19    Q    WHAT DO YOU DO FOR A LIVING?
20    A    I CLEAN HOUSES.
21    Q    FOR HOW MANY YEARS HAVE YOU CLEANED HOUSES?
22    A    NINE YEARS.
23    Q    DO YOU CLEAN A HOUSE ON OVERLOOK ROAD IN LOS
24    GATOS?
25    A    YES.
26    Q    DO YOU STILL CLEAN THAT HOUSE?
27    A    NO, NOT ANY LONGER.
28    Q    FOR HOW LONG DID YOU CLEAN THAT HOUSE?
```

145

```
1   A    FOR ABOUT TWO MONTHS.  ONE MONTH, TWO MONTHS.  MY
2   BOSS HAD JUST GOTTEN THAT HOUSE.
3   Q    DID YOU CLEAN THAT HOUSE ON OVERLOOK ROAD ON MARCH
4   14, 2008?
5   A    YES.
6   Q    WHAT TIME DID YOUR BOSS DROP YOU OFF AT THE
7   HOUSE?
8   A    9:25.
9   Q    IS THIS -- HOW WOULD YOU DESCRIBE THE RESIDENCE?
10  IS IT A HOUSE?  IS IT AN APARTMENT?  IS IT A TOWNHOUSE?
11  HOW WOULD YOU DESCRIBE IT?
12  A    I WOULD DESCRIBE IT AS AN APARTMENT.
13  Q    AFTER YOUR BOSS DROPPED YOU OFF TO CLEAN THIS
14  APARTMENT, WERE YOU BY YOURSELF OR WERE YOU CLEANING WITH
15  SOMEONE ELSE?
16  A    I WAS WITH ANOTHER PERSON.
17  Q    WHAT WAS HIS OR HER NAME?
18  A    HER NAME WAS AVIA.
19  Q    WHILE YOU WERE CLEANING THE APARTMENT, DID YOU OPEN
20  SOME SHUTTERS?
21  A    YES, BECAUSE I HAD TO CLEAN THEM.
22  Q    WHEN YOU OPENED THE SHUTTERS, DID YOU LOOK OUTSIDE
23  TOWARDS THE CARPORT AREA?
24  A    YES.
25  Q    DID YOU SEE ANYONE WALKING IN THE CARPORT AREA?
26  A    YES.
27  Q    A MAN OR A WOMAN?
28  A    A MAN.
```

146

1  Q    ABOUT WHAT TIME DID YOU FINISH CLEANING THE
2  APARTMENT?
3  A    I FINISH AT ABOUT 10:30.
4  Q    AFTER YOU FINISHED CLEANING THE APARTMENT, WHAT DID
5  YOU DO?
6  A    I WAS OUTSIDE WAITING FOR MY BOSS.
7  Q    WHEN YOU SAY YOU WERE OUTSIDE, WERE YOU ON THE
8  STREET, WERE YOU ON STEPS?  WHAT WERE YOU ON?
9  A    I WAS SITTING DOWN ON THE STAIRS.
10 Q    ARE THERE SOME STAIRS THAT LEAD FROM THE STREET
11 DOWN INTO THE APARTMENT?
12 A    YES.
13 Q    WHILE SITTING ON THE STEPS, DID YOU SEE ANYTHING?
14 A    THE PERSON THAT WAS -- THAT WAS THERE WHEN --
15 WALKING.  FROM THE TIME THAT WE STARTED CLEANING THE
16 APARTMENT, THAT SAME PERSON WAS THERE WALKING, AND SMILED
17 AT ME.  KEPT GETTING ON THE PHONE.
18 Q    THIS PERSON THAT YOU SAW WALKING BY YOU, WHO SMILED
19 AT YOU, AND WAS ON THE PHONE, IS THAT THE SAME MAN THAT
20 YOU SAW EARLIER WHEN YOU OPENED THE SHUTTERS?
21 A    YES.
22 Q    ABOUT HOW MUCH TIME WOULD YOU ESTIMATE BETWEEN WHEN
23 YOU OPENED THE SHUTTERS AND SAW THE MAN AND THEN WHEN YOU
24 WERE SITTING ON THE STEPS AND YOU SAW THE SAME MAN WALK
25 BY?
26 A    FROM ABOUT 9:25 AND THEN OUR BOSS CAME TO GET US AT
27 ABOUT 11:30.
28 Q    WHEN YOU SAW THIS MAN WALK BY YOU TALKING ON THE

147

1  CELL PHONE AND SMILE AT YOU, APPROXIMATELY WHAT TIME WAS

2  THAT?

3  A    ABOUT 10:30.  IN OTHER WORDS, I KEPT SEEING HIM ALL

4  THE TIME THAT WE WERE THERE.

5  Q    HOW -- WHAT WAS THE CLOSEST DISTANCE THAT THE

6  MAN -- THAT YOU AND THE MAN WERE?

7  A    HE WOULD WALK BEHIND US FROM CORNER TO CORNER.

8  Q    HOW CLOSE DID HE GET TO YOU?  AND WHEN I SAY HOW

9  CLOSE, HOW MANY -- WITHIN HOW MANY FEET DID HE GET TO

10  YOU?  AND YOU CAN USE SOMETHING IN THE COURTROOM TO HELP

11  YOU WITH THAT.

12  A    OKAY.  MORE OR LESS, I WAS SEATED HERE ON STAIRS,

13  THE STREET IS A REGULAR STREET, ABOUT THIS FAR.

14  Q    OKAY.  LET'S TRY IT THIS WAY.  LET'S SAY THAT

15  YOU'RE SITTING ON THE STEPS RIGHT THERE, AND I'M THE MAN

16  THAT YOU SEE WALKING BY YOU.  I'M GOING TO WALK TOWARD

17  YOU, AND YOU TELL ME WHEN TO STOP AT THE POINT WHERE THE

18  MAN WAS CLOSEST TO YOU.

19  A    UH-HUH.

20  Q    DO YOU UNDERSTAND?

21  A    YES.

22  Q    WHAT'S THE DISTANCE?

23  A    OKAY.  LET'S SAY HERE'S THE STAIRS.  THE MAN WAS

24  WALKING BEHIND US.  FROM HERE TO HERE.

25  Q    FROM HERE TO HERE?

26  A    YES.  VERY CLOSE.

27  Q    OKAY.  YOU CAN HAVE A SEAT.  I'M GOING TO ESTIMATE

28  THIS AS FOUR TO FIVE FEET.  FROM HERE TO HERE?

148

1   A   FROM HERE TO HERE, MORE OR LESS.

2   Q   MORE OR LESS.

3       MR. ROSEN:  THAT LOOKS LIKE FOUR TO FIVE FEET,

4   COUNSEL.  FIVE FEET.

5       OKAY, ABOUT FIVE FEET, FOR THE RECORD.

6   Q   (BY MR. ROSEN)  THIS MAN THAT WAS SPEAKING ON THE

7   CELL PHONE, WHAT LANGUAGE WAS HE SPEAKING?

8       MR. ROBERTSON:  OBJECTION, FOUNDATION.

9       THE COURT:  I'LL ALLOW IT.

10      THE WITNESS:  IN SPANISH.

11  Q   (BY MR. ROSEN)  WERE YOU ABLE TO UNDERSTAND WHAT HE

12  WAS SAYING?

13  A   NO.

14  Q   YOU COULD JUST -- IT WAS LOUD ENOUGH FOR YOU TO

15  TELL IT WAS SPANISH?

16  A   YES.

17  Q   LOUD ENOUGH TO TELL IT WAS SPANISH, BUT NOT LOUD

18  ENOUGH TO UNDERSTAND WHAT HE WAS SAYING?

19  A   UH-HUH, YES.

20  Q   OKAY.  DID YOUR BOSS JOE COLONNA ARRIVE A FEW

21  MINUTES LATER?

22  A   YES.

23  Q   WHAT DID YOU DO?

24  A   AT ABOUT 11:30 HE CAME TO GET US.

25  Q   WHEN JOE ARRIVED AT ABOUT 11:30, WHAT DID YOU AND

26  JOE DO?

27  A   MRS. AVIA GOT INSIDE THE VAN.  JOE COLONNA AND I

28  WENT INSIDE THE APARTMENT FOR ABOUT FOUR MINUTES.

1   Q       WHAT HAPPENED NEXT?

2   A       WHEN THE BOSS WAS WITH ME, WE WERE CLEANING A DOOR,

3   WE HEARD ABOUT SIX SHOTS.

4            MR. PEREZ:  YOUR HONOR, THERE WILL BE AN

5   OBJECTION AS TO THE WE.

6            THE COURT:  I'LL SUSTAIN THE OBJECTION.  WHY

7   DON'T YOU ASK ANOTHER QUESTION, MR. ROSEN.

8   Q       (BY MR. ROSEN)  MISS FUENTES, DID YOU HEAR ABOUT

9   SIX SHOTS?

10  A       YES.

11  Q       AFTER YOU HEARD THE SIX SHOTS, WHAT DID YOU DO?

12  A       I GOT SCARED AND I WENT OUTSIDE THROUGH THE DOOR.

13  Q       WHAT DID YOU SEE NEXT?

14  A       I SAW THE PERSON THAT I HAD SEEN WALKING, THAT HAD

15  BEEN THERE, I SAW HIM RUNNING.

16  Q       THE SAME MAN THAT YOU SAW TALKING ON THE CELL

17  PHONE?

18  A       YES.

19  Q       WHICH DIRECTION WAS HE RUNNING?

20  A       THAT WAY.

21  Q       SO IF YOU WERE FACING THE STREET --

22  A       UH-HUH.

23  Q       -- WHICH DIRECTION WAS IT?

24  A       THE MAN WENT THAT WAY.  HE WENT TOWARDS THE STREET,

25  RUNNING.

26  Q       TOWARDS THE STREET RUNNING?

27  A       YES.

28  Q       HAD YOU EVER SEEN THE MAN BEFORE THAT DAY?

1   A    NO.

2   Q    LET ME ASK YOU SOME QUESTIONS ABOUT WHAT THIS

3   PARTICULAR MAN LOOKED LIKE.  FIRST QUESTION, WHITE,

4   ASIAN, HISPANIC, BLACK, WHAT?

5   A    HE WAS HISPANIC.  HISPANIC.

6   Q    WOULD YOU DESCRIBE HIM AS --

7   A    HE WAS -- HE WAS, LIKE, WHITE, NOT BROWN.

8   Q    DID YOU THINK BORN HERE OR BORN SOMEWHERE ELSE?

9   A    I THINK -- I THINK -- I DON'T KNOW IF HE WAS BORN

10  HERE OR SOMEWHERE ELSE.

11  Q    ABOUT HOW OLD?

12  A    I ESTIMATE ABOUT 26.  TWENTY-SIX, 30 YEARS,

13  SOMETHING LIKE THAT.

14  Q    WHAT KIND OF BUILD?  THIN, MEDIUM, HEAVY?

15  A    HE WAS THIN.

16  Q    DID YOU SEE THE COLOR OF THE CLOTHES HE WAS

17  WEARING?

18  A    BLACK.  BLACK PANTS.  HE HAD A BLACK BACKPACK ON

19  HIS BACK.

20  Q    WHAT ABOUT, WAS HE WEARING A SHIRT OR A JACKET?

21  A    HE HAD THE JACKET THAT WAS PART OF THE PANTS.

22  Q    WHAT COLOR?

23  A    BLACK.

24  Q    WAS THE MAN WEARING A HAT?

25  A    BLACK CAP.

26        MR. ROSEN:  ONE MOMENT.

27  Q    (BY MR. ROSEN)  MISS FUENTES, I WANT TO ASK YOU A

28  COUPLE QUESTIONS.  I'M SHOWING YOU A HAT THAT WAS MARKED

1  AS PEOPLE'S 31.  DOES THIS HAT LOOK SIMILAR, NOT SIMILAR,

2  TO THE KIND OF HAT THAT YOU SAW THE MAN WEARING?

3  A    LIKE THAT.  IT WAS LIKE THAT, MORE OR LESS.

4  Q    I WANT YOU TO TAKE A LOOK AT WHAT WE MARKED

5  PEOPLE'S 34.  TAKE A LOOK AT THIS JACKET.

6      DOES THIS JACKET LOOK SIMILAR OR NOT SIMILAR TO THE

7  JACKET YOU SAW THE MAN WEARING?

8  A    IT WAS THE COLOR, YES, BUT IT WAS LIKE -- LIKE, A

9  NYLON JACKET.

10  Q    OKAY.  NYLON JACKET.  THE KIND OF JACKET THAT WOULD

11  GO WITH SWEAT PANTS?

12  A    YES.

13  Q    MS. FUENTES, DO YOU RECALL THE POLICE COMING TO

14  TALK TO YOU A COUPLE WEEKS AFTER HEARING THE GUNSHOT AND

15  SHOWING YOU SOME PHOTOS TO SEE IF YOU COULD IDENTIFY THE

16  MAN?

17  A    YES.

18  Q    NOW, WHEN YOU SAW THE PHOTOS, DID YOU -- WERE YOU

19  ABLE TO IDENTIFY THE MAN IN THE PHOTOS?

20  A    YES.  THEY SHOWED ME ABOUT THREE.  I THINK ONE OF

21  THEM WAS HIS.  THERE WAS ONE PHOTO THAT LOOKED LIKE THAT

22  PERSON.

23  Q    LET ME SHOW YOU WHAT WE HAVE MARKED AS PEOPLE'S 64.

24  THERE ARE A NUMBER OF PHOTOS THAT I WANT TO SHOW YOU AND

25  ASK YOU --

26  A    YES.

27  Q    A COUPLE QUESTIONS ABOUT THEM.

28  A    YES.

```
1   Q    MISS FUENTES?

2         MR. ROBERTSON:  MR. ROSEN, BEFORE YOU

3   APPROACH, YOUR HONOR, I HAVE A PROBLEM WITH THE MANNER OF

4   PRESENTATION OF THE EVIDENCE AT THIS TIME, AND WOULD

5   OBJECT TO THE WITNESS BEING SHOWN THE PARTICULAR GROUP OF

6   PHOTOGRAPHS THAT MR. ROSEN IS SEEKING TO DO.  THEY ARE

7   NOT CLEAR COPIES.  THEY'RE NOT COLOR.  THEY ARE NOT THE

8   PHOTOS SHE WAS SHOWN IN THE FIRST PLACE.

9         I BELIEVE BECAUSE OF THAT, THEY'RE UNDULY SUGGESTIVE

10  AND CREATE A DIFFICULTY BECAUSE THEY'RE NOT CLEAR, AND I

11  WOULD ASK THE COURT TO TAKE A LOOK AT THE EXHIBIT BEFORE

12  MAKING THE RULING, BECAUSE I THINK IT'S GOING TO CREATE

13  THE POSSIBILITY TO TAINTING AN I.D, GIVEN WHAT IS IN THE

14  RECORD ABOUT THE WITNESS'S PRIOR STATEMENT.

15        MR. ROSEN:  I HAVE A SUGGESTION, YOUR HONOR.

16        FIRST, I WANT TO JUST ASK THE WITNESS IF SHE SEES

17  THE PERSON IN COURT TODAY AND START WITH THAT.  AND THEN

18  IN TERMS OF WHETHER OR NOT TO SHOW HER THE PHOTO LINEUP,

19  I'M HAPPY TO APPROACH AND SHOW THE LINEUP THAT I HAVE TO

20  THE COURT.

21        THE COURT:  OKAY.

22        MR. ROBERTSON:  IF THAT IS THE ORIGINAL

23  LINEUP, IF THAT'S PRESENT HERE.  THIS IS NOT THE

24  ORIGINAL.

25        THE COURT:  LET'S DEAL WITH THAT WHEN WE GET

26  TO THAT POINT.

27        MR. ROSEN:  THANK YOU.

28  Q    (BY MR. ROSEN)  MISS FUENTES, THE MAN THAT YOU SAW
```

153

```
1    WHEN YOU LOOKED OUT THE WINDOW THAT MORNING, THE SAME MAN
2    THAT YOU SAW WHEN YOU WERE SITTING ON THE STEPS WHO
3    WALKED BY YOU AND WAS SPEAKING IN SPANISH ON HIS CELL
4    PHONE, AND THE SAME MAN THAT YOU SAW RUNNING AWAY AFTER
5    HEARING THE GUNSHOTS, DO YOU SEE THAT MAN ANYWHERE IN THE
6    COURTROOM TODAY, MISS FUENTES, ARE YOU SCARED?
7    A    YES.
8    Q    WHY ARE YOU SCARED?  ARE YOU AFRAID FOR YOUR OWN
9    SAFETY?
10            MR. ROBERTSON:  OBJECTION, LEADING AND
11   SUGGESTIVE.
12            MR. PEREZ:  JOIN ON THAT, YOUR HONOR.
13            THE COURT:  OVERRULED.
14            THE WITNESS:  CAN YOU STATE THE QUESTION
15   AGAIN, PLEASE, COUNSEL.
16   Q    (BY MR. ROSEN)  PLEASE TELL US WHY YOU'RE SCARED.
17   A    I'M AFRAID, AND I FEEL BADLY FOR THE FAMILY.
18   Q    WHAT DOES THAT MEAN?  WHAT ARE YOU AFRAID OF?
19   A    I'M AFRAID ABOUT -- I'M AFRAID THAT THEY MIGHT COME
20   AFTER ME.
21   Q    DO YOU SEE THE MAN IN COURT?
22   A    YES.
23   Q    WHEN THE POLICE SHOWED YOU A PHOTO LINEUP A COUPLE
24   WEEKS AFTER YOU HEARD THE SHOTS, WERE YOU TOO AFRAID TO
25   POINT OUT THE MAN IN THE LINEUP?
26   A    NO.
27   Q    CAN YOU POINT OUT WHERE THE MAN IS IN COURT TODAY
28   THAT YOU SAW ON MARCH 14, 2008, RUNNING AWAY AFTER THE
```

```
 1   SHOTS WERE FIRED?
 2   A    DO I HAVE TO POINT HIM OUT.
 3   Q    CAN YOU -- LET ME ASK YOU THIS.  CAN YOU DESCRIBE
 4   WHAT HE'S WEARING TODAY?
 5   A    HE'S WEARING AN ORANGE SWEATSHIRT.  I'M NOT SURE IF
 6   IT'S GREEN.
 7   Q    LET ME ASK YOU THAT.  IS IT THE MAN THAT I'M
 8   POINTING TO?
 9   A    NO.
10   Q    ALL RIGHT.  IS IT THIS MAN?
11   A    NO.
12   Q    IS IT THIS MAN?
13   A    NO.
14   Q    IS IT THIS MAN?
15   A    YES.
16              MR. ROSEN:  LET THE RECORD REFLECT WITNESS
17   IDENTIFIED THE DEFENDANT LUCIO ESTRADA.
18              THE COURT:  NOTED.
19   Q    (BY MR. ROSEN)  I'D LIKE TO SHOW YOU A FEW PHOTOS.
20   I WANT TO PUT THEM ON THE SCREEN, SO YOU WILL SEE THEM.
21   OKAY.  SHOWING YOU WHAT WE MARKED AS PEOPLE'S 2, CAN YOU
22   SEE THAT FROM WHERE YOU ARE?
23   A    YES.
24   Q    DOES THAT AREA LOOK FAMILIAR TO YOU?
25   A    YES.
26   Q    IS THAT THE PART OF THE APARTMENT COMPLEX WHERE YOU
27   WENT TO CLEAN ON MARCH 14, 2008?
28   A    YES.
```

1   Q     YOU MENTIONED THAT AFTER YOU HEARD THE SHOTS FIRED

2   YOU SAW THE MAN RUNNING AWAY?

3   A     YES.

4   Q     I'M GOING TO BRING THIS UP TO YOU AND JUST ASK IF

5   YOU CAN NOTE ON THE DIAGRAM WITH LITTLE ARROWS THE

6   DIRECTION THAT THE MAN WAS RUNNING.

7             MR. ROBERTSON:  I'M GOING TO OBJECT TO THE

8   FORM OF THE QUESTION AT THIS POINT, BECAUSE IT ASSUMES

9   FACTS NOT IN EVIDENCE, AND THAT IS THAT AREA IS DISPLAYED

10  ON THAT PHOTOGRAPH.  AND IT'S LEADING AND SUGGESTIVE, IN

11  ADDITION.

12            THE COURT:  WHY DON'T YOU REPHRASE, MR.

13  ROSEN.

14            MR. ROSEN:  SURE.

15            THE COURT:  SUSTAINED.

16  Q     (BY MR. ROSEN)  THIS DIAGRAM, PEOPLE'S 2, ARE YOU

17  ABLE ON THIS DIAGRAM TO SHOW THE DIRECTION THAT THE MAN

18  WAS RUNNING AWAY AFTER THE SHOTS WERE FIRED?

19  A     YES.

20  Q     OKAY.  SO, I'M GOING TO HAND YOU PEOPLE'S 2, AND

21  I'M GOING TO GIVE YOU A PEN IN JUST A SECOND.  AND IF YOU

22  COULD MAKE LITTLE ARROWS SHOWING THE DIRECTION THAT THE

23  MAN WAS RUNNING AWAY AFTER YOU HEARD THE GUNSHOTS.

24            MR. ROBERTSON:  IF I MAY, YOUR HONOR.

25            THE COURT:  ALL RIGHT.

26            THE WITNESS:  HE WAS RUNNING THIS WAY.

27  Q     (BY MR. ROSEN)  COULD YOU PUT A LITTLE TOP ON THE

28  ARROW, SO WE KNOW THE DIRECTION.

156

```
 1          OKAY.  AND IF YOU COULD JUST WRITE YOUR NAME ON THE
 2   BOTTOM JUST SO WE KNOW WHICH WAY MR. ESTRADA RUNS.
 3   A     MY ENTIRE NAME?
 4   Q     JUST THE LAST NAME.  AND MISS FUENTES, WHERE YOU
 5   PUT THE ARROWS ON THIS DIAGRAM, IN ADDITION TO THE
 6   DIRECTION THAT THE MAN WAS RUNNING, IS THIS ALSO AN
 7   INDICATION OF WHERE YOU SAW THE MAN AS HE THEN RAN
 8   AWAY?
 9   A     THE CARS ARE RIGHT HERE AND THE STAIRS WERE -- THE
10   APARTMENTS WERE RIGHT IN FRONT.  THE GUY RAN FROM THE
11   VERY LAST STAIRS TO THE APARTMENT THAT WAY --
12   Q     OKAY.
13   A     -- TO GO OUT.
14   Q     I'M JUST -- HAVE A SEAT.  I'M JUST GOING TO SHOW
15   THIS ON THE DIAGRAM.  SHOWING PEOPLE'S 2, JUST FOR THE
16   RECORD, THE ARROW HERE TOWARDS THE CENTER DIRECTION, THE
17   MAN RAN AWAY, AND THEN WHEN SHE MENTIONED ABOUT RUNNING
18   LIKE AROUND A CAR, SHE MENTIONED THIS ARROW HERE, OR SHE
19   PLACED THAT ARROW THERE AS WELL.
20          MR. ROBERTSON:  I THINK THAT WAS WHEN SHE
21   INDICATED HE LEFT THE BOTTOM OF THE STAIRS.
22          MR. ROSEN: OKAY.
23   Q     (BY MR. ROSEN)  AND, MISS FUENTES, SHOWING YOU
24   PEOPLE'S 12, YOU MENTIONED THAT THERE WERE APARTMENTS ON
25   THE OTHER SIDE OF THE STREET.  ARE THESE THE KINDS OF
26   APARTMENTS YOU MEAN WERE ON THE OTHER SIDE OF THE
27   STREET?
28   A     THESE ARE THE ONES THAT ARE IN FRONT OF THE --
```

1 WHERE THE CARPORTS ARE, THEN THOSE ARE THE SAME

2 APARTMENTS.

3 Q    OKAY.  AND I GUESS WHAT I'M ASKING IS JUST, IF

4 YOU'RE FACING THIS DIRECTION OF THE PHOTO, YOU SEE THE

5 APARTMENTS AND THEN IF YOU TURNED 180 DEGREES, WOULD YOU

6 SEE THE CARPORT AND THE CARS?

7 A    OKAY.  YES.  THOSE ARE THE APARTMENTS.

8 Q    OKAY.  THANK YOU.

9      SHOWING YOU PEOPLE'S 13, YOU HAD MENTIONED SOME

10 STAIRS LEADING FROM THE STREET DOWN TO THE APARTMENTS.

11 ARE THESE AN EXAMPLE OF THOSE?

12 A    YES.  THIS IS THE STREET.

13 Q    OKAY.

14 A    THE MAN WHO DIED GOT OUT OF A BLACK CAR.

15 Q    OKAY.  AND --

16      MR. ROBERTSON:  FOR THE RECORD, THE WITNESS

17 INDICATED WITH HER HAND IN THE MIDDLE OF EXHIBIT NUMBER

18 13 ACROSS THE MIDDLE FROM LEFT TO RIGHT UNDERNEATH THE

19 ORANGE CONE.  AND WHEN SHE INDICATED WHERE THE PERSON WAS

20 THAT HAD DIED, IT LOOKS LIKE THAT WAS IN THE CARPORT AREA

21 TO THE LEFT-HAND EDGE OF THE LOWER YELLOW CRIME SCENE

22 STRIPE.

23 Q    (BY MR. ROSEN)  MISS FUENTES, YOU MENTIONED THAT

24 THE MAN WHO DIED GOT OUT OF A BLACK CAR.  SHOWING YOU

25 PEOPLE'S NUMBER 3 --

26 A    YES.

27 Q    -- IS THAT THE BLACK CAR?

28 A    YES, IT WAS A BLACK CAR.

1   Q    AND YOU MENTIONED THAT THERE ARE STAIRS THAT LED

2   FROM THE STREET DOWN TO THE APARTMENTS, SHOWING YOU

3   PEOPLE'S --

4   A    TO GET IN THE APARTMENTS, YES.

5   Q    SHOWING YOU PEOPLE'S 15, IS THIS AN EXAMPLE OF

6   STAIRS THAT LEAD FROM THE STREET DOWN TO THE

7   APARTMENTS?

8   A    YES.

9   Q    WHEN YOU SAY THAT THE MAN WHO WAS KILLED CAME OUT

10   OF A BLACK CAR, DO YOU REMEMBER ANYTHING ABOUT WHAT THAT

11   MAN WAS WEARING?

12   A    HE WAS WEARING A BEIGE TYPE PANTS, KHAKI COLOR.

13   Q    AND DID YOU SEE THAT MAN GET OUT OF THE CAR BEFORE

14   YOU HEARD THE GUNSHOTS?

15   A    THE ONE WHO DIED?

16   Q    YES.

17   A    YES.

18   Q    SO JUST SO I CAN UNDERSTAND THE TIME FRAME, YOU'RE

19   SITTING ON THE STEPS AFTER YOU HAVE CLEANED THE

20   RESIDENCE, AND YOU SEE THE MAN IN BLACK SPEAKING ON A

21   CELL PHONE IN SPANISH, WALKING AROUND.  AT WHAT POINT DID

22   YOU SEE THIS OTHER MAN GET OUT OF A BLACK CAR?

23   A    WHEN I WAS SITTING DOWN ON THE STAIRS, THE MAN GOT

24   OUT.  HE WENT INSIDE HIS APARTMENT.  HE -- IT WAS AN

25   OLDER MAN.  MAYBE 65, 66, 65 YEARS OLD.

26   Q    WHEN YOU SAID HE WALKED INTO HIS APARTMENT, HOW

27   CLOSE WAS HIS APARTMENT TO THE APARTMENT THAT YOU WERE

28   CLEANING?

1    A      I WAS IN THIS ONE AND THEN THERE'S A SECOND ONE AND

2    THEN IN THE THIRD ONE.

3    Q      SO HE'S A COUPLE OF APARTMENTS AWAY.

4    A      THERE IS ONE APARTMENT IN BETWEEN AND THEN THE NEXT

5    ONE WAS HIS.

6    Q      AND IF I WAS -- PARDON ME.  FROM WHERE YOU'RE

7    SITTING, IF YOU WERE FACING THE APARTMENT THAT YOU

8    CLEANED, POINT TO THE DIRECTION OF THE APARTMENT THAT THE

9    MAN IN THE BLACK CAR WALKED INTO.

10        YOU'RE FACING THE APARTMENT?

11   A      IT WAS THE THIRD APARTMENT.  YES.

12   Q      HOLD ON A SECOND.  THIS IS PEOPLE'S 69.  IF THIS IS

13   THE APARTMENT YOU WERE CLEANING, OKAY, DOES WHERE THIS

14   RED RECTANGLE IS, DOES THAT SEEM LIKE THE APARTMENT THAT

15   THE MAN WALKED INTO?

16   A      YES, BECAUSE THEY WERE NEXT TO EACH OTHER, LIKE

17   THIS.

18   Q      AND I'M GOING TO HAND THIS TO YOU, BECAUSE THERE'S

19   LITTLE FOOTSTEPS ON HERE, ON PEOPLE'S 69.  IF YOU LOOK

20   CLOSELY, THERE'S LITTLE FOOTSTEPS ON HERE.  AND DO THOSE

21   FOOTSTEPS SHOW THE DIRECTION THAT THE MAN IN BLACK ON THE

22   CELL PHONE, THE DIRECTION HE WAS RUNNING AFTER THE

23   GUNSHOTS?

24   A      AFTER THE SHOTS, THE MAN RAN FROM HERE TO HERE.  HE

25   WAS GOING UP -- HE HAD ALREADY FINISHED GOING UP THE

26   STAIRS TO GET ONTO THE STREET.

27   Q      OKAY.  THANK YOU.  ONE MOMENT.

28   A      YES.

160

1    MR. ROSEN:  I DON'T HAVE ANY MORE QUESTIONS

2  FOR YOU RIGHT NOW.

3    THE COURT:  MR. PEREZ.

4    MR. PEREZ:  NO QUESTIONS.

5    THE COURT:  MR. GILLAN?

6    MR. GILLAN:  THANK YOU.

7    CROSS EXAMINATION

8  Q    (BY MR. GILLAN)  MISS FUENTES, DID YOU EVER SEE A

9  GUN ON THAT DAY?

10 A    NO.  I JUST HEARD THE SHOTS.

11 Q    YOU ARRIVED TO START CLEANING APARTMENT NUMBER 33

12 AROUND 9:30 IN THE MORNING; IS THAT RIGHT?

13 A    ABOUT 9:25 TO 10:30.

14 Q    AND JOE COLONNA CAME AROUND TO PICK YOU UP AROUND

15 11:30?

16 A    11:30, YES.

17 Q    WHAT DID YOU DO BETWEEN 10:30 AND 11:30?

18 A    I WAS JUST SITTING DOWN AND MRS. AVIA WAS STANDING

19 UP AND WE WERE JUST TALKING.

20 Q    DID YOU WAIT INSIDE THE APARTMENT OR OUTSIDE THE

21 APARTMENT?

22 A    OUTSIDE.

23 Q    WERE YOU IN THE PARKING AREA OR WERE YOU JUST

24 OUTSIDE ON THE FRONT DOORSTEP AREA?

25 A    I WAS ON THE FIRST STEP FROM TOP TO BOTTOM.

26 Q    OKAY.  DOES THAT MEAN THAT YOU HAD TO CLIMB STEPS

27 TO GET UP TO THE DRIVEWAY AREA?

28 A    UH-HUH, TO THE STREET, YES.

161

```
1    Q      NOW, IS THERE A WALKWAY IN BETWEEN THE APARTMENTS
2    AT THE BOTTOM OF THE STEPS?
3           THE INTERPRETER:   CAN YOU REPEAT?
4    Q      (BY MR. GILLAN)  IS THERE A WALKWAY AT THE BOTTOM
5    OF THE STEPS IN BETWEEN THE APARTMENTS?
6    A      YES.
7    Q      WHEN YOU FIRST SAW THIS GUY IN BLACK, WAS HE IN THE
8    PARKING AREA OR WAS HE CLOSE TO THE HOMES?
9    A      CAN YOU REPEAT THE QUESTION?
10   Q      YEAH.  WHEN YOU FIRST SAW THE GUY IN BLACK, WAS HE
11   IN THE PARKING AREA OR WAS HE DOWN BY THE APARTMENTS?
12   A      THE MAN WAS WALKING WHEN WE WERE WAITING.  WALKING.
13   WHEN OUR BOSS CAME, WE WENT INSIDE THE APARTMENT ABOUT
14   FOUR MINUTES.
15   Q      LET ME INTERRUPT YOU.  I DON'T THINK YOU UNDERSTAND
16   MY QUESTION.  WHERE WAS THE MAN IN BLACK WHEN YOU FIRST
17   SAW HIM?
18   A      WALKING THERE ON THE STREET FROM HERE TO HERE.
19   Q      WAS IT IN THE CARPORT AREA?
20   A      YES, ON THE STREET.
21   Q      DID HE EVER WALK DOWN THE STEPS TO WHERE THE
22   APARTMENTS WERE?
23   A      NO, HE WAS WALKING FROM CORNER TO CORNER.
24   Q      WHERE THE CARS WERE PARKED?
25   A      YES.
26   Q      SO, IF YOU'RE DOWN BY THE APARTMENT, YOU HAVE TO
27   LOOK UP TO SEE THE GUY IN BLACK; IS THAT RIGHT?
28   A      CAN YOU REPEAT?
```

162

1    Q     I'M GOING TO APPROACH YOU.  WHAT'S BEEN MARKED

2   PEOPLE'S 15, I'M POINTING TO THE BOTTOM OF PEOPLE'S 15.

3    A     YES.

4    Q     WHAT DO YOU CALL THOSE THAT I'M POINTING TO?

5    A     THE RAILING.

6    Q     YES.  AND WHAT'S NEXT TO THE RAILING?

7    A     THE FIRST STEP.

8    Q     OKAY.  NOW, WHEN YOU -- WHEN YOU SAW THE MAN IN

9   BLACK, THERE'S A PICTURE OF A MAN IN A BLACK SHIRT WITH

10  SOME WRITING ON IT, BY A BLUE CAR.  DO YOU SEE THAT IN

11  PEOPLE'S 15?  I'M POINTING TO IT.

12   A     YES, BUT HE WAS NOT THERE THEN.

13   Q     YOU SEE WHERE THIS COVERED AREA IS?  WHAT IS

14  THAT?

15         IS THAT A CARPORT?

16   A     YES, THIS IS A CARPORT.

17         MR. GILLAN:  OKAY.  AND, FOR THE RECORD, SHE'S

18  POINTING TO THE COVERED AREA IN PEOPLE'S 15.

19         MR. ROSEN:  THANK YOU.

20   Q     (BY MR. GILLAN)  AND DO YOU SEE THIS BLACK CAR IN

21  PEOPLE'S 15?

22   A     YES, I SAW A PATROL CAR.

23   Q     THAT PATROL CAR PARKED IN THE STREET?

24   A     YES.

25   Q     WHEN YOU SAW THE MAN THAT WAS WEARING BLACK, YOU

26  SAID THAT YOU WERE AT THE FIRST STEP?

27   A     YES, UP HERE.

28   Q     OKAY.  SO THAT WOULD BE THE FIRST STEP AT THE TOP

163

```
 1   OF THE STEPS; IS THAT RIGHT?
 2   A     YES.  FROM TOP TO BOTTOM.
 3   Q     AND THE MAN IN BLACK, WAS HE IN THE STREET AREA
 4   THAT WAS WHERE THE CARS ARE?
 5   A     THE MAN IN BLACK RAN FROM THE THIRD APARTMENT.   HE
 6   GOT -- HE RAN OUT OF THE THIRD APARTMENT TOWARD THE
 7   STREET.
 8   Q     HE RAN OUT OF THE APARTMENT?
 9   A     YES, HE WAS.
10   Q     SO YOU SAW THE MAN IN BLACK COME OUT OF AN
11   APARTMENT?
12   A     NO, I DID NOT SEE HIM COMING OUT.  OH, HE WAS
13   RUNNING AND HE WAS ON HIS WAY OUT.
14   Q     DID YOU SEE A MAN -- DID YOU SEE THE MAN IN BLACK
15   RUN UPSTAIRS?
16   A     YES.
17   Q     SO, DID THE MAN THAT RAN UP THE STEPS, DID HE RUN
18   PAST YOU?
19   A     NO, BECAUSE HE WAS AT THE CORNER OF THE THIRD
20   APARTMENT.
21   Q     OKAY.  LET ME GRAB ANOTHER EXHIBIT.  I'M GOING TO
22   SHOW YOU WHAT'S BEEN MARKED AS PEOPLE'S 67.  DO YOU
23   RECOGNIZE THE YELLOW RECTANGLE AROUND THE NUMBER 33?
24   A     I DO SEE THE RECTANGLE.
25   Q     NOW, IN FRONT OF THAT RECTANGLE IT LOOKS LIKE
26   THERE'S SOME STEPS.  DO YOU SEE THOSE?
27   A     YES.
28   Q     AND IT LOOKS LIKE IT'S RIGHT NEXT TO THE CIRCLE
```

1    THAT'S DRAWN ON THAT IN PEN.

2    A     YOU CAN SEE THEM BUT --

3    Q     IT'S PRETTY SMALL, RIGHT?

4    A     YES.

5    Q     NOW, DO YOU SEE THE RED RECTANGLE THAT HAS 36 IN

6    IT?

7    A     YES.

8    Q     SO, WHEN YOU SAW THE MAN IN BLACK, WAS HE RUNNING

9    UP THE STEPS NEXT TO THE AREA WHERE THE RED RECTANGLE

10   WAS?

11   A     YES.  IN OTHER WORDS, HE WAS RUNNING FROM THE

12   STAIRS TO THE STREET, BECAUSE THE MAIN STREET THAT YOU

13   USE TO GET INTO THAT AREA RUNS THIS WAY.

14   Q     OKAY.  MY QUESTION IS, DID YOU SEE HIM RUN UP

15   STEPS?

16   A     THE VERY LAST STEPS.

17   Q     OKAY.  SO, AS HE WAS RUNNING UP THE STEPS, DID YOU

18   SEE HIS PROFILE?

19   A     NO, BECAUSE HE WAS -- HIS BACK WAS TO ME.  I ONLY

20   SAW HIS BACK.

21   Q     YOU SAW HIS BACK.  OKAY.  SO, ALL RIGHT.

22         DID YOU SEE HIM RUNNING BEFORE OR AFTER YOU HEARD

23   THE GUNSHOTS?

24   A     AFTER THE GUNSHOTS.

25   Q     WHEN YOU HEARD THE GUNSHOTS, WERE YOU INSIDE

26   APARTMENT 33 OR OUTSIDE APARTMENT 33?

27   A     OUTSIDE AT THE DOOR TO THE APARTMENT.  I WENT OUT

28   TO SEE WHAT WAS HAPPENING.

1   Q       WHEN YOU FIRST HEARD THE GUNSHOT WERE YOU INSIDE

2   THE APARTMENT?

3   A       YES, AND I WENT OUT RUNNING TO THE DOOR.

4   Q       OKAY.  WITHOUT -- SO, NOW, CORRECT ME IF I'M WRONG.

5           YOU'RE INSIDE APARTMENT 33, YOU HEAR GUNSHOTS AND

6   THEN YOU RUN OUT TO SEE WHAT HAPPENS?

7   A       YES.

8   Q       OKAY.  AND THEN YOU CLIMB THE STEPS UP TO WHERE?

9   A       NO, I WENT BACK INSIDE TO TELL MY BOSS THAT THE MAN

10  WAS RUNNING.

11  Q       OKAY.  HERE IS WHAT I UNDERSTOOD YOU TO SAY BEFORE

12  THOUGH.  YOU SAID THAT YOU WERE AT THE VERY TOP OF THE

13  STEPS WHEN YOU SAW THE MAN RUNNING UP THE STEPS AND AWAY

14  FROM YOU, DIDN'T YOU?

15  A       NO.  WHAT I MEANT TO SAY, WHEN I SAW THE MAN THAT

16  GOT THERE, HE KEPT WALKING AND WALKING AND WALKING.  WHEN

17  WE FINISHED WORKING, WE WENT OUTSIDE TO WAIT FOR THE

18  BOSS.

19  Q       EXCUSE ME.  LET ME INTERRUPT YOU.  I DON'T WANT

20  YOUR WHOLE TESTIMONY.

21          I'M JUST TALKING ABOUT AT THE POINT WHEN YOU HEARD

22  THE GUNSHOTS TO THE POINT THAT YOU GOT IN THE VAN.  SO

23  CORRECT ME IF I'M WRONG.  THIS IS WHAT I UNDERSTAND YOUR

24  TESTIMONY TO BE.  YOU WERE INSIDE WHEN YOU HEARD THE

25  GUNSHOTS?

26  A       YES.

27  Q       IS THAT CORRECT?

28  A       I WENT OUT TO SEE WHAT WAS HAPPENING.

1   Q     LET ME INTERRUPT YOU THERE.   JUST ANSWER ME YES OR

2   NO.

3   A     OKAY.

4   Q     YOU'RE INSIDE THE APARTMENT WHEN YOU HEARD THE

5   GUNSHOTS?

6   A     YES.

7   Q     YOU WENT OUTSIDE OF THE APARTMENT AFTER YOU HEARD

8   THE GUNSHOTS?

9   A     YES.

10   Q     OUTSIDE OF THE APARTMENT YOU SAW A MAN IN BLACK RUN

11   AWAY?

12   A     YES.

13   Q     ALL YOU SAW WAS THE BACK OF THE MAN RUNNING AWAY?

14   A     YES.

15   Q     THE MAN THAT WAS RUNNING AWAY HAD ON A NYLON BLACK

16   SWEAT SUIT?

17   A     YES.

18   Q     AND THE MAN THAT WAS RUNNING AWAY FROM YOU HAD A

19   BLACK HAT ON?

20   A     YES.

21   Q     AND THE MAN THAT WAS RUNNING AWAY, YOU NEVER SAW

22   HIS FACE AFTER YOU HEARD THE SHOTS?

23   A     I DIDN'T.

24   Q     OKAY. NOW THAT WE ARE ON THE SAME PAGE, YOU

25   POINTED TO THE TOP OF THE STEPS AS THE PLACE WHERE YOU

26   SAW THIS MAN IN BLACK. DO YOU REMEMBER THAT?

27   A     I ONLY SAW THAT HE WAS RUNNING TOWARD THE STREET.

28   Q     NO. YOU POINTED TO THE TOP OF THE STEPS EARLIER

1   TODAY, RIGHT?

2   A     YES.

3   Q     YOU POINTED AT THAT TOP STEP AS A PLACE WHERE YOU

4   WERE STANDING, RIGHT?

5   A     YES.

6   Q     WHEN WERE YOU STANDING AT THE TOP OF THE STEPS?

7   A     WHEN I WAS WAITING FOR MY BOSS.

8   Q     NOW I UNDERSTAND.  IT'S MY FAULT.  SO, LET'S SEE IF

9   I UNDERSTAND THE SEQUENCE NOW.  YOU FINISH CLEANING THE

10  APARTMENT?

11  A     YES.

12  Q     AND THEN YOU MOVE OUT TO THE TOP OF THE STEPS TO

13  WAIT FOR YOUR BOSS?

14  A     YES.

15  Q     AS YOU'RE WAITING FOR YOUR BOSS, YOU'RE TALKING

16  WITH AVIA?

17  A     YES.

18  Q     AND WHILE YOU'RE TALKING TO AVIA, YOU SEE A MAN

19  WEARING BLACK WALKING IN THE AREA YOU'RE STANDING?

20  A     YES.

21  Q     AND THAT MAN COMES WITHIN FIVE FEET OF YOU; IS THAT

22  RIGHT?

23  A     YES, MORE OR LESS.

24  Q     AND YOU SAY HI TO HIM; IS THAT RIGHT?

25  A     NO, HE JUST SMILED AT ME AND I SMILED BACK AT

26  HIM.

27  Q     SO YOU SORT OF GREET EACH OTHER BY SMILING?

28  A     YES, BECAUSE I DIDN'T THINK HE WAS GOING TO DO

168

```
 1    ANYTHING WRONG.
 2    Q     OKAY.  AND THAT MAN, YOU SAW HIS FACE; IS THAT
 3    RIGHT?
 4    A     YES.
 5    Q     AND THAT MAN WAS WEARING BLACK?
 6    A     YES.
 7    Q     NOW, WHILE YOU WERE CLEANING THE HOUSE, DID YOU SEE
 8    THAT SAME MAN WALKING AROUND?
 9    A     YES.
10    Q     OKAY.  AND WHILE YOU WERE WAITING FOR YOUR BOSS,
11    YOU SAW THE SAME MAN WALKING AROUND?
12    A     YES.
13    Q     BUT AFTER THE GUNSHOTS, ALL YOU SAW WAS SOMEONE IN
14    BLACK RUNNING AWAY FROM YOU; IS THAT RIGHT?
15    A     YES.
16    Q     NOW, BEFORE THE GUNSHOTS, YOU SAW THE FACE OF THE
17    MAN IN BLACK; IS THAT RIGHT?
18    A     YES.
19    Q     AND AFTER THE GUNSHOTS, YOU NEVER SAW THE FACE OF
20    THE MAN RUNNING AWAY; IS THAT RIGHT?
21    A     NO, BECAUSE HE WAS RUNNING.  ALL I SEE WAS -- ALL I
22    COULD SEE WAS HIS BACK.  HE WAS RUNNING FORWARD.
23    Q     BUT THE MAN THAT YOU SAW IN THE PARKING LOT WAS
24    WEARING BLACK; IS THAT RIGHT?
25    A     YES.
26    Q     AND THE MAN YOU SAW RUNNING AWAY WAS WEARING BLACK;
27    IS THAT RIGHT?
28    A     YES.
```

169

1  Q    BUT, THE MAN THAT WAS RUNNING AWAY, IT DIDN'T LOOK

2  LIKE HE WAS WEARING THIS OUTFIT THAT I'M HOLDING, THAT'S

3  EXHIBIT NUMBER 34; IS THAT RIGHT?

4  A    THE COLOR, YES, BUT NOT THE FABRIC.

5  Q    OKAY.  DO YOU REMEMBER -- DO YOU REMEMBER A POLICE

6  OFFICER SHOWING YOU ABOUT SIX DIFFERENT PHOTOGRAPHS?

7  A    YES.

8  Q    DO YOU REMEMBER POINTING ONE OUT AS POSSIBLY BEING

9  THE PERSON THAT YOU SAW?

10  A    YES.

11  Q    NOW, YOU HAVE -- DO YOU THINK THAT YOU'RE HERE IN

12  COURT TODAY BECAUSE SOMEONE IN THIS COURTROOM IS

13  RESPONSIBLE FOR KILLING SOMEONE?

14  A    YES.

15  Q    SO, YOU ASSUME THAT SOMEONE IN THIS COURTROOM IS

16  THE PERSON THAT DID THE SHOOTING, DON'T YOU?

17  A    YES.

18  Q    OKAY.  AND YOU'RE TRYING TO HELP -- YOU'RE TRYING

19  TO REMEMBER THINGS AS BEST AS YOU CAN, RIGHT?

20  A    YES.

21  Q    OKAY.

22          MR. GILLAN:  THAT'S ALL I HAVE.

23          THE COURT:  MR. ROBERTSON.

24                  CROSS EXAMINATION

25  Q    (BY MR. ROBERTSON)  MA'AM, MY NAME IS HARRY

26  ROBERTSON.  I'M AN ATTORNEY.

27  A    NICE TO MEET YOU.

28  Q    MUCHO GUSTO.  COULD YOU EXPLAIN TO ME WHAT A

170

1   BACKPACK IS?

2   A    BAG THAT YOU HANG IN THE BACK.  YOU PUT YOUR HANDS

3   THROUGH IT AND THEN YOU HANG IT IN THE BACK.

4   Q    AND BACKPACKS HAVE TWO STRAPS, ONE THAT GOES OVER

5   EACH SHOULDER TO HOLD IT, RIGHT?

6   A    YES.

7   Q    A BACKPACK IS DIFFERENT THAN A COMPUTER BAG?

8   A    OH, YES.

9   Q    I MAY EMBARRASS MYSELF WITH THIS QUESTION, BUT THE

10  FELLOW THAT YOU SAW WALK INTO THE APARTMENT, IS HE

11  YOUNGER OR OLDER THAN I AM?

12           THE INTERPRETER:  CAN YOU PLEASE REPEAT?

13           MR. ROBERTSON:  YES.

14  Q    (BY MR. ROBERTSON)  THE FELLOW THAT YOU SAW WALK

15  INTO THE APARTMENT FROM THE CARPORT, IS HE YOUNGER OR

16  OLDER THAN I AM, DO YOU BELIEVE?

17           MR. GILLAN:  FOR THE RECORD, MR. ROBERTSON IS

18  ABOUT 80.  I'M SORRY, APPEARS ABOUT 80.

19           MR. ROBERTSON:  STIPULATED.

20  Q    (BY MR. ROBERTSON)  IT'S OKAY.  I'M NOT REALLY 80.

21  A    WHAT HAPPENED?

22  Q    SOME -- A LITTLE BIT OF LEVITY.

23       I REMEMBER YOU SAID THAT THE WOMAN -- STRIKE THAT.

24       I REMEMBER YOU SAID THE MAN WHO WENT INTO THE

25  APARTMENT LOOKED LIKE, I THINK WAS BETWEEN 60 AND MAYBE

26  65.

27  A    MORE OR LESS.  HE WAS AN OLDER MAN.

28  Q    WOULD YOU CLASSIFY ME AS AN OLDER MAN IN THE SAME

```
 1   RANGE?

 2        IT'S OKAY.  IT'S REALLY OKAY.

 3   A    WELL, YES.

 4   Q    IT'S OKAY.  NOW, WHEN HE WAS WALKING, DID YOU SEE

 5   ANYTHING IN HIS HANDS?

 6   A    NO.  HE WENT OUT, HE OPENED HIS CAR, GOT OUT AND

 7   GOT INTO HIS APARTMENT.

 8   Q    HE DIDN'T -- HE WASN'T CARRYING NEWSPAPERS, COFFEE,

 9   THAT TYPE OF THING?

10   A    NO.

11   Q    OKAY.  WHEN THE PERSON THAT YOU SAW RUNNING AWAY

12   FROM YOU DOWN THE DRIVEWAY, THAT PERSON WASN'T CARRYING A

13   HANDBAG, WERE THEY?

14   A    I DID NOT UNDERSTAND YOU.

15   Q    OKAY.  THE BACKPACK, WHEN WAS THE FIRST TIME YOU

16   SAW THE BACKPACK?

17   A    THE BAG?

18   Q    THE BACKPACK YOU DESCRIBED.

19   A    ALL THE TIME THAT THIS PERSON WAS WALKING AROUND HE

20   HAD IT IN THE BACK.

21   Q    AND YOU NEVER SAW A GUN IN HIS HAND?

22   A    NO.

23   Q    NO COFFEE OR A MAP?

24   A    ONLY THE TELEPHONE.

25   Q    RIGHT.  NOW, I'M GOING TO WALK TOWARDS YOU AND I

26   WANT YOU TO STOP ME WHEN I'M THE CLOSEST TO YOU THIS MAN

27   GOT TO YOU.

28        DID HE EVER GET AS CLOSE AS I AM TO YOU?
```

172

```
 1   A     NO.  YOU'RE TOO FAR AWAY.

 2   Q     OKAY.  TELL ME WHEN TO STOP.

 3   A     YES, NO, KEEP GOING.  MORE OR LESS.  FROM HERE TO

 4   HERE, YES.

 5   Q     SO YOU SAW THE BACKPACK AND THE JACKET?

 6   A     YES, THE WHOLE SUIT, BLACK.  IT WAS PANTS AND THE

 7   JACKET.

 8   Q     YOU KNOW WHAT EXERCISE CLOTHING IS?

 9   A     YES, THAT'S THE KIND OF CLOTHING.

10   Q     ALL RIGHT.  WE KNOW IT WAS NOT THIS PARTICULAR

11   JACKET, WHATEVER IT IS YOU WERE SHOWN HERE, CORRECT?

12   A     YES.

13   Q     CAN YOU TELL ME MORE ABOUT THE BACKPACK?

14   A     HE JUST HAD IT IN THE BACK.

15   Q     OKAY.  WAS THERE ANYTHING ABOUT IT, LIKE, COULD YOU

16   TELL POCKETS OR ZIPPERS, ANYTHING LIKE THAT?

17   A     NO.  I JUST SAW THE BAG.  I DIDN'T PAY MUCH

18   ATTENTION TO IT.

19   Q     WHEN THE POLICE FIRST SPOKE TO YOU -- LET ME BACK

20   UP FOR A SECOND.  SENIOR COLONNA, MR. PATRON -- IS YOUR

21   PATRON, IS YOUR BOSS?

22   A     YES.

23   Q     WHEN YOU WERE INSIDE AND YOU HEARD THESE SHOTS --

24   A     YES.

25   Q     -- WAS SENIOR COLONNA IN THERE, TOO, WITH YOU?

26   A     INSIDE.  HE DIDN'T COME OUT, HE KEPT ON CLEANING

27   THE DOOR.

28   Q     SO, WHEN YOU HEARD THE SHOTS, YOU WENT TO SEE WHAT
```

```
 1   HAPPENED?
 2   A     WENT OUT RUNNING.
 3   Q     AND WHEN YOU CAME BACK IN --
 4   A     YES.
 5   Q     -- WHAT DID HE SAY?
 6   A     THAT THE MAN WAS RUNNING.  THAT HE WAS ALREADY
 7   RUNNING AWAY, THE GUY IN BLACK.
 8   Q     YOU SAID THAT, CORRECT?
 9   A     YES.
10   Q     WHAT DID SENIOR COLONNA SAY?
11   A     I DON'T REMEMBER WHAT HE SAID TO ME.
12   Q     DID YOU SAY ANYTHING, LIKE CALL THE POLICE, THERE
13   ARE SHOTS, ANYTHING LIKE THAT?
14   A     NO.  A MAN WHO WAS CLEANING THE YARD ON THE UPPER
15   PART, HE TOLD MY BOSS THAT THERE WAS A POLICE OFFICER
16   DOWN IN THE BELOW AREA AND WE WENT TO SEE HIM.
17   Q     RIGHT.  BUT THAT WAS WHEN YOU GOT IN THE VAN AND
18   YOU WERE DRIVING AWAY, CORRECT?
19   A     YES.  WHEN WE WERE LEAVING TO DO ANOTHER JOB.
20   Q     WHAT I'M CURIOUS ABOUT IS WHEN YOU HEARD GUNSHOTS
21   OR WHAT YOU THOUGHT WERE GUNSHOTS, AND YOU SAW SOMEBODY
22   RUNNING AWAY, WHY DIDN'T YOU CALL THE POLICE?
23   A     BECAUSE I DIDN'T THINK.  I THOUGHT MAYBE A NEIGHBOR
24   WAS SHOOTING AT SOMEBODY, SO TO MAKE THEM SCARED, SO THAT
25   THEY WOULDN'T BE OUT THERE.
26         OR IT COULD ALSO BE THAT SOMEBODY MIGHT HAVE BEEN
27   PLAYING WITH A WEAPON.  THAT'S WHAT I THOUGHT.
28   Q     JUST SO WE CAN BE CLEAR.  THIS IS NOT THE
```

174

1    BACKPACK?

2    A    NO.

3    Q    THIS IS NOT WHAT THAT PERSON HAD?

4    A    NO.

5    Q    AND IT DIDN'T LOOK LIKE THIS EITHER, DID IT?

6    A    NO.

7    Q    COULD YOU TELL IF IT WAS AN ADULT OR A CHILDREN'S

8    BACKPACK?

9    A    IT WAS AN ADULT ONE, BECAUSE IT WAS BIG.  BUT THEN

10   AGAIN, CHILDREN ALSO CARRY BIG BACKPACKS.

11          MR. ROBERTSON: I HAVE NO FURTHER QUESTIONS OF

12   THIS WITNESS.

13          MR. ROSEN:  NO FURTHER QUESTIONS.

14          MR. GILLAN:  I THINK THE RECORD SHOULD

15   PROBABLY REFLECT THAT MR. ROBERTSON HELD UP ABOUT AN 18

16   BY 12 INCH NYLON BRIEFCASE WHEN HE WAS ASKING THE WITNESS

17   WHETHER OR NOT THIS RESEMBLED THE BACKPACK, AND THAT HE

18   ALSO HELD UP A PEOPLE'S EXHIBIT WHEN THE WITNESS

19   IDENTIFIED THAT AS NOT A BACKPACK AS WELL, AND I DON'T

20   THINK THAT WAS -- I DON'T THINK THAT WAS REFERRED TO.  I

21   THINK THAT'S PEOPLE'S EXHIBIT 60, I THINK WAS BEING HELD

22   UP.

23          THE COURT:  ALL RIGHT.  SO NOTED.

24          MR. GILLAN:  IS THAT ACCURATE?

25          MR. ROSEN:  YES.

26          MR. ROBERTSON:  THOSE -- THOSE ARE WHAT I HELD

27   UP AND WHAT I REFERRED TO.

28          THE COURT:  YOU HAVE NO FURTHER QUESTIONS.

175

1      MR. ROSEN:   I DO NOT HAVE ANY FURTHER
2  QUESTIONS.
3          THE COURT:   OKAY.   EITHER COUNSEL.
4          MR. PEREZ:   NO.
5          MR. GILLAN:   NO.
6          MR. ROBERTSON:   IT'S POSSIBLE THAT I MIGHT.   I
7  WOULD ASK THIS WITNESS REMAIN AVAILABLE FOR THE REMAINDER
8  OF THE PRELIM.
9          THE COURT:   AS I SAID BEFORE, UNLESS I EXCUSE
10  THE WITNESSES, THEY'RE SUBJECT TO RECALL.
11          MR. ROBERTSON:   I APOLOGIZE.
12          THE COURT:   YOU CAN STEP DOWN, MISS FUENTES.
13  THANK YOU.
14          MR. ROSEN:   I'LL CALL MY NEXT WITNESS.   I
15  THINK THEY WILL BE RELATIVELY SHORT.
16          THE COURT:   VERY GOOD.
17          MR. ROSEN:   AT THIS TIME THE PEOPLE CALL
18  OFFICER PABLO LOPEZ AS TO THE WITNESS STAND.
19          THE COURT:   OFFICER LOPEZ, IF YOU'LL STEP UP
20  HERE TO THE WITNESS STAND.   COULD YOU RAISE YOUR
21  RIGHT HAND TO BE SWORN.
22              PABLO LOPEZ,
23  HAVING BEEN CALLED AS A WITNESS ON BEHALF OF THE PEOPLE,
24  BEING FIRST DULY SWORN TO TELL THE TRUTH, TESTIFIED AS
25  FOLLOWS:
26          THE COURT:   HAVE A SEAT.   PULL THAT
27  MICROPHONE OVER TOWARD YOU.   COULD YOU PLEASE STATE AND
28  SPELL YOUR FULL NAME.

```
1           THE WITNESS:  PABLO LOPEZ, P-A-B-L-O
2    L-O-P-E-Z.
3              THE COURT:  GO AHEAD, MR. ROSEN.
4                   DIRECT EXAMINATION
5    Q    (BY MR. ROSEN)  GOOD AFTERNOON, OFFICER LOPEZ.
6    A    AFTERNOON.
7    Q    HOW LONG HAVE YOU BEEN A POLICE OFFICER?
8    A    ELEVEN YEARS.
9    Q    FOR WHAT AGENCIES?
10   A    CITY OF SANTA CLARA POLICE DEPARTMENT.
11   Q    WHAT HAVE YOUR DUTIES BEEN GENERALLY IN THOSE 11
12   YEARS?
13   A    BOTH PATROL AND DETECTIVE.
14   Q    WHEN YOU HAVE WORKED AS A DETECTIVE, WHAT KINDS OF
15   CRIMES DID YOU INVESTIGATE?
16   A    CURRENTLY I'M A BURGLARY DETECTIVE ASSIGNED TO THE
17   BURGLARY UNIT AND BEFORE I WAS A NARCOTICS DETECTIVE.
18   Q    BESIDES ENGLISH, ARE YOU FLUENT IN ANY OTHER
19   LANGUAGE?
20   A    SPANISH.
21   Q    ON MARCH 14, OR EXCUSE ME.  DID YOU INTERVIEW A
22   WITNESS RELATED TO THIS CASE WHOSE NAME IS AVIA DELOYA?
23   A    YES.
24   Q    WHAT DAY DID YOU INTERVIEW HER?
25   A    ON THE 21ST OF MARCH OF THIS YEAR.
26   Q    DID YOU INTERVIEW HER IN PERSON OR OVER THE
27   PHONE?
28   A    IN PERSON.
```

177

```
 1    Q      DID YOU INTERVIEW HER IN ENGLISH OR IN SPANISH?

 2    A      IN SPANISH.

 3    Q      DID YOU ASK HER QUESTIONS ABOUT WHAT SHE SAW ON

 4    MARCH 14TH, 2008?

 5    A      YES.

 6    Q      OKAY.  DID SHE TELL YOU WHETHER SHE ARRIVED AT

 7    18400 OVERLOOK ROAD THAT MORNING?

 8    A      SHE TOLD ME THAT -- WE ACTUALLY WENT TO THAT

 9    LOCATION.  SHE DIDN'T TELL ME THE ADDRESS.

10    Q      OKAY.  WHEN YOU SAY THAT LOCATION, MEANING YOU

11    INTERVIEWED HER AT 18400 OVERLOOK?

12    A      YES.

13    Q      DID SHE TELL YOU HOW SHE ARRIVED AT THAT ADDRESS?

14    A      YES.

15    Q      HOW DID SHE ARRIVE?

16    A      SHE WAS BROUGHT TO THAT ADDRESS BY HER BOSS, WHO

17    DROVE HER AND ANOTHER HOUSE CLEANER IN A VAN.

18    Q      DID SHE TELL YOU WHAT SHE DID AFTER HER BOSS

19    DROPPED HER AND THE CO-WORKER OFF?

20    A      SHE AND HER CO-WORKER WENT TO CLEAN UNIT, I BELIEVE

21    IT WAS NUMBER 33.

22    Q      DID SHE TELL YOU HOW MUCH TIME THEY HAD TO CLEAN

23    THE UNIT?

24    A      SHE APPROXIMATED IT.  I BELIEVE IT WAS AN HOUR AND

25    FIFTEEN MINUTES OR HOUR AND TWENTY MINUTES.

26    Q      DID SHE TELL YOU WHAT SHE AND HER CO-WORKER DID

27    AFTER THEY FINISHED CLEANING THE UNIT?

28    A      YES.
```

```
 1    Q     WHAT DID SHE TELL YOU?
 2    A     THEY EXITED THE UNIT AND WAITED TO BE PICKED UP BY
 3  HER BOSS.
 4    Q     WHERE DID SHE TELL YOU THAT SHE AND HER CO-WORKER
 5  WAITED AS THEY WAITED FOR THEIR BOSS TO PICK THEM UP?
 6    A     THEY WAITED ON THE STAIRS THAT LED DOWN FROM THE
 7  CARPORT AREA TO UNIT 33.
 8    Q     DID SHE TELL YOU WHAT SHE DID WHEN HER BOSS JOE
 9  ARRIVED?
10    A     YES.
11    Q     WHAT DID SHE TELL YOU SHE DID?
12    A     SHE LOADED THE SUPPLIES INTO THE VAN.
13    Q     DID SHE TELL YOU IF SHE SAW ANOTHER MAN WALKING
14  NORTHBOUND ON THE DRIVEWAY?
15    A     YES.
16    Q     WHAT DID SHE TELL YOU THAT MAN WAS WEARING?
17    A     BLACK CLOTHING.
18    Q     DID SHE DESCRIBE TO YOU HOW THE MAN WAS ACTING AS
19  HE WAS WALKING AROUND THE DRIVEWAY?
20    A     YES.
21    Q     WHAT DID SHE SAY?
22    A     SHE SAID THAT HE WAS LOOKING AROUND.
23    Q     DID SHE SAY WHETHER HE HAD ANYTHING IN HIS HAND?
24    A     YES.
25    Q     WHAT DID SHE TELL YOU?
26    A     SMALL PIECE OF PAPER AND A PEN.
27          THE COURT:  WHAT WAS THAT SMALL PAPER AND --
28          THE WITNESS:  AND A PEN.
```

179

```
 1              THE COURT:   SORRY.
 2     Q     (BY MR. ROSEN)   AS THE MAN WEARING BLACK WALKED IN
 3   THE CARPORT AREA, DID SHE TELL YOU WHETHER ANOTHER CAR
 4   PULLED UP?
 5     A     YES.
 6     Q     WHAT COLOR WAS THE CAR THAT PULLED INTO THE
 7   CARPORT?
 8     A     IT WAS A BLACK CAR.
 9     Q     DID SHE TELL YOU WHETHER THE PERSON THAT GOT OUT OF
10   THE BLACK CAR WAS A MAN OR A WOMAN?
11     A     YES.
12     Q     WHAT DID SHE SAY?
13     A     MAN.
14     Q     WHAT DID SHE TELL YOU THE MAN DID AFTER -- WHAT DID
15   SHE TELL YOU THAT THE MAN WHO GOT OUT OF THE CAR DID
16   AFTER HE GOT OUT OF THE CAR?
17     A     AS HE HELD ONTO HIS KEYS, HE WALKED TO A UNIT
18   ACROSS FROM THE -- THAT WAS NOT AT THE CARPORT, BUT
19   ACROSS THE DRIVEWAY.
20     Q     DID SHE DESCRIBE SOME -- DID SHE GIVE YOU A GENERAL
21   DESCRIPTION OF THE MAN THAT GOT OUT OF THE CAR?
22     A     YES.
23     Q     HOW DID SHE DESCRIBE HIM?
24     A     OLDER, NOT -- NOT SENIOR CITIZEN, SHE DIDN'T SAY
25   THAT, BUT OLDER MALE.
26     Q     DID SHE SAY WHETHER THE MAN HAD GRAY HAIR OR NOT?
27     A     SHE TOLD ME THAT HE DID NOT HAVE GRAY HAIR.
28     Q     NOW, DID MS. DELOYA TELL YOU WHETHER THE MAN WHO
```

```
 1  WAS DRESSED IN BLACK, AND THE MAN WHO GOT OUT OF THE
 2  BLACK CAR, CROSSED PATHS OR HAD ANY INTERACTION, OR WHAT
 3  DID SHE TELL YOU ABOUT THAT?
 4  A     SHE SAID THAT THEY -- THE MAN THAT GOT OUT OF THE
 5  CAR, CROSSED THE DRIVEWAY AS THE MAN DRESSED IN BLACK WAS
 6  WALKING.
 7  Q     DID SHE DESCRIBE HOW THE MAN IN BLACK WAS WALKING
 8  AND THE MAN WHO GOT OUT OF THE CAR WAS CROSSING THE
 9  DRIVEWAY?
10  A     SHE DESCRIBED THE MAN AS WALKING -- THE MAN DRESSED
11  IN BLACK AS WALKING, AND SHE BELIEVED THAT HE WAS GOING
12  TO GREET THIS MAN.
13  Q     BUT HE DIDN'T ACTUALLY GREET THE MAN?  THE MAN IN
14  BLACK DIDN'T ACTUALLY GREET THE MAN THAT GOT OUT OF THE
15  CAR.  THE MAN IN BLACK JUST WALKED BY HIM?
16  A     HE CONTINUED WALKING UP THE DRIVEWAY.
17  Q     AND "HE" IS THE MAN IN BLACK?
18  A     CORRECT.
19  Q     DID MS. DELOYA TELL YOU WHETHER SOME TIME LATER
20  THAT MORNING SHE HEARD GUNSHOTS.
21  A     YES.
22  Q     WHERE WAS SHE WHEN SHE HEARD THE GUNSHOTS?
23  A     SHE WAS SEATED INSIDE THE VAN BEHIND THE DRIVER'S
24  SEAT.
25  Q     DID YOU ASK HER WHETHER SHE WAS ABLE TO SEE
26  ANYTHING GOING ON OUTSIDE THE VAN?
27  A     YES.
28  Q     WHAT DID SHE SAY?
```

1  A    SHE WAS NOT ABLE TO SEE ANYTHING.

2  Q    DID SHE TELL YOU WHY?

3  A    THERE WAS NO WINDOWS WHERE SHE WAS AT ON THE

4  DRIVER'S SIDE, AND THEN SHE CROUCHED DOWN.

5  Q    DID SHE HAVE ANY DESCRIPTION FOR YOU OF THIS MAN

6  WEARING BLACK OTHER THAN HE WAS A MAN WEARING BLACK?

7  A    NO.

8  Q    OKAY.

9           MR. ROSEN:  I DON'T HAVE ANY MORE QUESTIONS

10  FOR YOU.  THANK YOU, OFFICER LOPEZ.

11           THE COURT:  MR. PEREZ.

12           MR. PEREZ:  NO QUESTIONS.

13           THE COURT:  MR. GILLAN.

14                CROSS EXAMINATION

15  Q    (BY MR. GILLAN)  DID MS. ERESMELDI-DELOYA, IS THAT

16  ACTUALLY HER LAST NAME?

17  A    IT MIGHT BE ERESMENDI SLASH DELOYA, SO -- THAT'S

18  THE WAY THE COMPUTER ENTERS IT.

19  Q    DID THE THIS WITNESS EVER TELL YOU THAT SHE SAW A

20  GUN?

21  A    NO, SHE DID NOT.

22  Q    AFTER SHE HEARD THE SHOOTING, DID SHE EVER LOOK TO

23  SEE THE PERSON THAT GOT SHOT?

24  A    NO.

25  Q    AFTER THE SHOOTING, DID SHE EVER LOOK OUT OF THE

26  VAN TO SEE WHAT WAS GOING ON?

27  A    SHE DID NOT SAY THAT.

28           MR. GILLAN:  I GUESS THAT'S ALL I HAVE.

182

1       THE COURT:  MR. ROBERTSON.

2            CROSS EXAMINATION

3   Q    (BY MR. ROBERTSON)  OFFICER LOPEZ, BEFORE YOU CAME

4   TO COURT TODAY, DID YOU REVIEW ANY DOCUMENTS TO ASSIST

5   YOU IN PREPARING FOR YOUR TESTIMONY?

6   A    YES.

7   Q    DO YOU HAVE THOSE DOCUMENTS WITH YOU ON THE WITNESS

8   STAND?

9   A    YES.

10  Q    HAVE YOU REFERRED TO THEM WHILE YOU HAVE BEEN UP

11  THERE?

12  A    RIGHT NOW, WHEN I LOOKED AT THE WITNESS'S NAME.

13            MR. ROBERTSON: IF I MAY APPROACH, YOUR

14  HONOR.

15            THE COURT:  ALL RIGHT.

16            MR. ROBERTSON:  IF I COULD HAVE JUST A MOMENT.

17  Q    (BY MR. ROBERTSON)  OFFICER LOPEZ, I NOTE THAT

18  YOU'RE HERE TO GIVE PROP 115 TESTIMONY FOR MS. DELOYA.

19  DO YOU STILL HAVE CONTACT WITH HER?

20  A    NO, I DO NOT.

21  Q    HAVE YOU TRIED TO GET IN CONTACT WITH HER?

22  A    NOT YET.

23  Q    OKAY.  SO IN ANTICIPATION OF THE PRELIM YOU DIDN'T

24  TRY TO LOCATE HER OR SEE IF YOU COULD GET HER HERE?

25  A    I DID NOT.

26  Q    DO YOU KNOW IF ANYONE DID?

27  A    I DON'T KNOW IF ANYONE DID OR -- I DON'T KNOW IF

28  ANYONE TRIED TO YET.

1   Q     ALL RIGHT.  AND I NOTE THAT YOUR PARTICULAR REPORT

2   IS A SANTA CLARA POLICE DEPARTMENT REPORT?

3   A     YES.

4   Q     IS THAT MAINTAINED BY YOU AT THE SANTA CLARA

5   POLICE?

6   A     THE POLICE DEPARTMENT ITSELF MAINTAINS IT.

7   Q     DID YOU HAVE AN UNDERSTANDING AS TO WHY THE SANTA

8   CLARA POLICE, YOU IN PARTICULAR, WERE ASSISTING ANOTHER

9   AGENCY IN THIS CASE?

10            MR. ROSEN:  OBJECTION, RELEVANCE.

11            THE COURT:  SUSTAINED.

12            MR. ROBERTSON:  NOTHING FURTHER.

13            THE COURT:  ANY REDIRECT?

14            MR. ROSEN:  NO.

15            THE COURT:  MR. GILLAN, YOU HAVE A QUESTION.

16            MR. GILLAN:  I HAVE A BRIEF QUESTION ON

17   RECROSS.

18                  RECROSS EXAMINATION

19   Q     (BY MR. GILLAN)  DID THIS WITNESS TELL YOU THE TIME

20   BETWEEN THE TIME THAT -- OR THE TIME THAT LAPSED BETWEEN

21   THE TIME SHE GOT INTO THE VAN AND THE TIME SHE HEARD THE

22   GUNSHOTS?

23   A     SHE SAID IT HAPPENED FAST.  THERE WAS NO NUMBER

24   TIME.

25   Q     DID YOU ASK HER IF THAT WAS SECONDS OR MINUTES

26   OR --

27   A     I DON'T RECALL DOING THAT.

28   Q     OKAY.  DID YOU ASK HER TO DEMONSTRATE HOW LONG IT

184

```
 1   TOOK JUST IN REAL TIME?

 2   A     NO.

 3   Q     FAIR ENOUGH.  DID SHE ALSO TELL YOU THAT THE OTHER

 4   TWO PEOPLE WITH HER, MISS MELLO AND MR. COLONNA, WERE IN

 5   THE VAN AT THE TIME THAT THE GUNSHOTS WERE FIRED?

 6   A     I BELIEVE MISS MELLO WAS NOT IN THE VAN AND SHE

 7   SAID THERE WAS TWO OTHER INDIVIDUALS.  I BELIEVE AN

 8   INDIVIDUAL BY THE NAME OF JOE WAS WITH MELLO OUTSIDE OF

 9   THE VAN, BUT THERE WAS TWO OTHER PEOPLE INSIDE THE VAN

10   WITH HER.

11   Q     IN YOUR REPORT ON PAGE 2 -- OKAY.

12          MR. GILLAN:  WELL, IN ANY EVENT, FAIR ENOUGH.

13   THAT'S ALL I GOT.

14          THE COURT:  ALL RIGHT.  YOU CAN STEP DOWN.

15   THANK YOU.

16          MR. ROBERTSON:  COULD I HAVE JUST ONE SECOND,

17   YOUR HONOR.

18          THE COURT:  ALL RIGHT.

19                RECROSS EXAMINATION

20   Q     (BY MR. ROBERTSON)  OFFICER LOPEZ, HOW MANY PEOPLE

21   DID YOU UNDERSTAND TO BE IN THE VAN?

22   A     AT WHICH TIME?

23   Q     WHEN THE WITNESS THAT YOU JUST TESTIFIED FOR HEARD

24   THE SHOTS?

25   A     I'M GOING TO REFER TO MY REPORT.

26   Q     IF IT WOULD ASSIST YOU, BATE STAMP 596 OR 598, PAGE

27   2 OF YOUR REPORT, A PARAGRAPH SECOND FROM THE BOTTOM.

28   A     SHE SAID THERE WAS TWO CO-WORKERS IN THE VAN WHEN
```

1   SHE HEARD THE SHOTS.

2   Q    CORRECT.  AND THEY'RE ALSO REFERRED TO IN PARAGRAPH

3   3 ON THE SAME PAGE.  WERE YOU EVER ABLE TO IDENTIFY THEM

4   OR INTERVIEW THEM?

5   A    I BELIEVE I DID GET A CHANCE TO TALK TO THEM.

6   Q    AND DO YOU KNOW THEIR NAMES?

7   A    I DON'T HAVE THAT INFORMATION WITH ME RIGHT NOW.

8   Q    DID YOU SHOW THAT WITNESS A LINEUP, A PHOTO

9   LINEUP?

10   A    WHICH WITNESS.

11   Q    ANY OF THE WITNESSES THERE?

12   A    UM, I DON'T RECALL.  YOU KNOW WHAT, I DID SHOW

13   WITNESS MELLO WITH OFFICER SANDOVAL A LINEUP.

14   Q    CORRECT.  AS TO THIS WITNESS, DO YOU RECALL WHETHER

15   OR NOT YOU SHOWED HER ONE?

16   A    I DON'T RECALL THAT.

17   Q    DO YOU RECALL WHETHER OR NOT THE WITNESS, WHEN YOU

18   SPOKE WITH HER, YOU ALREADY HAD CERTAIN INFORMATION THAT

19   HAD BEEN GATHERED BY THE DETECTIVES ABOUT POSSIBLE

20   DESCRIPTIONS, CORRECT?

21   A    I DON'T RECALL THAT.

22   Q    I KNOW IN MY REPORT IT SHOWS THAT IT WAS PRESENTED

23   ON APRIL 28.  DO YOU REMEMBER WHAT DAY YOU DID THE

24   INTERVIEW WITH THE WITNESS?

25   A    ON THE 21ST OF MARCH.

26   Q    SO, ABOUT A WEEK AFTER, ABOUT A WEEK AFTER THE

27   HOMICIDE ON MARCH 14?

28   A    APPROXIMATELY, YES.

1    Q      DO YOU RECALL ASKING THE WITNESS IF SHE RECALLED

2   SEEING THE INDIVIDUAL WITH A GUN?

3    A      I DON'T RECALL ASKING THAT.

4    Q      A BACKPACK?

5    A      WHICH WITNESS ARE WE TALKING ABOUT NOW?

6    Q      THE ONLY ONE -- I'M SORRY.  THE WITNESS YOU JUST

7   TESTIFIED ON BEHALF OF, AND THAT WOULD BE AVIA SOMETHING

8   DELOYA.

9    A      I DON'T RECALL ASKING HER ABOUT A BACKPACK.

10    Q      DO YOU RECALL ASKING HER ABOUT THE AGE OF THE

11   PERSON SHE SAW?

12    A      WHICH PERSON THAT SHE SAW?

13    Q      AGAIN, THE PERSON WEARING THE BLACK.

14    A      I'M GOING TO REFER TO MY REPORT.

15    Q      PLEASE.

16    A      I DON'T BELIEVE I ASKED HER ABOUT THE AGE.

17    Q      IF IT WOULD HELP YOU, THE WITNESS DELOYA, I THINK

18   HAD REFERRED TO THE TWO PEOPLE IN THE VAN WITH HER AS

19   PRIMO AND ERICA.

20    A      OKAY.

21    Q      DO YOU REMEMBER TALKING WITH THEM?

22    A      YOU KNOW, IF I'M GOING TO LOOK AT MY REPORT, I'M

23   GOING TO LOOK AT MY REPORT AT PAGE 4.  OKAY.  YES.

24    Q      AND YOU WEREN'T ABLE TO GAIN ANY FURTHER

25   INFORMATION, OTHER THAN SOMEONE IN BLACK FROM THOSE TWO

26   PEOPLE?

27    A      THAT'S CORRECT.

28           MR. ROBERTSON:  I HAVE NO FURTHER QUESTIONS.

```
 1              THE COURT:  ANY REDIRECT.
 2              MR. ROBERTSON:  I APOLOGIZE, I DO.
 3    Q    (BY MR. ROBERTSON)  WHEN -- IT WAS JOE COLONNA WHO
 4    BROUGHT THEM TO YOU, CORRECT?
 5    A    I BELIEVE TO -- TO ME?
 6    Q    TO -- I UNDERSTOOD, MAYBE I'M MISTAKEN HERE, BUT I
 7    THOUGHT YOU CONDUCTED AN INTERVIEW ACTUALLY OUT AT 18400
 8    OVERLOOK.
 9    A    YES.
10    Q    AND THE WITNESS WAS BROUGHT TO YOU THERE BY HER
11    BOSS?
12    A    I BELIEVE WE PICKED HER UP.
13    Q    I'M SORRY.
14              MR. ROBERTSON:  I'M SORRY.  THANK YOU.
15              THE COURT:  ANY FOLLOW-UP?
16              MR. ROSEN:  NO.
17              THE COURT:  YOU CAN STEP DOWN.  THANK YOU.
18    ALL RIGHT.  WE'LL BE IN RECESS THEN UNTIL NEXT TUESDAY AT
19    9:00, DECEMBER 16 AT 9:00 IN THIS DEPARTMENT.
20              MR. ROSEN:  YES, YOUR HONOR.  I JUST WONDER IF
21    WE CAN TALK A LITTLE BIT ABOUT SCHEDULING.
22              THE COURT:  SURE.
23              MR. ROSEN:  WHILE WE ARE STILL HERE.  I'VE
24    JUST TALKED A LITTLE BIT WITH COUNSEL AND IT'S POSSIBLE
25    WE MIGHT FINISH TUESDAY, WEDNESDAY, THURSDAY OF THE
26    FOLLOWING WEEK.  I THINK THERE'S A GOOD POSSIBILITY THAT
27    WE MAY NOT, SO I JUST WONDERED IF WE COULD LOOK AT OUR
28    CALDENDARS AND FIGURE OUT AN EXTRA, SAY, TWO DAYS THAT WE
```

```
 1   COULD AGREE TO GO OVER UNTIL.  I DON'T KNOW WHAT THE
 2   COURT'S AVAILABILITY IS THE LAST TWO WEEKS OF THE YEAR.
 3           THE COURT:  THE 23RD -- THE REASON I'M
 4   THINKING IS BECAUSE I'M FILLING IN FOR JUDGE CENA AND
 5   TRYING TO REMEMBER JUST EXACTLY HIS CALENDAR TO COVER
 6   THAT, I'D BE AVAILABLE THE 23RD, THE 26TH.
 7           MR. ROSEN:  WHAT ABOUT THE FOLLOWING WEEK,
 8   YOUR HONOR?
 9           THE COURT:  AND THE 30TH AND THE 2ND.
10           MR. ROSEN:  YOU THINK THAT ON THE 29TH YOU'LL
11   BE CALLING THE CALENDAR AGAIN?
12           THE COURT:  YEAH, I'LL BE TIED UP IN THE
13   MORNING WITH MASTER TRIAL CALENDAR AND THEN IN THE
14   AFTERNOON IT'S THE ARRAIGNMENT ON THE INFORMATIONS.
15           MR. ROSEN:  OKAY.
16           THE COURT:  EACH MONDAY AND THEN THERE'S
17   WEDNESDAY AFTERNOON, THE AFTER ARRAIGNMENT CALENDAR.
18           MR. ROSEN:  SO POSSIBLY THE 30TH AND THE
19   MORNING OF THE 31ST?
20           THE COURT:  YEAH, THAT WOULD PROBABLY WORK.
21           MR. ROSEN:  LET ME CONFER WITH COUNSEL FOR A
22   MOMENT AND JUST SEE WHAT DAYS WORK.
23      OKAY.  THE 30TH IS FINE.  IT SEEMS LIKE THE 30TH IS
24   FINE WITH EVERYONE AND, IF FOR SOME REASON, IT DOESN'T
25   FINISH ON THE 30TH, JANUARY 2, FRIDAY, THAT'S FINE WITH
26   THE PEOPLE.
27           MR. ROBERTSON:  SO WE WOULD GO FROM -- WE
28   WOULD SKIP CHRISTMAS WEEK.
```

189

```
 1              MR. ROSEN:   YES.

 2              MR. ROBERTSON:   AND THEN COME BACK ON THE

 3    30TH.

 4              MR. ROSEN:   AND POSSIBLY FRIDAY THE 2ND, IF WE

 5    DON'T FINISH.

 6              MR. ROBERTSON:   THAT'S FINE.

 7              MR. PEREZ:   THAT'S FINE WITH ME.

 8              THE COURT:   OKAY.   SOUNDS GOOD.   SEE YOU ALL

 9    NEXT TUESDAY.

10              MR. ROSEN:   THANK YOU, VERY MUCH, YOUR HONOR.

11

12                           ---O0O---

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28
```

190

| | |
|---|---|
| 1 | |
| 2 | STATE OF CALIFORNIA                    ) |
| 3 | )       SS. |
| 4 | COUNTY OF SANTA CLARA            ) |
| 5 | |
| 6 | |
| 7 | |

8       I, JILL L. PETTENGILL, HEREBY CERTIFY:  THAT I

9  WAS APPOINTED BY THE COURT TO ACT AS OFFICIAL COURT

10  REPORTER IN THE ABOVE-ENTITLED ACTION; THAT I REPORTED

11  THE SAME IN STENOTYPE AND THEREAFTER TRANSCRIBED THE SAME

12  INTO TYPEWRITING AS APPEARS BY THE FOREGING TRANSCRIPT;

13  THAT SAID TRANSCRIPT IS A FULL, TRUE AND CORRECT

14  STATEMENT OF THE PROCEEDINGS, TO THE BEST OF MY ABILITY.

15     I FURTHER CERTIFY THAT I HAVE COMPLIED WITH CCP

16  237(A)(2) IN THAT ALL PERSONAL JUROR IDENTIFYING

17  INFORMATION HAS BEEN REDACTED IF APPLICABLE.

18

19

20       JILL PETTENGILL, C.S.R.

21       LICENSE NUMBER C-5285

22

23  ATTENTION:  CALIFORNIA GOVERNMENT CODE SECTION 69954(D)

24  STATES:
       "ANY COURT, PARTY, OR PERSON WHO HAS PURCHASED A

25  TRANSCRIPT MAY, WITHOUT PAYING A FURTHER FEE TO THE
   REPORTER, REPRODUCE A COPY OR PORTION THEREOF AS AN

26  EXHIBIT PURSUANT TO COURT ORDER OR RULE, OR FOR THE
   INTERNAL USE, BUT SHALL NOT OTHERWISE PROVIDE OR SELL A

27  COPY OR COPIES TO ANY OTHER PARTY OR PERSON."

28