1  XAVIER BECERRA
   Attorney General of California
2  PEGGY S. RUFFRA
   Supervising Deputy Attorney General
3  JILL M. THAYER
   Deputy Attorney General
4  State Bar No. 166428
     455 Golden Gate Avenue, Suite 11000
5    San Francisco, CA 94102-7004
     Telephone: (415) 510-3868
6  Fax: (415) 703-1234
     E-mail: Jill.Thayer@doj.ca.gov
7  *Attorneys for Respondent*

8              IN THE UNITED STATES DISTRICT COURT

9            FOR THE NORTHERN DISTRICT OF CALIFORNIA

10                    SAN JOSE DIVISION

11

12

13  **ESEQUIEL "PAUL" GARCIA,**          5:16-cv-05301-BLF (PR)

14                          Petitioner,

15            **v.**

16  **NEIL MCDOWELL, Warden,**

17                          Respondent.

18

19

20              # EXHIBIT 10

21              ## (Part 2 of 21)

22

23

24

25

26

27

28

Exhibit 10 (Part 2 of 21) (5:16-cv-05301-BLF (PR))

TO THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

---oOo---

PEOPLE OF THE STATE OF CALIFORNIA,

    Plaintiff,

vs.

ESEQUIEL PAUL GARCIA, MIGUEL CHAIDEZ, and LUCIO ESTRADA,

    Defendants.

Case No. CC800985

COPY

VOLUME 3

PAGES 200-399

---oOo---

REPORTER'S TRANSCRIPT ON APPEAL

FROM THE JUDGMENT OF THE SUPERIOR COURT

OF THE STATE OF CALIFORNIA IN AND FOR

THE COUNTY OF SANTA CLARA

THE HONORABLE DAVID A. CENA, JUDGE

AUGUST 20, 31, 2010

A P P E A R A N C E S

FOR DEFENDANT/APPELLANT:   SIXTH DISTRICT APPELLATE PROGRAM
              100 N. WINCHESTER BOULEVARD
              SUITE 310
              SANTA CLARA, CA 95050

FOR RESPONDENT/PEOPLE:    OFFICE OF THE ATTORNEY GENERAL
              455 GOLDEN GATE AVENUE, ROOM 11000
              SAN FRANCISCO, CA 94102

IN THE SUPERIOR COURT OF THE STATE OF CALIFORNIA

IN AND FOR THE COUNTY OF SANTA CLARA

BEFORE THE HONORABLE DAVID A. CENA, JUDGE

DEPARTMENT 34

---oOo---

PEOPLE OF THE STATE OF CALIFORNIA,

     Plaintiff,

vs.

ESEQUIEL PAUL GARCIA, MIGUEL CHAIDEZ, and LUCIO ESTRADA,

     Defendants.

Case No. CC800985

COPY

VOLUME 3, PAGES 200-399

REPORTER'S TRANSCRIPT OF PROCEEDINGS

HELD ON AUGUST 20, 31, 2010

A P P E A R A N C E

| | |
|---|---|
| FOR THE PEOPLE: | JEFF ROSEN, DDA<br>OFFICE OF THE DISTRICT ATTORNEY |
| FOR THE DEFENDANT:<br>ESEQUIEL P. GARCIA | HARRY ROBERTSON, ESQ.<br>ATTORNEY AT LAW |
| FOR THE DEFENDANT:<br>MIGUEL CHAIDEZ | JAMES LEININGER, ESQ.<br>ATTORNEY AT LAW |
| FOR THE DEFENDANT:<br>LUCIO ESTRADA | CHARLIE GILLAN, DPD<br>OFFICE OF THE PUBLIC DEFENDER |
| OFFICIAL REPORTER: | R. SCOTT UPTON, CSR, 9405 |

INDEX OF WITNESSES

PEOPLE'S

EXAMINATIONS

402 HEARINGS

MICHAEL D'ANTONIO

DIRECT.....................204
CROSS BY MR. LEININGER.......209, 222
CROSS BY MR. GILLAN.........220

MATT FRISBY

DIRECT.....................225
CROSS MR. MR. LEININGER......232
REDIRECT....................234
RECROSS BY MR. GILLAN........235
RECROSS BY MR. LEININGER.....238

BRYANT LING

DIRECT.....................282
CROSS BY MR. ROBERTSON.......300


DEFENDANT CHAIDEZ

EXAMINATIONS

402 HEARING

MIGUEL CHAIDEZ

DIRECT.....................249
CROSS BY MR. ROSEN..........262
CROSS BY MR. ROBERTSON.......266


DEFENDANT GARCIA

EXAMINATIONS

402 HEARING

MATT FRISBY

DIRECT.....................317
CROSS BY MR. ROSEN..........320
REDIRECT....................320

INDEX OF EXHIBITS

COURT'S

MARKED

1    – Clear bag containing Palm Treo
     cell phone inside a manila envelope          285

| | |
|---|---|
| 1 | SAN JOSE, CALIFORNIA                    AUGUST 20, 2010 |
| 2 | |
| 3 | P R O C E E D I N G S |
| 4 | THE COURT:  All right.  Let's take up |
| 5 | Mr. Leininger's motion. |
| 6 | Mr. Leininger, do you want to start and then we'll |
| 7 | let the People produce evidence. |
| 8 | MR. LEININGER:  Judge, I think that since Mr. Rosen |
| 9 | has his witnesses here, I'd defer to him to start.  And I |
| 10 | believe the burden is on them. |
| 11 | THE COURT:  Correct. |
| 12 | MR. ROSEN:  Thank you, Your Honor.  At this time, |
| 13 | the People call Detective Mike D'Antonio to the stand. |
| 14 | THE CLERK:  Sir, if you could stop right there and |
| 15 | raise your right hand for me. |
| 16 | MICHAEL D'ANTONIO, |
| 17 | Being called as a witness on behalf of the |
| 18 | People, having been first duly sworn, was |
| 19 | examined and testified as follows: |
| 20 | THE WITNESS:  I do. |
| 21 | THE COURT:  Good morning.  Would you state your name |
| 22 | and spell your last name, please. |
| 23 | THE WITNESS:  Yes.  Michael D'Antonio.  The last |
| 24 | name is spelled D-, apostrophe, A-n-t-o-n-i-o. |
| 25 | THE COURT:  Go ahead, Mr. Rosen. |
| 26 | 402 HEARING |
| 27 | DIRECT EXAMINATION |
| 28 | BY MR. ROSEN: |

```
 1        Q.   What do you do for a living?
 2        A.   I'm employed by the Town of Los Gatos as a police
 3    officer.
 4        Q.   How long have you been a police officer for the Los
 5    Gatos Police Department?
 6        A.   I was hired with them in March of 2000.
 7        Q.   Were you a police officer with another agency before
 8    that?
 9        A.   I was.
10        Q.   What agency was that?
11        A.   Moffett Field Security  Police.  I was there for
12    two years.  And I was with San Jose Police Department for a
13    short time.
14        Q.   Are you currently a sergeant with the Los Gatos
15    Police Department?
16        A.   Yes.
17        Q.   Were you one of the officers involved in
18    investigating the case that we're here in court on?
19        A.   Yes.
20        Q.   On March 28th of 2008, at about 8:40 a.m., were you
21    on duty?
22        A.   Yes, I was.
23        Q.   Where were you?
24        A.   I was in Duarte, California.
25        Q.   Where is that?
26        A.   It's south of here, I think it's in L.A. County.
27             THE COURT:  How do you spell it?
28             THE WITNESS:  I believe it's D-u-a-r-t-e.
```

1        THE COURT:  Thank you.

2        Q.   (BY MR. ROSEN):  Sergeant, did you have a chance to

3    review the report that you wrote about being in Duarte on

4    March 28 of 2008?

5        A.   Yes.

6        Q.   Did reviewing that report help refresh your memory?

7        A.   Yes.

8        Q.   Did you also have an opportunity to review the

9    report of Campbell Officer David Carmichael about what Officer

10   Carmichael did on March 28th, 2008?

11       A.   Yes.

12       Q.   Did that also help to refresh your memory?

13       A.   Yes, it did.

14       Q.   So while you were in Duarte, California on March 28,

15   2008, what were you doing?

16       A.   We -- I was there to attempt to locate Miguel

17   Chaidez.

18       Q.   Were you able to locate him?

19       A.   Yes.

20       Q.   How did you find him?

21       A.   I was conducting surveillance near his residence at

22   1610 Fairdale Avenue.  I was in a vehicle with Sergeant

23   Carmichael.  Sergeant Carmichael was driving and we saw, at

24   that time, it was a vehicle that matched the color and type of

25   vehicle leave the area.

26       Q.   Did you then follow that vehicle to a gas station?

27       A.   Yes, we did.

28       Q.   At the gas station, did you and other officers

1  arrest Miguel Chaidez?

2      A.    Yes.

3      Q.    After Miguel Chaidez was arrested, where did

4  Mr. Chaidez go, or where was he taken to?

5      A.    He was transported to the Monrovia Police

6  Department.

7      Q.    At approximately what time was Miguel Chaidez

8  arrested and then transported to the Monrovia Police

9  Department?

10     A.    8:46 based on my recollection about how long after

11 we saw him.  8:46 in the report.

12         THE COURT:  Well, which?  The transport or the

13 arrest?

14         THE WITNESS:  The arrest.

15         THE COURT:  Thank you.

16     Q.    (BY MR. ROSEN):  After Miguel Chaidez was taken to

17 the Monrovia Police Department, did you see Miguel Chaidez

18 later that day?

19     A.    I did.

20     Q.    About what time did you then see Miguel Chaidez?

21     A.    I saw him about 3 o'clock that day, later that day.

22     Q.    Do you see Miguel Chaidez in court today?

23     A.    Yes.

24     Q.    Can you just point him out for the record.

25     A.    He's sitting to my right in the courtroom, wearing

26 brown and orange.

27         MR. ROSEN:  Your Honor, let the record reflect the

28 witness has identified the defendant, Miguel Chaidez.

1    THE COURT:  Not yet.  What's the individual sitting
2  next to him wearing?

3    THE WITNESS:  A gray suit, blue shirt, blue tie.

4    THE COURT:  The record will reflect an
5  identification of Mr. Chaidez.

6    Q.   (BY MR. ROSEN):  At 3 o'clock when you came into
7  contact with Miguel Chaidez again, what did you and Sergeant
8  Carmichael do with him?

9    A.   We actually placed him in what they call waist
10  chains, chained so his hands were secured near his waist.  We
11  placed him in Sergeant Carmichael's vehicle, which is an
12  unmarked Campbell Police unit.  Seat belted him into the front
13  seat of the vehicle and drove him to Santa Clara Police
14  Department.

15    Q.   On the way to the Santa Clara Police Department, did
16  you and Sergeant Carmichael have any conversation with Miguel
17  Chaidez?

18    A.   Yes.

19    Q.   What was the conversation about that you had with
20  Miguel Chaidez?

21    A.   We talked about football, sports, general -- general
22  topics.

23    Q.   Did you or Sergeant Carmichael talk to Miguel
24  Chaidez about why he was arrested or the facts of the case?

25    A.   No.

26    Q.   On the way from Monrovia to Santa Clara, did you
27  stop anywhere?

28    A.   Yes.

1    Q.   Where did you stop?

2    A.   We stopped at a Taco Bell.

3    Q.   Why?

4    A.   We got food for all of us to eat, myself, Sergeant

5    Carmichael, and I believe Miguel had some food.

6    Q.   Approximately what time did you arrive in Santa

7    Clara?

8    A.   Approximately 7:30 p.m. that same evening.

9    Q.   When you arrived with Miguel Chaidez at 7:30 p.m. at

10   the Santa Clara Police Department, who did you then turn

11   Miguel Chaidez over to?

12   A.   To Sergeant Frisby and Detective Kazem Wahid.

13        MR. ROSEN:   W-a-h-i-d, and the last name is

14   K-a-z-e-m.

15        Thank you.   I don't have any more questions for you

16   at this time.   The defense may have questions.

17        THE COURT:   Cross-examination?

18        MR. LEININGER:   Thank you.

19                    CROSS-EXAMINATION

20        BY MR. LEININGER:

21   Q.   Sergeant, were you there -- did you physically make

22   the arrest on Mr. Chaidez?

23   A.   I believe so.

24   Q.   Okay.   Well, would there have been anybody else

25   besides you that would have?

26   A.   There was four of us.   It was Sergeant Carmichael,

27   Sergeant Burris, and Officer Rush.   Those two officers -- the

28   last two are from the Santa Clara Police Department.   The

1   hesitation is 'cause Cesar was there as well and I believe

2   that I was the one who actually handcuffed Miguel, but --

3       Q.   Okay.  Well, what I'm getting at is are you the

4   person who took Miguel out of the car?

5       A.   He was out of the vehicle.  They were -- the person

6   that I took into custody was already out of the vehicle

7   starting to pump gas or in and around the gas pumps.

8       Q.   So you didn't do any search of the vehicle yourself?

9       A.   I did.  I looked in the vehicle briefly.  There was

10  a cell phone in the center console that I removed prior to

11  having the vehicle sealed and then transported.

12      Q.   Okay.  And you removed the cell phone why?

13      A.   It was a cell phone that I was concerned could have

14  been used -- involved in the homicide.

15      Q.   It wasn't any immediate reason to worry about

16  whether the cell phone would disappear?

17      A.   No.  No, I just -- it was something that -- that

18  piece of evidence stood out and was important to me.

19      Q.   Was there a search warrant being sought at the same

20  time for Miguel Chaidez's home?

21      A.   Yes.

22      Q.   Did you ever seek a search warrant for his car?

23      A.   Yeah.  For the Dodge Durango there was a search

24  warrant, yes.

25      Q.   Okay.  Now, I'm not sure we got to that point.  Was

26  that the car he was arrested --

27      A.   Yes.

28      Q.   -- filling at the station?

1    A.   Yes.

2    Q.   Okay.  But you removed the cell phone prior to

3 obtaining a search warrant; right?

4    A.   No.

5    Q.   You had the search warrant at that time?

6    A.   Yes.

7    Q.   Okay.

8    A.   Can I clarify?

9    Q.   Sure.

10   A.   It was faxed to me by a Commander Metzer from the

11 Santa Clara County Enforcement Team early that morning before

12 we actually went to the 1610 Fairdale address.

13   Q.   Okay.  Now, did Miguel ask you anything at all when

14 you arrested him?

15   A.   No, I don't think -- other than maybe he may have

16 asked why he was arrested.  I don't recall exactly what he

17 asked.

18   Q.   Well, do you recall having any conversation with him

19 at all?

20   A.   Very minimal, if any.

21   Q.   Well, did you ask him who he was?

22   A.   Yes.

23   Q.   Did you ask him for any identification of himself?

24   A.   I don't recall.

25   Q.   Did you order him on the ground?

26   A.   Yes.

27   Q.   And that was before you knew who he was or he

28 identified himself to you?

1    A.    That was before I knew that -- who he was, correct.

2    Q.    So you were functioning on the basis of a

3 description that you had of him?

4    A.    Yes, and the license plate of the vehicle.

5    Q.    Okay.  And his brother was in the car?

6    A.    Yes.

7    Q.    And what happened to his brother?  Did you arrest

8 him?

9    A.    I think it was the other two officers who

10 actually -- probably Sergeant Burris and Officer Rush, I

11 believe.

12    Q.    Now, you removed Miguel from the ground and put him

13 in a police car?

14    A.    Yes, he was -- Monrovia PD came to the -- came to

15 our location and conducted the transport.

16    Q.    So they were the transportation officers?

17    A.    Yes.

18    Q.    Okay.  Did you have any discussion with Miguel

19 before he got in the car or once he got in the car?

20    A.    I don't believe so.

21    Q.    He didn't ask you any questions?

22    A.    If he did, I don't recall.

23    Q.    Do you recall whether he ever asked you whether or

24 not he could make a phone call?

25    A.    I do not.  I don't recall.  He may have.

26    Q.    So you wouldn't remember what your answer to him

27 was, then, I guess?

28    A.    No.  Sorry.

Q.    Would it most likely have been negative?

A.    Yes.

Q.    And why is that?

A.    Probably the biggest reason is that we had still --
were going to conduct the execution of the search warrant on
Fairdale.  It would be unlikely and probably never would I
allow somebody who could provide information back to the
residence where the search warrant was going to be conducted
to make that phone call.

Q.    Did it occur to you he might have been calling a
lawyer or wanted to call a lawyer?

A.    No.

Q.    I know this is hypothetical, but does that fit
underneath your umbrella of no communication until after the
search warrant?

A.    I've never had anybody ask me that.

Q.    You never, in all your years in police work, anybody
ask you to talk to a lawyer?

A.    Prior to executing a search warrant?

Q.    Well, let's put it this way:  How about -- he
doesn't know you're executing a search warrant; right?  You
didn't tell him you were searching his house?

A.    We may have.  I don't think we were trying to hide
what we were doing.

Q.    So then you had some conversation about searching
his house?

A.    I know we did with his brother, because I
interviewed his brother earlier -- later that morning.

1      Q.   No.   Actually, Sergeant, what I'm trying to get at

2   from a point of view of time, is what transpired between

3   yourself and Miguel Chaidez at the time of the arrest and at

4   the time of his being put into transportation.

5      A.   I can tell you that he didn't ask me to make a phone

6   call to call a lawyer.

7      Q.   He did not?

8      A.   He did not.

9      Q.   Okay.   You would remember that; right?

10     A.   Yes.   Yes.

11     Q.   All right.   Did he ask you to make a phone call?   Do

12  you remember that?

13     A.   I don't recall.

14     Q.   Okay.   But if he wanted to talk to a lawyer, that

15  would have been memorable; right?

16     A.   Yes.

17     Q.   Now, that was, like, about 9 o'clock in the morning;

18  right?

19     A.   Correct.

20     Q.   And the next time you saw him was 7:30 at night?

21     A.   No, I saw him for sure at about 3 o'clock that

22  afternoon.

23     Q.   I'm sorry, 3 o'clock.   7:30's Santa Clara; right?

24     A.   Correct.   I may have seen him in a passing sense

25  while he was in custody at the -- at Monrovia, but --

26     Q.   In Monrovia, the Monrovian Police Department --

27     A.   Correct.

28     Q.   -- took care of him?

1    A.    Correct.  They have a temporary holding facility.

2    Q.    Okay.  And you had no discussion with Miguel at that

3    point?

4    A.    No.

5    Q.    Did you actually take him out of that cell and put

6    him in the car to transport him to Santa Clara?

7    A.    Yes.  Yes, Sergeant Carmichael and I, yes.

8    Q.    Did you talk to him then?  I mean, did you say

9    anything like, "Hey, Miguel, we're going to Northern

10   California"?

11   A.    Oh, yes.

12   Q.    And did you tell him why?

13   A.    I believe we said that his name may have come up in

14   a homicide investigation.  There was detectives that wanted to

15   talk to him.  At the very least, we told him there was

16   detectives that wanted to talk to him in Santa Clara.

17   Q.    Okay.  To the best of your knowledge and memory, is

18   that the first time that Miguel was told why he was in custody

19   by you?

20   A.    It's possible, yes.

21   Q.    So he could have been held for, like, five hours in

22   custody without being told why he was there, by you at least?

23   A.    I may have -- I may have told him at the initial

24   arrest, but I don't recall.

25   Q.    Did you do the search when he was booked into

26   Monrovia or did they do that?

27   A.    The --

28   Q.    Of the person of Mr. Chaidez.

1      A.    I believe Monrovia actually -- when he got to
2   Monrovia PD, and I must have seen him again because they had
3   actually taken his clothes and put them in a -- like, a white
4   paper suit.

5      Q.    Okay.

6      A.    And that wasn't done in my presence.

7      Q.    And at that point, you had no conversation with him
8   about why he was there or what was going on with his property
9   or anything?

10      A.    Not that I recall.

11      Q.    Okay.  So when you came to get him about 3 o'clock,
12   he got dressed again?  Or was he transported in his white
13   paper suit?

14      A.    No, I had him get dressed before that, actually.

15      Q.    And that was in the street clothes he was arrested
16   in?

17      A.    Yes.

18      Q.    Okay.  Did he get his personal property back?  Or
19   maybe I should ask you this question:  Did you give him the
20   personal property back or do you know who did?

21      A.    I don't recall who did.

22      Q.    But it wasn't you?

23      A.    No, I don't believe so.

24      Q.    Okay.  So you and Sergeant Carmichael then
25   transported him to Santa Clara PD?

26      A.    Correct.

27      Q.    Okay.  And that was, I presume, because Santa Clara
28   PD was brought in as extra help for you?

1      A.    Yes.

2      Q.    And in the roughly, what, four-hour trip,

3 four-and-a-half-hour trip, no one had any discussion with

4 Mr. Miguel Chaidez as to why he was handcuffed in the back

5 seat?

6      A.    He was in the front seat; I was sitting in the back

7 seat.

8      Q.    Pardon me.  All right.  Front seat.

9      A.    No, we didn't -- we didn't discuss any of the

10 details.

11     Q.    Just football?

12     A.    Football, and we talked about some political things,

13 talked about Miguel playing football in high school.

14     Q.    And he wasn't -- apparently, to what you're

15 testifying, he wasn't curious as to what you were arresting

16 him for in four or five hours?

17     A.    He didn't -- he didn't ask -- I don't recall him

18 asking us any questions about our investigation.  We may have

19 made it clear that we weren't going to talk about it, but we

20 didn't have any discussions.

21     Q.    Okay.  That's kind of a double answer.  Let me

22 ask -- let's just break it down a second.

23     A.    Okay.

24     Q.    Is your memory clear on the subject as to whether or

25 not you said anything to him or you just don't remember?

26     A.    I remember I talked to him.

27     Q.    Okay.  Now, you were arresting him for a conspiracy

28 to commit murder; right?

1      A.    Yes.

2      Q.    And you never advised him of that?

3      A.    No, I don't believe so.

4      Q.    Okay.  Do you know whether he was ever advised of

5   that before he ended up in Santa Clara?

6      A.    I do not.

7      Q.    So you don't know what happened in Monrovia in terms

8   of whether he was advised of that offense or not; right?

9      A.    By other -- by anyone else besides --

10      Q.    By anyone that you were working with.

11      A.    No.

12      Q.    Okay.  You were with Sergeant Carmichael the whole

13   time?

14      A.    For the majority of the time, yes.

15      Q.    Okay.  On your report, there's an officer named

16   Steve Burris.  Is he from Los Gatos Police Department?

17      A.    Santa Clara Police Department.

18      Q.    He's Santa Clara.  So did you actually prepare a

19   report on your activities?

20      A.    Yes.

21      Q.    So I should have a report with your name on it;

22   right?

23      A.    Yes, sir.

24      Q.    Okay.  Now, you didn't conduct the interview at

25   Santa Clara PD; right?

26      A.    I did not.

27      Q.    So did you have any parting words with Miguel when

28   he came out of the car?

1    A.    Probably said something like appreciated his

2    cooperation.  I mean --

3    Q.    Tell him where he was?

4    A.    It was cordial.

5    Q.    Did you tell him where he was?

6    A.    I don't recall.

7    Q.    Did you tell him he was in Santa Clara?

8    A.    I believe he asked where he was at, but I don't

9    recall that specific statement saying, "You're now in Santa

10   Clara PD."  We had told him -- I do believe we had told him

11   before we left that he was going to San Jose, Santa Clara PD

12   area, where we were going.

13   Q.    And did he ask you to call anybody at that stage of

14   the game?

15   A.    No.

16   Q.    Would that still have been a blackout area for him?

17   A.    Yes.

18   Q.    Search warrant was executed; right?

19   A.    By the time -- yes, I believe so.

20   Q.    So was there any immediate reason why he couldn't

21   make a phone call to a lawyer or whomever he wanted?

22   A.    No.

23   Q.    You just didn't make it available to him; is that

24   it?

25   A.    Well, I think the question is if he would have

26   asked.  I don't recall him asking for a phone call.

27          MR. LEININGER:  Okay.  Thank you.  I have nothing

28   further, Your Honor.

1              THE COURT:  Any redirect?

2              MR. ROSEN:  Just --

3              THE COURT:  Well, does Mr. Gillan --

4              MR. GILLAN:  Could I just ask a few points of

5      clarification, since I'm here?  It can be stricken if it's not

6      relevant to the motion.

7              THE COURT:  Go ahead.

8                          CROSS-EXAMINATION

9              BY MR. GILLAN:

10       Q.   When you arrested Miguel Chaidez, did you read him

11     his *Miranda* rights?

12       A.   No.

13       Q.   During the trip from Duarte to Santa Clara County,

14     was he read his *Miranda* rights?

15       A.   No.

16       Q.   Okay.  And he wasn't advised of why he was arrested;

17     is that your testimony?

18       A.   He was advised that his name had come up in a

19     homicide investigation.  As to say, "You're under arrest for

20     conspiracy to commit murder," no, I don't believe that we ever

21     told him that.

22       Q.   No one said that in your presence?

23       A.   I'm sorry?

24       Q.   No one said that in your presence?

25       A.   Correct.

26       Q.   But you engaged in small talk with Miguel from

27     Duarte all the way up to Santa Clara?

28       A.   Correct.

1          Q.    And you stopped to buy him food as well at Taco
2     Bell?

3          A.    Yes.

4          Q.    And I'm curious, is the reason that you didn't
5     advise him of his rights is because this wasn't going to be an
6     interrogation; is that right?

7          A.    We, Sergeant Carmichael and I, were instructed not
8     to ask Miguel any questions.  And we were not going to ask any
9     questions in regards to the homicide.

10         Q.    Okay.  Is the engaging in the small talk, is that
11    part of a technique that you use to make a suspect comfortable
12    with you and more likely to speak with the investigating
13    officer?

14         A.    At that time, I don't think it was a technique.  It
15    was more I had concerns about somebody I didn't know, driving
16    that many hours in an unsecured, caged car.  I really just
17    wanted to make sure that we got there safely without having
18    any problems.

19         Q.    So as part of, like, the Reid's School of
20    Interrogation, you haven't been taught to engage in small talk
21    with defendants before actually reading them their *Miranda*
22    rights?

23         A.    I don't know if I've been to Reid's.

24               MR. ROSEN:  Objection.  Asked and answered.

25               THE COURT:  Overruled.

26               MR. ROSEN:  Objection.  Relevance.

27               THE COURT:  Overruled.

28               THE WITNESS:  Can you ask the question one more

1   time?

2        Q.   (BY MR. GILLAN):  Yeah, I'm just wondering if

3   engaging in small talk is something you've been taught as a

4   technique to get suspects to speak with you?

5        A.   Yes.

6             MR. GILLAN:  Okay.  That's all I have.

7             THE COURT:  Mr. Rosen, any redirect?

8             MR. ROSEN:  Yes.  Just one moment, Your Honor.

9   Mr. Leininger might have some more questions, I'm not sure.

10                    FURTHER CROSS-EXAMINATION

11           BY MR. LEININGER:

12       Q.   You have your report with you?

13       A.   Yes.

14       Q.   Okay.  I want you to take a look at your second page

15  somewhere down towards the end.  I think you were asked a

16  question as to whether or not you ever Mirandized Mr. Chaidez.

17       A.   Yes.

18       Q.   Is there a paragraph on your report that says that

19  you did?

20       A.   Cesar Chaidez.

21       Q.   Oh, it was Cesar.  Okay.  So you Mirandized Cesar

22  but you didn't Mirandize --

23       A.   Correct, I conducted an -- prior to the interview I

24  conducted at Monrovia Police Department, I Mirandized Cesar

25  Chaidez.

26       Q.   Okay.  So I'm going to summarize something, and you

27  correct me if I'm wrong.  Okay?

28       A.   Okay.

1     Q.   You have an arrest where you did not inform

2    Mr. Chaidez of why you were putting him on the ground, why

3    you -- you pat searched him I assume; right?

4     A.   Yes.

5     Q.   Okay.  And the conversation was not about

6    identification?  There was no conversation, you just hooked

7    him up and took him to Monrovia?

8     A.   Prior to him -- prior to him being taken to Monrovia

9    Police Department, I must have ID'ed who he was, that it was

10   Miguel Chaidez.  I just don't recall actually looking at a

11   driver's license or how we ID'ed him.

12    Q.   Okay.  And you recall no conversation because you

13   were told not to discuss the case; is that what it is?

14    A.   Yes.

15    Q.   Is it your habit and custom as a police officer to

16   have someone in custody for, say, four -- well, seven hours

17   and not tell them why they were in custody?

18          MR. ROSEN:  Objection.  Relevance.

19          THE COURT:  Sustained.  Sustained.

20          MR. LEININGER:  It's foundational, Judge, to tell

21   you the truth.

22          THE COURT:  Foundation for?

23          MR. LEININGER:  I want to ask him a question if

24   that's his custom, that's one thing.  If not, why didn't he

25   say something to him?  It seems to me odd that somebody's in

26   custody for seven hours and not told why he's in custody.

27          MR. ROSEN:  Objection.  Asked and answered.

28          THE COURT:  Sustained.  The objection's sustained.

1      Q.    (BY MR. LEININGER):  But that is a fact, by your
2  testimony, you had him for seven hours and never told him why?
3      A.    Why he was under arrest?
4      Q.    Yes.
5      A.    Yes.
6           MR. LEININGER:  Okay.  I have nothing further, Your
7  Honor.
8           THE COURT:  Mr. Rosen?
9           MR. ROSEN:  Nothing further, Your Honor.
10          THE COURT:  Mr. Gillan?
11          MR. GILLAN:  I don't think I probably should have
12  even asked questions the last time, so I'm just happy you gave
13  me that opportunity.
14          THE COURT:  You can step down.
15          MR. ROSEN:  Your Honor, at this time, the People
16  call Sergeant Matt Frisby to the witness stand.
17          THE COURT:  Yes.
18                     MATT FRISBY,
19          Being called as a witness on behalf of the
20          People, having been first duly sworn, was
21          examined and testified as follows:
22          THE WITNESS:  I do.
23          THE CLERK:  All right, sir.
24          THE COURT:  We're going to go off the record here
25  for a second and see if we can fix this.
26          (TECHNICAL DIFFICULTIES).
27          THE COURT:  We're ready.  Go ahead, Mr. Rosen.
28          I'm sorry.  Would you state your full name and spell

```
 1    your last name.

 2                 THE WITNESS:  Matt Frisby, last name is spelled

 3    F-r-i-s-b-y.

 4                 THE COURT:  Go ahead, Mr. Rosen.

 5                          DIRECT EXAMINATION

 6            BY MR. ROSEN:

 7       Q.    Good morning.

 8       A.    Good morning.

 9       Q.    What do you do for a living?

10       A.    I'm a sergeant with the Los Gatos Police Department.

11       Q.    How long have you been a police officer?

12       A.    Since October of 1992.

13       Q.    All with the Los Gatos Police Department?

14       A.    Yes.

15       Q.    Are you one of the investigating officers on this

16    case?

17       A.    I am.

18       Q.    On March 28th of 2008, did you interview Miguel

19    Chaidez?

20       A.    I did.

21       Q.    Do you see Miguel Chaidez in court?

22       A.    Yes.

23       Q.    Can you just point him out.

24       A.    He's sitting to the right of Mr. Leininger, brown

25    and orange top.

26                 MR. ROSEN:  Thank you.  Let the record reflect the

27    officer's identified Miguel Chaidez.

28                 THE COURT:  So noted.
```

1    Q.   (BY MR. ROSEN):  Did you see Miguel Chaidez on March
2    28th of 2008?

3    A.   I did.

4    Q.   Where did you see him?

5    A.   At Santa Clara Police Department.

6    Q.   What time did you first see him?

7    A.   I believe it was about 7 o'clock, 7:30 p.m.

8    Q.   In the evening?

9    A.   P.m., yes.

10   Q.   Was he in an interview room?

11   A.   Yes, he was.

12   Q.   Did you audio and videotape the interview that you
13   conducted with Miguel Chaidez?

14   A.   Yes, I did.

15   Q.   Was there another officer with you as well?

16   A.   There was.

17   Q.   What officer was that?

18   A.   Sergeant Wahid Kazem.

19   Q.   For approximately how long did you and Sergeant
20   Kazem interview Miguel Chaidez at the Santa Clara Police
21   Department?

22   A.   It was a long time.  It was probably five, six
23   hours.

24   Q.   At the beginning of the interview, did you Mirandize
25   Miguel Chaidez?

26   A.   I did.

27   Q.   Did you advise him of his right to remain silent and
28   ask him if he understood that?

1      A.   I did.

2      Q.   Did he indicate that he understood that?

3      A.   Yes, he did.

4      Q.   Did you tell him that anything that he said could be

5 used against him in a court of law?

6      A.   I did.

7      Q.   Did he indicate he understood that?

8      A.   Yes, he did.

9      Q.   Did you tell him that he had the right to an

10 attorney -- to the presence of an attorney, and if he could

11 not afford an attorney, one would be hired to represent him?

12 Did you ask him if he understood that right?

13      A.   I did.

14      Q.   Did you ask him if he had any questions for you

15 before the interview continued?

16      A.   Yes.

17      Q.   And what did he say?

18      A.   He asked about his brother, if I knew what was going

19 on with his brother.

20      Q.   Did you -- before starting to talk about the

21 brother, did you ask him if he fully understood his rights?

22      A.   Yes.

23      Q.   Did he indicate that he did?

24      A.   He did.

25      Q.   Did you speak to him in English?

26      A.   I did.

27      Q.   Any trouble communicating with him?

28      A.   No.

```
 1        Q.   Did you then start to talk with him about this case,

 2   this investigation?

 3        A.   After Miranda?

 4        Q.   Yeah.

 5        A.   I did.

 6        Q.   Did he tell you that in February 28th, his cousin --

 7   that in February of 2008 his cousin, Daniel Chaidez, called

 8   him?

 9        A.   Yes.

10        Q.   Did Daniel Chaidez ask Miguel if Miguel could

11   arrange to have someone taken care of?

12        A.   Yes.

13        Q.   Did Daniel give Miguel any indication of how much

14   would be paid for the hit?

15        A.   No more than $10,000.

16        Q.   Did Miguel tell you what he and Daniel ultimately

17   agreed on regarding cost of the hit?

18        A.   Yeah, I believe it was 9500.

19        Q.   Did Miguel tell you that Daniel told him to go to a

20   certain place or use a certain mechanism to get a picture of

21   the victim, the intended target of the hit?

22        A.   Yes.

23        Q.   Where did Miguel tell you that Daniel told him to go

24   to get a picture of the victim?

25        A.   To a metroactive web site on the Internet.

26        Q.   Did Miguel tell you that Daniel walked Miguel

27   through the web site while they spoke to each other on the

28   phone?
```

```
 1        A.    He did.

 2        Q.    Did Miguel tell you whether he saw a picture of the

 3   victim on his, Miguel's, Dell laptop?

 4        A.    Yes, he did.

 5        Q.    Did Miguel describe to you how the victim looked in

 6   the photo that Miguel pulled up on the Internet?

 7        A.    He did.

 8        Q.    What did he say?

 9        A.    I believe he said that he was an older white dude

10   and he talked about some numbers in the back, 180.

11        Q.    And did he say about -- say anything about the color

12   shirt that the victim was wearing?

13        A.    Yes, he did.  I believe it was gray or black, he

14   mentioned.

15        Q.    Did you talk with Miguel about what the phrase "take

16   care of it" meant?

17        A.    Yes.

18        Q.    What did Miguel say?

19        A.    He explained to me that "take care of it" meant to

20   kill someone.

21             MR. LEININGER:  Excuse me, Judge.  Could you move

22   that -- can we have the witness move the microphone closer.

23   His voice is dropping off.

24             THE COURT:  And talk right into it.  It's not the

25   greatest microphone.  Is that better?

26             MR. LEININGER:  Well, I haven't heard yet, but I

27   think so.

28             THE WITNESS:  That better?
```

```
1              MR. LEININGER:  Yes, thank you.
2         Q.   (BY MR. ROSEN):  Did Miguel tell you that -- whether
3    or not Miguel found someone who would kill the victim?
4         A.   Yes.
5         Q.   And that person wasn't Miguel?  Miguel wasn't
6    getting -- taking the money to kill the victim himself?
7    Miguel was taking the money, keeping part of it, and finding
8    someone else to kill the victim; is that correct?
9         A.   Correct.
10        Q.   Did Miguel tell you if he gave the photo that he
11   found on the -- on his computer, if he gave that photo to the
12   person that was going to kill Mark Achilli?
13        A.   He did.
14        Q.   Of the $9500 that Miguel received from Daniel
15   Chaidez, how much money did Miguel keep, approximately?
16        A.   Can I refer to my report?
17             MR. ROSEN:  Sure.
18             THE COURT:  Mr. Rosen, just for my clarification, is
19   this something he said?  Is this part of his statement?
20        Q.   (BY MR. ROSEN):  Yes.  Actually, do you have a copy
21   of the transcript with you up there, Detective Frisby?
22        A.   I don't.
23        Q.   One second.  I'm going to hand you a transcript and
24   just direct your attention to page 49.
25             Can I approach the witness, Your Honor?
26             THE COURT:  Yes.
27        Q.   (BY MR. ROSEN):  And just take a look at page 49.
28   Just read through it and see if that refreshes your memory
```

1    about how much money Miguel told you that he kept.

2         A.    (Reviewing document).  You want to know how much

3    Miguel got out of this?

4         Q.    Yeah.

5         A.    It says here a couple grand.

6         Q.    Okay.  So did Miguel talk to you about how he

7    received money from Daniel Chaidez?

8         A.    He did.

9         Q.    What did he say about that?

10        A.    The first payment was made via money order, wire

11   transfer.  And the second was made in person.

12        Q.    What day did Miguel say that he got the wire

13   transfer from Daniel?

14        A.    I believe it was March 12th.

15        Q.    How much was it?

16        A.    Approximately $2500.

17        Q.    Where did Miguel tell you he received the transfer?

18        A.    A convenience store in the Southern California area.

19        Q.    Did Miguel tell you if he met with the shooter the

20   following day?

21        A.    He did.

22        Q.    Meaning March 13th, 2008?

23        A.    Correct.

24        Q.    What did Miguel tell you that he gave the shooter?

25        A.    He gave him a portion of the money and he gave him

26   the picture from the Internet and the address of the victim.

27              MR. ROSEN:  I don't have any more questions for you.

28              THE COURT:  Cross-examination?

1              MR. LEININGER: ·Thank you.

2                         CROSS-EXAMINATION

3              BY MR. LEININGER:

4         Q.    Sergeant, this interview went on five or six hours?

5         A.    I would guess, without looking at the tape.

6         Q.    Yeah.  Were there any breaks in that interview for

7    the defendant or for you?

8         A.    Quite a few breaks for both.

9         Q.    Did you give him anything to eat?

10        A.    I did.

11        Q.    What'd you give him?  Do you remember?

12        A.    Pizza.

13        Q.    Okay.  He was concerned, was he not, about the

14   welfare of his brother?

15        A.    He was.

16        Q.    And was this one of the major points in his talking

17   to you was that he wanted to make sure you understood his

18   brother was not involved?

19        A.    I don't know if it was a major point.  He brought it

20   up at the very beginning and wanted to know where his brother

21   was.

22        Q.    First thing out of his mouth; right?

23        A.    At the very beginning.  I don't know if it was the

24   first thing.  It was at the beginning.

25        Q.    Okay.  Did he ask you to make a phone call?

26        A.    No.

27        Q.    Did you ever suggest to him he could?

28        A.    No.

1   Q. Did you read these *Miranda* rights off a card, or how

2 did you give them?

3   A. It's customary for me to do so from a card that I

4 have on the back of my badge.  I don't have an independent

5 recollection of that right now, but --

6   Q. Okay.  Now, Mr. Chaidez didn't tell you right off

7 the get-go that this whole thing was about a killing, did he?

8   A. Pretty quickly.

9   Q. Well, but you had a little discussion, did you not,

10 about what the original purpose of the call was as far as he

11 understood?

12   A. Could you repeat the question?

13   Q. Yeah.  Let me just strike that.

14   Did he tell you early on about having a different

15 understanding about the words "taken care of"?

16   A. No, he explained to me what those words meant.

17   Q. That was -- well, you asked him those questions

18 after you asked Daniel what those words meant; right?

19   A. I had a previous discussion with Daniel.  He gave me

20 his interpretation of those words.  And then I asked Miguel

21 what his interpretation of those words were and he explained

22 to me.

23   Q. And he told you right from the get-go that the

24 interpretation was to kill someone?

25   A. Pretty early on.

26   Q. Well, did he first tell you it was for some other

27 purpose?

28   A. No.

```
 1                    MR. LEININGER:  I have nothing further, Your Honor.
 2      I'd defer to Mr. Gillan, if he has any questions.
 3                    THE COURT:  Any questions, Mr. Rosen?
 4                    MR. ROSEN:  Yes, I have a couple more questions and
 5      then --
 6                    THE COURT:  Do you have questions, Mr. Gillan?
 7                    MR. GILLAN:  I think some of the answers related to
 8      Mr. Estrada.
 9                    THE COURT:  He did mention it.  I'll let --
10                    MR. ROSEN:  They do, I just -- I think maybe before
11      Mr. Gillan -- if it's okay with Mr. Gillan, I just have a few
12      more questions so that you'll have an idea of all what you
13      want to cross on.
14                    MR. GILLAN:  Okay.
15                    THE COURT:  Go ahead, Mr. Rosen.
16                            REDIRECT EXAMINATION
17            BY MR. ROSEN:
18            Q.    Sergeant Frisby, did Miguel tell you that he met
19      with Daniel Chaidez on March 15th, the day after the murder,
20      in the area of Highway 152 and Highway 33?
21            A.    Yes.
22            Q.    Did Miguel tell you what Daniel Chaidez gave him
23      when they met on March 15th, 2008?
24            A.    Yes.
25            Q.    What was that?
26            A.    Approximately $6500.
27            Q.    Did Miguel tell you where he then drove back to?
28            A.    Yes.
```

```
 1        Q.    What city did he drive back to?

 2        A.    Duarte, I believe.  Might have been Burbank.  It was

 3   down south.

 4        Q.    Okay.  Did Miguel tell you that he gave the shooter

 5   $2240 as final payment?

 6        A.    Yes.

 7        Q.    Okay.  Those are all the -- and then you had -- at

 8   the end of the interview, did you offer Miguel an opportunity

 9   to write out what he did?

10        A.    I did.

11        Q.    And did he write that out?

12        A.    Yes, he did.

13              MR. ROSEN:  And I don't need to show you that.

14              I don't have any other questions.

15              THE COURT:  Mr. Gillan?

16                         CROSS-EXAMINATION

17              BY MR. GILLAN:

18        Q.    Detective Frisby, when Miguel Chaidez spoke to you

19   about transferring money and the photograph to the shooter to,

20   I guess, commit a hit, did he refer to the actual killing in

21   euphemisms, or did he just say that he asked someone to go

22   kill Mark Achilli?

23        A.    It was mostly in euphemisms.  I believe he told him

24   that he needed something taken care of in Norteno country.

25        Q.    He needed someone to take care of a problem?

26        A.    Take care of a problem, things like that.

27        Q.    So he basically told you that he gave -- he gave

28   someone a photo of Mark Achilli and $2400 to take care of a
```

```
 1    problem?
 2        A.    Ultimately, it was about $2400.  When that took
 3    place, I think he only gave him a portion of the money, in
 4    addition to the address and the photograph.
 5        Q.    Okay.  So he gave him an address, a photograph, and
 6    do you know how much money?
 7        A.    I would say about $1500, I think.
 8        Q.    Okay.  And then so later, on March 15th, he says
 9    that he then gave the same person another $2200?
10        A.    There's a lot of talk about the money.  I think
11    ultimately the shooter got about 20 -- no, he may have -- you
12    may be correct.  Without me looking specifically at the
13    transcript, the last payment would have been about 2240.
14        Q.    So in total, the killer got about $3700?
15        A.    Yeah, roughly.
16        Q.    And Daniel kept the rest of the money -- I'm sorry,
17    Miguel kept the rest of the money?
18        A.    Miguel kept the majority of the money.  Daniel kept
19    a small amount as well.
20        Q.    Now, during your questioning of Mr. Miguel Chaidez,
21    you said that you read him his Miranda rights; is that
22    correct?
23        A.    Yes, I believe I read them.  I don't have an
24    independent recollection if I read them from my card.  It's
25    customary of what I did, I advised him for sure of his Miranda
26    rights.
27        Q.    And you didn't take an explicit waiver, did you?
28        A.    Meaning?
```

1      Q.    You didn't ask him "Having these rights in mind, do
2   you give up your right to remain silent?"
3      A.    I asked him if he understood each right; it's
4   customary for me to do.  I read them one at a time, and asked
5   him if he understood his rights.  So I'm not sure.  I'd have
6   to look at the transcript as to how I finished.
7      Q.    Okay.  Well, you've been taught that you don't need
8   an explicit waiver from suspects that you question; is that
9   right?
10     A.    Correct.
11     Q.    You can take an implicit waiver; is that right?
12     A.    Correct.
13     Q.    Did you converse with Detective D'Antonio before
14   Miguel Chaidez actually arrived in Santa Clara?
15     A.    Yeah, I'm sure I did.
16     Q.    Are you the one that instructed him not to actually
17   talk about the case?
18     A.    Yes.
19     Q.    Okay.  But you knew that Miguel Chaidez had been
20   talking freely with the detective about small talk for about
21   five hours before you spoke with Miguel Chaidez; is that
22   right?
23     A.    I did.
24     Q.    You know that there was already a rapport built?
25     A.    I did.
26     Q.    Okay.  At one point in the interrogation of
27   Mr. Miguel Chaidez, did you tell him that he was actually
28   under arrest for conspiracy to commit murder?

        A.    I don't believe so.  I know the front part I told
him we were investigating a murder, and I wanted to talk to
him about his involvement with his cousin Daniel.  I don't
think I officially said, "You're under arrest for a conspiracy
to commit murder."  I made it clear to him what we were
discussing.

        Q.    At the very end of the interview, did you tell him
that he was being arrested for conspiracy to commit murder
and, "You'll be booked on that charge"?

        A.    I don't have an independent recollection of that.  I
may have.

        Q.    Okay.  I believe -- oh, you said that Miguel Chaidez
told you that he didn't commit the actual killing; is that
right?

        A.    Correct.

        Q.    Did Miguel Chaidez say that he witnessed the
killing?

        A.    No.

                MR. GILLAN:  Did he -- okay.  That's all I have.

                THE COURT:  Redirect?

                MR. ROSEN:  No, Your Honor.

                MR. LEININGER:  Just one question, Judge, maybe two.

                         RECROSS-EXAMINATION

                BY MR. LEININGER:

        Q.    Let's talk about the written statement for a minute.
All right?

        A.    Okay.

        Q.    That took place at the end of the interview?

1    A.    Towards the end of our time with him, yes.

2    Q.    And did you explain to Mr. Chaidez what the purpose

3    of the written interview was, a written statement was?

4    A.    Yeah, it was to -- I think I said something to the

5    effect of, you know, "We went over this a bunch of times.  I

6    don't want to make sure I'm misconstruing things that you're

7    saying.  We talked about a lot of details.  Why don't you

8    write it down in your own words so we all understand what's

9    going on."

10    Q.    Did you lead him to believe that he was doing

11    himself a favor by giving you this written statement?

12    A.    I don't believe so.

13    Q.    No?  This just popped out of the generosity of his

14    heart?

15    A.    I wanted him -- I wanted a true recollection of what

16    occurred, dates, from him.  I didn't want -- I didn't want to

17    infer anything.  I wanted him to have the opportunity to sit

18    down by himself and write what occurred.

19    Q.    But the truth of the matter is you had a camera

20    running with an audio equipment at the same time; right?

21    A.    Yes.

22    Q.    So the purpose, as I understand your testimony, the

23    purpose was to memorialize this five- or six-hour interview

24    with a written statement; right?

25    A.    It was for the purpose of Miguel to get out anything

26    that hadn't been covered.  And we talked about it for so long

27    and so many different times about different portions, we gave

28    him the opportunity to write it down.  So if that's to

```
 1    memorialize it, I'd say yes.
 2         Q.   I'll tell you where I want a little explanation, if
 3    I can.  What do you mean you "gave him the opportunity"?
 4         A.   He didn't have to do that.
 5         Q.   Did you tell him that?
 6         A.   I don't recall.
 7              MR. LEININGER:  Okay.  Thank you.
 8              MR. ROSEN:  Nothing further, Your Honor.
 9              THE COURT:  Mr. Gillan?
10              MR. GILLAN:  I have nothing further, Your Honor.
11              THE COURT:  Thank you.  You can step down.
12              MR. ROSEN:  The People would just note for the
13    record that we provided to the Court yesterday a transcript of
14    this interview, and we also provided this morning to the Court
15    the audio and video DVDs of the interview.
16              THE COURT:  That's the three CDs; right?
17              MR. ROSEN:  Yeah.
18              THE COURT:  Any other evidence?
19              MR. ROSEN:  No, that's the all evidence the People
20    have.
21              THE COURT:  Let's take a five-minute break and start
22    up again.
23              (BRIEF RECESS).
24              THE COURT:  We're back on the record.  The
25    defendants are present.  The attorneys, with the exception of
26    Mr. Robertson, are present.
27              Is there any evidence from the defense,
28    Mr. Leininger?
```

1          MR. LEININGER:  Judge, if I may:  I believe this was

2     our original understanding, I would like to reserve my portion

3     of this until after I've had time to finish the written

4     motion, which I've ordered from today's hearing and I should

5     have that Monday, and I should have it with the Court and

6     Mr. Rosen -- well, I don't know if I can have it Monday or

7     not.  If not, I'll have it Tuesday.

8          THE COURT:  All right.  Any objection, Mr. Rosen?

9          MR. ROSEN:  That's fine.

10          THE COURT:  Fair enough.  Okay.  Do we have anything

11     else that we can do this morning?

12          MR. ROSEN:  No, I don't think so.  You want us to

13     come Monday at 9:30 to Department --

14          THE COURT:  24.

15          MR. ROSEN:  24.  And I have a feeling it's -- some

16     jurors might come back to this department, 34.

17          THE COURT:  We're going to have a sign on the door.

18          MR. ROSEN:  There's a lot of signs on the door.

19          THE COURT:  And they're supposed to go to the second

20     floor jury assembly room and they will be told to go to 24,

21     you know, if they're on our trial.  So I'll have Corinne make

22     sure that the jury commissioner makes sure that they

23     understand where they're supposed to be and we have to take

24     role.  But we'll put a note on the door to report to the

25     second floor jury assembly room.  That way, they know where to

26     go.

27          All right.  Gentlemen, thank you.  I will see you on

28     Monday.  Oh, before we break, on the other issue that we were

 1   talking about, we'll schedule a 402.

 2             MR. ROSEN:  Yes.

 3             THE COURT:  It seems like we can probably do that --

 4   is that person from out of town?

 5             MR. ROSEN:  No, they're local.

 6             THE COURT:  Okay.  Good.  Then we can fit it in.

 7             MR. ROSEN:  Yeah.  I'll talk to him and get a sense

 8   of his schedule and advise the Court about that and we can set

 9   that up.

10             THE COURT:  All right.  Thank you, gentlemen.

11             (BRIEF RECESS).

12             THE COURT:  All right.  Counsel, good morning.  This

13   is People versus Garcia, et al.  All the attorneys are here

14   and all the defendants are present.

15             Counsel, this on the alpha list, the number,

16   Corinne, on the new list?

17             THE CLERK:  I believe it's on the new list, Judge.

18             THE COURT:  Counsel, No. 36 on the alpha list is

19   Antonio Fernandez.  He's provided us with a printout of the

20   employee handbook dealing with jury duty, and he gets 80

21   hours, which is two weeks.  With your agreement, I would be

22   giving him a hardship.  So with your agreement, we can call

23   him and have him not come in on Monday.  Does anyone object to

24   that?

25             MR. LEININGER:  I don't object.

26             MR. ROSEN:  No, Your Honor.

27             THE COURT:  All right.  So we'll notify him.  Thank

28   you.

1          I did receive Mr. Robertson's motion to change

2    venue, and -- wait.  Did you fax a new copy of it?  This is

3    the same one; right?

4          MR. ROBERTSON:  Yes.

5          THE COURT:  Maybe I don't have the caption.  I

6    noticed it because of -- anyway.

7          I did read the motion.  I know that the exhibits are

8    not prepared yet, and as you point out in your papers, it's

9    probably more appropriate to hear this motion after we've had

10   some questioning of jurors.  So with your permission, I would

11   defer a hearing on the motion to change venue.

12         MR. ROBERTSON:  I think that's appropriate,

13   particularly in light of -- I think *Davis* is probably the most

14   instructional case on that.  When the judge tried to get a

15   jury in Marin County, couldn't do it.  That transfer only

16   occurred after a yeoman's effort by the Court to try to get a

17   jury up here.

18         I think the current thrust of authority is that the

19   Court should try to find an impartial jury locally first.  And

20   I know the Mehserle case is different.  I didn't go off on a

21   tangent and hire an expert because I don't think that will be

22   well-taken in this case.  In this county it's of a different

23   nature.

24         THE COURT:  And are you in agreement with that,

25   Mr. Rosen?

26         MR. ROSEN:  Yes, Your Honor.

27         THE COURT:  Mr. Leininger?

28         MR. LEININGER:  Yes.

```
 1              THE COURT:  Mr. Gillan?

 2              MR. GILLAN:  Yes.

 3              THE COURT:  All right.  All right.  I also received

 4   Mr. Garcia's proposed witness list.  We'll go through that to

 5   see what names are duplicative of the ones on the People's

 6   list.  And Mr. Leininger, Mr. Gillan, if you have additional

 7   people that you need to add, if there -- if you have

 8   statements, I presume that you've provided them to the

 9   prosecutor?

10              MR. ROBERTSON:  We either have or we're in the

11   process of doing so.  Virtually all of the witnesses with

12   exception of six or seven have already been interviewed by the

13   Government.  And so -- and we have provided Mr. Rosen some

14   reports.  I'll double-check to make sure he has all the ones.

15   And we're also going to disclose another witness, Your Honor,

16   Katelyn Hanna Robertson, no relation.

17              THE COURT:  Katelyn, C-a-i-t --

18              MR. ROBERTSON:  That's actually K, K-a-t-e.

19              THE COURT:  K-a-t-e-l-y-n?

20              MR. ROBERTSON:  L-y-n.

21              THE COURT:  What was the middle?

22              MR. ROBERTSON:  Hanna.  Hanna is H-a-n-n-a, and it's

23   Robertson and the date of birth is 4/20 of '89.  The address

24   on Puerto Vallarta Drive in San Jose

25              MR. ROSEN:  So, Judge, what the People would request

26   is for all of the witnesses that are from Mr. Garcia that are

27   not on the People's list already, meaning that the People

28   haven't already interviewed them to have their statements --
```

1  and I have received some statements from the defense.  I don't

2  know if I have all of them and just, also, the dates of birth

3  for the witnesses they have that are not people that the

4  police have already interviewed so I can run their raps.

5          THE COURT:  Can you have someone provide that to

6  Mr. Rosen sometime today?

7          MR. ROBERTSON:  I think I have someone who can do

8  that.

9          MS. FIELDS:  By tomorrow you'll get them.

10          MR. ROSEN:  By Monday is fine.

11          THE COURT:  Okay.  I also have Mr. Leininger's

12  witness list.

13          MR. LEININGER:  Judge, let me amend something on the

14  fifth person, Miguel Chaidez.  His first name is actually

15  Jose.

16          THE COURT:  Jose Miguel?

17          MR. LEININGER:  There's no Miguel at all.

18  Apparently Miguel is a nickname.

19          MR. ROSEN:  Okay.  And just -- the People would

20  request for the witness list from Mr. Leininger, Cesar Chaidez

21  No. 1, we already have.  We interviewed Mr. Chaidez.

22          MR. LEININGER:  That's the only one I got.

23          MR. ROSEN:  The other five witnesses that are listed

24  there, we would -- before they testify, we'd need statements

25  from them.  And --

26          THE COURT:  Can you do that by Monday?

27          MR. LEININGER:  I can't get statements from them

28  all, Judge, but I think I can try to do the date of birth.

1    I'll have someone call.  A number of these people speak only

2    Spanish so there's a problem with that.

3              THE COURT:  Well, if you do take statements, you

4    need to provide those.

5              MR. LEININGER:  Yes, I know that and I would be

6    willing to do that if I could get a statement.

7              THE COURT:  Okay.

8              MR. ROSEN:  And, Judge, the other thing I just

9    wanted to mention is that the People probably on Monday will

10   provide to the defense attorneys the photographic exhibits

11   that we intend to use in our opening statement so they can

12   review them and they can make any objections they have to

13   those.  We talked about that a little bit yesterday in terms

14   of autopsy photos and things, and that's included in the

15   opening statement.

16             THE COURT:  All right.  Now, I believe the next item

17   is the motion by Mr. Chaidez to preclude the use of the

18   statement made to the police.  And as I understand it, this

19   motion relates only to his statement and/or statements that he

20   made that -- I think you've already dealt with it with regard

21   to Mr. Estrada, but it does not involve any statements that he

22   may have made that would implicate Mr. Garcia; is that

23   correct?

24             MR. ROSEN:  That's correct, Your Honor.

25             THE COURT:  And if, in the future, there is

26   something that implicates Mr. Garcia and you want to introduce

27   it, we'll let Mr. Robertson know.  As I understand,

28   Mr. Robertson is going to be leaving; correct?

1        MR. ROBERTSON:  My intention, Your Honor, with the
2    Court's permission, was I was going to absent myself from this
3    part of the hearing and go back and continue to work on some
4    proposed jury voir dire questions I'd like to get to the Court
5    today.
6        THE COURT:  Is Mr. Garcia going to remain or is he
7    going to go as well?
8        MR. ROBERTSON:  He's going to stay, Your Honor.
9        THE COURT:  All right.  And you're okay with
10   Mr. Robertson leaving?
11       DEFENDANT GARCIA:  Yes, sir.
12       THE COURT:  Thank you.
13               (PROCEEDINGS CONCLUDED).
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

```
 1    SAN JOSE, CALIFORNIA                 AUGUST 31, 2010

 2

 3                    P R O C E E D I N G S

 4          THE COURT:  Good morning, Ladies and Gentlemen.

 5          All right.  This is continuation of the motion by

 6    Mr. Chaidez to exclude statements made to the police.  I

 7    received papers from Mr. Chaidez's side this morning.  Did you

 8    want to call any witnesses?

 9          MR. LEININGER:  I do.

10          THE COURT:  Okay.  Go ahead.

11          MR. LEININGER:  I'd like to call Miguel Chaidez,

12    Your Honor.

13          THE COURT:  Very well.

14          MR. LEININGER:  Before Mr. Chaidez testifies,

15    though, there is an area that I think we can take up in this

16    motion.  Well, maybe he should testify to it first, but does

17    the Court have a transcript of the officer's testimony?

18    Because I --

19          THE COURT:  I don't have a transcript.  I have my

20    notes.

21          MR. LEININGER:  Well, I had a transcript made by

22    your reporter.

23          THE COURT:  Okay.

24          MR. LEININGER:  And if it would be helpful, I would

25    like to file that with the Court so that you would --

26          THE COURT:  I'm sure that I have the original

27    available, so you don't need to file your copy.  I have the

28    original.
```

```
 1            MR. LEININGER:  That's fine.  Thank you.
 2                          402 HEARING
 3            THE CLERK:  Mr. Chaidez, I need you to raise your
 4   right hand.
 5                       MIGUEL CHAIDEZ,
 6            Being called as a witness on behalf of
 7            Defendant Chaidez, having been first duly
 8            sworn, was examined and testified as follows:
 9       DEFENDANT CHAIDEZ:  Yes.
10            THE CLERK:  All right.  Sir, make yourself
11   comfortable in the chair.
12            THE COURT:  Talk right into that microphone,
13   Mr. Chaidez.  Go ahead.
14                       DIRECT EXAMINATION
15            BY MR. LEININGER:
16       Q.   Mr. Chaidez, would you give your name for the
17   record, please.
18       A.   Miguel Chaidez; M-i-g-u-e-l, last name
19   C-h-a-i-d-e-z.
20       Q.   Okay.  And you were present here in court when
21   Officer D'Antonio and Officer Frisby testified the other day?
22       A.   Yes, sir.
23       Q.   Now, I want to take you through that day and ask you
24   some questions about that.  All right?
25       A.   Okay.
26       Q.   Now, you have a throat problem this morning, do you
27   not?
28       A.   Yes, I have a bit of a cold, coughing.
```

1          Q.    There's water by you if you need it.

2          A.    Okay.

3          Q.    And if you have trouble, you need to rest your

4     throat, let us know.  Okay?

5          A.    Okay.

6          Q.    All right.  Now, you were arrested -- or let's put

7     it this way:  You were taken into custody by Sergeant

8     D'Antonio about 8:20 in the morning on March 28th; right?

9          A.    8:29, 8:30-ish.

10         Q.    8:29.  Sorry.

11              Now, can you tell us -- can you tell us what you

12    were doing at the time that you met Sergeant D'Antonio?

13         A.    I was at a Union 76 station in the city of Monrovia

14    off of Myrtle Avenue pumping gas with my brother, Cesar

15    Chaidez.

16         Q.    And how do you happen to come in contact with

17    Sergeant D'Antonio?

18         A.    My brother had just returned from paying for the gas

19    and getting his drinks, and for some reason, I look over to my

20    left and there was a car, looked out of place.  I looked over

21    to my right and that's when I had Officer D'Antonio, and I

22    believe it was Officer Carmichael, guns drawn, telling me --

23    yelling at me to, "Get on the f'ing ground."

24         Q.    Okay.  So did they identify themselves to you?

25         A.    No.  They were -- they just -- "Get on the ground.

26    Get on the ground."

27         Q.    But you responded to the presence of the guns and

28    the order?

1      A.   Yes.  I do remember, after looking at the guns, I

2  looked to my right, my brother was already on the floor and I

3  remember telling Cesar, "Just comply with whatever they tell

4  you," and I walked over and got on the ground.

5      Q.   Okay.  Now, that morning, you were in the process of

6  running some personal errands, were you not?

7      A.   Yes.

8      Q.   Okay.

9      A.   Me and my brother were running some errands.  The

10  plan was run some errands, go to Target and buy some personal

11  hair products.

12      Q.   Okay.

13      A.   And then go with my girlfriend.

14      Q.   Okay.  Did you see your brother after you got out of

15  the car?

16      A.   After I got out of my car?

17      Q.   Yeah.

18      A.   Yeah.  Well, he paid for the gas, got us drinks.

19  When he came back is when the officers pretty much, well,

20  came -- well, he started yelling at me to get on the ground.

21  And then we were both put in separate squad cars from the

22  Monrovia PD --

23           (REPORTER INTERRUPTS PROCEEDINGS).

24           DEFENDANT CHAIDEZ:   -- taken to the Monrovia station

25  and I see my brother taken into the station and that was the

26  last I saw of him.

27      Q.   Okay.  So you were taken in separate cars to a

28  police station in where?  In Monrovia?

1        A.    Yes, in Monrovia.

2        Q.    Now, before you were put in a police car, were you

3    advised as to why you were being detained?

4        A.    No, I wasn't.

5        Q.    Were you told you were under arrest?

6        A.    No, I wasn't.

7        Q.    So you got to the police station in Monrovia, and

8    what was the first thing that happened there?

9        A.    Got put in a -- got put in a holding cell.  Then

10   that's when -- stripped.  I stripped.  I was given a paper

11   suit.  Some -- I asked for some sort of shoes or something.

12   They gave me some paper slippers, and I was left there for a

13   couple hours.  I was fed, and then I was left there for a

14   couple hours.

15       Q.    And what happened after a couple of hours?  Were you

16   ever removed from that cell that morning?

17       A.    Yeah.  Well, not in the morning.  I was there for my

18   arrest, so I'm guessing from, like, 9 to -- it was maybe

19   like -- looking at the -- I remember looking at the clock when

20   they brought me out of the holding cell and it was around 3,

21   3:30.

22       Q.    So you were in the holding cell approximately five

23   to six hours; is that right?

24       A.    Yeah, approximately.

25       Q.    All right.  And at that time, were you given

26   anything to eat?

27       A.    Yes, I was fed.

28       Q.    And what were you given to eat?

1      A.    I was given a cup of coffee, some milk, a breakfast
2   burrito and apple, I believe.

3      Q.    Did you eat the food?

4      A.    I drank the milk and some of the apple, I think.  I
5   wasn't real hungry.

6      Q.    Okay.  And what happened at 3:30?

7      A.    I was advised -- I'm thinking it was Officer
8   D'Antonio who told me, "Well, we're --" they had my clothes
9   and I believe they handed it to -- I believe it was Officer
10  D'Antonio or Officer Carmichael handed me my clothes, and I
11  believe that's when, for some reason, I heard my brother's
12  voice so I called out to him.  And then they put waist chains
13  on me and brought me out from the Monrovia Police Station to
14  the street, to their car, I guess.  It was a Ford Explorer,
15  unmarked, and they put me in the car, chained me, no leg
16  chains, and I was in bare feet and I was in a sleeveless
17  tank-top, my shorts.  And that's when they told me, "We're
18  going up north," and Officer Carmichael went as far as asking
19  me how do we get on the freeway from here.

20     Q.    We're going to get to that in a second.  Let me ask
21  you, when you left the facility, were you advised -- were you
22  allowed an opportunity to make a phone call, tell anybody
23  where you were going, talk to anyone?

24     A.    No, I wasn't.  I thought they were going to ask me
25  if I needed a phone call but I was never asked during --

26     Q.    Well, was there anybody there besides the Monrovian
27  Police for you to talk to?

28     A.    No.

1      Q.   Anybody from Los Gatos PD come in and talk to you?

2      A.   Well, I just knew it was Monrovia PD and Officers

3   D'Antonio and Carmichael were there.

4      Q.   Well, they were there but did they come back and

5   talk to you in your holding cell?

6      A.   No.

7      Q.   Okay.  So you got in the car and you were told you

8   were going to Northern California; is that correct

9      A.   Yes.

10     Q.   And because they didn't know how to get to Highway

11   101 or Highway 5, you told them how to do it?

12     A.   Well, Officer Carmichael asked me -- I said, "Okay.

13   Well, make a U-turn, make a left, and this street will lead

14   you to the 210, and then from there, decide if you want to go

15   this route or that route."

16     Q.   Conversation was kind of light and friendly about

17   giving directions?

18     A.   Yeah, we were -- I remember I made a comment about

19   Monrovia being our hometown rivals.  Me living in Duarte, city

20   right next to it, and how the movie theater on the corner from

21   the Monrovia PD's, I guess, station was a theater -- the

22   theater that I frequently went to.  And we just started

23   talking.  I mean, it was -- it felt kind of like a road

24   trip --

25     Q.   Okay.

26     A.   -- kind of atmosphere.

27     Q.   All right.  And you went from Monrovia to a town

28   that you did not know but it was called Santa Clara; is that

1    right?

2         A.    Yes.

3         Q.    Okay.  And during that trip, did you talk to --

4    anybody tell you any reason why you were being manacled and

5    held in detention?

6         A.    No.

7         Q.    Anybody tell you you were free to leave at any

8    moment?

9         A.    No, but I pretty much figured out I couldn't, since

10   I was chained up.

11        Q.    Well, no one told you that, though; right?

12        A.    No.

13        Q.    Okay.  Did anyone -- anyone give you any idea of the

14   kind of trouble you were in, why you were being manacled?

15        A.    No.

16        Q.    Okay.  So did you make a straight shot up to Santa

17   Clara or did you stop somewhere?

18        A.    We stopped somewhere to get gas, and I believe

19   Officer D'Antonio went and paid and he got me a Snickers bar

20   and some water.

21        Q.    Okay.

22        A.    And then he -- I think he wanted to eat, or at that

23   point, I think he took over driving and Officer Carmichael

24   wanted to eat, so one of the two got me a burrito at Taco Bell

25   and food for themselves.  I believe it was Officer D'Antonio.

26   I'm not too certain.

27        Q.    Okay.  So you arrived at Santa Clara.  Do you

28   remember the time?

1          A.    I believe it was somewhere between 7:30 and 8.

2          Q.    Okay.

3          A.    I remember 'cause it seemed like a fast trip.  They

4     were driving pretty fast, and I remember making a comment

5     about it.  So I believe it was around 7:30, 8 o'clock.

6          Q.    And when you got to Santa Clara PD, did you see

7     anybody there that was familiar to you?

8          A.    After being in the holding cell for a little bit,

9     then, I believe it was Officer Frisby and Kazem -- I'm not

10    sure if I'm pronouncing that right -- took me out and we

11    walked in front of the holding tank and then I remember

12    looking down and seeing some shoes that I recognized.  I told

13    myself, "I know those shoes."  I looked up and my cousin

14    Daniel Chaidez was in there.

15         Q.    So you saw Daniel in custody there?

16         A.    Yes.

17         Q.    Did anyone say anything to you about Daniel?

18         A.    Not at that moment.  We walked through a small

19    corridor and I asked for a drink of water 'cause there was a

20    drinking fountain there.  I was allowed to get water.  And

21    right before we went into the actual interview room, I think

22    it was Officer Kazem that tells me, "Well, you seen we have

23    Daniel here."  And I believe that was -- "You see we have

24    Daniel here and he's been real helpful.  And we know --" or he

25    said -- I think it was, "We know it was someone on the other

26    side, a cousin on the other side," I think, is the term they

27    used.

28         Q.    Okay.  But did they tell you anything about Daniel

1    and why he was there or anything about your run-in with
2    Daniel?  Did the police offer you any information?

3        A.    No.  They just -- just that:  "You seen we have
4    Daniel here, and we know there was a cousin on the other
5    side," I believe.

6        Q.    Did they tell you anything about Daniel having
7    spoken to them?

8        A.    Yeah.  They said, "Daniel has been real helpful."

9        Q.    He told you, "Daniel had been real helpful"?

10       A.    Yeah, Dan was -- Dan was the way they were
11   addressing him.

12       Q.    On a first name basis, Dan?

13       A.    Dan.

14       Q.    Okay.  That conversation continued on for, what,
15   another four hours?

16       A.    After we went into the interview room, yeah, I
17   believe for about three, four hours.  I had no access at a
18   clock so I'm not exactly sure.

19       Q.    And during that period of time, you were given no
20   food; right?

21       A.    Yeah, I was given two slices of pizza and some
22   water.

23       Q.    You were given some pizza and some water?

24       A.    And I remember making a request for a blanket
25   because it was cold in there, and I just had a tank top.  My
26   shirt that I had over my tank top was left in Monrovia.

27       Q.    Okay.  Now, prior to that time, your conversation
28   was pretty casual with these police officers; right?

```
 1      A.   Yes.
 2      Q.   Pretty friendly?
 3      A.   The whole drive up here felt like a road trip,
 4  talking about football, just things that we did for fun around
 5  the area where I lived.
 6      Q.   Okay.  Talked about you playing football?
 7      A.   Yeah.
 8      Q.   Did they seem personally interested in you?
 9      A.   Little bit.
10      Q.   No one told you anything about a search warrant
11  going on at your house, did they?
12      A.   No.  I overheard them speaking on the phone about a
13  search warrant.
14      Q.   Okay.  But no one told you that?
15      A.   No.
16      Q.   Okay.  So you knew at some point that they were
17  searching your house; right?
18      A.   Yes.
19      Q.   And you knew that simply because you overheard the
20  conversation?
21      A.   Yes.  I believe when Officer Carmichael was driving.
22  Officer D'Antonio was in the back, making or receiving phone
23  calls and that's when I overheard him.
24      Q.   And at some point, you got into a serious discussion
25  about some incidents involving a homicide in Los Gatos; isn't
26  that correct?
27      A.   Yes.
28      Q.   And do you recall how that happened, how the
```

1    conversation got brought up?

2        A.    It got started to where I think it was Kazem told

3    me, "Here's some ground rules:  If you respect us, we'll

4    respect you."  I said, "Okay."  And then I said -- I think

5    they read me my rights.

6            Then I asked about my brother.  I remember saying,

7    "Well, first of all, you guys have my brother.  How's he

8    doing?  What's going to go on with him?"  And the response I

9    got was, "Well, you can help us clarify as to Cesar's

10   involvement."  Then the questioning got started.

11       Q.    Okay.  So you were told that if you talked to them,

12   you could help clarify Cesar's involvement about what you

13   suspected was something more serious; right?

14       A.    Yes.

15       Q.    As far as you knew, Cesar had nothing to do with

16   this incident in Los Gatos; right?

17       A.    Yes.

18       Q.    So him being arrested for that, that's what you

19   thought was serious to you; right?

20       A.    Yes, real serious.  I mean, I didn't like being in

21   that position and I didn't want my younger brother to be in

22   that position either.

23       Q.    So that was kind of like the carrot to get you to

24   talk; is that a fair description?

25            MR. ROSEN:  Objection.

26            THE COURT:  Sustained.  Rephrase the question.

27       Q.    (BY MR. LEININGER):  Was that an incentive for you

28   to talk to the police?

1      A.  Me and my brother are not that far in age, nine

2 months, but I did mature faster than him. And I have a

3 younger sister. I only see them as my brother and sister,

4 kind of like a parental feeling towards them, me having a hand

5 in their upbringing. So as soon as my brother's in danger, in

6 any type of danger, my -- either of my siblings, my first

7 reaction is to protect them, so as soon as I was told, "You

8 can help us to clarify as to Cesar's involvement," it pretty

9 much -- it was a light bulb, "This is how you can help your

10 brother."

11      Q.  Okay. How did you feel physically about the time

12 they started? Were you tired?

13      A.  I was getting to the point where I was really tired.

14 I had been up since Thursday morning, no sleep. I was getting

15 to -- yeah, pretty tired.

16      Q.  Try to put a figure on this in terms of numbers of

17 hours. You said you -- the last sleep you had was on --

18      A.  Wednesday night, into Thursday morning.

19      Q.  Wednesday night. All right.

20      So that's roughly, what, 36 hours, something like

21 that? Am I wrong? Try to figure it out for me. How long

22 were you wide awake? How long were you awake without sleep?

23      A.  Well, from Thursday, like, around 9 o'clock in the

24 morning till the time I'm still there with them talking.

25      Q.  Okay. And was there some reason why you were awake

26 that long?

27      A.  Yes.

28      Q.  And what was that?

```
 1        A.   We -- me and my brother stayed up -- my excuse for
 2   doing the crystal meth that I was doing was I went to school
 3   Thursday at night from 3 o'clock till 2 o'clock at night.  I
 4   needed to stay awake.  Doesn't justify the drug use but that's
 5   what I was on.  I didn't -- took some when I woke up Thursday.
 6   Took some before I left to school.  And then when it was
 7   morning time Friday, maybe 30 minutes before I was arrested, I
 8   snorted some more, and that's why I had been wide awake since
 9   Thursday morning.
10        Q.   Did any police officer from Campbell, Los Gatos,
11   Monrovia, Santa Clara, any of them check you for any symptoms
12   of intoxication?
13        A.   No.  They drew blood once I got here to Santa Clara.
14        Q.   They drew blood in Santa Clara?
15        A.   Yes.
16        Q.   Okay.  And this homicide had occurred, what,
17   approximately two weeks before this?
18        A.   Yeah.
19        Q.   Okay.  Did they tell you why they wanted to draw
20   blood?
21        A.   No.  They just drew blood.
22        Q.   They just drew it?
23        A.   Yeah.
24        Q.   "Give me your arm"?
25        A.   Yeah; "We're going to draw blood."
26        Q.   Okay.  And then after your time at Santa Clara, were
27   you taken somewhere else?
28        A.   I believe after the interview, then I was placed
```

1  back in the holding cell for a minute.  I remember I thought I

2  was going to be there for a while, so I asked for a blanket

3  and pillow.  Never been arrested before.  I figured you get a

4  pillow but I didn't.  I was only there for maybe another 15,

5  20 minutes, then I was transported, I guess, to the main jail.

6       Q.   So let me ask you something that you just said.  You

7  had never been arrested before?

8       A.   No.

9       Q.   You knew nothing of the processes in terms of --

10      A.   I had been arrested once before, for a program,

11 voluntarily.  It's called "Every 15 Minutes" program for drunk

12 driving awareness.  And I was -- it was -- we staged a fake

13 accident.  I was a drunk driver.  I was arrested, booked,

14 placed in a cell.  There was a whole video filmed.  And that's

15 been the only other time that I've been arrested.

16      Q.   Well, that was, what, a high school play?

17      A.   My senior year in high school, which was in maybe

18 April of 2004.

19      Q.   So you were never arrested for real?

20      A.   No.

21      Q.   You never had a police officer handcuff you, detain

22 you, and whatever; right?

23      A.   No.

24           MR. LEININGER:  I have nothing further, Your Honor.

25           THE COURT:  Cross-examination?

26                     CROSS-EXAMINATION

27           BY MR. ROSEN:

28      Q.   Mr. Chaidez, did the officers treat you nicely

     1    during the time that you were transported from Monrovia to
     2    Santa Clara?

     3         A.   Actually, yes.  I remember wanting to thank them
     4    after Santa Clara for treating me like a human being.

     5         Q.   They didn't beat you or hit you or anything like
     6    that?

     7         A.   No.   They -- Officer Carmichael made a comment that
     8    if -- pretty much if I behaved it was going to be an okay
     9    trip.  And then gave me a little side comment as to, "When
    10    people don't behave, that's when we have fun."

    11         Q.   And they were nice to you.  They gave you food, you
    12    stopped at Taco Bell; right?

    13         A.   Yes.  And they first -- at a convenience store and
    14    bought me a Snickers and some water.

    15         Q.   When you were in the holding cell in Monrovia for a
    16    few hours and the officers there brought you breakfast
    17    burrito, an apple, milk, and coffee, did you ask those
    18    officers if you could make a telephone call?

    19         A.   No.

    20         Q.   During the time that you were interviewed in Santa
    21    Clara by Sergeant Kazem and Sergeant Frisby, approximately how
    22    many breaks were there during that interview?

    23         A.   There were several breaks with -- there was one
    24    where they got me food.  They didn't bring in any food;
    25    somebody else did.  I got -- after a couple -- after awhile, I
    26    got a blanket and they just taking little breaks back and
    27    forth, not too long.

    28         Q.   And during those breaks, were you able to just sit

1   there and relax then?

2        A.   I wouldn't call it relax.  For the first -- for a

3   while, being I was pretty much cold, freezing, I had just a

4   tank top on.

5        Q.   Sure.  And then when you asked them for a blanket

6   they gave you a blanket?

7        A.   I remember them saying, "We'll get you one in a

8   minute," and then kept questioning me.  It took awhile, but it

9   came eventually.

10       Q.   Okay.  And they read you your Miranda rights;

11  correct?

12       A.   Yes.

13       Q.   And you understood those rights?

14       A.   I understood, yes.  I understood them.

15       Q.   They read you the rights and you said that you

16  understood them; correct?

17       A.   Yes.

18       Q.   And then you started talking to them; correct?

19       A.   After I made a question about my brother.

20       Q.   Well, you were asked, "Do you fully understand your

21  rights," and you said, "Yes, sir"?

22       A.   Um-hum.

23       Q.   Is that correct?

24       A.   Yes.

25       Q.   And then you voluntarily spoke with the police for

26  the next few hours; correct?

27       A.   Yes.

28            MR. ROSEN:  I don't have any other questions for

```
 1    you.
 2              THE COURT:  Any redirect?
 3              MR. LEININGER:  No.
 4              MR. ROBERTSON:  I'd like to cross.
 5              THE COURT:  Any objection?  I don't know what --
 6              MR. ROSEN:  I don't know what --
 7              THE COURT:  What standing do you have for --
 8              MR. ROBERTSON:  Well, if the statement comes in,
 9    it's going to affect my client.
10              THE COURT:  I don't think that's true.
11              MR. ROSEN:  This witness?
12              THE COURT:  I think that would be --
13              MR. ROBERTSON:  The problem is, even if the Court
14    makes a motion and instructs the jury not to consider, that
15    kind of thing is still going to come in.  It will affect my
16    client, and I'd like to ask just a couple of quick questions.
17              MR. ROSEN:  The statement that would come in, if the
18    Court allows Mr. Miguel Chaidez's statement in, is a statement
19    that would only incriminate Mr. Chaidez.  That's what we
20    worked on last week.
21              MR. ROBERTSON:  That may be true, but, Your Honor,
22    the simple fact is as part of his case-in-chief and it will be
23    heard by the jury.
24              THE COURT:  And what are you going to ask him?  Are
25    you going to ask him a statement that relates to the
26    voluntariness of the statement?
27              MR. ROBERTSON:  Absolutely.  And it will be very
28    quick.
```

```
 1              THE COURT:  All right.  Go ahead.
 2                        CROSS-EXAMINATION
 3         BY MR. ROBERTSON:
 4         Q.   So, Mr. Chaidez, when you were sitting and the
 5    officer's indicated to you that you could help clear the
 6    situation up for your brother, didn't that become of utmost
 7    important to you?
 8         A.   Yes.  Like I stated, I have more than a brotherly
 9    relationship with my brother, and having a bit of a hand in
10    his upbringing, being the older one, my first instinct is
11    always my brother, to protect him.
12         Q.   And my question for you is:  Had that not been made
13    apparent to you, that -- well, let me go back.
14              So you understood from what they asked you that you
15    could make it easier on your brother and perhaps clear him at
16    that point?
17         A.   Yes.
18              MR. ROSEN:  Objection.  Leading.
19              THE COURT:  Sustained.
20              MR. ROBERTSON:  I get to do that.  I didn't -- I'm
21    not the one who asked.  This is cross.
22              THE COURT:  This is more along the lines of a
23    direct, Counsel.  Technically, you didn't call the witness,
24    but --
25              MR. ROBERTSON:  Right.
26              THE COURT:  But he's not an antagonistic witness.
27         Q.   (BY MR. ROBERTSON):  So when they asked you --
28    strike that.
```

1      On the way up, did they ever say anything to you
2  like, "We'll talk to you when we get there," or, "We'll want
3  to speak to you," anything like that?
4      A.   Well, he told some officer -- some officer asked him
5  questions from me.  I think that was after I got to Santa
6  Clara.
7      Q.   What do you mean they asked you some questions?
8      A.   No.  After, in Santa Clara, I believe -- I think it
9  was Carmichael, said, "Well, there's some detectives or
10 officers here that have some questions for you."  But on the
11 way up here, the conversation -- the conversation, like I
12 said, was really -- I guess you could say, friendly, just,
13 like I said, it felt like a road trip.
14     Q.   Well, it was always friendly; right?  No one ever
15 threatened you, harassed you, threatened to beat you or
16 anything like that?
17     A.   The only thing that -- it didn't seem that much of a
18 direct threat -- was the comment that Officer Carmichael did
19 make, "If you tell me --" pretty much if I behaved, it was
20 going to be a cool trip.  And then he said, "It's when people
21 misbehave that we have fun."  That was the only thing that --
22 it wasn't really a threat but it was maybe a warning.
23     Q.   My question to you is when the officers made that
24 statement to you to the effect that you could clear things up
25 for your brother, had you been given your rights yet?
26     A.   I believe so.
27     Q.   You do?
28     A.   Yes.

1  Q. And do you remember that clear or not?  Have you had
2 a chance to see the transcript of what you said?

3  A. Yes.  Yeah, I think I was mirandized, then I asked,
4 "Well, you guys --" I think it was, "You guys have my brother.
5 What's going to happen with him?"

6  Q. If your brother -- if your brother had not been in
7 custody and the police indicated to you that essentially you
8 could clear things for him, would you have made any
9 statements?

10  A. Probably not.  I mean, you see in the movies all the
11 time not to speak to the police.  I guess it was more -- my
12 brother -- my brother tell -- telling me that about my brother
13 and not telling me what I was there for, and it was the way it
14 was just real -- prior to that, the drive up here was just
15 real relaxed, real chummy, real friendly, I guess.

16  Q. Out at the scene when you were taken into custody at
17 gunpoint, did anyone tell you that you were under arrest?

18  A. No.

19  Q. Did anyone tell you that you were under arrest for
20 the murder of Mark Achilli?

21  A. No.

22  Q. At any point during the ten-plus hours after you
23 were taken into custody, were you told the reason that you
24 were taken into custody?

25  A. No.

26    MR. ROBERTSON:  Nothing further.

27    THE COURT:  Mr. Leninger?

28    MR. LEININGER:  I'd just like to argue.

1          THE COURT:  Any other questions based on that?

2          MR. ROSEN:  No, Your Honor.

3          THE COURT:  All right.  You can step down,

4    Mr. Chaidez.

5          MR. LEININGER:  I have no other witnesses.

6          THE COURT:  Any rebuttal witnesses?

7          MR. ROSEN:  No.

8          THE COURT:  Go ahead, Mr. Leninger.

9          MR. LEININGER:  Judge, the first thing I'd like to

10   do is refer you to Penal Code Section 841.  The Penal Code

11   Section 841 says, "A person making the arrest must inform the

12   person to be arrested the intention to arrest him, of the

13   cause of the arrest, and the authority to make it, except when

14   the person making the arrest has reasonable cause to believe

15   that the person to be arrested is actually engaged in the

16   commission of or attempted commission of an offense, or is

17   going to escape."

18          Now, what we have here, as Miguel Chaidez testified,

19   that he was in his car with his brother going to buy some

20   personal products from a drug store or something of that

21   nature, and they had stopped to get gas and I think Cesar went

22   in and got something to eat.

23          So the surveillance of the police officers obviously

24   came to rest at that gas station, but there is no reason why

25   those officers could not have complied with 841.  That is not

26   a discretionary thing on their part.  That is a statute of the

27   State of California

28          Now, Officer D'Antonio testified that he was

1    instructed not to discuss this case in any fashion by, I

2    believe he called him his supervisor, Sergeant Frisby, between

3    whatever time that arrest was made and the time they got to

4    Santa Clara.  So, in fact, they did not do that.

5          Now, I want to refer you to a case that I don't have

6    on this sheet but the case is this:  The case is *People versus*

7    *Honeycut*, 20 Cal3rd., 150 and 160.  And what *Honeycut* says is

8    this:  "A waiver that results from a clever softening up of a

9    suspect such as by involving him or her in an ingratiating

10   conversation before given the *Miranda* advisement will likely

11   result in any statement being held to be involuntary."

12         Judge, this went on, this little chuck and jive

13   situation with the police officers and my client, for over ten

14   hours.  During that period of time, we talked about -- they

15   talked about Miguel Sanchez's (verbatim) football career in

16   high school, all the nice ingratiating things that needed to

17   be talked about.

18         That wasn't just a pleasant conversation that was a

19   contrived conversation.  Officer D'Antonio -- Sergeant

20   D'Antonio testified to that, that he was doing that under

21   instructions.  We haven't heard from Carmichael, so I don't

22   know what his instructions were.  But Mr. Chaidez testified

23   that he told him, "Hey, be nice, we'll be nice.  You be bad,

24   we'll be bad," kind of conversation with him.

25         So it was the invitation to keep things light and

26   that's exactly what they did with Mr. Chaidez.  So

27   Mr. Chaidez, obviously, as he said, did not know what problem

28   he was in and what steps he needed to take.  He was focusing

1    on his brother.  They knew he was focusing on his brother

2    because he asked all the way -- starting from Monrovia, all

3    the way through Santa Clara what the status of his brother

4    was, because he didn't want his brother involved in this

5    situation.  And I think the police did take advantage of that

6    situation also.

7            I'm going to refer you to page 2 of the People

8    versus Garcia interview of Miguel Chaidez by Detective Frisby

9    and Detective Kazem on March 28th.  Do you have it?

10           MR. ROSEN:  Yeah.

11           MR. LEININGER:  Okay.  And I don't have a numbered

12   page, Judge, but halfway down the page it goes like this:

13   They advised him his rights.

14               "You have the right to the presence

15               of a lawyer.  If one cannot be afforded,

16               one will be appointed for you.  Do you

17               fully understand your rights?

18           "Frisby:  Okay.  We talked about

19               briefly we had been working on this case

20               for a long time now.  Daniel is here.

21               He's been very cooperative with us for

22               this entire investigation and basically

23               that's all we're looking for  from you.

24           "Chaidez:  Do -- I have a question.

25               What happened to my brother?  Do you guys

26               know?

27           "Kazem:  Well, we're figuring out

28               that he's actually -- he's still with some

```
 1                 of our partners down there."  And then
 2                 there's a word here called
 3                 "unintelligible."
 4                     "But let me tell you what my partner
 5                 is saying.  You can choose to believe us
 6                 or not, but we're going to be honest with
 7                 you until you decide to be honest with
 8                 us, people have been cooperative."
 9                 I'm not sure I read that correctly, but basically
10      what it's saying here, Judge, is this:  They knew exactly what
11      Mr. Chaidez -- was on Mr. Chaidez's mind.  They knew what they
12      had to do to get him to talk.  This was -- the confession
13      essentially came and was written down between 15 and 16 hours
14      after his arrest.  During that period of time, he was given no
15      access to a phone.  He was given no access to a lawyer.  He
16      was given no access to his family.  He was given some access
17      to food.  I presume we can call some access to sleeping since
18      he was kept in a cell by himself in a paper suit for a period
19      of approximately, what, from 9 a.m. in the morning till 3:30
20      in the afternoon, so that's six and a half hours.
21                 From what Mr. Chaidez's testimony has been, it was
22      isolation.  It was total isolation, other than when they chose
23      to talk to him.  And no one talked to him in any manner in
24      compliance with 841.  None of the officers that were there
25      seemed to think that that particular statute was relevant in
26      this situation.  And I think it's highly relevant, and I think
27      Honeycut points out that it's highly relevant.  There was no
28      mitigating circumstances on the part of these officers to
```

1  forget that statute.

2       They could easily have said that -- all it did

3  was -- their failure to do that just simply points out what

4  *Honeycut* wants to avoid, and that's this ingratiating

5  conversation, the softening up of the individual to make them

6  think that, "You know what?  There is a way out of this:  Be

7  friendly, we'll be friendly, and pretty soon we'll talk and

8  everything will just be okay."

9       Now, I'm a little surprised when Mr. Chaidez told me

10  that he had been under the influence of methamphetamine for a

11  period of time because that's certainly something that most

12  police officers are trained to recognize, and we had no less

13  than four named police officers in the situation and I don't

14  know how many in Monrovia.  I don't know why the blood test

15  was taken.  That was some two weeks after the homicide but

16  nonetheless, it was taken.  None of the symptoms that one

17  might expect from someone under the influence of this, someone

18  who by his own admission said he hadn't been asleep for about

19  36 hours, might have occurred to these folks that there was

20  something wrong here.  No steps were taken in that regard.

21       Now, why this is important is this:  841, *Honeycut*,

22  and the entire philosophy behind *Miranda* is that these

23  individuals not be kept from the ability to understand the

24  situation that they're in and the ability to voluntarily give

25  up what they want to give up or not.  And voluntariness has to

26  do with, number one, knowing, knowledge, understanding.

27  Because you can't very well give up something you don't

28  understand.  If you're not given the instructions and the

1    information as to why you've been chained for 14, 15 hours,

2    until, you know, this goes on, if you're told that, "Well, you

3    know, you might as well talk to us because your cousin just

4    ratted you out."  That's basically what they said; "Daniel

5    talked to us."  They basically told him that.

6         They didn't tell him what he said.  They told him

7    that after he made his waiver.  They could have told him that

8    before this.  They could have had him fully informed so that

9    he could have made a voluntary waiver.

10        As it was, it was kind of like a little trap game

11   playing here.  We'll take you to this step, to this step, to

12   this step.  And finally, Mr. Chaidez fell through the final

13   step and that was after he had given everything up.  And he

14   was told, "Hey, you might as well give it up anyway because we

15   already have this information."  That's basically what they

16   meant when they said, "Daniel's talked to us."

17        So on that point of view, Judge, I think that this

18   motion -- this confession should be suppressed.  I think that

19   the arrest of Mr. Chaidez should be declared illegal under 841

20   and Mr. Chaidez should go free.

21             THE COURT:  Mr. Rosen?

22             MR. ROSEN:  841 has no relevance to a motion as to

23   whether or not a confession is voluntary or not.  The case

24   that counsel cited, Honeycut, makes no reference to Penal Code

25   Section 841.  In addition, 841 says that if the person who's

26   in custody asks why they're in custody, the officer shall tell

27   them.  Miguel Chaidez just testified he never asked why he was

28   under arrest, so the officers were under no duty to tell him

1    that.

2         He never asked to use a phone, never asked for an

3    attorney during the time that he's in Monrovia.  The officers

4    drive him up here.  What would the Court have?  That the

5    officers not say anything to him, just completely not say

6    anything?  That -- I'm sure counsel would say they were

7    inhuman, they didn't say anything when they brought him up

8    here and that wasn't nice.  Instead, they were nice, they were

9    friendly to him.  It's a three, four-hour drive.  They didn't

10   ask him any questions about the murder case.  He didn't say

11   anything about his brother Cesar during that ride.  They just

12   had light conversation.

13        They told him, because as the Court will remember,

14   this wasn't a caged car, this was an unmarked patrol car so

15   there's not a cage in between the defendant and the officers.

16   There's an officer driving.  The officers thought it was

17   safest to put Mr. Chaidez in the front passenger seat and have

18   Sergeant D'Antonio behind him.  That's not an ideal

19   circumstance for the officers.  It would be better to have a

20   caged car, hence, why Sergeant Carmichael tells Miguel

21   Chaidez, you know, if you behave, there's not going to be a

22   problem, because the officers don't want a problem during this

23   ride up there.  And Mr. Chaidez was very cooperative.

24        MR. LEININGER:  Excuse me, Mr. Rosen.  Judge,

25   there's no testimony on why he was put in the front seat.

26   There's no testimony as to whether there was a caged car or

27   not a caged car.  I don't know where that came from, but it

28   didn't come from the records that I have.  Excuse me.

1          MR. ROSEN:  Great.  So they're up there for four
2     hours, they come here, he's brought to a holding cell, and
3     he's Mirandized.  And what does he say?  Yes, he understands
4     his *Miranda* rights.  After he's Mirandized -- after he's
5     Mirandized, he asked about his brother.  And the officers say,
6     you know, "Can you clear up this situation?"  After he's
7     Mirandized, he's told that Daniel's been cooperative and
8     honest with them.  He talks with the officers for three or
9     four hours.  They're not threatening to him.  They don't hit
10    him.  They're very polite.  He's hungry.  They get him food.
11    He wants a blanket.  They give him a blanket.

12          And at the end of that interview, he writes out a
13    confession that's legible, fairly grammatical, and, you
14    know -- and articulate.

15          He certainly, knowingly, and intelligently waived
16    his rights.  And the last question I asked him was, "Did you
17    freely and voluntarily --" the last question that I asked
18    Mr. Chaidez, "Did you freely and voluntarily speak to the
19    officers," and he just testified and said "Yes."  That's
20    really the end of the analysis for the Court, and the
21    statement should be admitted.

22          MR. LEININGER:  May I just say one thing in
23    rebuttal?

24          THE COURT:  Go ahead.

25          MR. LEININGER:  Judge, there's nothing in the law
26    that I know that requires a defendant in custody to ask to
27    make a phone call.  His rights are to be protected by the
28    police and they know what they are and they're required to

1   give them to him.  No one did give them to him and they didn't

2   give them to him for a very simple reason.  And Sergeant

3   D'Antonio testified to that.  They didn't want him to know

4   what was going on.  There was a search warrant being executed

5   at his house.  They didn't want anybody to know that so they

6   had a lot of reasons for playing this little game of silence.

7           The problem with this, in my mind, is that if that

8   had been done for the first hour or so that he was in custody,

9   then they might be able to come back and argue some kind of an

10  intelligent argument about, "Well, we had to do this.  Exigent

11  circumstances," whatever the magic words are that we use.

12          This didn't happen.  This did not happen.  This

13  didn't happen for hours and hours and hours.  And to indicate

14  that that had no affect on a person who had never been

15  arrested, had no experience of what it was to be in police

16  custody, who was manacled to his waist for hours on end with

17  no information about why he was, is, I think to assume,

18  something just out of the ordinary of human experience.

19          I don't think people know these things.  They may

20  watch TV.  They may watch CSI.  They may watch all that stuff.

21  I think we heard from our jury selection that's where a lot of

22  people get their ideas about this.  But there's nothing in the

23  law that requires you to watch CSI to know you can ask for a

24  phone call.  All right.  There's nothing on that.

25          That has to come from the only source in authority

26  at the time and that's the police and it didn't come from

27  there.  So that's my argument with that.

28          MR. ROSEN:  Just briefly, Your Honor?  If I may,

1    Your Honor?

2              THE COURT:  Yeah, go ahead.

3              MR. ROSEN:  Although on TV suspects make phone calls

4    and the police say, "Here's a phone call," there's actually no

5    case law or statutory requirement for the police to say, "You

6    get to make a phone call."  That's  number one.

7              Number two, there's also, of course, no legal

8    requirement for the officers to inform defendants of the

9    status of the investigation, how everything's going, where

10   they've gathered evidence, what everyone's told them.  That's

11   certainly not required, and common sense indicates that's not

12   necessary.

13             The sole question for this Court as to whether the

14   defendant's statement should be admitted is, number one, was

15   he Mirandized?  Yes, he was.  Did he indicate he understood

16   those rights?  "Yes, sir," is what his response was.

17             Number two, even if he's been Mirandized and he's

18   waived his *Miranda* rights, was his statement to the police

19   voluntary?

20             "Question:  Was the statement that he made

21             to the officers free and voluntary?

22             "Answer:  Yes."

23             That's the end of the analysis.  We think the

24   statement should come in.

25             THE COURT:  All right.  Give me one second.  Just

26   give me a couple minutes.  I want to take a look at *Honeycut*.

27   We'll be in recess.

28             (MORNING RECESS).

```
 1              THE COURT:  We'll go back on the record.  And I
 2     should note for the record that all the defendants, all the
 3     attorneys are present.
 4              THE DEPUTY:  Not yet, Judge.
 5              THE COURT:  Oh, Mr. Robertson is here now.  And all
 6     the attorneys and defendants were present during the portion
 7     of the hearing that we had this morning.
 8              I took a look at Honeycut.  I think Honeycut is
 9     distinguishable on its facts.  The motion to suppress the
10     statement to the police by Mr. Chaidez is denied.  There was
11     an implied waiver.
12              MR. LEININGER:  Is that your final -- did you make a
13     decision on the 841, on the compliance with that?
14              THE COURT:  Yeah.  I don't think that there's -- I
15     don't have any authority that says that by failing to advise,
16     that that requires them to -- or that requires a suppression
17     of the statement.
18              MR. LEININGER:  Do you have a copy of the code?
19              THE COURT:  Yeah, I do.
20              MR. LEININGER:  Well, without being argumentative
21     with the Court, the code says --
22              THE COURT:  If you have a case that says that not
23     telling the individual the purpose of an arrest results in a
24     suppression of the statement, I'll certainly consider it,
25     but -- you don't have to give it to me right now, but I don't
26     think Honeycut --
27              MR. LEININGER:  Honeycut's on a different issue.
28     That's voluntariness.  But the 841, I think, is pretty clear.
```

```
 1    I don't know that there's cases on it.
 2              THE COURT:  Okay.
 3              MR. LEININGER:  Can we leave that open?  I'd like to
 4    bring one back to you.
 5              THE COURT:  If you have a case, I'll always consider
 6    it.  All motions in limine are based on the time that we do it
 7    but it's not going to affect what's done in the opening
 8    statement.
 9              MR. ROSEN:  Thank you, Your Honor.
10              THE COURT:  You're still allowed to comment on it.
11              MR. ROSEN:  Thank you.
12              THE COURT:  What was the other motion we had this
13    morning?  We have your 402.
14              MR. ROSEN:  Yes.  I have Bryant Ling here to talk
15    about examining Paul Garcia's Palm Treo.
16              THE COURT:  All right.  Do we have anything we want
17    to take up before that one?  There was another motion that
18    we -- I have to find my notes, but --
19              Mr. Robertson, did you withdraw the motion to change
20    venue?
21              MR. ROBERTSON:  Actually, Your Honor, on the record,
22    I did do that.  And so that was the last thing that I did
23    before we adjourned, and I want to make sure the record's
24    clear as to why, because it's a practical and a tactical
25    choice.
26              We're happy with the jury that we got.  We are not
27    happy with the fact that the jury venire was so -- from a
28    paucity of Mexican/American or Latin individuals both by name
```

1    and in appearance.  Notwithstanding that, we are satisfied

2    with this jury as it's presently constituted.  And based on

3    that, we withdraw the motion for change of venue.

4              I had a couple of other minor motions --

5              MR. ROSEN:  Judge, I'd just like to speak --

6              THE COURT:  Let's take up the one with the

7    witnesses.  I'm sorry.  Did you want to say something?

8              MR. ROSEN:  I was just going to comment 'cause I've

9    heard Mr. Robertson say that before.  The People's view about

10   the jury venire is that it was a cross section of the

11   community.  I noticed a number of Mexican/Americans, Latinos,

12   and I would point out that it was the defense in this case

13   that kicked off of the jury three Latinos, not -- whereas, the

14   People did not.

15             And I know that defense counsel has said there's one

16   Latino on this panel.  You know, we didn't ask people what

17   they were, but I actually think there's two Latinos on this

18   panel.  But, you know, I didn't think it was necessary to, you

19   know, ask people what their racial background was when they

20   sat down.

21             THE COURT:  Right.  And I'll just point out that

22   it's not always clear what an individual's ethnic background

23   is either by name or by appearance.  But in any event, the

24   motion's withdrawn, so we're okay with that.

25             The other motion that we had that I was thinking of

26   regarding, other than the text message motion, was objections

27   to the exhibits, and I don't know if anybody -- are those the

28   motions you want to bring up?

```
 1              THE COURT:  We'll do the 402 first.
 2              MR. ROBERTSON:  Right.
 3              THE COURT:  Go ahead, Mr. Rosen.  You can call your
 4    witness.
 5              MR. ROSEN:  Thank you, Your Honor.  At this time,
 6    the People call FBI Agent Bryant Ling to the witness stand.
 7              THE CLERK:  Agent Ling, you can raise your right
 8    hand.
 9                          BRYANT LING,
10              Being called as a witness on behalf of the
11              People, having been first duly sworn, was
12              examined and testified as follows:
13              THE CLERK:  All right.  Pull yourself all the way up
14    to the microphone if you would, please.
15              THE COURT:  Good morning.  Would you state your name
16    and spell your last name.
17              THE WITNESS:  Bryant Ling, L-i-n-g.
18              THE CLERK:  Is that Bryant with a B?
19              THE WITNESS:  B-r-y-a-n-t.
20              THE COURT:  Oh, thank you.
21              Go ahead, Mr. Rosen.
22                        DIRECT EXAMINATION
23         BY MR. ROSEN:
24         Q.   Good morning, Agent.
25         A.   Good morning, sir.
26         Q.   Tell us a little bit about your educational
27    background.
28         A.   I have a computer and systems engineering degree and
```

1    I've also gone through the educational process for becoming a
2    computer forensic examiner for the FBI.
3         Q.    And before you joined the FBI, what were you doing?
4         A.    I was a Naval flight officer in the United States
5    Navy.
6         Q.    For how many years were you a Naval flight officer
7    in the United States Navy?
8         A.    Approximately six and a half years.
9         Q.    What rank did you leave the Navy with?
10        A.    I left as a lieutenant.
11              MR. LEININGER:  I'm sorry.  I didn't hear that.
12              MR. ROSEN:  Lieutenant.
13              MR. LEININGER:  Lieutenant?
14              THE WITNESS:  Yes, sir.
15        Q.    (BY MR. ROSEN):  After leaving the Navy as a
16   lieutenant, did you then go work for the FBI?
17        A.    I was unemployed for a few months while I was going
18   to school, but I did -- my next place of employment was the
19   FBI.
20        Q.    While you've been working at the FBI, have you taken
21   courses to become a computer forensics expert?
22        A.    Yes, sir.
23        Q.    Where are you currently working now?
24        A.    I'm currently assigned to the Silicon Valley
25   Regional Computer Forensic Lab.
26        Q.    What does the Silicon Valley Computer Forensic Lab
27   do?
28        A.    We analyze digital evidence that is submitted in

```
 1   criminal proceedings from local agencies that are
 2   participating with us.
 3        Q.   For how many years have you been working for the
 4   Silicon Valley Regional Computer Forensic Lab?
 5        A.   Since its inception, so that would be approximately
 6   2004.
 7        Q.   I'd like to ask you some questions in the area of
 8   computer forensic analysis.  What training have you received
 9   to be a computer forensic analyst?
10        A.   I have undertaken the basic training, which covers
11   general computer operating systems, Windows, computer
12   desktops, analyzing data that's on hard drives, things of that
13   nature.
14            In addition to that, I've also gone through cellular
15   phone examinations, and also some other additional operating
16   systems, Macintosh, LINUX.
17        Q.   What courses have you taken to become an expert in
18   examining computers and cell phones?
19        A.   The FBI has an approximate one-year certification
20   process where you're taking various courses that the FBI has
21   prescribed and some of them are commercial courses.  And
22   they're computer forensics courses, some of them with the use
23   of computer forensic software that is commonly available and
24   computer forensic software that is commercially made
25   available.
26        Q.   Is the one-year certification process through the
27   FBI, is that something you're doing full-time for that year?
28        A.   It is.
```

1      Q.    When did you become certified by the FBI to
2   forensically examine computers and cell phones?
3      A.    I believe it was 1998.
4      Q.    Since 1998, approximately how many computers have
5   you forensically analyzed for the FBI?
6      A.    I don't have an exact count.  I could go through our
7   statistical database and pull that out, but it's hundreds.
8      Q.    What about electronic devices like cell phones?
9   Approximately how many cell phones have you forensically
10  analyzed for the FBI?
11     A.    I would estimate probably around 40 to 50.
12     Q.    Have you previously qualified as an expert witness
13  in court for the forensic examination of cell phones or
14  computers?
15     A.    Yes, I have.
16     Q.    How many times have you previously qualified as an
17  expert?
18     A.    I believe I've qualified twice.
19     Q.    In what courts?
20     A.    In San Mateo and Santa Clara.
21          MR. ROSEN:  I would like to mark this as --
22          THE COURT:  I'm sure she'll be back.
23          MR. ROSEN:  Hold on, Judge.  I got it.  Mark this as
24  Court's Exhibit No. 1.
25                    (Whereupon Court's Exhibit 1
26                     was marked for identification.)
27     Q.    (BY MR. ROSEN):  Judge, we've marked as Court
28  Exhibit No. 1 a clear plastic bag that contains a brown paper

1    bag and I want to show that to the witness.

2            Agent Ling, showing you what's been marked as

3    People's Exhibit No. 1 (sic), can you open up that package and

4    tell us if you recognize that?  Do you need scissors to open

5    it or did you get it?

6        A.    It appears to be taped.

7        Q.    Agent Ling, you've taken out a Palm Treo cell phone

8    from what's been marked as People's Exhibit -- pardon me,

9    Court's Exhibit No. 1.

10            Is that a cell phone that you have forensically

11    analyzed?

12        A.    Yes, sir, it is.

13        Q.    Did you prepare a report dated March 18th of 2008,

14    describing the analysis you did on that phone?

15            MR. ROBERTSON:  Objection.  Relevancy, Your Honor.

16    He hasn't been found as an expert yet.  And if he's going to

17    be offered as an expert, I'd like to cross.

18            THE COURT:  It's a 402 hearing.

19            MR. ROBERTSON:  He still has to have him qualified

20    as an expert.

21            MR. ROSEN:  That's fine, Your Honor.  I thought I

22    laid the foundation for that.

23            THE COURT:  Do you want to voir dire him --

24            MR. ROBERTSON:  I really do, please.

25            THE COURT:  -- for his qualifications?  Go ahead.

26                            VOIR DIRE

27        BY MR. ROBERTSON:

28        Q.    Good morning.

1          A.    Good morning, sir.

2          Q.    You said, sir, I think, that you had examined

3     between 40 and 50 cell phones?

4          A.    That's an approximate number, yes, sir.

5          Q.    How many of the Palm family have you examined?

6          A.    I believe, including phones as well as PDAs,

7     probably about 15 to 20.

8          Q.    I would just like to talk about the particular

9     device that's in front of you.  I believe that's a Palm Treo;

10    correct?

11         A.    Yes, sir.

12         Q.    Is it a model 700?

13         A.    It's a 700W.

14         Q.    How many of those have you examined?

15         A.    I may not have examined any other ones.  I don't

16    recall any other ones that I've examined.

17         Q.    And as it relates to the examination process of this

18    cell phone, have you had any training in it?

19         A.    Excuse me.  Can you rephrase that?

20         Q.    Certainly.  You said you've had general training as

21    it relates to computers and cell phones, and almost all the

22    questions Mr. Rosen asked you were broad.  They asked you

23    about training in computers and cell phones.  I'd like to just

24    know about your training as it relates to this particular cell

25    phone type.

26         A.    There's specific training that's provided with the

27    tools that we use for examining cell phones.  The software

28    that's used to examine these cell phones is generally a

1      multi-use piece of software that will examine different models
2      of cell phones and will extract software off of those devices.
3          Q.   Have you had any training in detecting whether there
4      are functional problems with the phone such as with the chip,
5      with the software, or whether there's been any -- let me just
6      stick to those two.
7          A.   There isn't specific troubleshooting or repair type
8      training that's provided, if that's what you're asking.
9          Q.   Do you know what kind of a chip is in this
10     particular cell phone?
11         A.   I do not.
12         Q.   Have you had any training in how the software would
13     interact with the chip or how data is handled or maintained?
14         A.   We have had some training with that.  I have.
15         Q.   And as it relates to this phone, could you tell us
16     where you got that training, please?
17         A.   I received that training from the FBI.
18         Q.   And when was that?
19         A.   I don't recall exactly, but I believe it was
20     approximately 2004, 2005.
21         Q.   Do you know if this model cell phone with this chip
22     was even manufactured then?
23         A.   I don't believe it was.
24         Q.   Had you ever been to the Palm -- strike that.
25              Have you ever been to the Palm factory?
26         A.   No, I have not.
27         Q.   Have you ever had any interaction with engineers,
28     albeit the electrical or software, as it relates to how

1    problems can develop inside this phone?

2         A.   Yes, I have.

3         Q.   And where did that take place?

4         A.   I have personal contacts with prior contractors of

5    Palm as it existed back then.  That company is no longer in

6    existence as we knew it back then.

7         Q.   Right.  It was purchased by HP earlier this year;

8    correct?

9         A.   Yes, sir.

10        Q.   But still uses the name, I believe, does it not?

11        A.   Yes, sir.

12        Q.   And so for our purposes, if you will, I'm referring

13   to the company that was purchased by HP which still uses the

14   name Palm.  And can you work with that?

15        A.   Yes, sir.  So the contractors or engineers, software

16   engineers that I spoke with were employees or contractors of

17   Palm during the era of when this phone was made.

18        Q.   And did you talk to any of them during or after the

19   time this phone was given to you?

20        A.   Yes, I did.

21        Q.   And when did that occur?

22        A.   That occurred approximately, I believe, in the

23   spring of 2009.

24        Q.   Can you tell us who you spoke with?

25        A.   I spoke with an individual named Samuel Kho.

26        Q.   Could you spell that, please?

27        A.   First name S-a-m-u-e-l, last name K-h-o.

28        Q.   Anyone else?

1     A.    No, he was the only one, and -- well, he was the
2   only one.

3     Q.    Did you ask him to examine the phone and assist you
4   in the examination process?

5     A.    I did not.

6     Q.    Did you ask him to perform any tests on the phone to
7   determine its functionality or whether or not there were any
8   difficulties with the chips?

9     A.    I did not.

10    Q.    Did you ask him to analyze the software that was in
11  the phone to determine whether or not the software had any
12  difficulties, glitches, or bugs?

13    A.    I did indirectly.

14    Q.    And did he examine the phone?

15    A.    No, he did not.

16    Q.    Okay.  When you say you "did indirectly," could you
17  tell me what you mean by that, please.

18    A.    With any software or device that can be modified by
19  the user, there's a possibility that the system can become
20  unstable.  So we're all familiar with computers; computers can
21  crash.  Where you have a smart phone and you can install
22  applications on there, whether it's customer installed or
23  company installed -- in this case Verizon -- it's possible
24  that some instability could exist.  And also within the
25  operating system of the device, it's also a possibility that
26  the operating system may have bugs which may cause certain
27  behaviors on the system.

28          So I asked him specifically about those things with

1    reference to the Palm operating system and SMS messaging.

2        Q.   And was the software on this particular cell phone

3    downloaded and checked for glitches or errors?

4        A.   I'm not sure I understand your question, sir.

5        Q.   Well, when the software is loaded into a phone, it

6    actually contains machine language; correct?

7        A.   Yes, sir.

8        Q.   And were you -- did you have this particular

9    software that's in the phone downloaded to see if it had

10   become corrupted, either through use or just over time?

11           MR. ROSEN:  I'm going to object at this point.  It

12   certainly seems that Mr. Robertson, by his questions, is

13   certainly implicitly acknowledging that Agent Ling is an

14   expert.  This is now just cross-examination, so I'd like to

15   finish.

16           THE COURT:  Sustained.

17           MR. ROBERTSON:  I believe --

18           THE COURT:  Are you done with voir dire?

19           MR. ROBERTSON:  I think the Court's going to find

20   him an expert at this point.  And I would submit it to the

21   Court.

22           THE COURT:  All right.  Very well.

23           MR. ROBERTSON:  However, I don't agree with that

24   finding.  Not on this particular cell phone and how it's used

25   or how the analytical process that may have been applied to

26   this phone.

27           THE COURT:  He's qualified as an expert regarding

28   the cell phone.

1           MR. ROBERTSON:  Your Honor, so my scope of my

2   motion, if it wasn't clear, is that unless and until it's been

3   demonstrated that this particular person has the appropriate

4   certification and qualifications and that the examination of

5   the phone was conducted in such a way to address the concerns

6   of reliability and stability, and answer questions how they

7   couldn't become deleted or changed, that's, in part, where my

8   motion is going.

9           THE COURT:  Well, I think he's qualified as an

10  expert in the forensic examination of cell phones.  And if you

11  want to, you know, go into various aspects of the forensic

12  examination, that'd be for the weight of the testimony, not

13  admissibility.

14         MR. ROBERTSON:  I agree, but not to the

15  admissibility whether or not it's allowed to come before the

16  jury, whether or not it's processed properly or whether or not

17  the data's reliable.  There's two parts to the motion.

18         THE COURT:  That's kind of what we're doing here

19  today.

20         MR. ROBERTSON:  Correct.

21         THE COURT:  Well, I'm not going to rule on that now.

22         MR. ROBERTSON:  Correct.

23                DIRECT EXAMINATION

24                  (continued)

25    Q.  (BY MR. ROSEN):  Agent Ling, did you forensically

26  analyze the Palm Treo phone that's in front of you?

27    A.   Yes, sir.

28    Q.   How did you do that?

1      A.    I ensured that the device was not transmitting.  And
2  would you like me to go into details on that as well?
3      Q.    What did you mean to make sure "the device wasn't
4  transmitting"?
5      A.    Many phones now, when you lose them or when you
6  misplace them, you have the ability to locate them or possibly
7  erase them.  And so a primary concern of law enforcement is
8  when seizing a cell phone as evidence, to make sure that that
9  piece of evidence does not have any modification capability
10  from the outside.  It may be modifying itself on its own, you
11  know, if it's powered on or something like that.
12        So one of the things you want to do is make sure
13  that wireless transmission is stopped.  And in some instances,
14  you want to make sure the battery's removed to prevent that
15  from happening.
16      Q.    Why do you want to make sure that there's no outside
17  modification of the phone or the possibility for outside
18  modification of the phone to take place?
19      A.    There's several reasons.  One can be the subscriber
20  can contact the cellular carrier through various means and
21  have the cell phone possibly erased or locked.  So that's one
22  reason.
23        Another reason is any additional incoming calls to
24  that phone could possibly overfill the cache or buffer for a
25  number of last calls.  So if you had a memory of ten last
26  calls in the call history and you receive five more calls, you
27  just lost five of the calls as it scrolls off the top of your
28  buffer.

1     Q.   So after -- so you first check to see that the phone

2  was not wirelessly transmitting and you made sure that the

3  battery had been removed?

4     A.   We received the battery -- or I received the battery

5  separately from the phone.  They were -- it was not installed

6  in the phone at the time.

7     Q.   And is that what you -- is that how you expected to

8  receive the phone?

9     A.   We receive phones both ways.  It just depends on the

10  submitting agency.  So different agencies have different

11  policies with regards to removing phones -- or removing

12  batteries from phones.

13     Q.   If the battery hadn't been removed, would you have

14  removed the battery from the phone before examining it?

15     A.   Yes, we would have.

16     Q.   So after checking to see that the battery had been

17  removed and the phone was not able to receive modification

18  from the outside, what did you then do?

19     A.   Well, to examine the phone electronically, the power

20  has to be applied to the device.  And to ensure that the phone

21  isn't transmitting -- obviously, it's not transmitting if

22  there's no battery or no power applied to it but when we do

23  apply power to it, it's going to come -- it's going to power

24  on, and it may try to connect with the carrier.

25         So we put that phone in a wireless -- or a radio

26  frequency enclosure which prevents wireless signals from being

27  transmitted into that enclosure.  It's essentially a steel box

28  with a glass window with a metal mesh through the window to

1    prevent a cell phone from working.  And it's easy enough to

2    check, if that box is working, by putting your own cell phone

3    in there and you can call it or you can just wait and look at

4    the screen and see that you have no more connectivity to your

5    carrier, you know it's working and that you can put another

6    phone in there and actually work on it at that point.

7         Q.   So after -- so you take the Palm Treo and you put it

8    in this steel cage, and then did you power it up then?

9         A.   Yes, sir.

10        Q.   And then after powering up the Palm Treo, what did

11   you do?

12        A.   We have forensic software that will attach and pull

13   off any recognizable data or usable testable data from that

14   device, and that's what we did.

15        Q.   What information did you pull off of the cell phone?

16        A.   I believe I pulled off messages, pictures, contacts,

17   notes, some text files, some identifying information.  There's

18   a splash screen on the phone that comes up with user

19   information.

20        Q.   And who was the user information for?

21        A.   I believe the information was for a Paul Garcia.

22        Q.   The information that you were able to take off the

23   cell phone, did you then put that on a CD and provide that to

24   another officer?

25        A.   I believe I did put that on a CD, and I provided

26   that, I believe, to Mike D'Antonio.

27        Q.   Did you become aware at some point that all of the

28   text messages that were still on Paul Garcia's cell phone were

```
 1    messages that Paul Garcia had sent but not text messages that
 2    he had received?
 3         A.   I'm trying to recall this now, but I believe it was
 4    only ones that he received, not the ones that he sent.  Or I'd
 5    have to look at my report to answer your question.
 6         Q.   Take a look at your report for a second.
 7         A.   May I look at my report?
 8         Q.   Yeah, sure.
 9         A.   (Reviewing report).  Okay.  So it was sent, and so I
10    was mistaken.
11         Q.   Okay.  So when you pulled the information off of the
12    cell phone, you saw that the text messages that were recovered
13    were messages that Paul Garcia had sent; correct?
14         A.   Yes, sir.
15         Q.   But you didn't find any messages on the cell phone
16    that had been sent to that phone?
17         A.   Yes, sir.
18         Q.   Did you find that odd or strange?
19         A.   I did find that odd.
20         Q.   Did you take any steps to try to figure out why
21    there weren't any received messages on the phone?
22         A.   We did, based on a request that came from the
23    submitting agency.
24         Q.   What did you then do?
25         A.   So if I may backtrack a little bit.
26         Q.   Sure.
27         A.   There's several steps that can occur when
28    something's submitted for forensic analysis.  One thing can
```

1    happen is we'll just provide what the requesting agency wants

2    and we're now analyzing it for them.  And so if they ask for

3    all the messages and all of the contacts, we will provide that

4    to them.  And we don't go through and create a timeline or

5    anything of that nature.  We'll just give them -- "Do you want

6    the CD?"  And they go through it.

7             And so in this instance, we didn't -- we didn't try

8    to associate any of the calls or messages or anything and

9    categorize them as far as missing messages.  We would just go

10   through and compare, here's what we recovered, take a quick

11   look at the phone, make sure that those messages are on there,

12   make sure that we don't see anything that's missing overtly.

13   And then we will return that to the agency.

14            So in this instance, the agency came back to us and

15   said, "We're noticing that, you know, only this type of

16   messages, incoming messages, is available in the report."

17       Q.   Outgoing messages?

18       A.   Or, "Outgoing messages are available in the report.

19   Where are the incoming messages?  You know, what's happening?

20   Is it possible that you missed it?"

21            And so at that point, we decided we're going to look

22   at this, it's significant, and we'll start analyzing this.  So

23   that's when I made calls to Palm Corporation or to the

24   previous contractor that worked for Palm and also discussed

25   with several other examiners what were the possibilities of

26   this happening.  And that's when we started looking at it.

27       Q.   And what were the possibilities?  What are the

28   reasons that a phone like this might be missing the incoming

1    messages but still have the outgoing messages?

2         A.   So based on my experience, as well as from what this

3    contractor told me, there are several explanations.  One can

4    be that -- or one is that this generation of phone from

5    Microsoft, from Palm, it was running Windows Mobile, and there

6    were known bugs in some of the SMS client software.  And so it

7    was possible that some of those things could get over --

8    disappear or get deleted, either overtly by the user or

9    accidentally.

10        And that bug could be introduced through a variety

11   of ways.  It could be through normal use.  It could be through

12   phone reset, if it was running Windows Mobile and the phone

13   could possibly crash.  And most of these phones had a small

14   pinhole where you could reset the phone.  It's possible that

15   if you reset that phone from that current state, it will

16   crash, which you could possibly erase your text messages.

17        And there were also several other methods that it

18   could happen.  One of them was you can install applications

19   onto a smart phone.  And if you do a search on the Internet,

20   you can see many other people have had issues with SMS

21   messages disappearing off of a phone, not because they removed

22   the battery, not because, you know, they tried to delete them,

23   but they either upgraded their phone or installed a certain

24   application and just by installing another application which

25   had nothing to do, possibly, with SMS messaging, their SMS

26   messages disappeared.

27        Q.   And SMS messages are sometimes called text messages?

28        A.   Yes, sir.

1    Q.   Was there any additional applications installed on
2    this Palm Treo?

3    A.   Yes, sir, there were.

4    Q.   What other applications have been installed on it?

5    A.   I don't remember all the full list of applications,
6    but I do recall that Verizon had a service which would try to
7    synchronize the content of the phone with Verizon service.
8    That's one specific application that I do remember.

9    Q.   So is the CD that you provided to Mike D'Antonio a
10   copy of all the information that you were able to take off of
11   this Palm Treo?

12   A.   That was all of the logical files.  So yes, at that
13   time, that was all of the data that we were able to pull off
14   the phone.

15        THE COURT:  Mr. Rosen, can I just ask for a
16   clarification.  You were talking about this generation of cell
17   phone that was using the Microsoft Mobile.

18        THE WITNESS:  Yes, sir.

19        THE COURT:  And did you say it had no bugs or --

20        THE WITNESS:  No.  It did have known bugs.

21        THE COURT:  Known bugs.

22        THE WITNESS:  The contractor specifically stated
23   that there were known bugs within Palm as well as he said just
24   go look on the Internet.  He wasn't going to provide me with
25   specific technical detail about any specific bugs, as they
26   were so varied that any one of those could introduce one of
27   those problems.

28        THE COURT:  All right.

```
 1        Q.    (BY MR. ROSEN):  And through subsequent examination
 2   of this Palm Treo, were you able to recover any more
 3   information or data from the phone than you were originally?
 4        A.    No.
 5              MR. ROSEN:  I don't have any further questions.
 6              THE COURT:  Cross-examination?
 7              MR. ROBERTSON:  I need a moment.  My client and
 8   investigator are speaking to me.
 9              THE COURT:  We'll take a -- five minutes enough?
10              MR. ROBERTSON:  Absolutely.  That's actually much
11   more than I need.
12              THE COURT:  We'll just sit here and wait for you.
13              MR. ROBERTSON:  I'm ready, Your Honor.
14              THE COURT:  Okay.
15                          CROSS-EXAMINATION
16        BY MR. ROBERTSON:
17        Q.    Agent Ling, in terms of the bugs that you're talking
18   about, are you talking about bugs that are generic to the
19   Windows operating system that was on this phone?
20        A.    Yes, sir.
21        Q.    Are you also talking about bugs that can occur
22   through corruption of the software on the phone itself?
23        A.    No, I'm not.
24        Q.    Were you ever able to determine whether or not the
25   software on this phone was corrupted?
26        A.    No, sir, I did not.
27        Q.    Did you try to do that?
28        A.    No, sir.
```

1      Q.   When the messages are stored on this phone, did you
2  come to understand that they're stored in what's called
3  nonvolatile memory?
4      A.   Yes, sir.
5      Q.   Would you explain what that is, please.
6      A.   So there's two types of memory, essentially, for
7  general purposes, volatile and nonvolatile.  And volatile
8  memory is memory that will lose its contents when power is
9  removed from the device or from that memory chip.
10         So most people are familiar with a desktop computer
11  and when a computer crashes or you turn the computer off and
12  turn it on again, the document they were working on, if it was
13  not saved to the hard drive, will most likely be gone.
14         And there's also nonvolatile memory which, even
15  though power is removed, it will, for some very extended
16  period of time, still retain its contents.  And so there's
17  Palm devices that have used both of those types of memory
18  through the Street Palm.
19      Q.   Do you know how long this particular phone was
20  without power by the time it came to you?
21      A.   I do not.
22      Q.   When you're doing -- strike that.
23         When a piece of evidence, such as a phone or a
24  computer, is seized by the police and is to undergo a
25  scientific analysis, is there a protocol that's supposed to be
26  followed by the individual agency?
27      A.   Yes, sir.
28      Q.   And would you explain what that is.

1    A. That would be dependent on the agency that submits

2 it.

3    Q. For example, do you know what the protocol would be

4 for Los Gatos Police Department, the agency involved here?

5    A. I'm not aware of their protocols.

6    Q. Is it important when you take a cell phone -- let me

7 back off.

8    When you say "up to the agency protocol," I mean --

9 what do you mean by that?

10    A. Some agencies may require that a device be

11 physically checked into custody at their site, at their police

12 department, their evidence storage room.  It may be required

13 to have their evidence tag attached -- physically attached to

14 it or label it, you know, adhered to it before they bring it

15 in.

16    Some agencies won't allow that to be done remotely,

17 so they'll bring it directly to us, and they'll fax in the

18 evidence entry form, and they'll receive some kind of

19 confirmation or labeling instructions that they can, at that

20 point, attach.

21    It just depends on the agency.  I've seen both of

22 those methods occur.

23    Q. But, for example, with a computer, if the local

24 police agency seizes a computer, they're not supposed to turn

25 it on, play with it, and run programs; right?

26    A. That's correct.  That would be -- forensically

27 speaking, that would not be desirable.

28    Q. Why is that?

1        A.    By turning on a device, you could possibly -- you

2    almost likely will modify the contents of that computer.

3        Q.    Would that be the same for a cell phone?

4        A.    It can be the same for the cell phone.  It just

5    depends on the cell phone.

6        Q.    Well, for example, do you know whether or not these

7    officers went through the cell phone and manipulated the keys

8    and looked at it themselves?

9        A.    I'm not aware of that.

10       Q.    You haven't seen any videos which would show, for

11   example, these officers showing this cell phone to other

12   people and bringing up messages?

13       A.    No, sir.

14       Q.    Would that be inappropriate, forensically?

15       A.    Yes.

16       Q.    And is that the kind of situation, for example, if

17   it's not the officer's cell phone, and they're not used to

18   using it, is that the kind of situation in which they could

19   accidentally delete out messages?

20       A.    Generally speaking, no.

21       Q.    Explain, please.

22       A.    With most smart phones, before you delete a message,

23   it will ask for confirmation unless that request for

24   confirmation has been overridden.  So it's generally difficult

25   to have a phone which you're not familiar with for you to do

26   something with that phone and delete all of the messages

27   without some type of confirmation.

28       Q.    Did you see the video of when Mr. Garcia handed the

1    phone over to the investigating officers?

2         A.   No, sir.

3         Q.   Would the proper protocol have been when he handed

4    them the phone, to take the battery out immediately and to

5    preserve it for you?

6         A.   It would depend on that agency's protocol.  Some

7    agencies have a desire for immediate retrieval.  For example,

8    if a call comes in, they want to know the call history before

9    that call gets deleted, so they'll actually go through

10   physically and look at the evidence.

11            And then some agencies have the additional

12   requirement, well, after you've documented or done a

13   contemporaneous search of that device, you should remove the

14   battery so that it doesn't transmit or put it in a radio

15   frequency shielding bag so it can't receive any more signals.

16        Q.   Did it come in an RFI bag?

17        A.   I believe it did not.  I believe it came exactly as

18   I'm seeing it here.

19        Q.   And when it came to you, did the officers indicate

20   to you in any manner that the sent messages were missing?

21        A.   I don't recall any indication from the first

22   submission.

23        Q.   Normally, is it possible to delete, *en banc*, all of

24   the sent messages on this phone?

25        A.   What do you mean by "normally"?  Like, is there a

26   function to do that?

27        Q.   Sure.  If I'm an end user and I say, "Well, okay.  I

28   want to delete all of my sent messages," you know the process

1    to do that?

2         A.    The process to do that, yes, I do.  The process to

3    do that for most phones would be to filter your messages for

4    sent messages and then highlight them all and then select, you

5    know, "delete," and possibly either have a visual confirmation

6    or a global confirmation for the deletion of all those

7    messages.

8         Q.    Were you able to determine in your -- strike that.

9               When you looked at the phone, were you able to

10   determine whether or not it had retained the set of commands

11   that it had been told to follow?

12        A.    Can you rephrase that question, please, sir?

13        Q.    Sure.  When an end user, for example, is using the

14   smart phone and is asking the program to execute commands such

15   as "delete" or "send," is there residual information contained

16   within the phone that would reflect that command?

17        A.    It's possible that there will be residual

18   information, but I did not detect any.

19        Q.    Did you look for it?

20        A.    Yes.

21        Q.    Would that normally have been the kind of thing that

22   would be present in this cell phone, absent a bug or other

23   difficulty that was known to the phone?

24        A.    I'm sorry.  Can you repeat that, please?

25        Q.    Yes, sir.  You said there's generally residual

26   information.

27        A.    There can be.

28        Q.    And in this case, there was no residual information?

1          A.    So there's two -- there's different types of
2     residual information.  One would be, like, the last executed
3     command or something like that.  The other type of residual
4     information would be that the message, even though it was
5     deleted from memory, would still be retained on the phone
6     somehow but not accessible.
7          Q.    And that's where I wanted to go, both places.
8          A.    Okay.
9          Q.    First, could you tell whether or not there was a
10    last command?
11         A.    I could not tell if there was a last command.
12         Q.    And were you able to check and see if any of the
13    sent messages were still present anywhere on that phone?
14         A.    At that point in time, we did not have that
15    capability.
16         Q.    Do you have that capability today?
17         A.    I'm not sure.  I would have to research that.
18         Q.    How long would it take you to do that?
19         A.    I can make a phone call right now if you want.
20               MR. ROBERTSON:  May we please, Your Honor?
21               MR. ROSEN:  Is it the sent or the received messages?
22         Q.    (BY MR. ROBERTSON):  As to both.  This applies to
23    both sent and received; correct, this --
24         A.    It would apply to the physical, nonvolatile memory
25    device since the device is basically completely nonvolatile.
26    And just to elaborate of what's happening here or the
27    explanation of the retrieval of the messages, it is possible
28    that if there's a tool out there that could possibly retrieve

1    the physical memory of that device, if you looked at the

2    report that we generated, we would be extracting logical files

3    because when you're working with a smart phone and it's using

4    volatile -- or nonvolatile memory, a lot of times it will move

5    things around in memory while the phone's powered on with no

6    interaction whatsoever, just to make things run more

7    efficiently five minutes from now when it receives the next

8    call or text messages, photo attachment, things of that

9    nature.

10         So back when this phone was processed, the tool that

11   we were using was extracting through logical files and that's

12   what we presented.  However, there have been some developments

13   in the cellular phone forensic field that have allowed the

14   physical memory acquisition of some phones.  And I'm not sure

15   if this phone is on that list or not.

16              MR. ROBERTSON:  Your Honor --

17              THE COURT:  So you want him to make a call to see if

18   they have a capability to find out if the sent messages -- I'm

19   sorry -- received messages are somewhere on the phone?

20              MR. ROBERTSON:  Yes.

21              MR. ROSEN:  That's fine.

22              THE COURT:  All right.

23              MR. ROBERTSON:  And I also --

24              THE COURT:  If you want, you can step out into the

25   hallway.

26              MR. ROBERTSON:  I have a witness that we brought

27   directly from Palm, so we might, if no objection, call him

28   while --

 1          THE COURT:  How long is this going to take?

 2          THE WITNESS:  I can have this result in three

 3   minutes.

 4          THE COURT:  Okay.

 5          MR. ROBERTSON:  Do it right now.

 6          THE COURT:  Go off the record.

 7          THE WITNESS:  Okay.

 8          (BRIEF BREAK).

 9          THE COURT:  We'll go back on the record.  The

10   witness has resumed the witness stand.  All the attorneys and

11   defendants are present.

12          You want him to advise?

13          MR. ROBERTSON:  Please.

14          THE COURT:  Could you tell us the results of your

15   call?

16          THE WITNESS:  So we just examined a 700W last week

17   in our office and attempted to do a physical memory

18   acquisition of that device and it was not possible for our

19   device.  So it -- I'm not saying it's not possible for anyone

20   because anyone with a good engineering background can actually

21   disassemble the phone, destroying it in the process, but

22   recovering some data off of it.  That would have been possible

23   for someone with a high level of engineering expertise.  But

24   that's not -- we don't go to that level of that analysis in

25   our office.

26      Q.   (BY MR. ROBERTSON):  Essentially, as I understand

27   your answer -- well, let me back up.

28          Did you find that there is new software available?

1      A.   We always have new software coming out, you know.

2  We're using commercially, as well as in-house, developed

3  software.  And we're always making modifications to that

4  software or buying the updates or acquiring the updates.

5      But I guess to answer your question, back-door my

6  original statement, we still do not have the capability that

7  I'm aware of to acquire physical memory on that 700W.

8      Q.   What software do you use in your analytical process?

9      A.   We use various softwares, one's produced by the FBI,

10  and we also use other commercial products, Susteen, Cellebrite

11  are some of the tools that we use.

12      Q.  And I'm sorry, could you spell them, please.

13      A.   Sure.  Susteen is spelled S-u-s-t-e-e-n.  And the

14  specific software that they produce for forensic examination

15  is titled SecureView all one word, capital S and capital V.

16      Another product that is used by cell phone carriers

17  when you go into the cell phone store to upgrade your phone or

18  to buy a new phone, you may want to transmit your current

19  address book off of your phone onto your new phone.  That

20  software or that piece of hardware is called Cellebrite, and

21  that's C-e-l-l-e-r-i-t-e (sic).

22      And in that instance, there are different models

23  that Cellebrite produces to be able to service different

24  sectors.  There's corporate sectors, law enforcement sectors,

25  military, you know, commercial.  So just depending on what

26  sector they're trying to service, they'll have different

27  models available.  And in this instance, we're using one that

28  is a forensic model.

1      Q.    And when you say "forensic," specifically produced

2  for law enforcement to extract information?

3      A.    Correct.

4      Q.    Was that particular -- and that's a mechanical

5  device, electromechanical?

6      A.    That is.

7      Q.    And was that used on this phone?

8      A.    A Cellebrite was not.  We used the Susteen device or

9  Susteen software.  And we -- I believe we attempted to use

10  Susteen software, and we used the FBI -- the final result was

11  using the FBI software to make the software extraction.

12      Q.    Tell us about the FBI software, please.  How is

13  it -- what I'm interested in is how -- let me back up.

14          With most software, it goes through a design

15  authentication engineering review process; correct, most

16  commercially available?

17      A.    To my knowledge, that's what happens with most

18  software.

19      Q.    How about the FBI software?

20      A.    I'm not qualified to testify about the FBI software

21  development process.

22      Q.    You don't know anything about it?

23      A.    I know a little bit about it, but I'm not

24  specifically aware of its tools that was used.  I wasn't

25  involved in the testing or development of that software.

26      Q.    Do you know what the name of it is?

27      A.    I believe the name of it is PDXPRESS.

28      Q.    Could you spell that, please?

1          A.    I believe it's P-D-X-P-R-E-S-S; something like that.

2          Q.    So how many different forms of software were used to

3     examine this phone?

4          A.    I believe it was just the FBI package, because none

5     of the other ones -- we didn't have a Cellebrite at the time.

6     We didn't have any other tools available that would analyze

7     that phone.

8          Q.    Sir, when you say that you recently examined the

9     700W in the laboratory and you weren't able to extract the

10    information, do you know what software was used?

11         A.    The specific question that I asked was regarding

12    physical memory acquisition, and it was the Cellebrite.

13         Q.    You don't know -- what I was curious about was it

14    sounds -- it sounds almost experimental, like, you plug it

15    into a phone and see if it works or not, as opposed to, has

16    Cellebrite been used on a number of different 700Ws to see if

17    it can recover the data or it just isn't there?  Do you

18    understand my question?

19         A.    I believe I understand your question.  So what will

20    happen with a cell phone examination is you can look at a

21    reference table to see if it's supported or not.  And you

22    don't have that table memorized because it's just too many

23    cell phones to keep track of.  So when we receive a device,

24    we'll look it up on the table and see if it's supported.  Or

25    you'll be able to fire up the software before you even attach

26    it and see if a device is supported or not.

27              So in this instance, when you're doing the

28    examination, they were able to say, "Hey, this phone is not

1    supported for physical memory acquisition," without even

2    trying to do an acquisition.  It's not experimental.  It's

3    either it will work or it's documented and it's supported, or

4    it's not documented.

5         Q.   Sir, as a scientist, can you tell us any more about

6    the how and the why of memory banks being deleted other than

7    what you have already?

8         A.   I don't believe so.

9         Q.   And from the time that the cell phone came into your

10   possession, I'm assuming that the testing that you used was

11   non-destructive?

12        A.   What do you mean by "non-destructive"?

13        Q.   The software that you used would not have, itself,

14   made changes to what was existing on the phone in its memory?

15        A.   So that technically, for all forensic software with

16   cell phones with memory devices, when the device is powered

17   on, some change will be made.  And then depending on the

18   protocols that are used to acquire data from a cell phone,

19   sometimes some small amount of information does need to be

20   inserted on the phone to create a channel to acquire that data

21   back.

22        So any time a cell phone is turned on, some change

23   is being made.  So I can't say that I didn't make any changes

24   to the phone because once I turned it on, the clock changed,

25   things of that nature changed.

26        And it also -- you know, just where software is

27   stored, it could have possibly been -- physically been

28   reallocated by the operating system just to maintain maximum

1    efficiency for the phone.

2        Q.   Is there any chance that these messages could have

3    been deleted through the use of the software if, when you

4    attached it to the device, memory was reallocated?

5        A.   No, sir.

6        Q.   So if we're looking to determine why the information

7    about sent or received messages was not on the phone, it's not

8    through anything that you did in the testing process?

9        A.   No, sir.

10       Q.   In other words, you didn't do anything that would

11   have removed those messages?

12       A.   No, sir.

13       Q.   Can you think of anything else at this point that

14   can be done to this phone to attempt to determine whether or

15   not both sent and received messages are on it?

16       A.   As a witness, I can.  And you mentioned earlier that

17   you had a witness coming in from Palm.  And obviously, someone

18   who's employed -- in the employment -- or was in the

19   employment of Palm at that time will have significantly more

20   knowledge than any outsider could have.  There's proprietary

21   issues.  There's engineering design issues, software design

22   issues, that anyone outside would not have any knowledge of.

23   And your expert witness may possibly be able to acquire that

24   information based on his experience and connections, you know,

25   within the company.

26       MR. ROBERTSON:  Agent Ling, thank you.  You seem

27   impeccably honest.

28       THE WITNESS:  Thank you, sir.

```
 1              THE COURT:  Redirect?
 2              MR. ROSEN:  No.  None, Your Honor.
 3              THE COURT:  All right.  You can step down.
 4              MR. ROBERTSON:  Can you ask him not to be excused,
 5      however.
 6              MR. ROSEN:  He's coming back to testify for the
 7      trial, Your Honor.
 8              THE COURT:  You're not -- are you talking about for
 9      now?
10              MR. ROBERTSON:  I am.
11              THE COURT:  Where's your office?
12              THE WITNESS:  Menlo Park.
13              MR. ROBERTSON:  I'd like him to stay for the next
14      portion of the testimony.
15              THE COURT:  How long do you think your witness is
16      going to be?
17              MR. ROSEN:  I'm going to call Detective Frisby next.
18              THE COURT:  Is it going to be more than five
19      minutes?
20              MR. ROBERTSON:  No.  I'll be done before noon.
21              THE COURT:  You'll be done before noon?
22              MR. ROBERTSON:  With this witness, with Detective
23      Frisby.
24              THE COURT:  Okay.  How long does this witness have
25      to be here?
26              MR. ROBERTSON:  I would like him to remain here and
27      the testimony, depending on what comes out from Detective
28      Frisby, recall him.
```

1          MR. ROSEN:  Okay.  That's fine.  But at this point,

2     the People believe we have established a foundation to admit

3     the text messages.  That's what the purpose of the 402 was,

4     not to just cross-examine witnesses and so forth.

5          THE COURT:  We can have an offer of proof.  Do you

6     have an offer of proof that includes that something that law

7     enforcement did removed it.

8          MR. ROBERTSON:  We believe, yes.

9          THE COURT:  And who's going to testify to that?

10         MR. ROBERTSON:  Law enforcement that's here in the

11    courtroom.

12         THE COURT:  All right.  Well, what's the offer of

13    proof?  What's Detective Frisby going to say?

14         MR. ROBERTSON:  That it was not turned off.  That it

15    was used.  That it was scanned.  That messages were searched.

16    That the phone was not stored or preserved after it came into

17    their possession.  That it was over a period of hours, if not

18    days, it was shown to other witnesses in the case.  I base

19    this on my offer of proof just on what I see on the videotape.

20    I don't know what's on the tape of what they did and I should

21    be allowed to ask about that.

22         MR. ROSEN:  The People's response to that is I don't

23    understand how that's relevant to this inquiry.

24         MR. ROBERTSON:  It's crucially relevant.  Not only

25    am I concerned about the manner and method of the examination

26    of the phone, but if they didn't know what they're doing with

27    the phone, if they didn't preserve it -- and it sounds like

28    they didn't because they didn't package it the right way, and

1   from what I can see on the video, on the video they're

2   manipulating the phone, apparently pushing keys and buttons

3   and at various times showing it to other witnesses on the

4   video I don't know what they didn't do on the video.

5           THE COURT:  All right.  So you're saying that if

6   Detective Frisby is called to testify, he's going to say that

7   the phone was left on, that it was manipulated, shown to other

8   people, and what else?

9           MR. ROBERTSON:  I think that's enough to start with.

10  I don't know what else he's going to say 'cause I've never

11  asked him.  If you want me to go out in the hallway and

12  interview him for half hour --

13          THE COURT:  I just want an offer of proof.

14          MR. ROBERTSON:  That's all I can give you right now.

15          THE COURT:  All right.  Well, I don't see -- the

16  witness can stay or remain or can be called back.

17          MR. ROBERTSON:  We can call him back later after the

18  other witness --

19          MR. ROSEN:  Look, look, that's fine.  I want to move

20  this along so whatever the fastest way to do it.  We're giving

21  opening statements tomorrow.  I don't have any written motion

22  from Mr. Robertson on this issue, so that's why I guess we're

23  all a little bit in the dark about it.

24                          **402 HEARING**

25          THE COURT:  Let's hear from the witness.  Who are

26  you calling?

27          MR. ROBERTSON:  I'd like to call Detective Frisby.

28                      MATT FRISBY,

1             Being called as a witness on behalf of the
2             People, having been first duly sworn, was
3             examined and testified as follows:
4             THE WITNESS:  I do.
5             THE CLERK:  Detective, thank you.
6             THE COURT:  Good morning.  State your name and spell
7    your last name.
8             THE WITNESS:  Matt Frisby, F-r-i-s-b-y.
9             THE COURT:  Go ahead.
10                      DIRECT EXAMINATION
11            BY MR. ROBERTSON:
12       Q.   Detective Frisby, you're the lead investigator in
13   this case; correct?
14       A.   Correct.
15       Q.   And you've reviewed the evidence and the videos?
16       A.   Correct.
17       Q.   And during the course of your investigation, have
18   you determined that the cell phone that was provided by
19   Mr. Garcia was, in fact, used by members of law enforcement
20   with your department to be shown to other individuals?
21       A.   I don't have a recollection of that.
22       Q.   Really?
23       A.   Shown to other witnesses?
24       Q.   Absolutely.  That it was, in fact, shown to them and
25   manipulated in front of them.
26       A.   Are you referring to Detective Tada?
27       Q.   Well, anyone from your knowledge.  That's why I was
28   asking with your familiarity in your investigation.

1          A.    Without referring to the reports, my recollection is
2     that it was just Detective Tada and myself with Mr. Garcia
3     when we received the phone.  And then besides professional
4     staff, meaning analysts, I don't have an independent
5     recollection of that.
6          Q.    Just a moment.
7                Now, what did you do with the phone when you took it
8     from Mr. Garcia?
9          A.    It was booked into evidence, our evidence.
10         Q.    What did you do with it during the interview?

1       A.    During the interview?

2       Q.    Yes.

3       A.    It's all on video.

4       Q.    It is on video, but I'm asking if you remember what
5    you did.

6       A.    I think I asked him for a pass code.  He was kind of
7    showing me how it worked.  He kind of did a demonstration
8    himself of this is where this is, this is where that is.  I
9    informed him that we needed to take it to see what was on the
10   phone, and I didn't want him to change anything.  He may have
11   shown that phone to Detective Tada as we all sat in there.  I
12   would have to, you know, specifically look at the video again,
13   that portion to give any more detail than that.

14      Q.    You took the phone from him and never gave it back;
15   right?

16      A.    Yes.

17      Q.    So he never had control over that phone after you
18   took it from him?

19      A.    No.  It was during when he was explaining to me how
20   the phone works that he was manipulating it.  I was standing
21   behind him.  He was very reluctant to give me the phone.

22      Q.    Well, when you asked him for it, he took it out;
23   correct?

24      A.    He took it out and then he began to manipulate it,
25   and I explained to him we needed the phone to see what was on
26   it.  I came around the table and then he began to continue to
27   just kind of show me how the phone worked.

28              MR. ROBERTSON:  Your Honor, let me bring in my other

1    expert.  I have no questions from Detective Frisby.  I'm going

2    to want to play the video later.

3              THE COURT:  Any questions?

4              MR. ROBERTSON:  I believe it absolutely impeaches

5    Detective Frisby that it was just handed to him.

6              MR. ROSEN:  So Detective --

7              Yes, I have a couple questions for Detective Frisby.

8              THE COURT:  Go ahead.

9                         CROSS-EXAMINATION

10             BY MR. ROSEN:

11        Q.   Detective Frisby, so before you received the phone

12   from Paul Garcia, he manipulated it himself before giving it

13   to you?

14        A.   Yes, I believe so.  And then I moved around to the

15   other side of the table to watch what was going on.  Like I

16   said, that -- you know, it's almost three years ago.  I

17   haven't looked at that end of that portion of the tape for a

18   long time.

19        Q.   Okay.  And after taking the phone from Paul Garcia,

20   what did you then do with it when you got control of it?

21        A.   At that point, we would have put it in temporary

22   storage in the evidence room, and then I eventually gave it to

23   Sergeant D'Antonio to give it off to an analyst to analyze the

24   phone.

25             MR. ROSEN:  Okay.  No other questions.

26                        REDIRECT EXAMINATION

27             BY MR. ROBERTSON:

28        Q.   Anybody show that phone to Lorene Woodleaf?

1        A.    I think we interviewed a Lorene Woodleaf at Santa

2   Clara PD.  And I don't have a recollection of that.  Again,

3   that would be on video as well.

4        Q.    What's your testimony?  Do you remember or not that

5   it was shown to Lorene Woodleaf?

6        A.    I would say no.  I don't have a recollection of

7   that.  And like I said, it's been a long time, but that was at

8   Santa Clara Police Department.  All those were videoed.  I

9   don't have an independent recollection of it.  That would be

10  well after the time that you're talking about.

11            MR. ROBERTSON:  It would be.

12            Your Honor, if we could, I'd like to break now and

13  call the Palm expert and then come back this afternoon to play

14  the video.

15            THE COURT:  All right.  You can step down.  Call

16  your witness.

17            Deputy, could you tell Mr. Robertson that we're

18  waiting for the witness.

19            Sorry, you didn't ask for a continuance or a recess.

20            MR. ROBERTSON:  No, I didn't.

21            THE COURT:  All right.

22            MR. ROBERTSON:  In speaking with the gentleman from

23  Palm, it looks like Agent Ling is as good as it's going to

24  get, but they don't have any more access to information or

25  data or process than what's been presented to the Court, and

26  Agent Ling is correct in his representation about what type of

27  memory it is and how it works.

28            THE COURT:  So you don't have any additional

```
 1   witness?
 2              MR. ROBERTSON:  No, but I to want to play the video.
 3              THE COURT:  Well --
 4              MR. ROBERTSON:  Unless you don't --
 5              THE COURT:  Counsel, this is just a 402 so this is
 6   just to determine whether there's sufficient evidence to allow
 7   the witness to testify to this and to show this.  So
 8   without -- without some sort of evidence that the police did
 9   something or someone connected with law enforcement did
10   something, I don't see how I could preclude the People from
11   putting this on.
12              MR. ROBERTSON:  I think it's a chain of custody.
13   For example, if it was any other item, fingerprints or
14   something like that, if there isn't some demonstration of
15   chain of custody and proper caring for the item, that's where
16   the problems come up.  And so the item wasn't -- when you take
17   blood, when you take fingerprints, that kind of thing, they're
18   taken and you wouldn't, for example, take a fingerprint off of
19   a piece of -- or you wouldn't take the item and contaminate it
20   yourself, and that's what my concern is.
21              THE COURT:  Well, is there something on the video
22   that's going to demonstrate clearly that the officers did
23   something to the cell phone?
24              MR. ROBERTSON:  I think it's going to show that Paul
25   Garcia was no -- that he turned it over directly.  That he
26   didn't try to manipulate anything and that the officers did.
27              THE COURT:  That would only show that Detective
28   Frisby is incorrect in his recollection and would show -- it
```

```
 1    wouldn't show that the evidence has been corrupted.
 2              MR. ROBERTSON:  That's true.  It would show it
 3    wasn't preserved properly.
 4              THE COURT:  I don't know if it would show that.
 5    Then it would certainly go to the weight of the evidence.  But
 6    what you can do is --
 7              MR. ROBERTSON:  How about if I want to renew the
 8    objection just before there's testimony about it.  I'm --
 9              THE COURT:  Well, I think what I'm going to do at
10    this point -- as I said before, all motions in limine are
11    subject to further information.  At this point -- at this
12    point, is it submitted?
13              MR. ROBERTSON:  It is.
14              THE COURT:  At this point, the 402 demonstrates to
15    me that the People can, in fact, put this evidence on.
16              MR. ROSEN:  Thank you, Your Honor.
17              THE COURT:  So the motion to exclude it is denied.
18              THE CLERK:  Is Agent Ling, then, excused?
19              THE COURT:  He's excused if he wants to go.
20              MR. ROBERTSON:  But subject to recall during the
21    trial.
22              THE COURT:  Well, yeah.  You said you had a couple
23    of motions that you wanted to raise?
24              MR. GILLAN:  I do.  I don't think I'm the only one.
25              THE COURT:  Are any of them involving testimony?
26              MR. GILLAN:  No.
27              THE COURT:  Okay.
28              MR. ROBERTSON:  I don't think we'll need testimony.
```

1    I have concerns about two parts.  One, Your Honor, the first
2    motion has to do with asking the Court to limit and control
3    the nature and length of opening statements.  And I would ask
4    the Court to consider the language in *People versus Armstead*,
5    that's at 102 CalApp. 4th, 784.
6          THE COURT:  Well, I'll just say that I think the
7    Court does have the authority to limit those.  What is it that
8    you think -- what do you think is the appropriate limitation
9    and why in this case?
10         MR. ROBERTSON:  Well, if I spent a little bit of
11   time going back over every case, I could find -- and
12   generally, they all stand for the same proposition that an
13   opening statement is to outline either one or both sides of
14   the case to the jury.  And there are a couple of cases that
15   talk about difficulties that come up when either matters that
16   are later not admissible or not approved or can become
17   inflammatory in front of the jury.
18         And in front of Mr. Rosen, and I think the Court may
19   have, is a stack of, I'm guessing, about 100 pages of exhibits
20   that I understand Mr. Rosen wants to use and display to the
21   jury during his opening statement, and I think it's
22   inflammatory.  I think under the Court's inherent authority
23   under 128 or otherwise, you can limit it.  And not only are
24   they numerous, but I think some of them are inflammatory in
25   that they show pictures of a body that has not only been shot
26   but is in various terms -- forms of examination in the
27   coroner's office with sticks protruding from the body, shoved
28   through the arm, that I don't think the jury necessarily needs

1    to see at any point.

2           I don't have a problem with Mr. Rosen telling the

3    jury that there's evidence that Mr. Achilli was shot.  That he

4    may have been shot at close range, but, Your Honor, either he

5    can make the case through evidence or not.  There's no reason

6    to try the entire case in front of them and lay out all the

7    photographs and exhibits.

8           I think it becomes unfair and an imbalance and

9    prejudicial, so I'd like it limited both in terms of time and

10   the material that's used.

11          THE COURT:  Well, you're kind of asking me to limit

12   him, but I mean, are there specific photographs that you think

13   are particularly inflammatory that you can show me?

14          MR. ROBERTSON:  Yes.

15          THE COURT:  And I can hear from Mr. Rosen as to why

16   he needs it, how many of these photos or documents he's going

17   to want to use in the opening statement.

18          MR. ROBERTSON:  I can.  To start with, there's a

19   whole number of photos of the crime scene with a body in it

20   and it's just kind of walking up to the body.  None of them

21   show a whole lot different.  One of them would be more than

22   necessary to show the body at the crime scene.

23          THE COURT:  Mr. Rosen, how many photographs do you

24   intend to use during the opening statement?

25          MR. ROSEN:  Of the crime scene?

26          THE COURT:  Well, let's start with the crime scene.

27          MR. ROSEN:  Of the crime scene, immediately around

28   the area of the body, there's maybe 15 or 20 and they're from

1    different angles.

2              THE COURT:   And why do you need so many?

3              MR. ROSEN:   Well, let's just take a step back.

4    There are probably, you know, 1500 photographs taken in this

5    case.   And I've narrowed this down to perhaps 100 photographs.

6    I don't even know if it's that many photographs.   What I'm

7    trying to show the jury is the orientation -- the orientation

8    of the crime scene, because they're going to hear testimony

9    from witnesses about where they saw Mr. Estrada walking, what

10   area he was walking in, where he went afterwards.   And then

11   we're also going to be showing the jury pictures of where the

12   evidence was found and so it helps to orient them, you know.

13             THE COURT:   How many of the photographs actually

14   have the body depicted?

15             MR. ROBERTSON:   25.

16             THE COURT:   Of the 15 or so.

17             MR. ROSEN:   Judge, I'm happy to let the Court, you

18   know -- I gave to each defense counsel basically the opening

19   statement in terms of photos and exhibits that I intend to

20   introduce.   I'm happy to let the Court look at those and

21   listen to specific objection -- the Court listen to specific

22   objections as to this photo or that photo, so I don't know

23   what the best way to proceed is.

24             I can tell the Court that I didn't prepare this to

25   say, like, "Well, here's 100 photos but I really only want to

26   get in 50 so I'm going to show the Court 100 because I'm sort

27   of, like, negotiating and bargaining about this."   I'm not.

28   I'm happy to have the Court look at this, and if Counsel has

1    specific objections to photos, I'm happy to explain why that

2    photo is relevant to the jury.

3              THE COURT:  Right.  But it could be the specific

4    photograph, but it could also -- as Mr. Robertson is arguing,

5    it could be that you can show it in ten photos and it's unduly

6    prejudicial at opening statement point to show 50 instead of

7    ten.  I don't know, frankly, how you're going to get through

8    hundreds and hundreds of pages of documents in two hours.

9              MR. ROSEN:  I think we're all going to find out.

10   But I'm confident the opening statement will be about two

11   hours.  Judge, there's three defendants on trial for murder

12   and an investigation that stretched from Los Gatos to Southern

13   California, and took weeks to put together.  There's a lot.

14             THE COURT:  Well, I think in order to do this,

15   Mr. Robertson, you need to do it a little more organized.  So

16   you come back at 1:30 and advise the specifics of what you

17   think should be excluded and I can deal with that.  But it's

18   sort of -- right now, you're just saying, "Well, cut him off."

19             MR. ROBERTSON:  I'm saying two things, reasonable

20   length.

21             THE COURT:  Yeah.  Well, he's indicated two hours,

22   and I think that that's not unduly excessive in a case of this

23   type.  So he gets his two hours.

24             MR. LEININGER:  Judge, can I give you an idea

25   because I've already numbered these.  There's 12 shots of

26   Mr. Achilli's body under a body bag on the carport.  Now, I

27   think that's the issue that we have to argue as to whether or

28   not that's inflammatory or not inflammatory.  There's the one

```
 1    autopsy shot of a pink tube going through his arm showing the
 2    fact that it was a wound through his arm.
 3             There's multiple photographs in here of the body,
 4    both in the autopsy and on the thing, and I'm just telling you
 5    there's a number of them, and my argument to Mr. Rosen is
 6    going to be, "Why do you need so many of them?" but that's
 7    really an issue of what you're going to accept as being -- the
 8    jury's going to be inflamed or not inflamed by it.  I mean,
 9    you heard the voir dire and what we're dealing with here.
10    That's all I'm concerned with.  That said, these pictures,
11    size-wise, are fairly small.  So that, I think --
12             MR. ROBERTSON:  I think the intention is to use the
13    projector and put them up in a huge display in front of the
14    jury.
15             THE COURT:  I'm sure they'll be bigger on the
16    screen.
17             MR. ROSEN:  And the photos of the body are all
18    covered.  There's a couple photos that before the paramedics
19    covered the body.  I'm happy to let the Court look at it.  You
20    know, when someone's murdered, it's ugly.  And that's what the
21    crime is.  So --
22             THE COURT:  All right.  We'll take it up at 1:30.
23             MR. ROBERTSON:  We have them pulled out, but does
24    the Court have -- I think Mr. Rosen gave the Court --
25             THE CLERK:  We did not receive a copy.
26             THE COURT:  All right.  I'll take a look.  And
27    you're intending to use this stack that you just gave to the
28    clerk?
```

```
 1              MR. ROSEN:  Yes.

 2              THE COURT:  During the opening?

 3              MR. ROSEN:  Yes.

 4              THE COURT:  All right.  I'll try and take a look at

 5    it.  Why don't you come at 2 o'clock this afternoon.

 6              MR. ROSEN:  That's fine.

 7              THE COURT:  And that will give me a little bit of

 8    time to look at this.

 9              Counsel, is there a stipulation that Court Exhibit 1

10    can be returned to the People for safekeeping?  Very well.

11    Thank you.  Agreed, Mr. Gillan?

12              MR. GILLAN:  Absolutely.

13              THE COURT:  And Mr. Leninger?

14              MR. LEININGER:  Absolutely.  At least we know where

15    it is, anyway.

16              THE COURT:  I'll see you guys at 2.

17              (WHEREUPON THE LUNCHEON RECESS WAS TAKEN).

18              THE COURT:  Good afternoon.  All the attorneys and

19    defendants are present.

20              All right.  I'm ready for -- I've looked through

21    them briefly, but I'm ready, at this point, Mr. Robertson, if

22    you have any -- or anyone else who wants to start.

23              Mr. Robertson, why don't you go first.

24              MR. ROBERTSON:  Your Honor, with -- there are

25    pictures that depict Mr. Achilli at the scene before anybody

26    arrives there.  There are two of them; one shows an officer

27    standing over him and the paramedic.  I would not have

28    objection to that one coming in, but the one that shows him
```

1    fully clothed, laying on his side with a bloody area to the
2    rear I'm concerned about and it's not necessary.  If the
3    reason is to show that there was a deceased person they
4    responded to, what he was wearing, and his location, one
5    photograph adequately establishes that.
6            I don't have any problem with the California
7    driver's license photograph.
8            THE COURT:  Let me just make a note of the ones
9    you're objecting to.  Okay.
10           MR. ROBERTSON:  There is a series of photographs
11   taken of the parking lot area, and the ones that I'm
12   specifically referring to --
13           THE COURT:  With the red car in the foreground?
14           MR. ROBERTSON:  Yes, Your Honor.
15           THE COURT:  All right.
16           MR. ROBERTSON:  And I don't have an issue if, for
17   example, the one from the distance with the red car and the
18   one that is most close-up is desired to be referred to, but
19   those two accomplish everything.  The one that shows the
20   deceased on his back with an IV bag and bloody hand and his
21   hands, I don't see the relevance of that.  What is in that
22   photograph is depicted in the one immediately before.  You can
23   see the IV bags, and, in fact, you can actually see more in
24   that one, but you don't see the bloody hand.  So I would
25   object to the one with the bloody hand.
26           So the two photographs that stand to be reasonable
27   is number one, from a distance with the red car and the one
28   that's most close that does not have the bloody hand in it.

```
 1              THE COURT:  That just shows the white car.

 2              MR. ROBERTSON:  Yes, it just shows the white car

 3    which can be seen in the one before.  And then I don't have

 4    any problem with the photographs that I expect testimony that

 5    would demonstrate of Mr. Achilli's front door with crime scene

 6    tape.

 7              THE COURT:  Okay.

 8              MR. ROBERTSON:  I don't have an objection to the one

 9    photograph taken at ground level from the stairs that shows

10    Mr. Achilli's body with a red cone and an overhead tent.  I

11    think that's appropriate because there'll be some testimony

12    about some dew and a need to preserve the crime scene because

13    of possible moisture coming down.

14              THE COURT:  Okay.

15              MR. ROBERTSON:  If he wants to use the next

16    photographs on the stairs with the crime scene tape, no

17    objection.  But then there's another series of photographs

18    with the body, about five of them, and the first one that I

19    would not -- I have an objection to it, but I think there's a

20    reason for it, and it shows the deceased on his back.  It does

21    show the bloody hand which I don't like, but it shows circles

22    on the ground which are going to be shown in the physical

23    evidence and the tarp.  There's no reason to bring in the

24    remaining five more photographs that show essentially the same

25    thing, which -- all of which show Mr. Achilli deceased and the

26    general layout.

27              THE COURT:  Okay.

28              MR. ROBERTSON:  I don't have an objection to the one
```

 1   photograph which shows looking back out towards Mr. Achilli's
 2   body.  It shows the clothing that was apparently removed from
 3   him, but bags in -- evidence drawings that depict where
 4   certain items of evidence were found and where his body was
 5   first located against the wall.
 6        I think that following up with six more photographs
 7   of the same area and the body isn't necessary.  The idea that
 8   there is physical evidence seen there can be communicated
 9   through any one of the three or four, but there's no need to
10   go through all the photographs and each individual item that's
11   going to be established to the jury through the crime scene
12   officers.
13        Starting with the next items, I have no objection to
14   the photographs that show spent shell casings and apparently
15   has a spent projectile.
16             THE COURT:  Okay.
17             MR. ROBERTSON:  As to the autopsy photographs, I
18   don't think that any defendant in this case is going to raise
19   an issue about the fact that Mr. Achilli was killed.  He was
20   killed as a result of gunfire.  That gunfire resulted in his
21   death, and that it was probably close range.  That's not going
22   to necessarily be contested.
23        And I think I speak for -- I'd like to know if
24   there's any disagreement on that -- because with the
25   understanding, it's not necessary to bring in any photographs
26   of the body, but if Mr. Rosen feels he needs to bring in one
27   to show that an autopsy was done, then two, maybe three would
28   accomplish, certainly, the same thing.

 1            But it's not going to be, at least on behalf of
 2    Mr. Garcia, a litigated issue, whether or not, how the death
 3    occurred, the result of gunfire, or the cause of death.
 4            THE COURT:  Okay.
 5            MR. ROBERTSON:  As to the evidence found near the
 6    crime scene, there is a whole series of maps, and one of my
 7    concerns about bringing in the entire series of maps is that
 8    if they're going to be shown to the jury as part of an opening
 9    statement, I don't know what Mr. Rosen's intent is, but you
10    could literally talk for 45 minutes or an hour about each one;
11    and in the absence of some detailed explanation, it doesn't
12    seem necessary to bring in virtually each and every one of
13    those maps.
14            I don't feel all that strongly about that, but in
15    the interest of time, I'm a little concerned.
16            And then the remaining photographs, Your Honor, I
17    don't have much objection to except in the interest of time.
18    It's finding the weapons, the gun, and other items.  And then
19    there's another series of maps.  I do have --
20            THE COURT:  Are you still in the evidence found near
21    the murder scene?
22            MR. ROBERTSON:  Yes.  And I'm prepared to pass on
23    from that and go to other photographs and evidence.  I don't
24    care about Paul Garcia's computer's records and obsession.
25            I object to the jury being shown --
26            THE COURT:  Go ahead.
27            MR. ROBERTSON:  I object to the jury being shown
28    anything which has argument in it, and certainly this

1   statement:  "His computer records show his obsession with

2   Tessa," is an argument.

3           THE COURT:  Are you talking about the e-mails now or

4   the texts, I guess?

5           MR. ROBERTSON:  Correct.

6           THE COURT:  The ones in yellow with the --

7           MR. ROBERTSON:  Yes.

8           THE COURT:  Under phone records showing obsession?

9           MR. ROBERTSON:  Yes.

10          THE COURT:  All right.  Actually, there's nothing

11  really there.  It's the one, two -- text messages to Joey

12  Battiato.

13          MR. ROBERTSON:  I'm talking about, Your Honor,

14  there's one that says, "Paul Garcia's computer records --"

15          THE COURT:  Oh, yeah.

16          MR. ROBERTSON:  "-- showing his obsession."

17          THE COURT:  Yes.  Okay.  Which ones are you

18  objecting to?

19          MR. ROBERTSON:  I'm objecting to the jury being

20  shown a slide that has argument on it.  And that statement

21  that, "Paul Garcia's records show his obsession with Tessa,"

22  is a straight-up statement of argument.

23          THE COURT:  I see what you're saying.  I gotcha.

24          MR. ROBERTSON:  And then the computer records, I

25  don't really care about those.  If Mr. Rosen wants to talk

26  about those, I don't have an objection.  But the page which is

27  in yellow and blue, I'd ask to have removed and not shown.

28          And the same thing --

1          THE COURT:  There are about a thousand pages here
2    with blue and yellow.
3          MR. ROBERTSON:  These pages here, which are the ones
4    that are not evidence.
5          THE COURT:  The title pages.
6          MR. ROBERTSON:  The title pages which make claims of
7    obsession.
8          THE COURT:  Okay.
9          MR. ROBERTSON:  You cautioned us specifically you
10   didn't want us getting into argument.
11         THE COURT:  No, I'm just making a note.  I
12   understand the objection.
13         MR. ROBERTSON:  Labeled "Paul Garcia text messages
14   to Joey Battiato."  I think they are what they are.  I don't
15   have a big objection about those coming in.  I've already made
16   my 402 objection and I'll renew that later on.
17         THE COURT:  All right.
18         MR. ROBERTSON:  And then again, the label with the
19   blue page with yellow print and this one says, "Paul Garcia's
20   text messages shows obsession with Tessa Donnelly."
21         THE COURT:  Right.
22         MR. ROBERTSON:  And again, Your Honor, I want to
23   restate my objection that it's only half of the conversation
24   that's coming in.  That, I think, is misleading.  That -- I
25   think that it doesn't allow for the entire context of the
26   conversation.  Much of it is not remembered by the witness or
27   speculated.  I think when one party tries to bring in half of
28   a conversation or part of it, the Evidence Code, I think, and

1    the case law says the jury's entitled to hear the whole

2    conversation; and absent compelling my client to testify,

3    that's not possible.  And for whatever reason that we contend

4    is not the fault of Paul Garcia, those messages are not on the

5    cell phone; his part of it isn't.

6              THE COURT:  All right.

7              MR. ROBERTSON:  Then turning again -- there's a blue

8    sheet with statements.

9              THE COURT:  I'm not on that.

10             MR. ROBERTSON:  And it says, "Evidence elicited that

11   he paid for the murder."  I object to that characterization.

12   It's argument.

13             THE COURT:  One second.  Okay.  Next one?

14             MR. ROBERTSON:  And then after that is a whole

15   series of pages, one starting with Joey Battiato.  Another one

16   after that with Daniel Chaidez.  Another one with Daniel

17   Chaidez.  And objection because those arguments seems to be

18   the effectiveness -- and the only reason the prosecution is

19   trying to do it this way, to print it up and put it up on the

20   big screen, is to have an emotional and psychological impact

21   on the jury.  It can be communicated without doing it this

22   way.

23             And if he's going to say someone will testify to

24   this effect, that's one thing, 'cause he can say what a

25   particular witness says but to lump it together and say it

26   like this is improper opening statement.

27             I don't have a problem if he wants to use the one

28   Daniel Chaidez plea agreement.

```
 1              THE COURT:  All right.

 2              MR. ROBERTSON:  The phone records label is not

 3    controversial.  It says what it is, but within it is a series

 4    of exhibits and I think Mr. Rosen will be entitled to use

 5    these.

 6              THE COURT:  Okay.  Are you doing computer records

 7    now?  Are you on computer records?

 8              MR. ROBERTSON:  Yes.  Now, after Paul Garcia

 9    computer records, in order --

10              THE COURT:  I just have a question.  I have,

11    "Computer records" and the very next page is:  "Paul Garcia's

12    computer records."  Is that one of those both stay?

13              MR. ROBERTSON:  I don't care.

14              MR. ROSEN:  It's a typo.

15              THE COURT:  Do you want to pull one of them?

16              MR. ROSEN:  Sure.

17              THE COURT:  Which one?

18              MR. ROSEN:  The one that just says "Computer

19    records."

20              THE COURT:  Okay.  Fair enough.  All right.

21              MR. ROBERTSON:  Now, after the statement, that blue

22    sheet that says, "Paul Garcia's computer records," there are

23    two records which I am going to establish that were extracted

24    from a computer that will be attributed to Paul Garcia;

25    however, after that is a series of photographs, none of which

26    allegedly came from his computer.  None of which will there be

27    any evidence that came from his computer.  In fact, the

28    contrary.  And there's a picture of the deceased on a crumpled
```

1   up piece of paper which I believe was found at the crime

2   scene, and I don't think Mr. Rosen will be able to offer any

3   testimony to link that to his computer or printer.

4        THE COURT:  I don't know.  We'll wait and see on

5   that one.  Okay.  And you're talking about those three

6   exhibits that have the photograph?

7        MR. ROBERTSON:  Yes.

8        THE COURT:  All right.

9        MR. ROBERTSON:  One of them, which has the

10  photograph, Your Honor, which is not torn and not crumpled up,

11  I believe, was the evidence that will show that it was

12  properly extracted from Paul Garcia's computer.  And I'm not

13  going any further into that.

14        THE COURT:  The first one?

15        MR. ROBERTSON:  When I say "Paul Garcia's computer,"

16  the one that was attributed to him.

17        THE COURT:  Okay.

18        MR. ROBERTSON:  I need to have a brief 30-second

19  conference.

20        THE COURT:  Okay.

21        (SIDEBAR).

22        THE COURT:  We'll go back on the record.  Which one

23  are you on now?

24        MR. ROBERTSON:  I was just going to clarify -- and

25  when I refer to certain items or computers, for example, like

26  the computer that I referred to as Paul Garcia's, that's the

27  language that police used.  I'm not getting farther in the

28  foundation or the relevance matters on that.

```
 1              THE COURT:  Fair enough.  So what page are you on?

 2              MR. ROBERTSON:  "Paul Garcia's financial records."

 3              THE COURT:  Did you skip over Daniel Chaidez's

 4      computer?

 5              MR. ROBERTSON:  I did.  That's his business, Your

 6      Honor.

 7              THE COURT:  All right.  I'm with you.

 8              MR. ROBERTSON:  And then as to the pages of

 9      "Garcia's financial records," I think that there's no reason

10      to put in writing this label "Paul Garcia's financial records"

11      I'm not concerned about.  But laying out again in writing,

12      there's no reason to put that up there.  That's argument and

13      the documents that are attached speak for themselves.  There's

14      no reason for Mr. Rosen to be able to make argument in his

15      opening statement.

16              As to the financial records he's referring to, we're

17      not stipulating to their admissibility or foundation issues.

18      And the same thing, there is another one with these yellow and

19      blue leaders with the blatant argument on, "Paul Garcia's bank

20      records corroborate Daniel Chaidez."  I object to that.

21              THE COURT:  All right.

22              MR. ROBERTSON:  And I think the rest of the exhibits

23      pertain to the remaining defendants.

24              THE COURT:  All right.  Aside from the ones that

25      Mr. Robertson has gone through, Mr. Gillan, do you have any

26      that you want to specifically point out to the Court that you

27      want to object to?

28              MR. GILLAN:  No, Your Honor.  And, in fact, quite
```

1    honestly, I don't join in Mr. Robertson's request because I
2    think that my reading of what the law is is that if you can
3    say the evidence will show and then everything else is written
4    out, it's proper opening statement.
5            THE COURT:  Right.  No.  I'm just asking if you have
6    anything else.  I'm not asking for argument.
7            MR. GILLAN:  No, I'm not.  I'm not joining.
8            THE COURT:  Got it.
9            Mr. Leninger?
10           MR. LEININGER:  Judge, I only have two observations.
11   One is -- and I don't know what Mr. Rosen intends to say with
12   any of these pictures, so obviously his intent for introducing
13   them would have some bearing.  But, I mean, I think the
14   overall rule here is that the relevancy of these things must
15   be tempered with their potential for their shock value.  And
16   the only one that seriously bothers me from a shock point of
17   view is the one autopsy with the pink straw or pink whatever
18   it is going through the arm.  And I don't know.  I mean, we've
19   already got lots of bullet holes and lots of pictures of the
20   homicide scene pretty well depicted, in my view.
21           That was one that just personally bothered me when I
22   looked at it.  So I figured if it bothered me -- and I've done
23   a number of these -- maybe it bothers them too.
24           But again, I would really -- that's the only one
25   that I think that fits the rule about shock value.  But other
26   than that, I think there's tons of pictures in here about the
27   map, the escape map, who lived where and who did what, and so
28   forth.  But that's Mr. Rosen's option, in my view, to do what

1    he wants to do with those.  I won't argue that.

2                THE COURT:  All right.  And before I get to

3    Mr. Rosen, I would note that I counted 166 -- we removed one,

4    so 165 pages, so it's about 45 seconds per page, if you wanted

5    to go evenly, but that's up to Mr. Rosen.  I want to take

6    these and I'll try to get them in some sort of order.

7                The first one is the depiction of the victim with no

8    officers, the very first photograph or second -- yeah, first

9    photograph.  My tentative would be to deny the objection or

10   overrule the objection on this.

11               Did you want to have anything to say, Mr. Rosen?

12               MR. ROSEN:  No, Your Honor.

13               THE COURT:  The objection of that is overruled.

14               All right.  Next, Mr. Robertson objected to the

15   series of photographs, the first one with the red car in the

16   foreground, and then proceeding up to the one with all the

17   tape coming from that fence, there's a portion of the fence.

18   You know which one I'm talking about?

19               MR. LEININGER:  Yes.

20               THE COURT:  Stopping before this picture.

21               MR. ROSEN:  Stopping before that one.  Okay.

22               THE COURT:  It's the other -- the group of the crime

23   scene.  Now, obviously the body's been moved for these

24   photographs; correct?

25               MR. ROSEN:  Yes.

26               THE COURT:  Okay.  The objection is that there are

27   too many, and I got a specific objection to the one in which

28   the left hand of the victim is visible.

```
 1              Did you want to comment, Mr. Rosen?

 2              MR. ROSEN:  So there's five photos that we're

 3     looking at; is that right?

 4              THE COURT:  We're looking at one, two, three, four,

 5     five photos.  He specifically said, if I got it correctly, he

 6     was not raising an objection to the photograph with the body

 7     in the middle right with the picture, before the -- the fourth

 8     picture in that series, if you count the first one being the

 9     red car in the foreground, count one, two, three, four, the

10     fourth picture he's not objecting to.  And he thinks that the

11     others are -- there are too many.

12              MR. ROSEN:  The reason I have these photos is to try

13     to give the jurors a perspective of what this area looks like

14     as you're walking towards where the victim's body is under the

15     yellow tarp.  And that's the purpose of showing, you know,

16     these five pictures.  The pictures, specifically the last one

17     in the series, No. 5, where the victim's hand is outside of

18     the body bag, that has a good view of the shell casings which

19     are circled to the left of the white Acura, and those are the

20     shell casings from the murder weapon.

21              So, you know, I think I would be more sympathetic to

22     the defense's view if the body was not basically covered.  But

23     then I would understand this, oh, these are so gory, they're

24     so this.  But the fact is, Your Honor, there's two photos that

25     we've shown -- putting aside the autopsy photos for a moment,

26     there's only two photos we've shown of the victim at the scene

27     uncovered.  Everything else is covered.  And I think that

28     helps to mitigate any kind of inflammatory reaction from the
```

1    jurors.  So --

2                THE COURT:  Submitted?

3                MR. ROSEN:  Submitted.

4                THE COURT:  I do not believe that these photographs

5    are unduly prejudicial or inflammatory and the objection's

6    overruled.

7                The next one that I have is -- it's after the

8    picture showing the stairwell, and it's a picture with the

9    victim's body in the foreground -- or actually, there's a

10   yellow -- red cone, orange cone in the foreground, and you can

11   see the white car to the right.

12               MR. ROSEN:  Can you just hold up the photo for a

13   moment, Your Honor, that you're looking at.  Okay.  That's

14   fine.  I got it.

15               THE COURT:  Is everybody with me on that?

16               MR. ROSEN:  I thought Mr. Robertson didn't have an

17   objection to this one.

18               THE COURT:  Did you not have an objection to this

19   one?

20               MR. ROBERTSON:  I do not.

21               THE COURT:  Sorry.  I wrote down you did.  All

22   right.

23               Next one is -- it's the close-up photograph of the

24   area where the body was found with the clothing in the center

25   of the picture.  And there's one, two, three, four -- four

26   pictures -- five.  Wait, six pictures before you get to the

27   one with the seven and eight marking.  Do you have those?

28               MR. ROSEN:  I think so, Your Honor.

1    THE COURT:  This is the first one and they go up to
2    this.
3        MR. ROSEN:  Okay.  Just one moment, Your Honor.
4        THE COURT:  I wish I would have numbered them now.
5        MR. ROSEN:  Let me just -- if the Court doesn't
6    mind, let me just take a look at them for a second and square
7    them up with mine.  Thank you.
8        THE COURT:  And in regard to these six photographs,
9    the objection is that there are too many and that there are
10   other pictures which depict the evidence photographs.  Do you
11   want to respond?
12       MR. ROSEN:  Yes.  I think the first picture shows
13   evidence item 7, 8, 9, 13, and 18.
14       The second photo, I think, can be removed because it
15   shows the subset of that, just 7, 8, 9 and 13.  But everything
16   that's on the previous photo is --
17       THE COURT:  And 12 is in there as well, by the way.
18       MR. ROSEN:  Yes.  Yes.
19       THE COURT:  So you're withdrawing this one?
20       MR. ROSEN:  The second one, yeah, I'll withdraw
21   that.
22       THE COURT:  So that one will not be.
23       MR. ROSEN:  And then the next photo also depicts 10
24   and 11 --
25       THE COURT:  Okay.
26       MR. ROSEN:  -- which is different.  The following
27   photo -- I think the following photo can be removed.  I don't
28   think that's in there.

```
1              THE COURT:  The one with the --
2              MR. ROSEN:  Taillights of the white car.
3              THE COURT:  Taillights showing.  You're withdrawing
4      that?
5              MR. ROSEN:  Yes.
6              THE COURT:  Okay.
7              MR. ROSEN:  And the last one, I think, puts it all
8      in perspective, so I think that one accurately -- you know, it
9      has exhibits -- evidence items that aren't marked and other
10     ones like No. 6, so I object to removing that.
11             THE COURT:  The objection's overruled.  They're not
12     unduly inflammatory.
13             The next one is the objection -- is to the autopsy
14     photo with the pink rod.
15             MR. ROSEN:  The People don't have another -- first
16     of all, the People have one photo with a rod in it.  And when
17     the coroner explains the path of the bullet, this photo
18     illustrates how one bullet made an entrance wound and an exit
19     wound and that's the purpose of putting the pink rod through.
20     It also shows the trajectory of the shot, so I think it's
21     information --
22             THE COURT:  Is there going to be some relevance to
23     the trajectory itself?
24             MR. ROSEN:  I think what the coroner's going to
25     testify about is the eight shots, first of all, where they hit
26     the victim's body, the direction of the shots, front to back
27     or back to front.  Most of the shots are back to front.
28     And --
```

1          MR. ROBERTSON:  I'm sorry, Jeff.  Did you say most
2    of the shots were back to front?
3          MR. ROSEN:  I think so.  And the direction and
4    angles of the shots, there will be testimony about it.  So
5    that's why I think the photo is helpful.
6          THE COURT:  I'm going to -- I'm just going to rule
7    that you can't use the one with the pink rod in the opening
8    statement.
9          MR. ROSEN:  Okay.
10          THE COURT:  You can use it subsequently, if
11    necessary.
12          MR. ROSEN:  Okay.
13          THE COURT:  All right.  The next one is the group of
14    maps.  Now, clearly there are a lot of maps.  I don't see
15    anything inflammatory about them.  I mean, unless there's some
16    error with regard to the flags and the identification of items
17    on the photographs, I think that they can be used, so the
18    objection's overruled.
19          Now, we go down to the next one, which is the title
20    page with the word "obsession" in it.
21          MR. ROSEN:  Let me get to that page, Your Honor.
22          THE COURT:  It's down quite a ways, Counsel.
23          MR. ROSEN:  The one "evidence that defendant Paul
24    Garcia was obsessed with Tessa"?
25          THE COURT:  No.  This one.
26          MR. ROSEN:  Oh, computer records?
27          MR. LEININGER:  The phone records.
28          THE COURT:  No, computer records.

```
1            MR. LEININGER:  I'm sorry.

2            MR. ROSEN:  Okay.

3            THE COURT:  All right.  I take it from discussions

4   that we've had that the People's position is that this

5   obsession, alleged obsession, is what is the motive for the

6   killings?

7            MR. ROSEN:  Correct.

8            THE COURT:  Mr. Robertson, I suppose that the word

9   "obsession" is technically not an evidentiary comment, but I

10  think that since it's the motive, as long as -- if he prefaces

11  it that this is a motive as opposed to a fact, I'm going to

12  allow it.

13           MR. ROBERTSON:  It would be alleged.  I mean, we

14  have a huge dispute about whether or not he was obsessed.

15           THE COURT:  I know.  But he gets to present his side

16  of it.  I don't think that the fact that -- I mean, the fact

17  is that he's arguing that this -- or his presentation of the

18  evidence is to demonstrate this motive.  And I think he can

19  present that to the jury as the motive.  I don't know how else

20  he would describe the motive -- any motive is technically

21  argument; right?

22           MR. ROBERTSON:  Certainly.  But there's a way to

23  communicate it without putting up a sheet that I think it's

24  much more significant to allow him to use a sheet that states

25  that.  It doesn't state it's an alleged motive, or it doesn't

26  state -- it just says, "His computer records show his

27  obsession with Tessa."  That is a straight-up argument

28  statement.
```

```
 1              THE COURT:  All right.  I understand the argument.
 2    I'm going to overrule it.  I don't think that it's overly
 3    prejudicial.  And I'm certainly cognizant of making sure that
 4    an opening statement doesn't contain argument, but I really
 5    don't see how he can do that.  He needs to preface it that
 6    it's a motive -- that the evidence is going to show a motive.
 7              MR. ROBERTSON:  Is there any reason at all to allow
 8    having -- here's my concern, so I can be real clear about it.
 9              The rest of the exhibits, if you're going to let him
10    put them up, these show specific items of physical evidence.
11    But it's a sneaky way to take your statement and slip it in
12    with the physical evidence which gives it a different nature
13    and characterization, a different import in the words.
14    There's no reason that this particular piece of paper has to
15    be couched or put in a list of documents or exhibits.  There
16    isn't a reason for that, except to put it in and be able to --
17              Your Honor, everybody knows that communication is
18    much more than just verbal, that more than 50 percent is
19    visual.  And the impact of allowing the Government to use this
20    statement that's straight-up argument which says, "Paul
21    Garcia's computer records show his obsession with Tessa," and
22    to split them in with exhibits he's going to use is unfair.  I
23    think it's highly prejudicial.  We do not admit that there was
24    an obsession, and yet by putting this up, he gets to flash
25    this along with the other pieces of evidence, and I don't
26    think that's fair, and there's no reason to do it.
27              He doesn't need that for his case.  He doesn't need
28    it for an effective opening statement.  He can communicate
```

1    that.  But to allow this piece of paper to slide in with

2    physical evidence items gives this piece of paper an import, a

3    meaning that it shouldn't have.

4              THE COURT:  Mr. Rosen, do you want to respond?

5              MR. ROSEN:  Yeah.  The purpose of that piece of

6    paper, along with the other pieces of papers, is I'm

7    sign-posting what I'm doing so the jury can follow along with

8    my opening statement.  And our position is that the evidence

9    shows that Paul Garcia's phone records are one piece of many

10   pieces of evidence that illustrate his obsession with Tessa.

11   So that's what our theory of the case is.  I understand the

12   defense has a different theory.  But this is what our evidence

13   is going to show.

14             And basically, the slides I have that are text are

15   sort of introducing each type of evidence, 'cause as the Court

16   made note earlier in this presentation, I sort of laid out

17   what's going to show us -- what's the evidence going to be

18   about Paul Garcia's motive or obsession in this case?  It's

19   going to be witnesses.  It's going to be phone records.  It's

20   going to be computer records.  It's going to be financial

21   documents, so that's --

22             And then as I get to each one of those kinds of

23   pieces of evidence:  Witnesses to Paul Garcia's obsession,

24   phone records to his obsession, computer records to his

25   obsession, it's sort of -- I've outlined it for the jury.

26             So I think it's -- I think it does make the opening

27   statement more effective in that it enables the jurors to

28   follow along with what I'm showing them.

1          MR. ROBERTSON:  Your Honor, I wouldn't have an

2     objection if it just said "Paul Garcia computer records."

3     That is a sign post, but to add the other language as part of

4     a list of evidentiary exhibits is wrong and unnecessary.

5          THE COURT:  You're saying that he can say that the

6     phone records show the obsession?

7          MR. ROBERTSON:  No, I don't want him to.  I think

8     it's wrong for him to do that, even.  But it's absolutely

9     wrong to -- if the Court feels that you want to let him have a

10    sign post which says "Paul Garcia's computer records,"  So be

11    it.  That I can live with.

12          But to allow him to put in physical items claiming

13    it shows his obsession with Tessa, I have a problem with that.

14          THE COURT:  Let me just ask you, how would anyone

15    show evidence of a motive without, technically, perhaps,

16    arguing because the motive is an argument, but it's also

17    demonstrated by evidence, typically, in any kind of case;

18    right?  The motive for robbery is "X".

19          MR. ROBERTSON:  Sure.  Personal gain or --

20          THE COURT:  Okay.

21          MR. ROBERTSON:  -- whatever it happens to be.

22          THE COURT:  And you're saying that obsession is an

23    inflammatory word?

24          MR. ROBERTSON:  I think -- well, two things:  I'm

25    saying the way it's presented is inflammatory, but also

26    remember that the jury's going to see this and they're going

27    to say, "Okay.  Let's see what's flashing in front of our

28    eyes, a list of physical evidence.  Here's the picture.  We

1   see that."  Okay.  There'll be people testifying to the

2   specifics of this.

3             But this is a statement.  This is argument that he

4   had an obsession with Tessa.  There's no reason to have that

5   in there.  It's inflammatory, it's unnecessary, and it's

6   prejudicial.

7             THE COURT:  So you're saying he can't describe the

8   motive in his opening statement?

9             MR. ROBERTSON:  I'm sure he can say that, if he's

10  going to say, "We are going to argue that the motive was," but

11  this doesn't say that.  This doesn't say, "The People will

12  argue --"

13            THE COURT:  So how about if he says, "Paul Garcia's

14  phone records show the motive is his obsession in Tessa"?

15            MR. ROBERTSON:  I don't think that's in physical

16  writing anywhere in there, not mixed in with physical items of

17  evidence.

18            THE COURT:  All right.  Well, I think that if the

19  People are entitled to -- if -- I think he can say it.  I

20  think he can state what the motive is, and, you know -- I

21  don't want to hear obsession 50 times in your opening

22  statement.  You can refer to the motive after you've told them

23  what the motive is, and maybe on the subsequent ones we can

24  change it.  But I'm going to overrule it as to the first one.

25  So this one's overruled.  Now --

26            MR. ROBERTSON:  Could you just make a note so at

27  least we've already described it so it can be part of the

28  record.

1          THE COURT:  Yes, it's the document that -- of the --

2    the page that says in yellow writing, "Paul Garcia's phone

3    records show his obsession with Tessa."  I'm going to allow

4    that one, but the next one that we come to is, "Paul Garcia's

5    text messages that show his obsession with Tessa Donnelly."

6          And on this one, Mr. Rosen, I'm going to, you

7    know -- you can either remove it or you can indicate that

8    the -- you know, support the motive.

9          MR. ROSEN:  I'll just have "Paul Garcia's text

10   messages to Tessa Donnelly," and I'll remove "shows his

11   obsession with her."  The People will be saying in their

12   opening statement, as the Court has indicated, that this is

13   the motive, and witnesses will say that Paul Garcia was

14   obsessed with Tessa Donnelly.  We'll use words just like that,

15   and the text messages to her literally show that.

16         So I'm happy to take off "show his obsession with

17   her."  It -- and I'll try not to use the word "obsession" 50

18   times in opening statement.

19         THE COURT:  If the witness says it, Mr. Rosen, you

20   can obviously say what the witness' testimony is.

21         MR. ROSEN:  Okay.

22         THE COURT:  The next one is the page that says in

23   yellow, "Evidence that Paul Garcia solicited and paid for the

24   murder of MA."  And this is objected to as argument.  On this

25   one, the objection is to the word "solicited"; is that

26   correct?

27         MR. ROBERTSON:  Yes.

28         THE COURT:  I just note that the 190.2(c) indicates

1    "solicit."  So I think that that's a fair characterization of

2    the enhancement, and the objection's overruled on that one.

3           The next is -- actually, I guess it's included with

4    this.  The next one is entitled "Joey Battiato" then "Daniel

5    Chaidez," "Daniel Chaidez," those three, and I believe the

6    People were objecting to these as having a psychological

7    effect or emotional effect on the jury.

8           We talked about the comment with "obsessed," as long

9    as that's phrased as the person is going to testify to it, I'm

10   going to allow that.  The one that caught my eye that,

11   Counsel, you didn't bring up is on the -- under "Joey

12   Battiato" and it's the second to the last one that,

13   "Mr. Garcia was arrogant."  I don't know if that's anticipated

14   testimony or if that is argument.  If it's argument, then I

15   think it should be removed.

16          MR. ROSEN:  While I think Joey Battiato's going to

17   say that, Your Honor, I think to just be more cautious, I can

18   just take out the "was arrogant."

19          THE COURT:  So taking out "was arrogant"?  And --

20          MR. ROSEN:  Correct.

21          THE COURT:  -- that will be the order.

22          The next one is, it's under "Paul Garcia's computer

23   records," and it's the second page under that, and has the

24   small picture, this one.  Now, you're not objecting to this

25   picture unless -- you have the objection regarding the

26   computer itself, but --

27          MR. ROBERTSON:  Right.

28          THE COURT:  But this picture allegedly comes from

1    his computer.  You're not objecting to that?  You're objecting

2    to the photographs --

3              MR. ROBERTSON:  Yes.

4              THE COURT:  -- being held by the gloves and then

5    showing the corner.  Mr. Rosen?

6              MR. ROSEN:  It's the same photo; that's the point

7    I'm trying to illustrate, that the photo that was found less

8    than a quarter mile away from where Mr. Mark Achilli was

9    murdered, a photo of Mark Achilli which someone who never met

10   Mark Achilli would need in order to know who he is and kill

11   him, is the same photo that was on Paul Garcia's computer.

12             Now, when I say "the same photo," I don't -- I'm not

13   saying that --

14             THE COURT:  Same image.

15             MR. ROSEN:  Same image; that's what I'm saying.  The

16   same image.

17             THE COURT:  The objection's overruled.

18             I presume that that piece of paper that he's holding

19   with the image is going to be introduced into evidence?

20             MR. ROSEN:  Yes.  Yes.

21             THE COURT:  The next one is entitled, in yellow,

22   "Paul Garcia's financial records."

23             The argument is that that's essentially stating

24   argument.  I guess from reading this, I assume that the

25   testimony's going to be that -- or I'm sorry; that the

26   evidence is going to be from Mr. Rosen that he's going to

27   demonstrate these various withdrawals and so forth.  And that

28   there's evidence about the price and so forth.  So I don't

1   think it's argument.

2          Now, there was a stipulation -- or I'm sorry, there

3   was an argument made that you're not stipulating to the

4   foundation.  Mr. Rosen, do you anticipate evidence to

5   introduce these documents as business records?

6          MR. ROSEN:  Yeah, they're on my -- the witness is on

7   my list.  His name is Geoffrey Jackson.  He's a custodian of

8   records from Bank of America.

9          THE COURT:  All right.  The objection's overruled.

10         The next one is the document that states, in yellow,

11  "Paul Garcia's bank records corroborate Daniel Chaidez."  The

12  argument being to the word "corroborate."

13         MR. ROSEN:  Support, buttress, are consistent with,

14  there's a lot of words that can --

15         MR. ROBERTSON:  He's already stated that.

16         MR. ROSEN:  That describe --

17         MR. ROBERTSON:  He's identifying on the one just

18  allowing in, the cash that came out and he's restating

19  twice --

20         MR. ROSEN:  Well, not exactly.  I mean, what this

21  slide is showing is on March 13th, the day before the murder,

22  Paul Garcia took out $5500.

23         THE COURT:  I'm just going to say this:  Instead of

24  using the word "corroborate," which is arguably argument, just

25  say "Paul Garcia's bank records" and "statement of Daniel

26  Chaidez."

27         MR. ROSEN:  Okay.  Paul Garcia's bank records and

28  Daniel --

1          THE COURT:  And whatever it is, statement,
2     testimony.
3          MR. ROSEN:  Okay.  Got it.  Thank you.
4          THE COURT:  All right.  Any other motions?
5          MR. GILLAN:  I have one.
6          THE COURT:  Mr. Gillan?
7          MR. GILLAN:  Yeah, Your Honor.  I thought that this
8     issue was already resolved this morning but I see the golf
9     pencils once more have made it back to the defendant's tables.
10    This suggests -- the fact that my client is limited to a golf
11    pencil or a small pencil to write suggests to the jury that
12    he's presently dangerous to me or to someone in the courtroom.
13    I spoke with the -- I guess the courtroom security
14    coordinator, who I believe spoke with the Court and the
15    deputy, and there's no reason -- or articulable reason to
16    believe that any one of these defendants is a danger to anyone
17    in the courtroom presently.
18         If any of these defendants were out of custody,
19    they'd be allowed to use any writing instrument that they
20    brought into Court with them.  I have a difficult time reading
21    what my client writes in pencil so it affects my ability to
22    communicate with my client.  And if I can't read what he's
23    writing, I have to listen to what he's saying, and I might be
24    missing what a witness would testify on the witness stand.
25         And the fact that we're going to be here for over a
26    month and the jury's going to be observing and judging our
27    clients on an instant -- on a basis -- on a minute-to-minute
28    basis, and seeing that they're writing with this little stubby

1   pencil when the counsel table has pens on it, it suggests that
2   they are dangerous and that they're a danger to their attorney
3   and they're a danger to the other court staff.  And there's no
4   reason that I've heard that -- to restrict them thusly.

5          So I would ask the Court order my client be allowed
6   to use a felt-tip pen as the security coordinator suggested.
7   And I believe that regardless of what any DOC bureaucrat says,
8   the Court's order, akin to the *Fierro* decision regarding
9   shackling of defendants at the preliminary examinations, would
10  override whatever bureaucratic rule that they've set in place.

11         THE COURT:  All right.  I'm going to take this under
12  submission, because at the moment, my understanding is that
13  the ranking officer has indicated that those should not be
14  allowed.  I will speak with that officer and see whether or
15  not a compromise can be reached such that you'll be able to
16  read what your client writes, and at the same time address the
17  security concerns the sheriff has.

18         MR. GILLAN:  I would just suggest that this Court's
19  authority supersedes that of the security or the --

20         THE COURT:  I know it does, but I don't want to
21  compromise security in the courtroom and the experts are the
22  Sheriff's Office.

23         MR. GILLAN:  Okay.  And if there is a reason that
24  can be stated in open court that suggests that any or all of
25  these defendants are presently dangerous to anyone in this
26  courtroom, other than the fact of what they're charged with, I
27  would certainly agree -- I would certainly have a problem with
28  that.  But I, thus far, haven't heard any reason to restrict

1    them.

2              THE COURT:  I'll check on it, Mr. Gillan, and I'll

3    let you know first thing in the morning.

4              MR. ROBERTSON:  And, Your Honor, I join in --

5              THE COURT:  I assume all the defendants do.

6              MR. ROBERTSON:  But I want to be safe in here too.

7    I want everybody to be safe.  I've been stabbed with a pencil.

8    I've got remnants of a pencil in my hand from over 50 years

9    ago.  And my investigators both feel I'm going to be a lot

10   less at risk with a soft-tip felt pen than something that can

11   go in and break off.  So if you're going to ask, I'd like some

12   testimony about why that's necessary as to a felt pen instead

13   of just someone in the back room saying, "Well, because."  I

14   mean, I want to push this issue because of, as you look out

15   there, you can see that it's real distinctive that the only

16   three people in here with small pencils and erasers are in

17   custody.

18             THE COURT:  Do you join, Mr. Leninger?

19             MR. LEININGER:  Of course.

20             THE COURT:  What do you have?

21             MR. LEININGER:  I just have some further argument on

22   my motion this morning on the case that you said I could

23   submit to you.

24             THE COURT:  Yes.

25             MR. LEININGER:  I've given Mr. Rosen a copy of it.

26             THE COURT:  What's the cite?

27             MR. LEININGER:  And I would just like to lodge this

28   with the Court now.

```
1              THE COURT:  Do you have a copy of the decision or
2      you just want to give me the cite?
3              MR. LEININGER:  I have a copy for you.
4              THE COURT:  Great.  I'll take a look at it.
5              MR. LEININGER:  Thank you.
6              THE COURT:  And for the record, it's People v.
7      Maddox.  And you do have it Mr. Rosen?
8              MR. ROSEN:  Yes.  Yes, I do.
9              THE COURT:  Does anybody else have anything else
10     they wanted to raise?  All right.  Then I'll see you tomorrow
11     morning at 9 o'clock.
12             MR. GILLAN:  Oh, I'm sorry.
13             THE COURT:  I just want to make a note for
14     everyone -- I want to make a note for everyone that at 9
15     o'clock, or within minutes thereafter, the jury will be called
16     up, the Court will be out here, so be on time.
17             MR. ROSEN:  Judge, will you read some instructions?
18             THE COURT:  Yes, I have some pre-instructions, so
19     the likelihood is that we probably will not get started -- if
20     we get out of here -- if we start pre-instruction at 9, it's
21     about 20 minutes for that, roughly.
22             MR. ROSEN:  Okay.  Then my suggestion would be after
23     the Court finishes pre-instructing, to maybe just let the
24     jurors stand up for a minute.  They don't have to leave.  Just
25     so -- I'll have already set up the equipment, but just --
26             THE COURT:  Stretch before you start.
27             MR. ROSEN:  Yeah, that would be great.
28             THE COURT:  Suggesting that I'll have them asleep,
```

```
1    Mr. Rosen.
2              MR. ROSEN:  Well, I just want them to be as --
3              THE COURT:  I'll try to make my pre-instructions
4    just as exciting as possible.
5              MR. ROSEN:  Right.  That would be good.
6              THE COURT:  Mr. Gillan?
7              MR. GILLAN:  Thank you, Your Honor.  I believe
8    Mr. Robertson had asked the Court to limit Mr. Rosen's opening
9    statement and I don't believe the Court's ruled on that.  I
10   would actually --
11             THE COURT:  He said he needed two hours.  I'm giving
12   him two hours.
13             MR. GILLAN:  Okay.  I would ask the Court not to
14   restrict his opening statement.
15             THE COURT:  As with everyone here, I'm not going to
16   hold a stopwatch, but if he goes very much beyond the
17   estimate, and this will hold true for closing arguments as
18   well, I expect when counsel give me an estimate, it's their
19   best estimate and that they'll live by that.
20             MR. GILLAN:  Mr. Rosen goes over two hours, I will
21   shorten my opening to nine minutes so that we don't have to
22   interrupt him.
23             MR. LEININGER:  Special trophy for Mr. Gillan.
24             THE COURT:  All right.  Gentlemen, I'll see you
25   tomorrow morning right at 9.
26                      (PROCEEDINGS CONCLUDED).
27
28
```

REPORTER'S CERTIFICATION


I, R. SCOTT UPTON, C.S.R. No. 9405, Certified Shorthand Reporter, do hereby certify that the foregoing pages, 200-399, inclusive, are a full, true and correct transcription of said stenotype as reported by me to the best of my ability.

That I reported the same in stenotype being the qualified and official reporter of the Superior Court of the State of California, in and for the County of Santa Clara, and thereafter had the same transcribed into typewriting as herein appears.

I further certify that I have complied with CCP Section 237(a)(2) in that all personal juror(s) identifying information has been redacted, if applicable.


Dated this 28th day of January 2011


_____
R. SCOTT UPTON, C.S.R. No. 9405


ATTENTION:
        CALIFORNIA GOVERNMENT CODE
        SECTION 69954(D) STATES:

        "Any court, party, or person who has purchased a transcript may, without paying a further fee to the reporter, reproduce a copy or portion thereof as an exhibit pursuant to court order or rule, or for the internal use, but shall not otherwise provide or sell a copy or copies to any other party or person."