1
2
3
4
5

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

6
7
8
9
10
11

ESEQUIEL PAUL GARCIA,

Petitioner,

v.

NEIL McDOWELL, Warden,

Respondent.

Case No.  16-05301 BLF (PR)

**ORDER DENYING SECOND
AMENDED PETITION FOR WRIT
OF HABEAS CORPUS; DENYING
CERTIFICATE OF
APPEALABILITY; DIRECTIONS TO
CLERK**

12
13
14
15
16
17
18

Petitioner is proceeding *pro se* on a second amended petition for a writ of habeas

corpus pursuant to 28 U.S.C. § 2254 challenging his 2010 criminal judgment.  Dkt No. 35

("Amended Petition").  Upon consideration of the amended petition, Respondent's answer

(Dkt No. 56), and Petitioner's traverse (Dkt No. 83), the amended petition will be

**DENIED**.

## I.  BACKGROUND

19
20
21
22
23
24
25

This case arises from a love triangle involving Petitioner, Tessa Donnelly, and her

ex-boyfriend, Mark Achilli.  Angry that Donnelly and Achilli wanted to renew their

relationship, Petitioner recruited his employee, Daniel Chaidez ("Daniel"), to help him

"get rid of a problem," which Daniel understood to mean kill Achilli.  Daniel then

coordinated the hit job with his cousin, Miguel Chaidez ("Miguel")[1], and a third man,

Lucio Estrada.  On March 14, 2008, Estrada shot Achilli multiple times, killing him.  For

this, Petitioner paid Daniel $9,500.

26
27

[1] Because Miguel Chaidez and Daniel Chaidez share the same last name, the Court will refer to
them by their first names.  No disrespect is intended.

28

Case No. 16-05301 BLF (PR)
ORDER DEN. PET. FOR WRIT OF HABEAS CORPUS; DEN. CERTIFICATE OF APPEALABILITY

Petitioner was charged with one count of first degree murder (Cal. Penal Code § 187) with the special circumstance of soliciting the murder (Cal. Penal Code § 190.2(a)(15). Dkt No. 56-8 at 203-05. He was tried jointly with Miguel and Estrada[2], and the trial commenced on September 1, 2010. Dkt No. 56-9 at 30-31. On October 26, 2010, a jury convicted Petitioner of first degree murder and found true the special circumstance of solicitation of first degree murder. Dkt No. 56-9 at 235-36. The jury also found Miguel and Estrada guilty of first degree murder, further finding as to Estrada true special circumstances that he committed an intentional murder for financial gain (Cal. Penal Code § 190.2(a)(1)) and while lying in wait (Cal. Penal Code § 190.2(a)(15)) and that he personally and intentionally discharged a firearm proximately causing death (Cal. Penal Code § 12022.53(d)). *Id.*

On February 2, 2011, Petitioner's trial counsel, Harry Robertson, moved for a new trial. Dkt No. 57 at 120-27. On February 23, 2011, Robertson declared a conflict, and the court appointed new counsel, Edward Sousa, to represent Petitioner on his motion for a new trial. *Id.* at 131. Attorneys Sousa and Gregory Ward filed a motion for new trial on December 22, 2011. Dkt No. 57-1 at 4-107. On May 10, 2012, the trial court denied the new trial motion and sentenced Petitioner to life in prison without the possibility of parole. Dkt No. 59-23 at 8-60.

With the assistance of appointed appellate counsel Mark Greenberg, Petitioner simultaneously pursued an appeal and a petition for writ of habeas corpus in the California Court of Appeal (the "state appellate court"). Dkt Nos. 58-3 at 1–99; 58-4 at 3-65; 58-6 at 52. The state appellate court affirmed the judgment and denied the habeas petition on March 2, 2015.[3] Dkt No. 58-4 at 76-159; *People v. Garcia*, No. H036346, 2015 WL 917801 (Cal. Ct. App. Mar. 2, 2015) (unpublished). Petitioner's subsequent petition for

---

[2] Daniel opted to cooperate with the prosecution and pled guilty to lesser charges.

[3] In that same opinion, the state appellate court also considered and rejected claims raised by Miguel and Estrada.

United States District Court
Northern District of California

1

2

rehearing was also denied, though the state appellate court did issue an order modifying the opinion with no change in the judgment.  Dkt No. 58-5 at 3-17, 22.

3

4

5

6

7

Petitioner proceeded to the California Supreme Court in pro per, filing petitions for review of the direct appeal and of the denial of the petition for writ of habeas corpus.  Dkt No. 58 at 3—Dkt No. 58-2 at 226.  After requesting and receiving an answer to the direct appeal and an informal response to the habeas matter, the California Supreme Court summarily denied both petitions on June 13, 2018.  Dkt No. 58-6 at 98-102.

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

When the last state court to adjudicate a federal constitutional claim on the merits does not provide an explanation for the denial," the federal court should 'look through' the unexplained decision to the last related state-court decision that does provide a relevant rationale." *Wilson v. Sellers*, ─── U.S. ───, 138 S.Ct. 1188, 1192 (2018).  "It should then presume that the unexplained decision adopted the same reasoning." *Id.*  Here, the California Supreme Court did not provide an explanation for its denial of the petition for review.  *See* Dkt No. 30-2 at 339.  Accordingly, this Court will "look through" the California Supreme Court's decision to the state appellate court's decision.  *See Skidmore v. Lizarraga*, No. 14-CV-04222-BLF, 2019 WL 1245150, at *7 (N.D. Cal. Mar. 18, 2019) (applying *Wilson*).  Moreover, where an issue was raised for the first time at the California Supreme Court, this Court "must determine what arguments or theories supported or, as here, could have supported, the state court's decision; and then it must ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of [the United States Supreme Court]." *Harrington v. Richter*, 562 U.S. 86, 102 (2011).

23

24

25

26

Petitioner filed the instant federal habeas petition on September 15, 2016 and is proceeding on a second amended petition filed on June 19, 2019.  *See* Dkt Nos. 1, 35.  Respondent filed an answer on June 19, 2020 (Dkt No. 56), and Petitioner filed a traverse on July 2, 2021 (Dkt No. 83).

27

28

United States District Court
Northern District of California

## II.  STATEMENT OF FACTS

The following background facts are taken from the opinion of the state appellate court on direct appeal:

> *Physical Evidence and Eyewitness Testimony*
>
> At approximately 11:40 a.m. on March 14, 2008, after he was told by a man that he had heard eight gunshots fired in rapid succession from a semi-automatic hand-gun, Los Gatos Police Officer Daniel Accardo approached the driveway of 18400 Overlook. As he did so a white van approached; the driver of the van said he had heard the gunshots. As the officer drove into the driveway an elderly gentleman flagged down the officer and told him that there was a badly injured man near a carport.
>
> At 18400 Overlook, Officer Accardo saw a man lying face down in a carport; the man was bleeding from multiple places and there were spent shell casings on the ground. Emergency personnel arrived and declared Achilli dead. Officer Accardo was able to identify Achilli from the driver's license the officer found in Achilli's wallet, which firefighters had collected from a pocket in Achilli's pants.
>
> Approximately two hours after the shooting, Los Gatos Police Department Corporal Kalipona Kauweloa and other officers collected evidence from the area surrounding the shooting scene. Specifically, in various different places they found a torn photograph of Achilli, a gun cleaning cloth, a black jacket recovered on Chestnut Avenue, [FN2] two black gloves, a gun magazine, a black Los Angeles Dodger's baseball cap, a gun magazine with two unspent .380 cartridges, and a page of printed driving directions from Fish Canyon Road to 18400 Overlook. The officers did not locate a gun.
>
>> [FN2: Testimony at trial showed that Chestnut Avenue is north of Overlook.]
>
> Los Gatos Police Officer Steve Walpole collected .380 shell casings, .380 bullet fragments, and a bullet jacket at the scene; all were recovered from near where Achilli's body had been.[FN3] Officer Walpole took a photograph of a bullet hole that was in a drain pipe. Officer Walpole removed a computer from unit No. 36[FN4] and collected a cellular telephone that had been recovered from amongst Achilli's bloody clothing. Achilli's body was removed from the scene by the coroner at 4:53 p.m.
>
>> [FN3: Paramedics moved Achilli's body approximately 12 feet east of where he was originally lying.]

United States District Court
Northern District of California

[FN4: Officer Accardo established that unit No. 36 was where Achilli lived.]

On the day after the shooting, Los Gatos Police Officer Sam Wonnell retrieved a Lorcin .380 semi-automatic pistol with no rounds in the magazine from some ground ivy located in front of some of the residences at 18400 Overlook. The next day, close to unit No. 35, Officer Wonnell found a .380–caliber shell casing.

On March 28, 2008, Santa Clara Police Sergeant Nicolas Richards served a search warrant on Miguel's residence in Duarte, California. Sergeant Richards seized a Dell laptop computer, a copier/fax machine, a gun cleaning kit, $3,240 cash, an Airsoft gun,[FN5] and a rifle. In the bedroom of the residence he located identifying information for Miguel. Sergeant Richards searched a Dodge Durango registered to Jose Chaidez; a MoneyGram receipt for $2,500 was found inside.

[FN5: Sergeant Richards testified that the Airsoft gun was not a real firearm.]

On March 29, 2008, California Highway Patrol Officer Edward Whitfield conducted a search of Estrada's Burbank apartment. There were papers belonging to Estrada in the apartment. Officer Whitfield recovered two baggies of marijuana, a baggie of various narcotics, a book entitled "Surgical Speed Shooting," a book entitled "The Gun Digest, Book of Combat Handgunnery," and a book entitled "Hit Man A Technical Manual for Independent Contractors." In addition, Officer Whitfield found two notebooks, one purple and one gray; a black bag containing $2,000 cash; and a black baseball cap with "LA" on it, which he found hanging on a hook on the back of a door. The notebooks were marked as exhibit Nos. 92 (the purple notebook) and 93 (the gray notebook), and two pages of notes taken from exhibit No. 93 were marked as exhibit No. 91. On one of the pages inside the purple notebook the name "Chaidez" was written. In the pages of the gray notebook was a letter addressed to Estrada. One of the pages of notes taken from the gray notebook included phrases such as "surveillance," "Fast Fast Fast," "Really Fast," "military style precision," "gloves, disguise," "fake wigs," "stay calm," "calm and precise," and "shoot to kill!" Inside a black backpack, Officer Whitfield found a .45–caliber handgun and under the bed he found two different .45–caliber handguns, numerous gun magazines, and a plastic baggie containing some ammunition and a gun cleaning cloth. The next day Officer Whitfield searched Estrada's car and found two cellular telephones. No ammunition or .380–caliber handguns were found in the residence.

United States District Court
Northern District of California

Criminalist Eric Barloewen from the Santa Clara County Crime Laboratory (the crime laboratory) examined the eight fired cartridge cases, two fired bullets, and the .380–caliber pistol. He testified that the Lorcin .380 pistol was the murder weapon. All the cartridge cases recovered from the scene were ejected from the recovered weapon. He explained that a fully loaded Lorcin pistol would be able to fire a total of eight rounds.

Crime laboratory employee Matthew Riles, an expert in examining physical evidence for latent prints, determined that there were no latent prints on the pistol. He explained, however, that if someone had worn gloves while using the pistol there would not be any prints. Riles was able to develop latent prints on the paper that contained the driving directions. Michael Valverde, a fingerprint examiner, was able to identify one of the prints as belonging to Cesar Chaidez, Miguel's brother, and two fingerprints belonging to Estrada.

An expert in DNA analysis examined the baseball cap recovered from the area close to 18400 Overlook and the right glove and black jacket. The major DNA profile for all three items was the same—Estrada. Garcia and Miguel were excluded as minor contributors. A gunshot residue expert testified that there were many particles of gunshot residue on the gloves.

On March 14, 2008, Laurie Babula lived at 18400 Overlook; she testified that 18400 Overlook Road is a complex of townhouses. At approximately 7:30 a.m. on March 14, she looked out of her bedroom window and saw a man in the parking lot dressed all in black with a black messenger bag; he was wearing a black baseball hat. When Babula left her townhouse at approximately 8:00 a.m. she saw the same man at a nearby intersection; he was looking at a newspaper. She described the man as a thin Hispanic in his twenties. A couple of weeks later she identified Estrada from a photographic lineup as the man she saw on the day of the murder.

On March 14, 2008, Joe Colonna, who runs a housecleaning business, dropped off two of his cleaners, Alma Fuentes and Alva at a townhouse—unit No. 33—on Overlook between 9:25 a.m. and 10:00 a.m. While cleaning the townhouse, Fuentes saw a young man walk back and forth outside. At approximately 10:30 a.m. she went outside to wait for Colonna. While she was waiting, she saw the man she had seen earlier walk back and forth while talking in Spanish on a cellular telephone. The man was wearing black pants, a black jacket, and a black cap; she described him as a "white Latino" between "24 and 25 or 26." Fuentes saw an older man arrive in a black car; he went into a unit that was close by. When Colonna arrived sometime between 11:00 a.m. and 11:30 a.m., she went back into the townhouse she had been cleaning with Colonna. While they were inside, Fuentes heard between "five and six" gunshots. Colonna heard the gunshots; he described the sound as "like somebody

unloaded the whole gun." He and Fuentes locked the townhouse and left. When Fuentes went outside she saw the man in black running away.

Colonna testified that when he came back to the complex to pick up Fuentes and Alva around 11:30 a.m., he noticed a man standing around; he thought the man looked suspicious. Colonna saw the man from approximately 20 yards away and for approximately three seconds; he made eye contact with the man. Colonna described the man as "thin and light complexion, unshaven face, black clothes, carrying a ... black bag." He had a black hat on. The man was about 25 years old and five feet seven inches tall. As Colonna was driving up to the complex he saw another man walking across the road, but he could not describe him. This man went into a unit close to unit No. 33. In court, both Fuentes and Colonna identified Estrada as the man in black they had seen on March 14.

Dr. Joseph O'Hara, the Santa Clara County Medical Examiner, testified that the cause of Achilli's death was "gunshot wounds of the head and torso."

*Testimony Regarding Tessa Donnelly's Relationship with Achilli and Garcia*

Tessa Donnelly met Achilli in 2004 when she was working at Mountain Charley's as a bartender; Achilli owned the bar. Donnelly dated Achilli for approximately four years, but broke up with him in September 2007 because Achilli was seeing someone else. About the same time, Achilli sold Mountain Charley's and the 180 Restaurant to Garcia and his brother, Eric. A few weeks after she broke up with Achilli, Donnelly began dating Garcia. Garcia told Donnelly that he had recently ended his relationship with his fiancée. Within a month of their first date, Garcia told Donnelly that he cared a lot about her and saw their future together. Donnelly spent most weekends in Discovery Bay where Garcia had a house. Their relationship was sexual. Garcia said he wanted to marry Donnelly and have children together, but Donnelly told him he was moving too fast. Donnelly never told Garcia she loved him.

In early November 2007, Donnelly decided Garcia was too possessive; she stopped having sexual intercourse with him. On a few occasions, Donnelly saw Garcia drive by Achilli's residence. Around New Year's Day 2008, Donnelly lost her cellular telephone. Garcia said that he did not know what happened to the telephone; Donnelly had not given Garcia permission to take it.[FN6] In January 2008, Donnelly and Achilli discussed dating again, so Donnelly told Garcia she wanted to date Achilli and not him. Around the same time Garcia demoted Donnelly from bar manager at the 180 Restaurant to bartender. Donnelly testified that she hoped to remain friends with Garcia because they had to work together. In February

United States District Court
Northern District of California

2008, Donnelly went on several trips with Garcia because Achilli started seeing someone else. On these trips Donnelly did not have sexual intercourse with Garcia, but they did engage in "foreplay."

> [FN6: On March 14, 2014, after Garcia had given the police consent to search his residence, Officer Clinton Tada located a black Dell laptop shoulder bag in which he found a blue and gray Casio cellular telephone. At trial, Donnelly identified the Casio telephone as hers.]

On March 1, 2008, Donnelly went home from the restaurant at around 1:00 a.m.; she lived only two blocks away. Donnelly let Steve Wilkins, another bartender, sleep on her couch. Garcia came to her apartment uninvited.[FN7] Garcia had been drinking so she let him sleep in her room, but they did not have sexual intercourse. Around 9:00 a.m., Donnelly heard voices. When she got up to check on who was there, Wilkins told her that Achilli had come to the apartment and asked if Garcia was there. Wilkins said that he told Achilli that he was. Donnelly grabbed her keys and rushed out of the apartment to go to Achilli's townhouse to tell him that nothing had happened. Donnelly could not remember if she spoke to Achilli later that day or the next day.

> [FN7: Wilkins confirmed that this incident happened.]

After the March 1 incident, Donnelly and Achilli talked and "figured it out." Donnelly told Garcia that she did not love him and that she loved Achilli and was getting back together with him; she told Garcia this two or three times. Garcia told her she was wasting her life and that Achilli was old and he was young. He asked her why she was choosing Achilli over him.

The weekend following the March 1 incident, Donnelly and Achilli went to San Francisco. They spent the night together and then drove back to Los Gatos in Achilli's black BMW. Achilli parked his car in front of Donnelly's apartment. As Donnelly and Achilli were taking suitcases out of the car, Donnelly noticed Garcia drive by. Donnelly received a text message from Garcia the "gist" of which was "What are you doing? I can't believe you're with him."[FN8]

> [FN8: This incident occurred on March 9.]

After March 9, 2008, Donnelly and Achilli went to Las Vegas for three days. They spoke about marriage. The night before the murder, Achilli spent the night at Donnelly's apartment. Achilli took Donnelly to work because her car was at his townhouse. He dropped her off at her work around 11:15 a.m. Achilli was going to go home and then he had a lunch meeting.

United States District Court
Northern District of California

Donnelly testified that between January 2008 and up until the time of Achilli's murder there were more than 30 telephone calls between her and Garcia. However, early in the week immediately preceding the murder Garcia called her a lot, but she did not return the calls. During March 2008, Garcia sent her dozens of text messages; in some he accused her of lying, in others he asked to see her. In other messages he demanded to know where she was and told her she needed to choose between him and Achilli.[FN9]

> [FN9: The prosecutor asked Donnelly if she remembered receiving a whole series of text messages from Garcia. Although Donnelly could not remember most of them, they were read to the jury during Donnelly's testimony and the exhibits containing the text messages were admitted into evidence.]

Numerous witnesses testified about the relationship between Garcia and Donnelly. Joey Battiato worked for Garcia, first at Pacific Blue Equity, a mortgage company, and then as a bartender at Mountain Charley's. Battiato had known Donnelly since high school. When he heard that Mountain Charley's and the 180 Restaurant were for sale he asked Garcia if he was interested in buying them. Achilli paid Battiato a $25,000 finder's fee and promised him $25,000 more when the final sales price was paid off.

For a couple of months Battiato and Garcia shared an apartment in Los Gatos. In January 2008, Garcia became upset that Donnelly was avoiding him. Garcia thought that Donnelly was seeing Achilli again. Garcia told Battiato that Donnelly had lied to him about being out of town when she was not. On numerous occasions Garcia asked him to check to see if Donnelly's car was parked at Achilli's townhouse. Late in February 2008, after Garcia and Donnelly took trips together to Portland and Las Vegas, Garcia thought that he and Donnelly were successfully back together. Garcia told Battiato about the incident when Achilli came to Donnelly's apartment and Donnelly chased after Achilli. Garcia could not understand Donnelly's attraction to Achilli.

On March 9, 2008, Battiato saw Donnelly and Achilli together in front of her house; they were removing suitcases from Achilli's car. Garcia said, "She's busted, hah. Caught her." Garcia told Battiato that he had other people checking on Donnelly's movements. Battiato testified that at least 50 percent of the telephone conversations he had with Garcia were about Donnelly. Garcia repeatedly asked him to check on Donnelly's whereabouts. Garcia told him that he checked Donnelly's telephone for text messages from Achilli. According to Battiato, Garcia threatened Achilli; he said things such as "I know people

United States District Court
Northern District of California

that will take care of it" and that he would "have to send flowers to the funeral or plan his funeral...." Garcia stated that they could make it look as if it was a drug deal "gone bad." Garcia threatened Battiato that if he said anything, "something bad" could happen to him or his son. Garcia's threats frightened Battiato. At one point when the comments about Achilli escalated, Battiato told Garcia "Don't do it. Don't talk to me about these things." Garcia told him that he was a "graduate of USF, VP of Hewlett Packard and Phillips, Bellarmine football coach" and that the "cops would talk to him for about five minutes and they'd be on their way." Initially, Battiato did not tell the police about Garcia's threats to Achilli because Battiato was unsure if he was an accomplice. Two days after the murder, Garcia told Battiato not to tell the police that he had driven by Achilli's house.

Francis Ogbogu, Garcia's business associate, knew that Garcia was dating Donnelly and that Donnelly had dated Achilli. Before March 6, 2008, he and Garcia had conversations about Garcia's relationship with Donnelly. At one point, Garcia told him that he would probably marry Donnelly; at another point Garcia told him that the relationship was "weird." Garcia told him about the time he spent the night at Donnelly's apartment and Achilli came to the door. Garcia thought the whole thing was strange because he was dating Donnelly. Ogbogu told Garcia to confront Donnelly. On March 6, 2008, Ogbogu received a text message from Garcia, which said "She denied everything."

Kristen Rush, one of Garcia's ex-girlfriends, said that Garcia had told her that his girlfriend was seeing someone else and that he had driven by the house of the girlfriend's ex-boyfriend where he saw her car.[FN10] Garcia appeared "upset." This happened sometime in February. Between January 2008 and the day of Achilli's murder, Rush talked to Garcia about the "situation" with his girlfriend but it was not "a lot." However, they did talk about other incidents that had happened with his girlfriend; he told Rush that he thought his girlfriend was with the man who used to own the bar. Garcia talked to her about his girlfriend not returning his telephone calls.

> [FN10: Rush did not know the name of the girlfriend, but Garcia told her he thought his girlfriend was seeing the previous owner of Mountain Charley's.]

Trevor Kozacek, a bartender at Mountain Charley's, told a similar tale—Garcia told him he was dating Donnelly. In the beginning the relationship was good, but then Garcia expressed concern that Donnelly was seeing Achilli. Garcia asked Kozacek to check on Donnelly's whereabouts. Garcia told him he wanted Achilli to come to the bar while Donnelly was there so he could see Donnelly's reaction.

Kristina Wilkins worked at the 180 Restaurant; she had known Donnelly since 2006. Garcia told her about his relationship with Donnelly; he said he really liked her and he could picture having children with Donnelly. Garcia appeared to be in love with Donnelly; Kristina described it as "super-infatuated." However, Donnelly "did not seem as into it as he was."

Wilkins met Garcia when Garcia took over ownership of Mountain Charley's. Again, Garcia said he was dating Donnelly and wanted to marry her. However, Garcia told Wilkins that he had gotten into a fight with Donnelly because she had lied to him. Garcia said that Donnelly's car was at Achilli's house. Garcia did not like Donnelly seeing Achilli, and he continued to pursue her. After the incident where Achilli came to Donnelly's apartment while Garcia was there, Wilkins told Garcia to let Donnelly go. Garcia said, "It's over but it's not over, if you know what I mean." Wilkins did not know what Garcia meant.

Lorene Novoa had known Garcia since eighth grade. In October 2007, Garcia told her that he was dating Donnelly. Later, Garcia told her that he thought Donnelly was seeing someone else because she stopped having sexual intercourse with him; he thought that Donnelly was going back to her old boyfriend. Novoa told Garcia not to drive by Donnelly's apartment as it could be considered stalking.

Robert Orner, who became the manager of the 180 Restaurant in February 2008, testified that about a week before Achilli was killed, he went to Santa Cruz with Garcia, Brad Tarter, and Battiato; Garcia was distant.

Nick Lezotte, who had known Garcia since high school, stated that one night Garcia called him at 1:00 a.m. to pick him up at Mountain Charley's. Lezotte drove Garcia to an address on Meridian Avenue where Donnelly was supposed to be at a dinner party; Garcia identified a black BMW there as belonging to Achilli.

In January 2008, Nome Wynn came to Los Gatos and stayed at Battiato's apartment. Garcia was there and he talked about putting a tracking device on a vehicle. Garcia said he thought his girlfriend was lying to him and seeing an old boyfriend; Garcia described him as "an old guy." Garcia became agitated when he was unable to reach Donnelly. Garcia left the apartment three or four times that night to check on Donnelly; he asked Battiato to go as well. In early February, Wynn returned to Los Gatos to talk to Garcia about buying the bar and restaurant. Garcia and Wynn left Battiato's apartment to discuss the purchase. Garcia started talking about his problems with Donnelly. As they were on their way to have a beer, Garcia tried to reach Donnelly on the telephone, but without success. Garcia asked Wynn to drive him to Achilli's townhouse to look for a dark BMW. Garcia

United States District Court
Northern District of California

wanted to know if Donnelly's car was there, but they did not see either car. Garcia had told Wynn that Donnelly was supposed to be at a family dinner in San Francisco, but he had concerns that Donnelly was lying to him. After they left Achilli's townhouse, Garcia told Wynn to drive by the house belonging to Donnelly's mother, but there were no cars there. When they went to a bar called Carry Nations they ran into Donnelly's brother. Garcia asked him about the family dinner in San Francisco. Donnelly's brother said, "What dinner? I've been drinking all night here." Garcia became visibly upset; he was pacing back and forth. Garcia tried to telephone Donnelly about five or six times, but the telephone went to voicemail. Garcia told Wynn that Donnelly was probably with Achilli. Wynn went with Garcia to Donnelly's apartment, where Garcia retrieved a key from under a rock and let himself in. He searched under Donnelly's bed for her make-up bag. Garcia said that if the make-up bag was not there Donnelly was probably out of town.

Garcia's friend Ali Aminigohar went to Las Vegas with Garcia, Donnelly, and another friend in February 2008. Garcia told Aminigohar that Achilli had come to Donnelly's apartment when he was there. Garcia said, "He doesn't know who he is fucking with."

Garcia contacted Amanda Freel, a licensed private investigator in January 2008. Garcia stated that he wanted his girlfriend followed because he believed she was seeing Achilli. Freel prepared a contract for her services, but Garcia never signed it.

*Daniel Chaidez's Testimony*

On December 2, 2008, pursuant to a plea agreement, Daniel Chaidez (Daniel) pleaded guilty in this case to voluntary manslaughter, vicarious arming, solicitation to commit murder, and accessory to commit murder. Daniel agreed to be sentenced to 12 years, eight months in prison. The terms of the plea agreement included the following statement: "That early in the investigation of Mark Achilli's murder, Daniel Chaidez ... contacted the police, drove himself to the police department where he ultimately described the circumstances surrounding Mark Achilli's murder, and fully cooperated with detectives. Daniel Chaidez's cooperation greatly assisted the investigation and led to the arrest of other defendants." Daniel agreed to "testify in a truthful, detailed, complete, and candid manner in any future proceedings concerning the circumstances surrounding the murder of Mark Achilli on March 14, 2008."

Daniel testified that he first met Garcia in the latter part of 2005 and he began working for Pacific Blue Equity in 2006. In October 2007, he started working for Garcia as a doorman at Mountain Charley's. Daniel barely knew Donnelly, and he did not know Achilli. In January 2008, Garcia asked him if he "knew anyone who could get rid of a problem." Daniel told him that he

United States District Court
Northern District of California

would "inquire." Daniel telephoned his cousin Miguel; he told Miguel that someone he knew had a problem. Miguel asked him what sort of problem and Daniel told him a person. Daniel thought he asked Miguel if he knew someone who could get rid of a problem and Miguel said he would find out and call him back. Miguel called him within a few days and Daniel told Garcia "it was possible." Garcia set a price ceiling of $10,000. Daniel talked to Miguel to find out how much it would cost; initially, Miguel said $10,000. After some haggling Miguel agreed on $9,000; Daniel told Garcia it would be $9,500— Daniel anticipated that he would have some expenses.

From March 1, 2008 to March 15, 2008, there were 43 telephone calls between Daniel and Miguel. Garcia told Daniel to go to a metroactive Web site and key in 180 Club or Mountain Charley's. Daniel found Achilli's photograph and then he told Miguel how to navigate the Web site to get Achilli's photograph.

On March 11, 2008, Garcia gave Daniel $4,000 for the murder; he told Daniel he "wanted this shit done." During February, Garcia had given Daniel a piece of paper with a street address, unit address, APN number, city, and zip code. Garcia told Daniel that Achilli drove a dark 6 series BMW, and Daniel told Miguel about the car. Garcia asked if the gun would have a silencer, but Daniel was not able to tell Garcia what sort of gun would be used. Several times, Garcia suggested that it should look as if it was a drug deal "gone bad" or that drugs were involved. Garcia and Daniel discussed the fact that Garcia might be a suspect, but Garcia said that it would "just blow over." Garcia indicated that he wished the murder could have happened on Valentine's Day weekend, and that he wanted the body left at the house. Garcia said that it would be best if there were no witnesses, and if Donnelly was there she should be killed.

On March 12, 2008, Daniel wired $2,500 to Miguel. Miguel confirmed that he had received the money. Daniel spoke with Garcia on the telephone both before and after the wire transfer. Renee Kelso, a cashier at Longs Drugs, confirmed that she had prepared a MoneyGram for $2,500 on March 12, 2008, at approximately 6:15 p.m. The man who had purchased the MoneyGram provided identification, but Kelso could not recall the name.

On March 13, 2008, Garcia gave Daniel $5,500 in cash in a brown paper bag. Daniel telephoned Miguel and told him he had all the money. Later Miguel telephoned Daniel to tell him the shooter was en route.

On March 14, 2008, a few minutes before noon, Miguel called Daniel to tell him that the mission was accomplished. Daniel agreed to meet Miguel to give him the remaining $6,500. The location of the meeting changed, but eventually they met at a gas station near Highway 152 and Highway 5, where Daniel gave

United States District Court
Northern District of California

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Miguel the remaining money. Daniel testified that he did not know why he helped Garcia arrange Achilli's murder.

Daniel spoke to the police twice after the murder, once on March 24 and once on March 27. Daniel freely admitted that he had lied to the police in the first interview. However, in the March 27 interview he told the police that he feared for his safety. Initially he again lied to the police about why he had wired money to Miguel in order to avoid incriminating Miguel. However, in this interview he told the police that Garcia wanted Achilli killed and that he had spoken to Miguel about finding someone to take care of the problem. At the end of the interview, Daniel was arrested for murder. It was not until many months later that there was a negotiated settlement for Daniel to plead guilty to lesser charges in exchange for his testimony.

*Miguel's Confession*[FN11]

> [FN11: Miguel's recorded confession was not played for the jury. The confession came into evidence through the testimony of Sergeant Frisby and through a redacted copy of Miguel's written confession, which made no mention of Estrada.]

On March 28, 2008, Los Gatos Police Sergeant Matt Frisby interviewed Miguel. The police read Miguel his *Miranda*[FN12] rights. Miguel said that his cousin Daniel called him in February 2008 and asked him if he could arrange to have someone "taken care of." Miguel said that he understood this to mean to kill someone. Miguel said that he and Daniel agreed on a price of $9,500. Later, Daniel told Miguel how to access a Web site with a photograph of Achilli. Miguel said he found the photograph of Achilli which had a 180 logo on it. Miguel printed out the photograph and gave it to someone he knew. Miguel said he got a wire transfer of $2,500 before the murder. On March 13 he met someone and gave him $1,500 cash, the victim's photograph, and the victim's address on Overlook Drive. Miguel said he met with Daniel on March 15 and Daniel gave him $6,500 cash. Miguel said he drove back to Southern California. Miguel wrote a confession on March 28, 2008. In his confession he wrote, "I called Dan to let him know right after." Miguel told police that Daniel put a maximum price of $10,000 for the murder. Miguel said that "tak[ing] care of" someone meant killing someone.

> [FN12: *Miranda v. Arizona* (1966) 384 U.S. 436.]

*Examination of Computer Hard Drives and Cellular Telephones*

San Jose Police Sergeant Alan Lee, a computer forensic analysis expert, examined a forensic copy of a computer hard drive in April 2008. There were two user accounts: Paul Garcia and guest. Garcia was the registered owner of the computer. Under

the login name Paul Garcia, a photograph of Achilli next to a 180 logo was placed on the computer on January 7, 2008. The computer had Google searches for "Mark Achilli pictures" and for private investigators, vehicle tracking devices, and GPS tracking devices.

Sergeant Lee examined a second computer with the e-mail address of danielchaidez@pacificblueequity.com. This computer had a link to the 180 Restaurant Web site that contained Achilli's photograph. This was the same photograph that was on Garcia's computer. The person using this computer accessed the photograph on March 11, 2008.

The police obtained telephone records for Achilli, Donnelly, Garcia, Daniel, Miguel, Estrada, and a Robert Jacome.[FN13] According to the records, Daniel and Miguel telephoned each other repeatedly on March 14, 2008. On the morning of the murder, Miguel telephoned Estrada at 9:58 a.m., Daniel at 11:24 a.m., and again at 11:42 a.m., and Estrada again at 11:30 a.m. Estrada telephoned Miguel at 11:07 and 11:39 a.m. This call was picked up by the Los Gatos cellular tower; in addition, Estrada called Jacome at 11:38 a.m. Daniel telephoned Miguel at 11:26 a.m. and after the 11:42 a.m. telephone call from Miguel, Daniel telephoned Miguel twice within two minutes. Estrada telephoned Miguel again at 11:45 a.m. and then Miguel telephoned Daniel at 11:46 a.m. Daniel returned Miguel's telephone call within a minute. At 11:57 a.m. Miguel telephoned Estrada again. On the afternoon of the murder when Miguel telephoned Estrada at 4:08 p.m. and again at 4:14 p.m., the telephone call connected to a cellular tower in Southern California. At 4:50 p.m. Daniel telephoned Miguel; Miguel immediately returned his call.

> [FN13: Robert Jacome testified at the preliminary examination in this case. He said that he drove Estrada from Southern California to Northern California on March 13, 2008, they stayed in a hotel that night. The next morning, he drove Estrada to somewhere off Highway 9. Later that morning, he received a telephone call from Estrada during which Estrada sounded panicked and told Jacome to pick him up. When Jacome saw Estrada again he was running toward Jacome's car. Estrada was wearing different clothes. Jacome did not testify at the trial.]

The telephone calls between Daniel and Miguel continued on March 15, the day after the murder. Specifically, Daniel telephoned Miguel at 3:50 p.m., 4:30 p.m., and 4:40 p.m.; the telephone calls connected to a cellular tower in Gilroy. At 5:30 p.m. Daniel telephoned Miguel; the telephone call connected to a cellular tower in Hollister. A 6:00 p.m. telephone call from

United States District Court
Northern District of California

Daniel to Miguel connected to a cellular tower at Bell Station. Between January 4 and February 11, 2008, there had been only nine telephone calls between Daniel and Miguel, and from February 12 to March 11, 2008, there were no telephone calls between the two men. From March 11 to March 15, 2008, there were 43 telephone calls between Daniel and Miguel.

As to telephone calls between Daniel and Garcia, there were eight calls between January 1 and January 31, 2008. In February the number increased to 26, and from March 1 to March 13 there were 37 telephone calls.

*Bank Records*

The custodian of records for Bank of America reviewed Garcia's bank records. The bank requires two forms of identification for cash withdrawals. The driver's license number and social security number utilized for withdrawals belonged to Garcia. On March 13, 2008, Garcia withdrew $1,500 cash from his personal account. On February 22, 2008, Garcia withdrew $2,000 cash from the Mountain Charley's savings account and the same amount on March 13, 2008. On March 13, 2008, Garcia withdrew $2,000 cash from the 180 Restaurant account. On March 14, 2008, he withdrew $1,400 from the 180 Restaurant account. There were ATM withdrawals from the 180 Restaurant account on March 6 and March 12, 2008, totaling $4,000.

A forensic accountant reviewed Garcia's financial records from March 2007 until April 2008. There were no big cash withdrawals from Garcia's personal account during that timeframe, before he withdrew the $1,500 on March 13, 2008. The accountant confirmed the cash withdrawals of $2,000 from the Mountain Charley's account on February 22 and March 13. These were the only cash withdrawals from that account. The $2,000 withdrawn from the 180 Restaurant account on March 13 was the only cash withdrawal from the account between February 21 and March 20, 2008. For March 13, 2008, from Garcia's checking account, the Mountain Charley's account, and the 180 Restaurant account, a total of $5,500 was withdrawn. As to the 180 Restaurant ATM account there were regular withdrawals approximately every six or seven days for at least the month of February in the amount of $4,000. However, as to Garcia's checking account, the Mountain Charley's account, and the 180 Restaurant expense account cash withdrawals were rare.

The forensic accountant examined Daniel's bank account for the period March 2007 through July 2008. From April 2007 until April 2008, the highest opening balance was $587.34; during that period, five months had negative balances, and the largest cash withdrawal was $490.

*Garcia's Testimony*

Case No. 16-05301 BLF (PR)
ORDER DEN. PET. FOR WRIT OF HABEAS CORPUS; DEN. CERTIFICATE OF APPEALABILITY

United States District Court
Northern District of California

United States District Court
Northern District of California

Garcia testified in his own defense that he did not hire Daniel to arrange Achilli's murder or give him $9,500; that he had nothing to do with Achilli's murder and never asked anyone to harm him; that he had never met Estrada, Miguel or Jacome; and that although he had a relationship with Donnelly, he was not jealous of Achilli's and Donnelly's relationship.

Garcia admitted that he drove past Donnelly's apartment many times, but he explained that taking the route past her apartment to Highway 9 was quicker than taking main streets.

Garcia's explanation for the withdrawal of a large amount in cash during the week before the murder was that he was expecting a large crowd for the Saint Patrick's Day weekend and he needed to put cash into the ATM machine. Also, he had to pay the janitor, buy pizza to serve during the busy weekend, make change, give Battiato $500 to buy 10 Saint Patrick's Day tickets for a party at another restaurant, pay approximately $1,000 in cash to the installer of a security system, and pay out the waitresses and bartenders for tips each night.

As to his numerous telephone calls to Daniel during the week before Achilli's murder, Garcia said that Daniel was responsible for handling the telephone calls that came in as a result of a Spanish language radio commercial that Pacific Blue Equity was running.[FN14] Garcia said that he would frequently telephone Daniel to find out if any telephone calls had come in and make sure that Daniel would follow up on the telephone calls.

> [FN14: At one point during his testimony Garcia said that during March 2008 he was in the process of closing Pacific Blue Equity; the lease on the building ended on April 1, 2008.]

When he heard that Achilli had been killed, Garcia went to the police station; he consented to searches of his house and automobile. On cross-examination Garcia admitted that during his police interview he lied to the police.

*Garcia*, 2015 WL 917801, at *1–10.

## III.  DISCUSSION

### A.    **Legal Standard**

This Court may entertain a petition for a writ of habeas corpus "in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States."  28 U.S.C. § 2254(a); *Rose v. Hodges*, 423 U.S. 19, 21 (1975).  The writ may not be granted with

respect to any claim that was adjudicated on the merits in state court unless the state court's adjudication of the claim:  "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d).

"Under the 'contrary to' clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts." *Williams v. Taylor*, 529 U.S. 362, 412-13 (2000). The only definitive source of clearly established federal law under 28 U.S.C. § 2254(d) is in the holdings (as opposed to the dicta) of the Supreme Court as of the time of the state court decision. *Id.* at 412; *Brewer v. Hall*, 378 F.3d 952, 955 (9th Cir. 2004).  While circuit law may be "persuasive authority" for purposes of determining whether a state court decision is an unreasonable application of Supreme Court precedent, only the Supreme Court's holdings are binding on the state courts and only those holdings need be "reasonably" applied. *Clark v. Murphy*, 331 F.3d 1062, 1069 (9th Cir.), *overruled on other grounds by Lockyer v. Andrade*, 538 U.S. 63 (2003).

"Under the 'unreasonable application' clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the Supreme Court's] decisions but unreasonably applies that principle to the facts of the prisoner's case." *Williams*, 529 U.S. at 413.  "Under § 2254(d)(1)'s 'unreasonable application' clause, . . . a federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." *Id*. at 411.  A federal habeas court

making the "unreasonable application" inquiry should ask whether the state court's application of clearly established federal law was "objectively unreasonable." *Id.* at 409.

**B.** <u>**Claims**</u>

Petitioner's second amended petition asserts the following federal claims[4]:

(1) **The Confrontation Clause**.  The trial court violated Petitioner's rights under the Confrontation Clause by admitting Miguel's testimonial statements at trial without a limiting instruction.

(2) **Ineffective Assistance of Counsel**

   a. **Trial Counsel.**  Petitioner's trial counsel, Harry Robertson, failed to investigate the prosecution's evidence and failed to present evidence establishing that the murder was the result of an effort to collect a drug debt.

   b. **Appellate Counsel:**  Petitioner's appointed appellate counsel, Mark Greenberg, failed to conduct adequate discovery and failed to research relevant claims prior to filing a habeas petition.

(3) **Prosecutorial misconduct.**  The prosecutor, Jeff Rosen, misstated material facts, conducted an "improper" cross-examination of Petitioner, knowingly used perjured testimony and "false" evidence, improperly vouched for Daniel, and improperly shifted the burden of proof to the defense.

(4) **Juror Misconduct.**  The trial court failed to conduct an adequate investigation into alleged juror misconduct.

---

[4] The second amended petition is well over 1,000 pages long and highlights scores of alleged errors and inconsistencies in the state criminal proceedings.  However, Petitioner misconstrues the nature of habeas proceedings.  This is neither an opportunity to re-try the case nor to correct ordinary trial errors.  Federal habeas review exists only as a guard against extreme malfunctions in the state criminal justice systems. *Woods v. Donald*, 135 S. Ct. 1372 (2015).  For that reason, this Court will address only those arguments that implicate Petitioner's constitutional rights and thereby declines to reach each minute legal and factual assertion made by Petitioner except insofar as it is necessary to resolve his constitutional claims.

United States District Court
Northern District of California

(5) **Fourth Amendment.**  Petitioner's Fourth Amendment rights were violated when the police entered his business during non-business hours without a warrant, exigent circumstances, or consent; conducted a search that exceeded the scope of consent; coerced Petitioner to consent to a search of his cellphone; and failed to inform Petitioner at the police station that his attorney, Robertson, had arrived.

(6) **Conflict of Interest.**  Robertson had several conflicts of interest, and Petitioner's waiver as to one of them was not made knowingly or intelligently.

(7) **Counsel of Choice.**  The trial court denied Petitioner representation by an attorney of his choice.

(8) **Cumulative Error.**

C.   <u>Analyses</u>

1.    **The Confrontation Clause**

Petitioner asserts that his rights under the Confrontation Clause were violated when Miguel's statements were introduced at trial over his objection and without a limiting instruction.

a.  **Relevant Facts**

Although Petitioner did not raise the Confrontation Clause claim on direct appeal, his co-defendant, Estrada, did.  The state appellate court set forth the relevant facts as follows:

> ***Miguel's Confession***[FN11]
>
> > [FN11] Miguel's recorded confession was not played for the jury. The confession came into evidence through the testimony of Sergeant Frisby and through a redacted copy of Miguel's written confession, which made no mention of Estrada.]
>
> > On March 28, 2008, Los Gatos Police Sergeant Matt Frisby interviewed Miguel. The police read Miguel his Miranda[FN12] rights. Miguel said that his cousin Daniel called him in February

2008 and asked him if he could arrange to have someone "taken care of." Miguel said that he understood this to mean to kill someone. Miguel said that he and Daniel agreed on a price of $9,500. Later, Daniel told Miguel how to access a Web site with a photograph of Achilli. Miguel said he found the photograph of Achilli which had a 180 logo on it. Miguel printed out the photograph and gave it to someone he knew. Miguel said he got a wire transfer of $2,500 before the murder. On March 13 he met someone and gave him $1,500 cash, the victim's photograph, and the victim's address on Overlook Drive. Miguel said he met with Daniel on March 15 and Daniel gave him $6,500 cash. Miguel said he drove back to Southern California. Miguel wrote a confession on March 28, 2008. In his confession he wrote, "I called Dan to let him know right after." Miguel told police that Daniel put a maximum price of $10,000 for the murder. Miguel said that "tak[ing] care of" someone meant killing someone.

[FN12: *Miranda v. Arizona* (1966) 384 U.S. 436.]

*Garcia*, 2015 WL 917801, at *8.

During Sergeant Frisby's testimony, Petitioner's attorney objected on grounds that Miguel's statements violated, among other things, Petitioner's rights under the Confrontation Clause.  *See* Dkt No. 59-12 at 60–61.  The trial court overruled the objection and denied counsel's request for a limiting instruction.  *Id.* at 65.  The court explained its reasoning at the May 2012 hearing on Petitioner's motion for a new trial, stating that Miguel's "statements did not implicate [Petitioner].  The written confession was properly redacted, and his — and the use of the term that he gave money to someone did not obviously refer to [Petitioner]."  Dkt No. 59-23 at 136.

### b.  Confrontation Clause

Petitioner raised his Confrontation Clause claim for the first time in a petition for writ of habeas corpus filed with the California Supreme Court.  Because the state's highest court summarily denied the petition, there is no reasoned opinion by a state court in the record as to that claim.  Thus, this Court determines what arguments or theories could have supported the state court's decision and whether "fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of [the United States Supreme Court]."  *Richter*, 562 U.S. at 102.

1

### i. Legal Standards

2

The Confrontation Clause of the Sixth Amendment provides that in criminal cases

3 the accused has the right to "be confronted with the witnesses against him." U.S. Const.

4 amend. VI. The federal confrontation right applies to the states through the Fourteenth

5 Amendment. *Pointer v. Texas*, 380 U.S. 400, 403 (1965).

6

The Confrontation Clause bars "admission of testimonial statements of a witness

7 who did not appear at trial unless he was unavailable to testify, and the defendant ... had a

8 prior opportunity for cross-examination." *Crawford v. Washington*, 541 U.S. 36, 53-54

9 (2004). *Crawford* did not spell out a comprehensive list of "testimonial" statements but

10 noted that they include (1) "ex parte in-court testimony or its functional equivalent," such

11 as affidavits, custodial examinations, prior testimony made without cross-examination, and

12 "similar pretrial statements that declarants would reasonably expect to be used

13 prosecutorially"; (2) extrajudicial statements contained in formalized testimonial materials;

14 and (3) "statements that were made under circumstances which would lead an objective

15 witness reasonably to believe that the statement would be available for use at a later trial."

16 541 U.S. at 51-52. Nontestimonial statements do not implicate the Confrontation Clause.

17 *Id.* at 68; *see also Davis v. Washington*, 547 U.S. 813, 821 (2006) ("It is the testimonial

18 character of the statement that separates it from other hearsay that, while subject to

19 traditional limitations upon hearsay evidence, is not subject to the Confrontation Clause.").

20 Moreover, the Confrontation Clause "does not bar the use of testimonial statements for

21 purposes other than establishing the truth of the matter asserted." *Crawford*, 541 U.S. at

22 59 n.9; *see also United States v. Wahchumwah*, 710 F.3d 862, 871 (9th Cir. 2013)

23 (*Crawford* "applies only to testimonial hearsay, and 'does not bar the use of testimonial

24 statements for purposes other than establishing the truth of the matter asserted.' " (citation

25 omitted)).

26

27

28

United States District Court
Northern District of California

In *Bruton v. United States*, 391 U.S. 123, 135-37 (1968), the Supreme Court held that a defendant's Sixth Amendment right to confrontation is violated when the "powerfully incriminating extrajudicial statements of a codefendant, who stands accused side-by-side with the defendant, are deliberately spread before the jury in a joint trial" — and in such circumstances, the violation cannot be cured by limiting instructions to the jury. *See also Richardson v. Marsh*, 481 U.S. 200, 201-02 (1987) ("[*Bruton*] held that a defendant is deprived of his rights under the Confrontation Clause when his nontestifying codefendant's confession naming him as a participant in the crime is introduced at their joint trial, even if the jury is instructed to consider that confession only against the codefendant."); *Gray v. Maryland*, 523 U.S. 185, 192 (1998) ("*Bruton*, as interpreted by *Richardson*, holds that certain 'powerfully incriminating extrajudicial statements of a codefendant' – those naming another defendant – considered as a class, are so prejudicial that limiting instructions cannot work") (citations omitted).  Because the holding in *Bruton* is based on the Confrontation Clause, it is limited by *Crawford*, such that "only testimonial codefendant statements are subject to the federal Confrontation Clause limits established in *Bruton*."  *Lucero v. Holland*, 902 F.3d 979, 987 (9th Cir. 2018), cert. denied, 139 S. Ct. 1180 (2019).

*Bruton* applies only when the non-testifying co-defendant's statement "facially, expressly, or powerfully implicates the defendant."  *United States v. Mitchell*, 502 F.3d 931, 965 (9th Cir. 2007) (citation omitted), *cert. denied*, 553 U.S. 1094 (2008).  Thus, *Bruton* and its progeny do not prohibit the introduction of a non-testifying co-defendant's statement that becomes incriminating of the other defendant(s) only when "linked with [other] evidence" of record.  *See Richardson*, 481 U.S. at 208; *Gray v. Maryland*, 523 U.S. at 195 ("*Richardson* placed outside the scope of *Bruton's* rule those statements that incriminate inferentially.") (citation omitted).

United States District Court
Northern District of California

United States District Court
Northern District of California

1    Confrontation Clause claims are subject to harmless error analysis.  *United States v.*

2    *Nielsen*, 371 F.3d 574, 581 (9th Cir. 2004) (post-*Crawford* case); *see also United States v.*

3    *Allen*, 425 F.3d 1231, 1235 (9th Cir. 2005).  For purposes of federal habeas corpus review,

4    the standard applicable to violations of the Confrontation Clause is whether the

5    inadmissible evidence had an actual and prejudicial effect upon the jury.  *See Hernandez v.*

6    *Small*, 282 F.3d 1132, 1144 (9th Cir. 2002) (citing *Brecht v. Abrahamson*, 507 U.S. 619,

7    637 (1993)).

8    **ii.  Admission of Miguel's Statements**

9    Petitioner argues that the admission of Miguel's statements amounted to a *Bruton*

10   violation.  To properly address this claim, this Court will delve briefly into the

11   development of the *Bruton* rule.

12   *Bruton* held that the Confrontation Clause was violated when a codefendant's out-

13   of-court statement was indisputably inculpatory of the defendant on its face, and was not

14   redacted or otherwise altered to prevent it from implicating the defendant.  *See* 391 U.S. at

15   123-26.  Thirty years later, the Supreme Court described its holding in *Bruton* as follows:

16          *Bruton* involved two defendants accused of participating in the
            same crime and tried jointly before the same jury. One of the
17          defendants had confessed. His confession named and
            incriminated the other defendant. The trial judge issued a
18          limiting instruction, telling the jury that it should consider the
            confession as evidence only against the codefendant who had
19          confessed and not against the defendant named in the
            confession. *Bruton* held that, despite the limiting instruction, the
20          Constitution forbids the use of such a confession in the joint trial.

21   *Gray*, 523 U.S. at 188.

22   Following *Bruton*, the Supreme Court considered the use of a redacted confession

23   in a joint trial.  *Richardson*, 481 U.S. 200.  As the *Richardson* Court put it, the issue was

24   "whether *Bruton* requires the same result when the codefendant's confession is redacted to

25   omit any reference to the defendant, but the defendant is nonetheless linked to the

26

27   Case No. 16-05301 BLF (PR)

28   ORDER DEN. PET. FOR WRIT OF HABEAS CORPUS; DEN. CERTIFICATE OF APPEALABILITY

confession by evidence properly admitted against him at trial."  *Id.* at 202.  The *Richardson* Court distinguished the facts of its case from *Bruton* as follows:

> In *Bruton*, the codefendant's confession "expressly implicat[ed]" the defendant as his accomplice. [*Bruton*, 391 U.S. at 124, n.1]. Thus, at the time that confession was introduced there was not the slightest doubt that it would prove "powerfully incriminating." *Id.*, at 135, 88 S.Ct., at 1627.

> By contrast, in this case the confession was not incriminating on its face, and became so only when linked with evidence introduced later at trial (the defendant's own testimony).

*Id.* at 208.  The *Richardson* Court thus held "that the Confrontation Clause is not violated by the admission of a nontestifying codefendant's confession with a proper limiting instruction when ... the confession is redacted to eliminate not only the defendant's name, but any reference to his or her existence."  *Id.* at 211.  The Court added, "[w]e express no opinion on the admissibility of a confession in which the defendant's name has been replaced with a symbol or neutral pronoun."  *Id.* at 211 n.5.

Later in *Gray*, the Supreme Court was faced with a codefendant's confession that included an obvious alteration.  523 U.S. at 188.  There, "the prosecution ... redacted the codefendant's confession by substituting for the defendant's name in the confession a blank space or the word 'deleted' ":

> In 1993, Stacey Williams died after a severe beating. Anthony Bell gave a confession, to the Baltimore City police, in which he said that he (Bell), Kevin Gray, and Jacquin "Tank" Vanlandingham had participated in the beating that resulted in Williams' death. Vanlandingham later died. A Maryland grand jury indicted Bell and Gray for murder. The State of Maryland tried them jointly.

> The trial judge, after denying Gray's motion for a separate trial, permitted the State to introduce Bell's confession into evidence at trial. But the judge ordered the confession redacted. Consequently, the police detective who read the confession into evidence said the word "deleted" or "deletion" whenever Gray's name or Vanlandingham's name appeared. Immediately after the police detective read the redacted confession to the jury, the prosecutor asked, "after he gave you that information, you subsequently were able to arrest Mr. Kevin Gray; is that correct?" The officer responded, "That's correct." The State also

United States District Court
Northern District of California

introduced into evidence a written copy of the confession with those two names omitted, leaving in their place blank white spaces separated by commas. The State produced other witnesses, who said that six persons (including Bell, Gray, and Vanlandingham) participated in the beating. Gray testified and denied his participation. Bell did not testify.

When instructing the jury, the trial judge specified that the confession was evidence only against Bell; the instructions said that the jury should not use the confession as evidence against Gray. The jury convicted both Bell and Gray.

*Gray*, 523 U.S. at 188-89 (citations to record on appeal omitted).  The *Gray* Court held that "[r]edactions that simply replace a name with an obvious blank space or a word such as 'deleted' or a symbol or other similarly obvious indications of alteration, however, leave statements that, considered as a class, so closely resemble *Bruton*'s unredacted statements that, in our view, the law must require the same result." *Id.* at 192.

In light of these developments of the *Bruton* rule, the California Supreme Court could have reasonably determined that, unlike in *Gray*, Miguel's statements were not obviously redacted to remove reference to Petitioner.  *Cf. U.S. v. Peterson*, 140 F.3d 819, 822 (9th Cir. 1998) ("*Gray* clarifies that the substitution of a neutral pronoun or symbol in place of the defendant's name is not permissible if it is obvious that an alteration has occurred to protect the identity of a specific person").  A fair-minded jurist could thus argue that this renders the case more akin to *Richardson* than *Gray*.  This is a reasonable distinction.

Moreover, Miguel's statements did not, on their face, implicate Petitioner.  The jury was required to link Miguel's statements to Petitioner using other evidence in the record. The Supreme Court in *Gray* recognized that *Richardson* "placed outside the scope of *Bruton*'s rule those statements that incriminate inferentially."  *Id.* at 195-96.  While the out-of-court statement in *Gray* also required inferences to incriminate the defendant, the Supreme Court still found the statement to violate the defendant's right of confrontation. *Id.* at 195-96.  The Court distinguished *Gray* from *Richardson* in this manner:

> ... *Richardson* must depend in significant part upon the *kind* of, not the simple *fact* of, inference. *Richardson*'s inferences involved statements that did not refer directly to the defendant himself and which became incriminating "only when linked with evidence introduced later at trial." 481 U.S., at 208, 107 S.Ct., at 1707. The inferences at issue here involve statements that, despite redaction, obviously refer directly to someone, often obviously the defendant, and which involve inferences that a jury ordinarily could make immediately, even were the confession the very first item introduced at trial. Moreover, the redacted confession with the blank prominent on its face, in *Richardson's* words, "*facially* incriminat[es]" the codefendant. *Id.*, at 209, 107 S.Ct., at 1708 (emphasis added). Like the confession in *Bruton* itself, the accusation that the redacted confession makes "is more vivid than inferential incrimination, and hence more difficult to thrust out of mind." 481 U.S., at 208, 107 S.Ct. at 1707.

*Id.* at 196.  The Court in *Gray* thus held that the defendant's Sixth Amendment right of confrontation was violated by admission of the codefendant's obviously redacted confession.

Miguel's statements here referred only to Daniel and Lucio Estrada; none of his statements referred to—or could be interpreted as referring to—Petitioner.  In fact, Miguel did not know Petitioner at all.  Applying an analysis suggested in *Gray*:  If Miguel's statements had been the very first evidence introduced at Petitioner's trial, they would not have implicated Petitioner.  *See Gray*, 523 U.S. at 196.  A fair-minded jurist could thus argue that the jury's need to use other evidence in the record to link Miguel's statements to Petitioner is another key difference from the statement considered in *Gray*.

The California Supreme Court could have thus reasonably argued that, under *Bruton*, *Richardson*, and *Gray*, the trial court's admission of Miguel's statements did not result in a violation of Petitioner's constitutional right to confrontation.

### c.  Failure to Provide a Limiting Instruction

Petitioner insists, however, that *Bruton* error occurred because no limiting instruction was given.  Citing *Melendez-Diaz v. Massachusetts*, 557 U.S. 305, 314 n.4 (2009), he argues that "without the limiting instruction [advising the jury that the confession could be considered only against the co-defendant] even admission of the

redacted confession containing evidence [that was incriminating only when linked with evidence introduced later at trial] would have violated the defendant's Sixth Amendment rights."  He claims that the admission of Miguel's statements without a limiting instruction prejudiced him because they were used to bolster Daniel's testimony.  According to Petitioner, Daniel was "the **only** witness that linked Petitioner to [the victim]'s murder." Dkt No. 35-6 at 9 (emphasis in original).  Petitioner claims that Daniel's testimony included many falsehoods and inconsistencies that would have undermined his credibility, including testimony relating to how and when Miguel accessed a picture of the victim.  But because Miguel's statements corroborated some portions of Daniel's testimony, Petitioner asserts that their admission impacted the jury's assessment of Daniel's credibility.

This argument, which was presented by Estrada on appeal, was rejected by the state appellate court:

> Even if we were to assume for the sake of argument that the trial court erred in refusing to give a limiting instruction along the lines that Garcia's counsel requested, we would find the assumed error harmless beyond a reasonable doubt. Contrary to Garcia's argument, Miguel's confession was not admitted against Garcia and the prosecution did not invite the jury to use Miguel's confession to unconstitutionally buttress Daniel's testimony for purposes of proof beyond a reasonable doubt. Miguel's redacted statements did not refer to Garcia either directly or indirectly, or by implication. In fact, it made no mention of anyone other than Daniel being involved in the plot to have someone killed. It was uncontested that Miguel never knew Garcia's identity or even that he existed. While Garcia argues that Miguel's testimony corroborated Daniel's testimony, it did so only as to the dealings between them rather than anything that occurred between Daniel and Garcia. No evidence adduced at trial linked Garcia directly to Miguel.

> Finally, we note the evidence detailing Garcia's obsession with Donnelly was overwhelming, as was the evidence of Garcia's frustration that Donnelly had renewed her relationship with Achilli. Daniel's testimony regarding Garcia's request to have Achilli murdered was confirmed by the forensic accounting. Thus, the evidence of Garcia's role in the murder was amply demonstrated by other evidence. Miguel's confession spoke only to the mechanics of the murder, something that Garcia was not involved in. Miguel's confession did not implicate Garcia as the person who had requested and financed the murder; and

United States District Court
Northern District of California

Miguel's confession was unimportant in relation to all the other evidence linking Garcia to the murder. Any assumed error in failing to give a limiting instruction that Miguel's confession could only be used against Miguel was harmless beyond a reasonable doubt.

*Garcia*, 2015 WL 917801, at *43.

A state trial court's refusal to give an instruction does not alone raise a ground cognizable in a federal habeas corpus proceedings. *See Dunckhurst v. Deeds*, 859 F.2d 110, 114 (9th Cir. 1988). The error must so infect the trial that the defendant was deprived of the fair trial guaranteed by the Fourteenth Amendment. *See id.*

Whether a constitutional violation has occurred will depend upon the evidence in the case and the overall instructions given to the jury. *See Duckett v. Godinez*, 67 F.3d 734, 745 (9th Cir. 1995). An examination of the record is required to see precisely what was given and what was refused and whether the given instructions adequately embodied the defendant's theory. *See United States v. Tsinnijinnie*, 601 F.2d 1035, 1040 (9th Cir. 1979), *cert. denied*, 445 U.S. 966 (1980). In other words, it allows a determination of whether what was given was so prejudicial as to infect the entire trial and so deny due process. *See id.*

The omission of an instruction is less likely to be prejudicial than a misstatement of the law. *See Walker v. Endell*, 850 F.2d at 475-76 (citing *Henderson v. Kibbe*, 431 U.S. at 155). Thus, a habeas petitioner whose claim involves a failure to give a particular instruction bears an "'especially heavy burden.'" *Villafuerte v. Stewart*, 111 F.3d 616, 624 (9th Cir. 1997) (quoting *Henderson v. Kibbe*, 431 U.S. 145, 155 (1977)). The significance of the omission of such an instruction may be evaluated by comparison with the instructions that were given. *Murtishaw v. Woodford*, 255 F.3d 926, 971 (9th Cir. 2001) (quoting *Henderson*, 431 U.S. at 156).

Assuming *Bruton* error, "[t]he mere finding of a violation of the *Bruton* rule in the course of the trial . . . does not automatically require reversal of the ensuing criminal conviction." *Schneble v. Florida*, 405 U.S. 427, 430 (1972). "In some cases, the properly

admitted evidence of guilt is so overwhelming, and the prejudicial effect of the codefendant's admission is so insignificant by comparison, that it is clear beyond a reasonable doubt that the improper use of the admission was harmless error." *Id.*

The California Supreme Court, like the state appellate court, could have reasonably determined that the evidence of Petitioner's guilt was extensive, rendering any assumed error in this context harmless. *See Brecht*, 507 U.S. at 638; *Schneble*, 405 U.S. at 430. This included testimony from several witnesses showing that Petitioner was obsessed with Tessa Donnelly, that he monitored her whereabouts, and that he was angry because she resumed a relationship with the victim. It included Daniel's testimony that Petitioner asked him to "get rid of a problem," that he set a price for the hitjob, and that Petitioner gave Daniel $9,500. It included phone records showing a spike in calls between Daniel and Petitioner in the period leading up to the murder. It included bank records evidencing atypical withdrawals made by Petitioner on March 12 and March 13 from his personal checking account, the Mountain Charley's account, and the 180 Restaurant expense account totaling $9,500. It included Petitioner's computer records showing Internet searches for the victim's photo—the same photo on Miguel's computer, on Daniel's computer, and in Estrada's possession on the day of the murder—and the assessor's parcel number for the victim's residence. The state court could have thus reasonably found that any claimed prejudicial effect of Miguel's statements was greatly minimized by the other, extensive evidence of Petitioner's guilt.

Petitioner has therefore not shown that the state court's denial of this claim was contrary to established Supreme Court precedent or involved an unreasonable application thereof.

### 2.   Ineffective Assistance of Counsel

Petitioner next argues that his trial counsel, Harry Robertson, failed to properly investigate and present Petitioner's defense theory that the victim was killed due to a drug

debt.  According to Petitioner, Robertson (1) failed to call Robert Jacome and Eric Hernandez as witnesses, (2) failed to move for a severance and mistrial, (3) failed to investigate Eric Hernandez and Chad Reager, (4) "ma[de] a promise" to the jury during opening statement that the murder was the result of an effort to collect a drug debt but then failed to pursue that theory during trial, and (5) made a closing argument that was unsupported by the record.  Dkt No. 35-6 at 87-88.

### a.  Robert Jacome and Eric Hernandez

Petitioner asserts that Robertson should have called both Robert Jacome and Eric Hernandez to support the defense theory that Achilli was killed because he owed money to a drug cartel.  As explained below, Robert Jacome drove Estrada to Northern California. At the preliminary hearing, Jacome testified that Estrada said he was going for a "debt collection" related to drugs.  Hernandez, who was housed with Estrada at the county jail, told Robertson's investigator that Estrada claimed Achilli was murdered over a drug debt and that the victim was moving drugs through Mountain Charley's.

### i.  Relevant Facts

The state appellate court set forth the relevant facts as follows:

> Robert Jacome testified for the prosecution at the preliminary hearing in this case, which was held on December 16, 2008. [FN25] Jacome said that he first spoke to the police on April 7, 2008, and told them that he would fully cooperate. On March 13, 2008, Estrada called him and asked him to take him to Northern California; Estrada said he needed to go on "a gun mission." Estrada did not tell him many details other than it was for a "debt collection" related to drugs. Estrada paid him $100 for the ride. They left Southern California at about 8:00 p.m. and arrived in San Jose at approximately 1:00 to 1:30 a.m. They checked into a hotel and ate at a Burger King. On the way up from Southern California Estrada was using an "Internet printout" with driving directions.
>
> > [FN25: Jacome testified pursuant to a plea agreement; the terms of the agreement were that he would plead guilty to lesser charges in this case in exchange for a maximum prison sentence of six years and eight months in exchange for his truthful testimony.]

Jacome said that he and Estrada stayed at the hotel; early in the morning he heard a clicking noise, "like a racking of a gun." Jacome looked up and saw a black object, which in his "mind made sense it was a gun." Jacome went back to sleep. When he awoke again Estrada was gone. When Estrada returned he had no facial hair. Estrada asked Jacome to drive him to a place and Jacome dropped him off at a small street off of Highway 9. Jacome went to a Walgreens that was down the street and parked. When Jacome dropped off Estrada, Estrada said he was going to talk to an individual to collect the money; he said he would call Jacome when he was done. It was approximately 10:00 a.m. to 10:15 a.m. when he dropped off Estrada.

Jacome read a newspaper in the Walgreens parking lot and made a couple of telephone calls. Sometime later he received a telephone call from Estrada; Estrada sounded panicked. Estrada told Jacome to pick him up. The telephone call occurred at 11:38 a.m. Jacome saw Estrada off Highway 9; he had on a different set of clothes and he was running toward Jacome. Estrada had on a green and brown sweater and no hat. When Jacome had dropped him off, Estrada had been wearing black; he had on a black hat, a black zip-up sweater, and black pants and he was carrying a black bag. Jacome realized that something was wrong when he saw two police cars racing up the street with sirens on. When Estrada got into Jacome's car, he "said something to the effect, I did it, I did it."

On the drive back to Southern California, Estrada made a telephone call. Jacome did not know who it was until Estrada mentioned Miguel's name; Jacome had met Miguel before. Estrada told Miguel "something to the effect he was going to ... pick up some money later on that day or the next day." Jacome did not hear Estrada say anything about being sorry about what had happened. In fact, Estrada said repeatedly that he had no remorse.

About an hour into the drive, Jacome asked Estrada what had happened because he had no idea what was going on. Estrada said that he shot an individual in the side of the head. Estrada said it was not "like the movies"; a little fountain of blood came out of the person's head. Jacome realized what had happened and he became confused and scared. Jacome testified that he thought it was going to be a robbery—a debt collection. He had no idea that there was going to be a murder. Jacome did not ask Estrada any more questions because he was scared; he just wanted to get back home. Estrada told him he was getting paid $3,000, but did not say from whom he was getting it. Estrada asked Jacome if he wanted to go with him to collect the money, but Jacome said no.

Garcia argues that his counsel knew of Jacome's testimony before trial, but failed to call him as a witness at trial. [FN26] In

Case No. 16-05301 BLF (PR)
ORDER DEN. PET. FOR WRIT OF HABEAS CORPUS; DEN. CERTIFICATE OF APPEALABILITY

fact, on October 4, 2010, before the presentation of the defense case, Garcia's counsel told the court that he had made a tactical decision not to call Jacome in his case in chief. The court told Garcia's counsel that he wanted to have an in-chambers discussion with counsel regarding the issue. At the end of the day, the court and Garcia's counsel went into chambers. The court made the following record at the in-chambers conference. [FN27] "A couple of days ago, last week, Mr. Robertson [Garcia's counsel] brought to my attention that he intended to call a witness, Robert Jacome, and his purposes for calling that witness had to do with—his proffer was that Mr. Estrada, on the drive up from Los Angeles to Los Gatos, told Mr. Jacome that they were coming up either to collect for a drug debt or a drug hit, and I can't remember exactly which one you said. He brought that up. [¶] He also commented that he was concerned about that because it was pivotal to the defense of Mr. Garcia. We had discussion regarding the admissibility of that evidence just in general. And then subsequently, I, after talking with research, provided counsel with a citation to a case which I now don't have in front of me, but which was an unpublished decision which cited other cases which suggested that that testimony would, in fact, be admissible if Mr. Jacome was permitted to testify. [¶] During that meeting, Mr. Gillan who represents Mr. Estrada indicated that if Jacome were called to testify to that, that he anticipated that Mr. Estrada would testify in rebuttal and deny those statements, and/or testify affirmatively that that was not the purpose of the shooting. And at that point, I believe Mr. Robertson brought up the fact that his client had advised him ther4eat there were statements made in the jail by Mr. Estrada to the effect that he would testify, and if he was going to be convicted, everyone else would be as well. [¶] I bring that up as a sort of backdrop for this, because in getting the list of witnesses that Mr. Robertson intends to call on behalf of Mr. Garcia, Mr. Jacome was not listed, and in fact, you mentioned him as a potential rebuttal witness depending on what else transpired during the trial. [¶] And so I told Mr. Robertson that I was going to have this conference with him to give a very brief explanation as to why he was not going to call Mr. Jacome, and I'm giving him the opportunity to do that, because I think it is an important issue and I did want to have something on the record. [¶] And this portion of the transcript that takes place in chambers, I'll be ordering sealed—or order it sealed now and it would not be transcribed until further order of the Court."

> [FN26: Garcia claims that Mr. Robertson did not attempt to interview Jacome and this constituted ineffective assistance of counsel. Mr. Robertson did not need to interview Jacome as he was fully aware of Jacome's preliminary hearing testimony; and since Mr. Robertson was present at the preliminary hearing and cross-examined Jacome, Mr. Robertson was able to see and hear

United States District Court
Northern District of California

how he testified on both direct and cross-examination and as to what he testified.]

[FN27: The certified reporter's transcript of the ex parte chambers conference was submitted as an exhibit (F) to Garcia's motion for a new trial and on the request of Garcia's counsel was ordered unsealed. It appears that the cover sheet of this transcript correctly identifies the day of the hearing—October 4—but incorrectly specifies that it was 2011. The confidential cover sheet and the transcript itself notes the correct year 2010, but has a date of August 25. We have no doubt, however, that the transcript submitted with the new trial motion is the transcript of the in-chambers conference held on October 4, 2010.]

The court invited Mr. Robertson to comment. Mr. Robertson explained, "Part of my concern and my tactical decision not to call Jacome relates to the fact that I have no idea what Mr. Gillan's going to do. He made statements himself a week, week and a half ago that if my client's going down, everybody's going down. His client ostensibly made the statements that if he's going down, everybody's going down. [¶] My client had no contact with Mr. Estrada under anybody's theory and there's no indication of it. But I have no idea of what Lucio would say or—what he would or would not say or what he would blurt out up there. [¶] And further ... don't know what Mr. Gillan's doing in terms of a defense, because I find myself having to call witnesses that would logically flow, and in my opinion, he should have called or planned on calling for his client, like, he made this statement to the jury that Lucio Estrada came upon a murder that had already happened, and yet the police reports are literally full of witnesses who see other people running away from the scene. [¶] And if you recall, I'm the only one who talked about other routes. I'm the only one who's bringing up these other people. So I don't understand what he would say. [¶] But I have some information that there may have been more than one vehicle there. That there was, in fact, drug trafficking going on between Southern California and Northern California. And that Daniel was involved in it. [¶] I can't prove this. And the Court has seen my efforts to try and get any information from law enforcement that would show that Miguel or Daniel or Lucio or Jacome were connected to drug dealing and/or a drug debt collection. [¶] So part of my reason behind not calling Jacome is that if I call him to talk about those limited statements and what was said, I don't know that Mr. Rosen won't, at that point, then try to bring out the statements that Estrada made to Jacome about seeing the blood splattering. He made statements that it wasn't like it was in the movie. Estrada completely incriminated himself to Jacome, if Jacome's believed, which—and I had a conversation with Mr. Gillan, and a—couple of times and he indicated that

calling Jacome would be devastating to his case. [¶] I've never had a case where I was confronted with someone who's acting as Mr. Gillan did. And he did indicate that part of the reason for his levity and poking fun at me and making jokes, which I find completely inappropriate, is that he is trying to create a situation for his client where he can sort of joke about the cops just got the right guy. [¶] ... So I think ... Mr. Gillan's conduct has been problematic for me already. And having ... made those statements, his client will get up and testify and he'll sink everybody, it's kind of like that poison pill or loaded bomb. I don't know ... what might be lurking there and I don't want to open that door at this time. [¶] You know, Gillan made the statement that he's not going to have any case. He's not going to call any witnesses except for that veiled threat of, in rebuttal, which means that he would put Lucio on. Now I don't know that he could tactically or technically do that, but my hope is that he'll be able to follow the evidence that I laid out about other people being there and run with that. [¶] I don't know what he's going to do. And I did not know before the trial what his conduct was going to be like. I didn't know. I've never seen anything like it."

The court acknowledged that the purpose of the in-chambers conference was to ascertain whether Mr. Robertson had thought through his decision not to call Jacome. The court told Mr. Robertson that the court was "satisfied that what you've told me, as I fully expected, is that you are making a reasoned, tactical decision. There's good logic behind your decision not to call Mr. Jacome, and so I'm happy with that, Okay."

In addition to Jacome's testimony, Garcia's counsel was aware that in May 2009, his investigator, Anne Fields, had interviewed Eric Hernandez. Hernandez had been housed at the county jail in the same pod as Estrada. Fields reported that Hernandez had told her about conversations that he had had with Estrada. Her report notes the following: "Lucio Estrada said that the hit on Mark Achilli was over money owed for drugs. Lucio said that drugs were being moved through the bar. Lucio said he was connected with the Mexican Mafia in Southern California. Lucio said that the Mexican Mafia wanted Mark dead. Lucio told Eric that the police have the reason for the homicide 'all wrong.' Lucio said that one guy working at the bar was family and he knew what was going on. [¶] Lucio made these statements in front of Eric Hernandez and Chad Reger. Mr. Reger is in prison serving a 15 to Life sentence for murder."

*Garcia*, 2015 WL 917801, at *32-34.

### ii.  The State Appellate Court's Rejection of this Claim

The state appellate court determined that Petitioner had not overcome the presumption that Robertson's tactical decisions were reasonable.

Garcia questions why Jacome and Hernandez were not called to testify during the presentation of his defense. Garcia argues that the need for their testimony was "readily apparent."

A court considering a claim of ineffective assistance of counsel must apply a "strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." (*Strickland, supra,* 466 U.S. at p. 689.) We reiterate that scrutiny of counsel's actions is highly deferential, undertaken with the view to removing the distorting effects of hindsight, and viewed as of the time that counsel was required to act. (*Id.* at pp. 689–690.) The challenger's burden is to show that counsel made "errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." (*Id.* at p. 687.)

As the United States Supreme Court has explained, " 'Surmounting *Strickland* 's high bar is never an easy task.' [Citation.] An ineffective-assistance claim can function as a way to escape rules of waiver and forfeiture and raise issues not presented at trial, and so the Strickland standard must be applied with scrupulous care, lest 'intrusive post-trial inquiry' threaten the integrity of the very adversary process the right to counsel is meant to serve. [Citation.] Even under de novo review, the standard for judging counsel's representation is a most deferential one. Unlike a later reviewing court, the attorney observed the relevant proceedings, knew of materials outside the record, and interacted with the client, with opposing counsel, and with the judge. It is 'all too tempting' to 'second-guess counsel's assistance after conviction or adverse sentence.' [Citations.] The question is whether an attorney's representation amounted to incompetence under 'prevailing professional norms,' not whether it deviated from best practices or most common custom. [Citation.]" (*Harrington v. Richter* (2011) 562 U.S. 86, 131.)

The failure to present specific evidence or witnesses, ask certain questions in direct or cross-examination, and make certain objections to evidence are traditionally deemed to fall within the realm of trial tactics over which the court will not engage in "judicial hindsight." (*People v. Beagle* (1972) 6 Cal.3d 441, 458, superseded by statute on other grounds as stated in *People v. Rogers* (1985) 173 Cal.App.3d 205, 208–209.)

The problem with Garcia's argument that his counsel should have called Jacome and Hernandez is that we do not know if they would have testified favorably or unfavorably to Garcia. Garcia's claim of incompetence is based entirely on a speculative, hopeful view of possible evidence. Further, had Jacome testified consistent with his preliminary hearing testimony, he would have been subject to impeachment and rebuttal evidence. [FN28] Jacome's statements to the police and

his preliminary hearing testimony attempted to minimize his involvement in the murder; he had a strong motive to fabricate his story that this was a mission to collect a drug debt. He denied any knowledge of a planned execution and "believed [that] Lucio was only going to 'wave his gun around' " to collect a debt for a large amount of cocaine. Jacome's sole source of information before the murder allegedly came from Estrada. Jacome had no independent knowledge that this was in fact related to the collection of a drug debt and we have serious doubts that this evidence was admissible as an admission by Estrada if elicited by Garcia. [FN29]

[FN28: As the prosecutor argued in rebuttal, "[w]e had a lot of discussion here about a drug hit. It's pure speculation. It's fantasy. There's no evidence of drug dealing at Mountain Charley's, of drugs going in and out, of Mark Achilli owing people money for drugs. Nothing. Defense counsel said, 'Oh, it was common knowledge that Mark Achilli, you know, was addicted to cocaine.' No. No. The testimony was a few people testified that, 'Yeah, I knew Mark Achilli used cocaine recreationally.' [¶] Okay. Now, remember Mark Achilli doesn't own Mountain Charley's anymore or Club 180. He sells it to Paul Garcia in September of 2007. So how does—he has nothing to do with what's going on at Mountain Charley's or Club 180 after September 2007. So all this—its drugs, it's all speculation and fantasy. There's no drugs found in Mark Achilli's house. There's no large amounts of cash found. If it's a drug hit for money that's owed—his wallet's not taken. His wallet's in his back pocket. There's no evidence that this had anything to do with drugs."]

[FN29: A statement that was made other than by a witness while testifying and that is offered to prove the truth of the matter stated is hearsay. (§ 1200, subd. (a).) Generally, hearsay is inadmissible. (*Id.*, subd. (b).) Here, Jacome's testimony that Estrada told him that they were on a mission to collect a drug debt would have been inadmissible because it was being offered to prove the truth of the matter asserted, i.e., that they were on a mission to collect a drug debt. Garcia suggests that it "was theoretically admissible as a party admission" under section 1220. However, section 1220 provides, "Evidence of a statement is not made inadmissible by the hearsay rule when offered against the declarant in an action to which he is a party...." (Italics added.) *See People v. Dennis*

(1998) 17 Cal.4th 468, 528 [the hearsay rule does not prevent evidence of a statement made by a party from being admitted against that party ]. The testimony that Garcia proposes should have been elicited was not being offered against the declarant, i.e., against Estrada; it was being offered to support Garcia's defense.]

More importantly, Garcia's counsel was aware that before trial he had sent a request to the prosecutor for information about whether Achilli or any of his business partners or employees had been involved in trafficking cocaine or money laundering. As the prosecutor explained to the court on the morning of September 3, 2010, Sergeant Frisby had used all the police resources available to him and determined that there was absolutely "no evidence of cocaine trafficking or money laundering associated with Mountain Charley's or Club 180. And the People ... then wrote a letter to the defense indicating that." Garcia's counsel knew that if he attempted to elicit Jacome's testimony, the prosecutor had solid evidence in the form of Sergeant Frisby's testimony, which could have been elicited in rebuttal, that there was no evidence that Achilli was involved in drug dealing. Without corroborating evidence, Jacome's testimony had little significance.

Finally, Jacome's testimony was potentially detrimental to Garcia's defense. First, Daniel testified that Garcia suggested several times that the murder should look as if it was a drug deal gone wrong. Thus, the jury could have used Jacome's testimony to tie Garcia into the conspiracy that way.

Given the prospect that Estrada would take the stand and testify that Jacome was lying about what he had said, and in light of all the other knowledge that Garcia's counsel had that there simply was no evidence that Achilli was involved in drug dealing, we cannot say that the decision by Mr. Robertson not to call Jacome and/or Hernandez amounted to incompetence under prevailing professional norms. It is well settled that strategic choices made by defense counsel after a thorough investigation of the law and facts relevant to the plausible options are "virtually unchallengeable." (*Strickland*, *supra*, 466 U.S. at p. 690.)

Garcia's citation to *Chambers v. Armontrout* (8th Cir.1990) 907 F.2d 825 (*Armontrout* ) does not persuade us otherwise. In *Armontrout*, the court found that trial counsel was incompetent because he failed to present "an unbiased, uncontradicted witness who provided evidentiary support to Chambers' only defense and whose damaging testimony was merely cumulative of several of the State's witnesses' testimony." (*Id.* at p. 831.) Here, Jacome was not an unbiased witness but a participant in a criminal enterprise, who, as noted *ante*, had a strong motive to fabricate his story about Estrada's purpose in coming to Los Gatos. His testimony did not eliminate Garcia as a participant;

United States District Court
Northern District of California

in fact, in some ways it bolstered Daniel's testimony that Garcia had told him to make sure that the murder looked as if it was a drug deal gone wrong; and his testimony was in conflict with the trial evidence in that there appeared to be no attempt to take Achilli's wallet or any attempt to take Achilli to a bank or ATM machine to get money.

Finally, as to Garcia's argument that Mr. Robertson had an obligation to call Hernandez as a defense witness, Mr. Robertson's declaration prepared for Garcia's new-trial motion indicates that both he and his investigator concluded that Hernandez was lying in an effort to curry favor with and/or spend more time with the investigator. Further, when they tried to re-interview him and confirm that he would be a witness, Hernandez would not return telephone calls. We cannot fault Mr. Robertson for not presenting a witness whom he did not trust to present truthful testimony and who had demonstrated an unwillingness to come forward to testify. [FN30]

> [FN30: When Mr. Robertson's investigator finally met Hernandez by chance, he confirmed that he would not take the stand and testify in a new trial.]

Garcia has failed to present any persuasive arguments to overcome the presumption that Mr. Robertson's decisions not to call Jacome and/or Hernandez to testify were sound trial strategies.

*Garcia*, 2015 WL 917801, at *34-36.

### iii. Legal Standards

The Sixth Amendment guarantees not only assistance, but the effective assistance, of counsel. *Strickland v. Washington*, 466 U.S. 668, 686 (1984). The benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied upon as having produced a just result. *Id.* To prevail on a Sixth Amendment ineffective assistance of counsel claim, a petitioner must satisfy a two-prong test. First, he must establish that counsel's performance was deficient, i.e., that it fell below an "objective standard of reasonableness" under prevailing professional norms. *Id.* at 687-88. Second, he must establish that he was prejudiced by counsel's deficient performance; he must show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of

1      the proceeding would have been different." *Id.* at 694.  A reasonable probability is a

2      probability sufficient to undermine confidence in the outcome.  *Id.*

3            A "doubly" deferential judicial review is appropriate in analyzing ineffective

4      assistance of counsel claims under § 2254.  *See Cullen v. Pinholster*, 563 U.S. 170, 202

5      (2011).  The "question is not whether counsel's actions were reasonable.  The question is

6      whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential

7      standard."  *Richter*, 562 U.S. at 105.

8            A court need not determine whether counsel's performance was deficient before

9      examining the prejudice suffered by the defendant as the result of the alleged deficiencies.

10     *See Strickland*, 466 U.S. at 697.

11           A difference of opinion as to trial tactics does not constitute denial of effective

12     assistance, *see United States v. Mayo*, 646 F.2d 369, 375 (9th Cir. 1981), and tactical

13     decisions are not ineffective assistance simply because in retrospect better tactics are

14     known to have been available.  *See Bashor v. Risley*, 730 F.2d 1228, 1241 (9th Cir. 1984),

15     cert. denied, 469 U.S. 838 (1984).

16           The petitioner bears the burden of rebutting the strong presumption that strategic

17     decisions by counsel are reasonable, and the absence of evidence cannot overcome the

18     presumption.  *Dunn v. Reeves*, 141 S. Ct. 2405, 2410 (2021) (per curiam) (internal

19     quotations omitted).

20                              **iv.  Analysis**

21           The state appellate court determined that Robertson made a "sound trial strategy"

22     by choosing to not call Jacome as a witness.  This was a reasonable determination based on

23     the facts before it.  "A fair assessment of attorney performance requires that every effort be

24     made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of

25     counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at

26     the time."  *Carrera v. Ayers*, 670 F.3d 938, 943 (9th Cir. 2011).  To overturn the strong

United States District Court
Northern District of California

1   presumption of adequate assistance, movant must demonstrate the challenged action

2   cannot reasonably be considered sound strategy under the circumstances of the case.  *See*

3   *Lord v. Wood*, 184 F.3d 1083, 1085 (9th Cir. 1999).

4         Robertson investigated the defense theory that Achilli was murdered because of a

5   drug debt.  He and his private investigator interviewed several people and pursued multiple

6   leads relating to both drug trafficking and Achilli's drug use.  Robertson even submitted a

7   discovery request to the DA asking for any information about drug dealing involving the

8   co-defendants.  Dkt Nos. 57-10 at 27; 85-23 at 105.  The investigation ultimately led

9   Robertson to decline calling Jacome and Hernandez as trial witnesses, a decision he

10   explained to the trial court in camera and then in a declaration in support of Petitioner's

11   motion for a new trial.  For one, there was scant evidence to support the drug debt theory.

12   The DA reported that the prosecution did not have any information related to drug

13   trafficking, Dkt No. 85-4 at 214, and there was no evidence—only speculation—that

14   Petitioner's co-defendants were involved with the Mexican Mafia.  *See, e.g.*, Dkt No. 85-

15   32 at 52-55 (Jacome told police that there was a "rumor" that another family related to

16   Miguel's family—but "[n]ot Miguel's family directly"—imported cocaine from Mexico).

17         The evidence also showed that Achilli was, at most, a recreational cocaine user.

18   *See* Dkt No. 56-6 at 43-44.  While Achilli's daughter, Alex, did tell the police about a

19   woman once looking for Achilli at a party to get cocaine, Alex also reported that her father

20   denied buying drugs and told her that he had only been given a hand-off.  Dkt No. 85-25 at

21   86-87.  Similarly, multiple witnesses close to Achilli testified that he used cocaine only

22   recreationally.  Moreover, at the time of the murder, there were no drugs found in Achilli's

23   home or car, and only a small amount of marijuana was found in his system.  *See* Dkt No.

24   59-12 at 131.  Given the paucity of evidence supporting the drug debt theory, the People

25   filed—and the trial court granted—a motion in limine to exclude third party culpability

26

27

28

United States District Court
Northern District of California

1    evidence on the ground that Petitioner's defense theory was premised on "empty

2    allegations."  Dkt No. 56-8 at 242-52.

3           In addition, Robertson explained that the circumstances of Achilli's murder were

4    inconsistent with a drug debt theory, stating, "If you want to collect a debt, you don't start

5    by killing the debtor."  Dkt No. 57-10 at 24.  Notably, Achilli's wallet and phone were still

6    on or around his person after the murder (Dkt No. 59-2 at 34-35, 169), his car was not

7    taken, and his home was left untouched.  Likewise, items taken during a search of

8    Estrada's residence did not support the defense theory.  This included books with titles

9    such as "Hit Man," "Surgical Speed Shooting," and "Combat Handgunnery."  Dkt No. 57-

10   8 at 65-66.  It also included Estrada's notebooks, wherein he wrote statements such as

11   "relax and stay calm, approach the appointed target, calm and precise.  Shoot to kill!"  Dkt

12   No. 57-9 at 8.

13          Even more, Robertson became concerned that calling Jacome would backfire and

14   harm Petitioner's defense.  This concern stemmed from animosity between Petitioner and

15   his co-defendants and from their inconsistent defense theories.  Estrada's defense was that

16   he came upon the scene, witnessed the murder, and ran away panicked.  Dkt No. 59-21 at

17   44.  Had Robertson called Jacome to testify as to statements he made about the drug debt

18   theory, Robertson feared that on cross-examination, the prosecutor would refer to other

19   statements made by Jacome implicating Estrada—namely, that Estrada said, "I did it. I did

20   it," and that the shooting "wasn't like in the movies."  Petitioner had reported to Robertson

21   that Estrada made statements in jail that "if he was going to be convicted, everyone else

22   would be as well."[5]  Dkt No. 85-4 at 52.  Thus, Robertson worried that if he called Jacome,

23   then Charlie Gillan, Estrada's defense counsel, would call Estrada to testify that the

24

---

25   [5] Robertson also claimed that Estrada's defense attorney, Charlie Gillan, told him that if
     Estrada is "going down, everybody's going down."  Dkt No. 85-4 at 53.  Gillan denies
26   having ever made this statement, though he did admit that he "intend[ed] to continue to
     represent Mr. Estrada to the best of my ability, even if it is to the detriment of Paul
27   Garcia."  Dkt No. 59-14 at 203.

28

United States District Court
Northern District of California

murder was *not* related to a drug debt.  Robertson also worried that the prosecutor would elicit testimony from Jacome regarding statements he made to the police that the killing was for Achilli's "business partner," which would have implicated Petitioner.  Dkt No. 57-10 at 24.

As for Hernandez, while Robertson believed his statements to be false, he nonetheless attempted to re-interview and confirm him as a witness.  Dkt No. 57-10 at 31.  However, Hernandez "became unavailable," failing to return phone calls and avoiding Robertson's private investigator, Anne Fields.  *Id.*  Fields did eventually see Hernandez in court when he appeared for jury duty, but Hernandez told her that he would not take the stand or affirm his original statement.  *Id.*

Petitioner counters that Robertson's failure to call Jacome and Hernandez as trial witnesses was objectively unreasonable "when combined with the wealth of supportive and corroborative evidence" that the murder was related to a drug debt.  Dkt No. 35-6 at 89.  As to the other evidence, Petitioner refers to Daniel's testimony that he had twice transported an ounce of cocaine and, once, an ounce of methamphetamine from Southern California to Northern California in 2006 or 2007.  Dkt No. 85-12 at 192-93.  Daniel testified, though, that "all three instances were not to benefit me, they were going to family members who requested it"; he was merely the "intermediary."  Dkt No. 85-12 at 193.  In any event, these transports were made one to two years before Achilli's murder.  Petitioner next points to several items found during a search of Miguel's residence that suggest a link to drug dealing, including six cell phones, two gun-cleaning cases, and $3240 in cash.  Dkt No. 85-35 at 39-40.  A search of Estrada's residence revealed $2000 in cash; a digital scale; multiple baggies of marijuana; rock cocaine, powder cocaine, and crystal methamphetamine; and a statue of "Malverde," the patron saint of drug traffickers.  Dkt No. 85-38 at 203-13, 224, 232-33.  But the record indicates that the $2000 and the marijuana belonged to Estrada's brother (Dkt No. 85-15 at 10, 30), and the other evidence

1    indicated that Estrada was involved in a *marijuana* growing operation, not trafficking of

2    cocaine.  *See, e.g.*, Dkt No. 85-38 at 232 (approximately 25 pictures were seized of Estrada

3    standing in front of what appeared to be a marijuana growing operation).  There was also

4    evidence that the co-defendants agreed after the murder to frame it as a drug deal gone

5    bad, and Petitioner himself told Daniel that it should look like a collection on a drug debt.

6         Even assuming there was definitive evidence showing that the co-defendants were

7    involved in drug trafficking, there was only tangential evidence linking those activities to

8    Achilli.  Petitioner points to reports of Achilli's cocaine use, as well a gambling-related

9    theft of "thousands of dollars" that occurred more than 15 years before the murder.  Dkt

10   No. 35-5 at 378-82.  He argues that this evidence, taken together, supported the drug debt

11   theory and that Jacome and Hernandez's testimony would have provided a critical link

12   between the victim's drug use and the co-defendants' involvement in drug trafficking.  As

13   noted above, however, the evidence of Achilli's drug use indicated that he used only

14   recreationally; it simply did not support Petitioner's claim that Achilli was indebted

15   $60,000 to a drug cartel for cocaine.  And the alleged theft was far too remote in time to

16   suggest a link to Achilli's murder.

17        Because Petitioner has failed to show that "there [was no] reasonable argument that

18   [Robertson] satisfied *Strickland*'s deferential standard," *Richter*, 562 U.S. at 105, he is not

19   entitled to habeas relief on this claim.

20              **b.  Failure to Move for a Severance and Mistrial**

21        Petitioner argues that Robertson was ineffective because he failed to move for a

22   severance before the trial and failed to move for a severance and mistrial during the trial.

23   Petitioner presented these arguments for the first time to the California Supreme Court.

24   Therefore, this Court is again tasked with determining what arguments or theories could

25   have supported the state high court's decision and whether "fairminded jurists could

26

27

28

United States District Court
Northern District of California

disagree that those arguments or theories are inconsistent with the holding in a prior decision of [the United States Supreme Court]." *Richter*, 562 U.S. at 102.

### i. Relevant Facts

Before trial, Robertson considered moving for a severance but did not believe that he had compelling grounds for it at the time.  Dkt No. 57-10 at 50.  Two days into the presentation of Petitioner's defense, though, Robertson did move for a mistrial and/or severance "based on conduct of counsel, divergence of interests, and that kind of thing." Dkt No. 59-14 at 199.  He noted that Petitioner and Estrada's defenses had begun to conflict, and he claimed that Estrada's attorney, Gillan, said that "if his client's going down, everybody's going down." *Id.* at 200.  Gillan admitted that "Mr. Robertson's tactical decision to call Robert Jacome as a witness causes the defense to have to alter its defense on behalf of Lucio Estrada." *Id.* at 203.  He continued, saying, "If, to benefit Mr. Estrada, it causes Paul Garcia's case to be worse, I have to be the advocate of Mr. Estrada, not Mr. Garcia.  And I intend to continue to represent Mr. Estrada to the best of my ability, even if it is to the detriment of Paul Garcia." *Id.*  Following further argument, the trial court denied the motion.  *Id.* at 206.

Robertson then considered moving for a severance or mistrial "several times" during the remainder of the trial but ultimately declined to pursue it after balancing the potential benefits versus risks of the delay.  *See* Dkt No. 57-10 at 50-51.  The risks included the potential that the prosecution would discover additional physical evidence not yet known by the prosecution, that new witnesses could come forward with damaging testimony, and that witnesses favorable to Petitioner could change their testimony.  *Id.* at 51-52.  When Robertson discussed moving for a mistrial and/or severance with Petitioner, Petitioner too wanted to proceed with matters.  *Id.*  According to Robertson, Petitioner "was opposed to continuances" and "wanted to move ahead as soon as possible." *Id.* Petitioner felt prepared to testify under questioning by the current prosecutor, whom he

United States District Court
Northern District of California

had "watched . . . intently," while a severance would have likely resulted in a new prosecutor. *Id.* at 55. There was also the opportunity for the prosecution, having seen the defense's trial strategy, to identify and exploit its weaknesses. *Id.* Finally, Robertson felt that Petitioner had a reasonable chance of appellate review and reversal based on the trial court's rulings. *Id.*

After trial, Robertson moved for a new trial based, in part, on the conflict between the defense strategies of Petitioner and Estrada and conflict between Robertson and Estrada's defense counsel. Dkt No. 57 at 120-29. When Robertson then conflicted out, Petitioner's newly-appointed trial counsel, Edward Sousa, filed another motion for a new trial, arguing, among other things, that Robertson rendered ineffective assistance by failing to move for a severance and mistrial earlier in the proceedings. Dkt No. 57-1 at 4-107. In denying the motion, the trial court addressed this argument as follows:

> With regard to the claim that the defense failed to move for severance and mistrial, this is Roman numeral I, subdivision (b). This issue was discussed, according to Mr. Garcia – or Mr. Robertson. It was discussed with the investigator and Paul Garcia by Mr. Robertson. He felt there was significant risks that additional damaging evidence would be found. He was concerned about Ms. Ronzano's testimony.
>
> Mr. Garcia told him that he was able to handle or take on Mr. Rosen. Mr. Robertson felt that the time was – to try the case was then, that he did not believe it was going to get better for them if there was a delay.

Dkt No. 59-23 at 38-39.

### ii.  Analysis

A lawyer need not file a motion or make an objection that the lawyer knows to be meritless on the facts and the law. *See Wilson v. Henry*, 185 F.3d 986, 990 (9th Cir. 1999) ("to show prejudice under *Strickland* from failure to file a motion, [a petitioner] must show that (1) had his counsel filed the motion, it is reasonable that the trial court would have granted it as meritorious, and (2) had the motion been granted, it is reasonable that there

would have been an outcome more favorable to him."). The failure of defense counsel to take a futile action does not constitute ineffective assistance. *See Rupe v. Wood*, 93 F.3d 1434, 1444-45 (9th Cir. 1996).

It would have been reasonable for the state's highest court to conclude that Robertson's decision to not move for a severance pretrial was reasonable because he was unaware of the extent of the conflict between Petitioner and Estrada's defenses at the time. It was only when Gillan confirmed that "Mr. Robertson's tactical decision to call Jacome as a witness causes the defense to have to alter its defense on behalf of Lucia Estrada" that Robertson did move for a severance and/or mistrial. Then, after that motion was denied, Robertson contemplated bringing another motion but ultimately decided against it, for the reasons identified *supra*. The California Supreme Court could therefore have reasonably determined that those reasons, coupled with the trial court's denial of Robertson's first motion for a severance and mistrial, rendered Robertson's decision to not file a second motion reasonable. *See Rupe*, 93 F.3d at 1445.

In addition, Petitioner has not shown that he was prejudiced by Robertson's failure to file a second motion for a severance and mistrial. Petitioner argues that a severance would have permitted Jacome to testify that Estrada told him that Achilli was murdered due to a drug debt, and it would have permitted Hernandez to testify about statements made by Estrada that the murder was related to money owed for drugs. *See* Dkt No. 35-6 at 147-48. As to the former, the state appellate court had "serious doubts that this evidence was admissible as an admission by Estrada if elicited by Garcia." Dkt No. 58-4 at 143, n. 29. As to the latter, Hernandez made clear that he would not testify. Thus, Petitioner has not demonstrated prejudice stemming from Robertson's failure to file a second severance motion.

1        Because Petitioner has not presented any argument or evidence to suggest that the

2   state's highest court's application of *Strickland* was unreasonable, he is not entitled to

3   relief on this claim, either.

### c.  Failure to Investigate Chad Reager

5        Petitioner argues that Robertson should have investigated Chad Reager.  This

6   argument was first presented to, and summarily denied by, the California Supreme Court.

### i.  Relevant Facts

8        During his May 2009 interview with Robertson's private investigator, Hernandez

9   identified Chad Reager as another inmate housed at the Santa Clara County Jail at the

10  same time as Estrada.  Dkt No. 57-1 at 127.  According to Hernandez, Reager also

11  overheard Estrada say that the police had it "all wrong" as to the motive for Achilli's

12  murder and claimed that the hit was over money owed for drugs.  *Id.*  Robertson did not

13  investigate Reager.  *See* Dkt No. 85-4 at 219.

14       After Robertson withdrew as counsel, Petitioner's appointed attorney, Edward

15  Sousa, located Reager at Ironwood State Prison.  Dkt No. 57-1 at 129.  Sousa's private

16  investigator interviewed Reager in December 2011 where Reager confirmed that he was

17  housed at the jail with Hernandez and Estrada but did not remember Estrada making the

18  statement because it was such a long time ago.  *Id.*  Subsequently, Sousa argued in his

19  motion for a new trial that, "[w]ithout adequate investigation as to Chad Reager, Mr.

20  Robertson lacked the knowledge necessary to make any informed tactical decision

21  regarding calling him to further corroborate the statements of Jacome and Hernandez."  *Id.*

22  at 43-44.

23       In a declaration filed in support of Sousa's motion for a new trial, Robertson

24  acknowledged that "[i]t might have been a good idea to interview Mr. Reager but I do not

25  believe that it would have yielded any benefit."  Dkt No. 57-10 at 32.  Robertson did not

26  believe Estrada made the statement attributed to him, as discussed above.  *Id.*  Roberston

United States District Court
Northern District of California

1    also reiterated the problems with Hernandez's statement to Anne Fields, including his

2    suspicion that Hernandez was merely saying things to curry favor with Fields, which

3    appeared to be confirmed when Hernandez refused to testify.  *Id.* at 32-33.  Robertson also

4    found it unbelievable that Reager, an inmate sentenced to 15 years to life for murder,

5    would not remember a conversation from a year prior about another inmate admitting to a

6    murder.  *Id.* at 33.

7          When presented with Sousa's motion for a new trial, the trial court found that

8    Robertson "set[ ] forth sound, tactical decisions not to interview Reiger [*sic*].  I also don't

9    believe that there would have been a reasonable probability of a different outcome if

10   Robertson had interviewed Chad Reiger [*sic*].  And given the rest of the evidence, I don't

11   believe there was a reasonable probability that it that it would have affected the outcome

12   given the fact that there was no other evidence of drug dealing in the bar or restaurant."

13   Dkt No. 59-23 at 39.

14                              **ii.  Analysis**

15         It would have been reasonable for the California Supreme Court to find that

16   Robertson made a sound, tactical decision regarding Reager considering the circumstances.

17   Due to the scant evidence supporting the drug debt theory, Robertson was concerned that

18   Estrada had lied to Jacome, and that Estrada would testify to that effect.  Robertson was

19   also concerned about the veracity of Hernandez's statement to Anne Fields, concerns that

20   he believed extended to Reager.  Not seeing a benefit to pursuing that potential lead,

21   Robertson decided to forego interviewing Reager.  *Richter*, 562 U.S. at 107 ("Counsel was

22   entitled to formulate a strategy that was reasonable at the time and to balance limited

23   resources in accord with effective trial tactics and strategies.").  The California Supreme

24   Court could have thus rejected Petitioner's argument on an objectively reasonable

25   application of the governing law to the facts presented, and Petitioner has not established

26   that no fairminded jurist could agree that such an outcome is consistent with federal law.

27   Case No. 16-05301 BLF (PR)

28   ORDER DEN. PET. FOR WRIT OF HABEAS CORPUS; DEN. CERTIFICATE OF APPEALABILITY

United States District Court
Northern District of California

Furthermore, Petitioner has not shown prejudice, as Reager could not remember the details of the conversation that purportedly occurred only one year prior.  Thus, he is not entitled to relief on this claim.

### d.  Promise Made in Opening Statement

In his opening statement, Robertson said, "I'm not going to get into specific detail, but I'll tell you that you're going to hear a little bit about drugs.  You're going to hear a little bit about drug use.  You'll likely hear that it's undisputed that Mark Achilli had a drug problem, that he used cocaine."  Dkt No. 59-21 at 52.  Later, he said, "[w]hat happened in this case was a drug collection.  *Id.* at 57.  Petitioner argues that Robertson never presented such evidence during the trial, thereby failing to fulfill his promise.

The California Supreme Court could have determined, however, that habeas relief was not warranted on this claim because the United States Supreme Court had never held that the failure to follow through on a promise made in an opening statement violates a defendant's constitutional rights.  The state court could have also found that Robertson's statements were not a promise to introduce specific evidence or witnesses, and therefore no promises were broken.  Furthermore, the court could have reasonably concluded that evidence of the drug debt theory *was* introduced, including testimony from several witnesses that Achilli used cocaine recreationally; evidence collected from Estrada's apartment, which included baggies of marijuana, pictures of Estrada in front of a marijuana growing operation, and various other drugs; and evidence that Daniel had transported drugs in 2006 or 2007.  Based thereon, this Court concludes that the state court's rejection of this claim was neither contrary to, nor an unreasonable application of, federal law.

### e.  Closing Argument

In his closing argument, Robertson again brought up the drug debt theory, stating:

> And, again, my theory, my belief, is that Daniel Chaidez did this
> related to drugs; that whatever plan he had was separate and
> apart from – and if I'm right, if it somehow related to his only
> a  few  times  admittedly  bringing  up  large  quantities  of

United States District Court
Northern District of California

> methamphetamine, cocaine for sale, those are dangerous people
> if you engage in that kind of behavior with.

Dkt No. 59-20 at 27-28.  Petitioner argues Robertson was ineffective for failing to tie any

evidence to the theory.

In *Yarbrough v. Gentry*, 540 U.S. 1 (2003), which addressed the deference owed to

a defense attorney's decisions with respect to their own closing argument, the Supreme

Court stated:

> The right to effective assistance extends to closing arguments.
> Nonetheless, counsel has wide latitude in deciding how best to
> represent a client, and deference to counsel's tactical decisions
> in his closing presentation is particularly important because of
> the broad range of legitimate defense strategy at that stage.
> Closing arguments should sharpen and clarify the issues for
> resolution by the trier of fact, but which issues to sharpen and
> how best to clarify them are questions with many reasonable
> answers. Indeed, it might sometimes make sense to forgo closing
> argument altogether. Judicial review of a defense attorney's
> summation is therefore highly deferential—and doubly
> deferential when it is conducted through the lens of federal
> habeas.

*Id.* at 5–6 (internal quotation marks and citations omitted).

It would have been reasonable for the California Supreme Court to deny this claim

on the ground that Robertson did highlight evidence supporting the drug debt theory, as

noted above.  The court could have also reasonably determined that Robertson chose not to

highlight what he believed to be indirect evidence supporting the theory.  Robertson may

also have sought to focus the jury's attention on weaknesses in the prosecution's case.  "To

support a defense argument that the prosecution has not proved its case it sometimes is

better to try to cast pervasive suspicion of doubt than to strive to prove a certainty that

exonerates."  *Richter*, 562 U.S. at 109.

Petitioner's arguments to the contrary — that the number of jury notes suggests

prejudice, that the length of jury deliberations suggest prejudice, that other individuals

could have testified to support the drug debt theory — are vague, conclusory, and

United States District Court
Northern District of California

1   manifestly insufficient to support an ineffective assistance of counsel claim.  *Greenway v.*

2   *Schriro*, 653 F.3d 790, 804 (9th Cir. 2011); *see also Sandgathe v. Maass*, 314 F.3d 371,

3   379 (9th Cir. 2002) (affirming denial of ineffective assistance of counsel claim when

4   petitioner presented no evidence in support of claim).  Petitioner has presented absolutely

5   no evidence, such as a declaration, demonstrating any such witness was available and

6   willing to testify on his behalf, or discussing the manner in which such a witness would

7   have testified and how such testimony would have benefitted Petitioner.  Absent such

8   evidence, Petitioner's speculative allegations are insufficient to warrant habeas corpus

9   relief.  *See Atwood v. Ryan*, 870 F.3d 1033, 1064 (9th Cir. 2017) ("An argument that

10  counsel could have relied on 'any number of hypothetical experts ... whose insight might

11  possibly have been useful' is speculative and insufficient to establish that counsel was

12  deficient." (quoting *Richter*, 562 U.S. at 107)); *Wildman v. Johnson*, 261 F.3d 832, 839

13  (9th Cir. 2001) (petitioner did not show his trial counsel was ineffective in failing to call an

14  arson expert when petitioner "offered no evidence that an arson expert would have testified

15  on his behalf at trial. He merely speculates that such an expert could be found. Such

16  speculation, however, is insufficient to establish prejudice.").

17          In conclusion, the Court finds that the state court's denial of Petitioner's ineffective

18  assistance of counsel claim was neither contrary to nor involved an unreasonable

19  application of federal law.

20          **3.      Ineffective Assistance of Appellate Counsel**

21          Petitioner also brings a claim of ineffective assistance of counsel as to his appellate

22  counsel, Mark Greenberg.  Petitioner contends that Greenberg failed to review the

23  discovery file and failed to investigate exonerating drug evidence before filing the

24  companion habeas petition in the state appellate court.

25          "[T]he right to appointed counsel extends to the first appeal of right, and no

26  further."  *Pennsylvania v. Finley*, 481 U.S. 551, 555 (1987).  There is no constitutional

right to an attorney in any other state postconviction proceedings. *See Coleman v. Thompson*, 501 U.S. 722, 755-57 (1991) (no right to counsel on appeal from state habeas trial court judgment); *Finley*, 481 U.S. at 556 (no right to counsel in state collateral proceedings after exhaustion of direct appellate review); *Wainwright v. Torna*, 455 U.S. 586, 587-88 (1982) (no right to counsel when pursuing discretionary state appeal); *Ross v. Moffitt*, 417 U.S. 600, 617-18 (1974) (no right to counsel for defendant seeking to file certiorari petition in U.S. Supreme Court); *cf. Halbert v. Michigan*, 545 U.S. 605, 617-25 (2005) (recognizing right to counsel for defendants convicted on their pleas who seek access to first-tier review in the Michigan Court of Appeals, which requires leave to appeal).

Where no constitutional right to counsel exists, there can be no claim for ineffective assistance. *See Coleman*, 501 U.S. at 757; *Torna*, 455 U.S. at 587-88 (no ineffective assistance of counsel claim for retained counsel's failure to file timely application for discretionary state appeal when no right to counsel at such proceeding); *Hunton v. Sinclair*, 732 F.3d 1124, 1126 (9th Cir. 2013) (affirming dismissal of procedurally defaulted claim because the claim was barred by *Coleman*.) A claim of ineffective assistance of counsel on state or federal collateral review is not cognizable on federal habeas corpus review. *See* 28 U.S.C. § 2254(i).

Further, while a petitioner is entitled to due process during habeas proceedings, *see Moran v. McDaniel*, 80 F.3d 1261, 1271 (9th Cir. 1996), the absence or ineffectiveness of counsel does not in and of itself constitute a due process violation. *See id.*; *see also Bonin v. Calderon*, 77 F.3d 1155, 1159-60 (9th Cir. 1996) (claim of ineffective assistance of counsel in state habeas proceedings does not present violation of Sixth Amendment right to counsel or Fourteenth Amendment right to due process where no constitutional right to counsel in such proceedings).

United States District Court
Northern District of California

Petitioner's claims relate to his appellate counsel's performance in the context of filing the companion habeas petition in the state appellate court. Those claims, however, are not cognizable here, and habeas relief is unavailable.

### 4.   Prosecutorial Misconduct

Petitioner next presents a series of arguments concerning the prosecutor, Jeffrey Rosen. Petitioner claims Rosen committed misconduct when he (1) presented exhibits with falsified phone evidence, (2) falsely claimed that Petitioner did not have a list with his Bank of America password on the wall, (3) falsely claimed that Petitioner gave Daniel $4,000 before Daniel wired $2,500 to Miguel on March 12, 2008, (4) vouched for the credibility of Daniel, and (5) permitted Daniel to testify falsely. Petitioner also presents an ineffective assistance of counsel claim with respect to some of these arguments. This claim was first presented to, and summary denied by, the California Supreme Court. This Court thus considers what arguments or theories could have supported the state court's decision, and then asks whether fairminded jurists could disagree that those arguments or theories are inconsistent with a prior Supreme Court decision. *Richter*, 562 U.S. at 102.

### a.   Legal Standards

Prosecutorial misconduct is cognizable in federal habeas corpus. The appropriate standard of review is the narrow one of due process and not the broad exercise of supervisory power. *Darden v. Wainwright*, 477 U.S. 168, 181 (1986). A defendant's due process rights are violated when a prosecutor's misconduct renders a trial "fundamentally unfair." *Id.*; *Smith v. Phillips*, 455 U.S. 209, 219 (1982) ("the touchstone of due process analysis in cases of alleged prosecutorial misconduct is the fairness of the trial, not the culpability of the prosecutor"). Under *Darden*, the first issue is whether the prosecutor's remarks were improper; if so, the next question is whether such conduct infected the trial with unfairness. *Tan v. Runnels*, 413 F.3d 1101, 1112 (9th Cir. 2005); *see also Deck v. Jenkins*, 814 F.3d 954, 978 (9th Cir. 2016) (recognizing that *Darden* is the clearly

United States District Court
Northern District of California

1    established federal law regarding a prosecutor's improper comments/remarks for AEDPA

2    review purposes).  A prosecutorial misconduct claim is decided "'on the merits, examining

3    the entire proceedings to determine whether the prosecutor's remarks so infected the trial

4    with unfairness as to make the resulting conviction a denial of due process.' " *Johnson v.*

5    *Sublett*, 63 F.3d 926, 929 (9th Cir. 1995); *see Trillo v. Biter*, 769 F.3d 995, 1001 (9th Cir.

6    2014) ("Our aim is not to punish society for the misdeeds of the prosecutor; rather, our

7    goal is to ensure that the petitioner received a fair trial.").

8         The key factor in determining whether misconduct amounted to a violation of due

9    process is whether the trial court issued a curative instruction.  When a curative instruction

10   is issued, a court presumes that the jury has disregarded inadmissible evidence and that no

11   due process violation occurred.  *See Greer v. Miller*, 483 U.S. 756, 766 n.8 (1987);

12   *Darden*, 477 U.S. at 182 (the Court condemned egregious, inflammatory comments by the

13   prosecutor but held that the trial was fair since curative actions were taken by the trial

14   judge); *Trillo*, 769 F.3d at 1000 ("We presume that juries listen to and follow curative

15   instructions from judges.").  This presumption may be overcome if there is an

16   "overwhelming probability" that the jury would be unable to disregard evidence and a

17   strong likelihood that the effect of the misconduct would be "devastating" to the defendant.

18   *See Greer*, 483 U.S. at 766 n.8; *Tan*, 413 F.3d at 1115-16 (finding trial fair where jury

19   received instructions five different times to consider only the evidence presented, and not

20   its sympathy for the victim's life story).

21        Other factors which a court may take into account in determining whether

22   misconduct rises to a level of due process violation include: (1) the weight of evidence of

23   guilt, compare *United States v. Young*, 470 U.S. 1, 19 (1985) (finding "overwhelming"

24   evidence of guilt) with *United States v. Schuler*, 813 F.2d 978, 982 (9th Cir. 1987) (in light

25   of prior hung jury and lack of curative instruction, new trial required after prosecutor's

26   reference to defendant's courtroom demeanor);  (2) whether the misconduct was isolated or

27

United States District Court
Northern District of California

1    part of an ongoing pattern, *see Lincoln v. Sunn*, 807 F.2d 805, 809 (9th Cir. 1987); (3)

2    whether the misconduct relates to a critical part of the case, *see Giglio v. United States*,

3    405 U.S. 150, 154 (1972) (failure to disclose information showing potential bias of witness

4    especially significant because governments case rested on credibility of that witness); and

5    (4) whether a prosecutor's comment misstates or manipulates the evidence, *see Darden*,

6    477 U.S. at 182.

### b.  Cell Phone Exhibits

8           Petitioner first accuses the prosecutor of using trial exhibits that falsely portrayed

9    data from the call records of phones belonging to several individuals.  These exhibits were

10   created at the direction of Sergeant Frisby using certified records from the individuals'

11   respective service providers.  Dkt No. 59-12 at 67-68.  Sergeant Frisby testified as to the

12   exhibits, which included a chart depicting calls between Petitioner and Daniel on March

13   12, 2008 (the "March 12 call chart"), the day that Daniel wired $2,500 to Miguel.  Dkt No.

14   59-12 at 80-81.  According to Sergeant Frisby, Petitioner called Daniel at 4:45 p.m., and

15   they spoke for approximately 6 minutes.  *Id.* at 81.  At 6:12 p.m., Daniel went to Long's

16   Drugs to transfer money to Miguel.  *Id.*  At 11:46 p.m. that evening, Paul called Daniel

17   again, and they had another six-minute conversation.  *Id.*

18          Petitioner argues that the prosecution's March 12 call chart included verifiably false

19   information.  In support, Petitioner relies on an analysis of the phone records conducted

20   post-trial by a forensic cellular expert.  *See* Dkt No. 35-6 at 335.  According to this expert,

21   the officers who created the charts lacked the training and expertise to properly analyze the

22   phone records.  Dkt No. 35-6 at 335.  Petitioner also claims that the phone records from

23   one of his devices—the Palm Treo—displayed the time of his calls with a 7-hour time

24   difference, thereby resulting in calls being counted more than once, as with the March 12

25   six-minute calls at 4:45 p.m. and at 11:45 p.m.

1    During cross-examination, Rosen asked Petitioner about the prosecution's exhibits,

2    including the March 12 call chart.  Dkt No. 59-18 at 143-44.  Petitioner repeatedly took

3    issue with the exhibits, claiming they "misstate[ ] the evidence."  *Id.* at 144.  At one point,

4    Petitioner said, "If we were to go ahead and look at the actual [phone] reports, we need —

5    we can get the accurate number that way."  Dkt No. 59-18 at 159.  But as Rosen

6    emphasized during closing arguments, the disagreement about the number of calls were

7    immaterial compared to the fact that their frequency increased as the day of the murder

8    neared.  Dkt No. 59-19 at 179.  Later, during jury deliberations, the jury requested and

9    received "all phone records and texts."  Dkt No. 59-19 at 225.

### i.  Legal Standards

11    There are three situations in which a violation of the prosecutor's duty to disclose

12    information may occur: (1) where the prosecutor uses testimony which he knows or should

13    know is perjured or false; (2) where defendant requests specific evidence which is not

14    provided; and (3) where the defense makes a general request or no request at all and

15    prosecutor fails to provide information which might create a reasonable doubt.  *See United*

16    *States v. Agurs*, 427 U.S. 97, 103-07 (1976).

17    When a prosecutor obtains a conviction using testimony or evidence that he knows

18    or should know is perjured or false, it has been consistently held that such conviction must

19    be set aside if there is any reasonable likelihood that the testimony or evidence could have

20    affected the judgment of the jury.  *See id.* at 103; *see, e.g., Brown v. Borg*, 951 F.2d 1011,

21    1015 (9th Cir. 1991) (prejudice to right to fair trial more palpable when prosecutor not

22    only withheld exculpatory evidence but knowingly introduced and argued false evidence);

23    *United States v. Polizzi*, 801 F.2d 1543, 1550 (9th Cir. 1986) (prosecutor's presentation of

24    tainted evidence viewed seriously and effects exceedingly carefully scrutinized; new trial

25    required if any reasonable likelihood false evidence could have affected judgment of the

26    jury).  In fact, "[a] conviction obtained using knowingly perjured testimony violates due

27
28

United States District Court
Northern District of California

1   process, even if the witness's perjured testimony goes only to his credibility as a witness

2   and not to the defendant's guilt." *United States v. Houston*, 648 F.3d 806, 814 (9th Cir.

3   2011) (citing *Mooney v. Holohan*, 294 U.S. 103, 211 (1935)).

4          The same result obtains when the prosecutor, although not soliciting false evidence,

5   allows it to go uncorrected when it appears.  *Napue v. Illinois*, 360 U.S. 264, 269 (1959);

6   *cf. United States v. Alli*, 344 F.3d 1002, 1006-08 (9th Cir. 2003) (reversal not required

7   under plain error standard where government breached its duty to correct known

8   misstatements of its witnesses regarding possible benefits in exchange for testimony

9   favorable to the government when defense counsel had the plea agreements, used them in

10  cross-examining the witnesses, and could have introduced them; the witnesses' false

11  testimony were corrected; and the prosecutor never sought to capitalize on the false

12  testimony).

13         A conviction based in part on perjured testimony or false evidence, even perjured

14  testimony or false evidence presented in good faith by the witness, does not comport with

15  fundamental fairness.  *See Phillips v. Ornoski*, 673 F.3d 1168, 1183-1186 (9th Cir. 2012)

16  (prosecutor's attempt to "insulate" primary witness from perjury by agreeing with her

17  counsel to keep immunity agreement secret from the witness, and then calling defense

18  counsel's accusation that witness was receiving a benefit "sheer speculation" was a blatant

19  violation of *Napue*); *Hayes v. Brown*, 399 F.3d 972, 980 (9th Cir. 2005) (en banc)

20  (prosecutor's action in presenting false evidence to the jury and by failing to correct the

21  record (that no agreement had been reached to favorably dispose of main witness' pending

22  felony cases) violated petitioner's rights, even where testifying witness did not commit

23  perjury because he had not been informed of prosecutor's agreement with his defense

24  counsel).

25         If the prosecutor knows that his witness has lied, he has a constitutional duty to

26  correct the false impression of the facts.  *United States v. LaPage*, 231 F.3d 488, 492 (9th

27

28

Cir. 2000). This duty is not discharged merely because defense counsel knows, and the jury might figure out, that the testimony is false. *Id.* No lawyer, prosecutor, or defense counsel, civil or criminal, may knowingly present lies to a jury and then sit idly by while opposing counsel struggles to contain this pollution of the trial. *Id.* (reversing conviction where prosecutor failed to correct false testimony during trial, despite fact that prosecutor conceded during closing argument that witness had lied); *Belmontes v. Brown*, 414 F.3d 1094, 1115 (9th Cir. 2005), *rev'd on other grounds*, 549 U.S. 7 (2007) (prosecutor had duty to correct witness's testimony that incident was the first time he was "busted," even though defense counsel knew of witness's prior arrests, but defense was not prejudiced); *Northern Mariana Islands v. Bowie*, 243 F.3d 1109, 1122-23 (9th Cir. 2001) (defendant cannot waive prosecutor's failure to meet his constitutional obligation to present truthful evidence).

Prosecutors will not be held accountable for discrepancies in testimony where there is no evidence from which to infer prosecutorial misconduct and the fairness of the trial was not materially affected. *See United States v. Zuno-Arce*, 44 F.3d 1420, 1423 (9th Cir. 1995) (no evidence of prosecutorial misconduct where discrepancies in testimony could as easily flow from errors in recollection as from lies) *overruled in part on other grounds by Valerio v. Crawford*, 306 F.3d 742, 764 (9th Cir. 2002) (en banc); *see, e.g.*, *Hayes v. Ayers*, 632 F.3d 500, 520 (9th Cir. 2011) (defendant failed to show that witness's "mostly equivocal" statements about when she received immunity or whether she actively sought immunity were actually false or that the prosecutor knew as much). Petitioner must establish factual basis for attributing knowledge that the testimony was perjured to the government. *See Morales v. Woodford*, 388 F.3d 1159, 1179 (9th Cir. 2004).

In sum, to prevail on a claim based on *Agurs/Napue*, the petitioner "must show 'that (1) the testimony (or evidence) was actually false, (2) the prosecution knew or should have known that the testimony was actually false, and (3) . . . the false testimony was

material.' " *Hayes*, 399 F.3d at 984 (quoting *United States v. Zuno-Arce*, 339 F.3d 886, 889 (9th Cir. 2003)); *see Soto v. Ryan*, 760 F.3d 947, 970-71 (9th Cir. 2014) (while co-defendants' convictions were overturned due to prosecutor's use of detective's false testimony, finding no prosecutorial misconduct in petitioner's separate trial involving same prosecutor where record showed that detective's testimony and prosecutor's arguments had morphed from accurate information in petitioner's trial to affirmative misrepresentations during co-defendants' trials); *Schad v. Ryan*, 671 F.3d 708, 717 (9th Cir. 2011) (per curiam) (finding no prosecutorial misconduct where it was not entirely clear that prosecution witness had lied or, assuming he did, that the state knew or should have known that his testimony was false). "Material" means that there is a reasonable likelihood that the false evidence or testimony could have affected the judgment of the jury. *Morris v. Ylst*, 447 F.3d 735, 743 (9th Cir. 2006); *see Jones v. Ryan*, 691 F.3d 1093, 1106 (9th Cir. 2012) (false impression allegedly created by sketches not material because there was overwhelming evidence of guilt unrelated to sketches). If the claim meets the materiality standard under *Agurs/Napue*, then no separate analysis of harmlessness under *Brecht* is required. *Hayes*, 399 F.3d at 984.

### ii.  Analysis

Petitioner has not demonstrated that he is entitled to habeas relief on this claim. As an initial matter, the state's highest court may well have reasoned that the jury did not rely on the prosecution's summary charts. The jury was instructed that they "may examine whatever exhibits you think will help you in your deliberations. Some of the exhibits will be sent into the jury room with you when you begin to deliberate. If you wish to see any other exhibits, please request them in writing." *See* Dkt No. 56-9 at 216. Although the record is unclear as to whether the summary charts were provided to the jury, the record reflects that the jury requested and received the certified phone records during

United States District Court
Northern District of California

deliberations, suggesting that they inspected the actual records in lieu of relying on the prosecution's exhibits summarizing the data.

But even assuming that the prosecution's summary charts were provided to the jury, the California Supreme Court could have reasonably determined that any inconsistencies between those charts and the actual phone records were the subject of expert opinion and cross-examination.  Further, it would have been reasonable for the high court to conclude that there was no showing the prosecutor was aware of any alleged inaccuracies.  The most suggestive evidence is merely the prosecutor's statement that he reviewed the phone records and that the parties have a "difference of opinion" about them.  Dkt No. 59-18 at 144.  Even then, a difference of opinion about the accuracy of exhibits does not suggest falsified evidence, especially considering that the exhibits were created at the behest of Sergeant Frisby.  While Petitioner apparently seeks to impute knowledge to the prosecutor, nothing in the petition or the record suggests that the prosecutor knew or should have known that Sergeant Frisby testified inaccurately.  Moreover, "[t]he Court has held that the prosecutor's knowing use of perjured testimony violates due process, but has not held that the false testimony of a police officer in itself violates constitutional rights."  *Briscoe v. LaHue*, 460 U.S. 325, 236 n.1 (citing *Agurs*, 427 U.S. at 103, and nn. 8–9).

And finally, it would have been reasonable for the California Supreme Court to conclude that the parties' disagreement regarding the number of calls was immaterial.  As Rosen highlighted during closing arguments, "Exactly how many times did Paul Garcia call Daniel Chaidez the week before the murder?  Was it 32 times?  Was it 18 times?  Who cares?  It was a lot.  It was a lot of times, it was a lot more than February.  It was a lot more than January.  It was a lot of times that Paul was calling Daniel."  Dkt No. 59-19 at 190.  Because this point is not in dispute, a discrepancy in the parties' respective exhibits regarding the precise number of calls from Petitioner to Daniel would not have affected the

United States District Court
Northern District of California

1   judgment of the jury.  This conclusion forecloses Petitioner's related argument that his trial

2   counsel was ineffective for failing to rebut the prosecution's charts.

3           **c.  Bank Withdrawals**

4         Petitioner claims the prosecutor falsely argued that Petitioner gave $4,000 to Daniel

5   on March 12, 2018, right before Daniel wired $2,500 to Miguel.  As to this, the prosecutor

6   argued during closing argument:

> And then, right, on March 12th, 2008, that Wednesday around
> 4:45, Paul calls Daniel, they have a six-minute conversation, a
> little more than an hour — pardon me — about 20 minutes later
> Paul goes into the bank, takes out $4,000 in cash.  Now,
> remember they're short of cash that week, they're short of cash,
> cash flow problem, short of cash.  Okay?  "So did you take the
> 4,000 out and then put it into the ATM machine?"
>
> "No. No. I put it in the safe.
>
> "Why did you take it out of the bank on the Wednesday for the
> ATM?  You've never done that before.  You usually do it on
> Thursday or Friday.  Why are you doing it two days before and
> then not even putting it into the ATM machine?"  Why?  'Cause
> it didn't go into the ATM machine 'cause he takes the money
> out at about 10 after 5, gives it to Daniel, and then approximately
> an hour later, Daniel goes into the drug store and wires the
> money to Long's Drug Store and wires 2500 of that $4,000 to
> Miguel Chaidez.

Dkt No. 59-19 at 180-81.  In his rebuttal, the prosecutor returned to this argument:

> So $4,000, March 12th, that's taken out by [Petitioner].  [¶]  That
> money on March 12th is taken out at 5:10 p.m.  We know that
> 20 minutes before that he's talking to Daniel Chaidez.  And we
> know that an hour later, hour, hour and a half later, Daniel
> Chaidez wires $2500 to Miguel Chaidez.  Daniel Chaidez who
> had maybe 5, $600, at most, ever in his checking account.

Dkt No. 59-20 at 106.

      Relying on the opinion of Thomas L. Blackburn, a cellular phone expert hired post-

trial, Petitioner argues that he and Daniel were not in the same vicinity on March 12, 2008,

during the time Petitioner is alleged to have given Daniel $4,000.  Dkt Nos. 35-6 at 359-

60; 85-13 at 2-58.  Following a cell tower analysis, Blackburn opined that Daniel and

United States District Court
Northern District of California

1    Petitioner were "not in the same location" on March 12, 2008, between 5:10 p.m. and 6:12

2    p.m., meaning they were not within 3-4 miles of one another.  Dkt No. 85-13 at 4-5, 15.

3            The California Supreme Court's denial of this claim could have reasonably been

4    premised on the fact that the Blackburn declaration was not in evidence at the time the

5    prosecutor made his arguments.  The state's highest court could have also concluded that

6    Blackburn's opinion, which relied on cell tower data, provided no insight during those

7    periods of time when Petitioner and Daniel did not connect to a cell tower.  For example,

8    Daniel's cell phone records reveal that he made a 10-minute call on March 12 at 5:09 p.m.

9    and then received a call at 6:01 p.m.  *See* Dkt No. 57-1 at 192.  It is entirely possible that

10   Daniel and Petitioner met during the approximately 40-minute period between these two

11   calls considering they were only 3-4 miles apart from one another.

12           Petitioner next refers to Daniel's testimony wherein he claimed to have received the

13   first installment from Petitioner on Tuesday, March 11th, 2008, whereas the prosecutor

14   argued that Daniel received the first payment on Wednesday, March 12th, 2008.  Dkt No.

15   59-8 at 155.  Daniel did initially testify that he received the $4,000 on March 11 and then

16   "the same day" wired money to Miguel.  Dkt No. 59-8 at 157.  After the prosecutor

17   showed Daniel a copy of the wire receipt, Rosen asked, "Mr. Chaidez, does that refresh

18   your memory as to whether you wired Miguel the money on March 11th or March 12th?"

19   *Id.*  Daniel then corrected his testimony, confirming that he wired the money on March 12.

20   Dkt No. 59-8 at 159.  Having also testified that he wired the money "on the same day" as

21   when he received the money from Petitioner, the California Court of Appeal could have

22   reasonably concluded that the March 11th date was simply a mistake.  Relief is therefore

23   not warranted on this ground either, and Petitioner's related ineffective assistance of

24   counsel claim also fails.

25                   **d.  The Password List**

26

27

United States District Court
Northern District of California

Next, Petitioner argues the prosecutor committed misconduct when commenting on a password list pinned to the 180 Restaurant office wall.  Robert Orner, the restaurant's general manager, had testified that a password list was pinned above the desktop computer in the restaurant's office.  Dkt No. 59-8 at 32, 59.  Once someone entered the password to access the computer, they would typically check on the Mountain Charley's Facebook page, the online reservations system, and the like.  *Id.* at 60.  Petitioner then testified that there were two password lists, one to access Petitioner's "laptop" and another with information to a Bank of America account that was linked to all of Petitioner's personal and business bank accounts.  Dkt No. 59-16 at 79.  Petitioner stated that the password list "was accessible to anybody" because "[i]t was right there next to the computer on the wall." *Id.* at 81.

The prosecutor, Rosen, argued that it was unlikely that Petitioner would post a password list to his bank accounts on the restaurant's office wall.   During cross-examination, Rosen elicited testimony from Petitioner that he was actively involved in the day-to-day running of his businesses, that he closely monitored his personal and business expenses, and that he was concerned about money and employee theft.  Dkt No. 59-18 at 144-48.  Rosen then asked rhetorically, "And yet you tell us that you had on the wall at Club 180, a piece of paper with the passwords for all of the bank accounts for the businesses and your personal bank account; correct?"  *Id.* at 148.

During his closing, Rosen continued with this argument:

> Paul Garcia's testified that he had, in the office at 180, the password that opened up all of the accounts, the Mountain Charley's accounts, the Bank of America — the 180 accounts, all of the accounts at Bank of America, including his personal checking account as well.  That there was a . . . password with - these pieces of paper up there.  That's what Paul said.

> Well, here's why that's just speculation:  Where is this password?  Where's this piece of paper with the passwords?  This is a guy that's such a micromanager like Paul Garcia and you've seen how he's conducted his defense here, you've seen that he's — he looks through everything, he's in control, he's

gone to business school.  He's just going to have a piece of paper with all the passwords to all the accounts, including his personal account, in an office that anyone can come in and see?  That's just ridiculous.

Dkt No. 59-19 at 191.  Notably, no objection was made to the prosecutor's arguments by Robertson, it was not raised in the motion for a new trial by Edward Sousa, and it was not raised on direct appeal by Mark Greenberg.

### i.  Legal Standards

When a prosecutor's statements during closing argument are at issue, federal courts must judge them "in the context of the entire argument and the [court's] instructions." *Ortiz-Sandoval v. Gomez*, 81 F.3d 891, 898 (9th Cir. 1996).  A prosecutor's misleading and inflammatory arguments may violate a defendant's due process right to a fair trial. *Darden*, 477 U.S. at 181–82.  However, "[p]rosecutors have considerable leeway to strike 'hard blows' based on the evidence and all reasonable inferences from the evidence." *United States v. Henderson*, 241 F.3d 638, 652 (9th Cir. 2000).  "It is not improper for a prosecutor to challenge the credibility of a testifying defendant by calling into question the defendant's version of events."  *Id.*  Furthermore, prosecutors are "free in argument to suggest that the jury draw reasonable inferences from the evidence presented at trial." *United States v. Flores*, 802 F.3d 1028, 1035 (9th Cir. 2015).

### ii.  Analysis

In denying this claim, the California Supreme Court could have reasonably determined that the prosecutor made a "reasonable inference" based on the evidence presented at trial.  For one, there was nothing to corroborate Petitioner's contention that he pinned the password list for his bank accounts on the office wall.  As Rosen noted, there was no password list in the evidence.  At most, Robert Orner testified that a password list existed, but the password to which he was referring was to gain access to the office's desktop computer, not to Petitioner's laptop or his bank accounts.  Second, Rosen highlighted that Petitioner is well-educated, a businessman, and a micromanager in all

United States District Court
Northern District of California

1    aspects of his life, including his defense in this case.  Rosen thus argued the improbability

2    that a person like Petitioner would simply pin to the wall his password to a bank account

3    that was linked to his business and personal accounts.  Petitioner counters here that he did

4    have a password list on his brother's computer, and that Robertson provided ineffective

5    assistance by failing to locate and print it.  The state court could have reasonably

6    concluded, however, that the *existence* of a password list saved in a computer is separate

7    and distinct from the *posting* of said list on an office wall.

8           The California Supreme Court could have also reasonably determined that, even if

9    the prosecutor's comments were improper, habeas relief would not be warranted because

10   the trial court instructed the jury several times that "Nothing that the attorneys say is

11   evidence.  In their opening statements and closing arguments, the attorneys discuss the

12   case, but their remarks are not evidence."  *See* Dkt Nos. 59-2 at 17; 59-19 at 117, 125.

13   When a curative instruction is issued, a court presumes that the jury has disregarded

14   inadmissible evidence and that no due process violation occurred.  *See Trillo*, 769 F.3d at

15   1000.  Petitioner may overcome this presumption by showing there is an "overwhelming

16   probability" that the jury would be unable to disregard evidence and a strong likelihood

17   that the effect of the misconduct would be "devastating" to the defendant.  *See Greer v.

18   Miller*, 483 U.S. 756, 766 n.8 (1987).  Considering the weight of the evidence supporting

19   Petitioner's guilt, as discussed above, and the prosecutor's passing remark made towards

20   the end of a lengthy closing argument, the state's highest court could have reasonably

21   determined that Petitioner did not make that showing.  Habeas relief is therefore not

22   warranted on this claim, and Petitioner's related ineffective assistance of counsel claim

23   likewise fails.

24                              **e.  Cross-Examination of Petitioner**

25           During cross-examination, Petitioner disputed portions of various witnesses'

26   testimonies.  In response, the prosecutor asked Petitioner whether the witnesses were lying

1   or mistaken: "So is Lorene Woodleaf lying also?" and "Is [Kristen Rush] mistaken about

2   that too?" and "So Steve Wilkins was mistaken when he testified to that?" and "So when

3   Nome testified . . . that you said to him, 'I think she's still with the old man,' he was

4   mistaken?" *See, e.g.*, Dkt No. 59-18 at 64, 67, 109, 114.  Petitioner argues these questions

5   constitute misconduct.

6        In the Ninth Circuit, "[a] prosecutor must not ask defendants during cross-

7   examination to comment on the truthfulness of other witnesses."  *United States v.*

8   *Alcantara-Castillo*, 788 F.3d 1186, 1191 (9th Cir. 2015); *see also United States v. Del*

9   *Toro-Barboza*, 673 F.3d 1136, 1152 (9th Cir. 2012) ("A prosecutor may not question a

10   defendant on the stand and ask him whether another witness was lying."); *United States v.*

11   *Harrison*, 585 F.3d 1155, 1158 (9th Cir. 2009) ("It's black letter law that a prosecutor may

12   not ask a defendant to comment on the truthfulness of another witness[.]").

13        But "circuit precedent does not constitute 'clearly established Federal law, as

14   determined by the Supreme Court,' " and "therefore cannot form the basis for habeas relief

15   under AEDPA."  *Parker v. Matthews*, 567 U.S. 37, 48-49 (2012) (per curiam).  As such,

16   several courts have held there is no clearly established federal law supporting the

17   conclusion that a prosecutor commits misconduct by asking a defendant whether a

18   government witness is lying.  *See, e.g.*, *Hall v. Scribner*, 619 F. Supp. 2d 823, 840 (N.D.

19   Cal. 2008) ("Petitioner cites no clearly established Supreme Court precedent, and the court

20   is aware of none providing that a prosecutor's questioning a witness about the veracity of

21   government witnesses may violate a defendant's right to due process."); *Lehmann v. Beard*,

22   2018 WL 2283740, *14 (C.D. Cal.) ("The United States Supreme Court has not addressed

23   the question of whether a prosecutor commits misconduct in asking a defendant who is a

24   percipient witness whether another witness is lying or mistaken.  Accordingly, the state

25   court's decisions cannot be contrary to, or an unreasonable application of, clearly

26   established federal law."), report and recommendation accepted by, 2018 WL 2282589

United States District Court
Northern District of California

(C.D. Cal. 2018); *Carrillo v. Arnold*, 2017 WL 840659, *10 (E.D. Cal. 2017) ("[T]he Supreme Court has never held that a prosecutor commits misconduct when he asks a defendant whether a witness is lying. Consequently, the Court of Appeal's conclusion that the prosecutor engaged in no misconduct was reasonable in light of the existing Supreme Court precedent." (citation omitted)).  Thus, the state court's reasonable conclusion that the prosecutor did not engage in misconduct was not contrary to, or an unreasonable application of, federal law.

### f.  Daniel Chaidez

Petitioner argues that the prosecutor improperly vouched for Daniel's credibility in his opening statement and that Daniel testified falsely repeatedly.

### i.  Vouching

During his opening statement, Rosen told the jury:

> Now, Daniel Chaidez, right, he's pretty involved in this.  He pled guilty because of his early and significant cooperation in the case, it led to the arrests of other defendants.  And the agreement, it's a written plea agreement that will be introduced in evidence. He agrees to testify truthfully in all future proceedings.  He pled guilty to voluntary manslaughter, vicarious arming, solicitation for murder, and accessory to murder.  The maximum for those charges was 12 years and eight months.  And that's what he was sentenced to, 12 years and eighth months in state prison.  He'll testify in a few weeks.  We brought him back from state prison. And he'll come in and testify, and in jail garb, and talk to you about this.

> If he presents false testimony, Daniel lies, presents false testimony, the agreement is set aside and he'll be prosecuted for murder.

Dkt No. 59-21 at 35-36.

### 1.  Legal Standards

As a general rule, "a prosecutor may not express his opinion of the defendant's guilt or his belief in the credibility of [government] witnesses."  *United States v. McKoy*, 771 F.2d 1207, 1211 (9th Cir. 1985); *see United States v. Alcantara-Castillo,* 788 F.3d 1186,

1194 (9th Cir. 2015) (not plainly improper when prosecutor said that "one of these two witnesses [a government agent and the criminal defendant] is not telling the truth" because "it was reasonable to infer from the evidence that either witness was lying"); *United States v. Lopez*, 803 F.2d 969, 973 (9th Cir. 1986) (improper to suggest that witness found credible by the grand jury should therefore be credible to the trial jury), *cert. denied*, 481 U.S. 1030 (1987).

Improper vouching for the credibility of a witness occurs when the prosecutor places the prestige of the government behind the witness or suggests that information not presented to the jury supports the witness's testimony. *United States v. Young*, 470 U.S. 1, 7 n.3, 11-12 (1985); *United States v. Parker*, 241 F.3d 1114, 1119-20 (9th Cir. 2001*); see, e.g., United States v. Flores*, 802 F.3d at 1040-41 (9th Cir. 2015) (improper vouching where prosecutor stated that he would hire his expert car witness to work on the prosecutor's car, but not the defense expert because the prosecution expert was experienced, though the error was not prejudicial); *Alcantara-Castillo*, 788 F.3d. at 1195 (improper vouching found when prosecutor asserted without evidentiary support that border patrol agents were more believable than defendant because they had "sworn to uphold the law;" error not cured by trial court's insufficient instruction); *United States v. Valencia-Riascos*, 696 F.3d 938, 941-42 (9th Cir. 2012) (no improper vouching where officer who was both a victim and testifying witness sat at prosecution table); *King v. Schriro*, 537 F.3d 1062, 1066, 1068-69, (9th Cir. 2008) (state court reasonably found no vouching where prosecutor in opening argument said witness would implicate defendant if witness "testifies truthfully"); *United States v. Ortiz*, 362 F.3d 1274, 1279 (9th Cir. 2004) (improper vouching when prosecutor implies that the court, as well as law enforcement, can, has, and will monitor the witnesses' truthfulness in order to enforce terms of plea agreement, but no plain error where prosecutor did not refer to anything outside the record or directly express a personal opinion); *Sanchez*, 176 F.3d at 1224-25 (improper vouching

United States District Court
Northern District of California

1  where prosecutor told jury reputation of prosecutor behind witness's credibility); *United*

2  *States v. Rudberg*, 122 F.3d 1199, 1204 (9th Cir. 1997) (prosecutor engaged in

3  impermissible vouching by repeated references to the obligation of critical witnesses who

4  are cooperating with the government under plea agreements to testify truthfully, in

5  exchange for government motions for reduced sentences and court granting such motions);

6  *United States v. Milner*, 962 F.2d 908, 913 (9th Cir.) (rebutting contention made by

7  defense that government forced witness to testify by explaining the terms of witnesses plea

8  agreement was not improper vouching where comment introduced no new evidence), *cert.*

9  *denied*, 506 U.S. 1004 (1992).

10      To warrant habeas relief, prosecutorial vouching must so infect the trial with

11  unfairness as to make the resulting conviction a denial of due process.  *Davis v. Woodford*,

12  384 F.3d 628, 644 (9th Cir. 2004).  Other factors for determining when reversal is required

13  include: "the form of vouching; how much the vouching implies that the prosecutor has

14  extra-record knowledge of or the capacity to monitor the witness's truthfulness; any

15  inference that the court is monitoring the witness's veracity; the degree of personal opinion

16  asserted; the timing of the vouching; the extent to which the witness's credibility was

17  attacked; the specificity and timing of a curative instruction; the importance of the

18  witness's testimony and the vouching to the case overall."  *Parker*, 241 F.3d at 1120; *see,*

19  *e.g., Fauber*, 43 F.4th 987 at 1002 (prosecution's reliance on witness's plea agreement to

20  bolster witness's credibility "did not exert a substantial and injurious effect on the jury"

21  because, among other reasons, the evidence against petitioner was overwhelming); *United*

22  *States v. Brooks*, 508 F.3d 1205, 1212 (9th Cir. 2007) (on direct appeal no reversal

23  required because vouching relating to plea agreement references and improper examination

24  on the wiretap authorization process did not undermine strong evidence presented against

25  defendant in lengthy trial which began and ended with curative instructions); *United States*

26  *v. Weatherspoon*, 410 F.3d 1142, 1152 (9th Cir. 2005) (in comparatively close case that

1   boiled down to a battle over credibility, prosecutorial statements that vouched for the

2   credibility of witnesses and that encouraged the jury to act based on considerations other

3   than the facts of the case posed a real danger to the defendant's right to a fair trial; because

4   that danger was not effectively mitigated by curative instructions, court concluded that

5   prosecutorial misconduct affected the jury's ability to consider the totality of the evidence

6   fairly and remanded the matter for a new trial); *see also United States v. Ruiz*, 710 F.3d

7   1077, 1084 (9th Cir. 2013) (finding harmless error when prosecutor made "someone must

8   be lying" argument because it followed a lengthy explanation of elements that government

9   was required to prove and a reminder of government's burden of proof).

## 2.   Analysis

11      Rosen's reference to the truthfulness provision of the plea agreement during his

12   opening statement amounted to vouching.  *See United States v. Necoechea*, 986 F.2d 1273,

13   1278 (9th Cir. 1993) (prosecutor's opening statement that "[the witness] has agreed to

14   cooperate with the government, and to testify truthfully," constitutes vouching).  But as

15   noted, not every instance of vouching warrants habeas relief.  Here, the California

16   Supreme Court could have reasonably determined that the vouching did not materially

17   affect the verdict.  That is, it did not translate to a personal assurance that Daniel would

18   testify truthfully, and Rosen never suggested that information not presented to the jury

19   supported Daniel's testimony.

20      Petitioner has not shown prejudice, either.  The prosecutor's vouching took the form

21   of a handful of sentences in the beginning of a lengthy opening statement.  When Daniel

22   eventually testified nearly three weeks later, all three defense attorneys thoroughly cross-

23   examined him, questioned his credibility, and, relevant here, addressed the plea agreement.

24   *See, e.g.*, Dkt Nos. 59-8 at 174-242, 59-9 at 6-18 (questioning by Estrada's defense

25   counsel); 59-9 at 18-29, 38-47 (questioning by Miguel's defense counsel); and 59-9 at 48-

26   76, 78-94, 111-124 (questioning by Petitioner's defense counsel).  Moreover, the trial court

United States District Court
Northern District of California

1    repeatedly instructed the jury that the attorneys' opening statements and closing arguments

2    were not evidence (Dkt No. 56-9 at 170), that only the jury was tasked with determining a

3    witness's credibility (*id.* at 175), and that the jury may consider whether a witness entered

4    into a plea agreement when weighing credibility (*id.* at 176).

5         Based on the foregoing, the Court concludes that relief is not warranted on this

6    ground.

7                        **ii.   Testimony**

8         Petitioner argues that Daniel testified falsely several times, and that the prosecutor

9    knowingly relied on these falsities.  The challenged testimony includes (1) Daniel's claim

10   that he and Petitioner talked on the phone on March 12, 2008 at times that Petitioner

11   claims are unsupported by the phone records, (2) Daniel's claim that he and Petitioner met

12   on March 12, 2008 to exchange money, which Petitioner claims did not occur according to

13   a forensic cell tower analysis (see discussion *supra*), (3) Daniel's testimony that Petitioner

14   said, "every war has its casualties" and "he wanted this shit done," (4) Daniel's testimony

15   that he told Miguel how to navigate the metroactive.com website to locate Achilli's

16   photograph, which Petitioner argues is not corroborated by computer records, and (5)

17   Daniel's testimony that Petitioner was involved in Achilli's murder.  Dkt No. 35-6 at 371-

18   72.

19        When a prosecutor obtains a conviction using testimony which she knows or should

20   know is perjured, the conviction must be set aside if there is any reasonable likelihood that

21   the testimony could have affected the judgment of the jury.  *See United States v. Agurs*,

22   427 U.S. 97, 103 (1976).  The same is true when the prosecutor, although not soliciting

23   false evidence, allows it to go uncorrected.  *Napue v. Illinois*, 360 U.S. 264, 269 (1959).

24   To establish a due process violation based on the government's use of false or misleading

25   testimony, a petitioner must show that "(1) the testimony (or evidence) was actually false,

26   (2) the prosecution knew or should have known that the testimony was actually false, and

27
     Case No. 16-05301 BLF (PR)

28   ORDER DEN. PET. FOR WRIT OF HABEAS CORPUS; DEN. CERTIFICATE OF APPEALABILITY

United States District Court
Northern District of California

1  (3) that the false testimony was material." *United States v. Zuno-Arce*, 339 F.3d 886, 889

2  (9th Cir. 2003).  Materiality is demonstrated when there is a "reasonable likelihood that the

3  false testimony could have affected the judgment of the jury." *Agurs*, 427 U.S. at 103; *see*

4  *also Giglio v. United States*, 405 U.S. 150, 154 (1972); *Napue*, 360 U.S. at 271–72.

5           It would have been reasonable for the California Supreme Court to conclude that

6  any alleged inconsistencies in Daniel's testimony does not establish a knowing

7  presentation of perjured testimony by the prosecutor.  The presentation of a conflicting

8  version of events does not establish the prosecutor's knowing use of perjured testimony.

9  *See Zuno-Arce*, 44 F.3d at 1423 (finding no evidence of prosecutorial misconduct where

10  discrepancies in testimony could as easily flow from errors in recollection as from lies);

11  *see also Geston*, 299 F.3d at 1135; *Tayborn v. Scott*, 251 F.3d 1125, 1131 (7th Cir. 2001)

12  (stating mere inconsistencies in the testimony of a government witness fall short of

13  establishing that the government knowingly used false testimony).  Petitioner must

14  establish a factual basis for attributing knowledge that the testimony was perjured to the

15  government.  *See Morales v. Woodford*, 388 F.3d 1159, 1179 (9th Cir. 2004).  Here,

16  Petitioner has failed to allege specific facts to show the prosecutor knew Daniel was

17  perjuring himself, as opposed to Daniel merely recalling the details inaccurately.

18           The state court could have also determined that the alleged inconsistencies in

19  Daniel's testimony and the phone and computer records were due to the phones and

20  computer records using differing time zones.  Further, it would have been reasonable for

21  the court to conclude that Daniel's account of statements made to him by Petitioner were

22  matters for the jury to resolve and did not suggest the knowing use of false testimony by

23  the prosecutor.  For example, Petitioner claims that Daniel lied when he attributed these

24  statements to Petitioner: "every war has its casualties" and "he wanted this shit done."  The

25  resolution of these disputes is within the province of the jury.

26

27  Case No. 16-05301 BLF (PR)

28  ORDER DEN. PET. FOR WRIT OF HABEAS CORPUS; DEN. CERTIFICATE OF APPEALABILITY

United States District Court
Northern District of California

1        Even more, it would have been reasonable for the court to conclude that the

2   inconsistencies in the record were resolved in Daniel's favor or that the jury found the

3   inconsistencies immaterial.  For example, the jury may have simply found Daniel more

4   credible than Petitioner.  The alleged inconsistencies in the timing of phone calls would

5   have been resolved by the jury, which asked for and received the original phone records, in

6   favor of Daniel's version of events  As for Daniel's testimony that he directed Miguel over

7   the phone to the metroactive.com website to locate Achilli's photograph, Petitioner argues

8   that the time stamps on the individual computers did not support the claim that they

9   accessed it at the same time.  But even if this were true, the jury could have found it

10  compelling that Petitioner, Daniel, Miguel, and Estrada each had the same picture of

11  Achilli that was accessed from the same website.

12        Petitioner effectively asks this Court to reweigh the evidence to support a more

13  favorable inference – i.e., an inference that Daniel lied.  However, credibility

14  determinations are reserved for the jury and this Court may not reweigh the evidence on

15  federal habeas review.  *See Cavazos v. Smith*, 565 U.S. 1, 8 n.* (2011) (on federal habeas

16  review of sufficiency of the evidence claim "reweighing of facts [ ] is precluded by

17  [*Jackson v. Virginia*, 443 U.S. 307, 324 (1979)]" and "second-guessing of a state court

18  decision applying *Jackson* [ ] is precluded by AEDPA") (citations omitted); *United States

19  v. Nevils*, 598 F.3d 1158, 1170 (9th Cir. 2010) (en banc) (in assessing sufficiency of the

20  evidence claim, it is not the court's function to reweigh the evidence) (citation and

21  quotation marks omitted); *Jones v. Wood*, 114 F.3d 1002, 1008 (9th Cir. 1997) (court must

22  respect province of trier of fact to determine credibility of witnesses, resolve evidentiary

23  conflicts, and draw reasonable inferences from proven facts by assuming that trier of fact

24  resolved all conflicts in a manner that supports the finding of guilt) (citation and quotations

25  omitted).

26

27

In short, the state court's rejection of this claim was not contrary to, and did not involve an unreasonable application of, clearly established Supreme Court law, and was not based on an unreasonable determination of the facts in light of the evidence presented. Accordingly, Petitioner is not entitled to federal habeas relief on this claim.

### g.   Reasonable Doubt

Petitioner contends that during closing argument, the prosecutor misstated the burden of proof, thereby misleading and confusing the jurors.  Dkt No. 35-7 at 175.  This claim was first presented to, and summarily denied by, the California Supreme Court.

Petitioner challenges the following portion of the prosecutor's closing argument:

> You'll get an instruction, reasonable doubt. It's doubt based on a reasonable belief, meaning it can't just be any kind of imaginary doubt; it's got to be reasonable. It's got to relate to an element. This is a way of saying if you're having a question about something that happened, is it relevant to deciding whether the People have proved beyond a reasonable doubt that these defendants are guilty of murder, or is it something that I'm just interested in? 'Cause if it's something that I'm just interested in or something that's not related to an element in the case, then it's not reasonable doubt.

Dkt No. 59-19 at 189.  Rosen then cited to multiple conflicts in the record that, he argued, did not create reasonable doubt.  For instance, Petitioner had testified that he maintained a password list to his bank accounts in the 180 Restaurant's office, but the prosecutor highlighted that this was only speculation as there was no evidence of the password list in the record.  *Id.* at 191.  Likewise, the prosecutor noted that the conflict about the number of calls between Petitioner and Daniel was ultimately immaterial because there was no dispute that the calls increased in frequency closer to the date of Achilli's murder.  *Id.* at 192.

Petitioner argues that, by asking the jury to tie their doubt to evidence in the record, the prosecutor improperly shifted the burden to the defense to come forth with affirmative evidence to create reasonable doubt.  The California Supreme Court, however, could have

1    determined that the prosecutor's statements were merely intended to focus the jury's
2    attention on the main elements of the charged offenses, providing a path through the tangle
3    of conflicting and speculative claims.  As the United States Supreme Court noted in
4    *Donnelly v. DeChristoforo*, 416 U.S. 637, 646-47 (1974), "Such arguments, like all closing
5    arguments of counsel, are seldom carefully constructed in toto before the event;
6    improvisation frequently results in syntax left imperfect and meaning less than crystal
7    clear.  While these general observations in no way justify prosecutorial misconduct, they
8    do suggest that a court should not lightly infer that a prosecutor intends an ambiguous
9    remark to have its most damaging meaning or that a jury, sitting through lengthy
10   exhortation, will draw that meaning from the plethora of less damaging interpretations."

11          Certainly, Petitioner is correct that his testimony constitutes evidence that could
12   create a reasonable doubt.  But the state court could have reasonably concluded that the
13   prosecutor was well within his discretion to point out the infirmities in a defendant's
14   testimony.  The Ninth Circuit faced a similar issue in *Demirdjian v. Gipson*, 832 F.3d 1060
15   (9th Cir. 2016).  There, the defendant argued counsel should have objected when a
16   prosecutor's arguments in closing essentially attacked the weakness of the defense case and
17   invited counsel to provide admissible evidence to support it.  *Demirdjian*, 832 F.3d at
18   1071.  The court held the comment on the failure to present exculpatory evidence was
19   permissible because the burden of proof was neither expressly nor implicitly shifted and
20   the prosecutor expressly told the jury that the government bore the burden of proof.  *Id.*
21   Likewise, here the prosecutor merely pointed out the weaknesses in the defense on certain
22   matters.  And as in *Demirdjian*, the prosecutor did not misstate his burden.  Moreover, he
23   repeatedly stated that he must prove his case beyond a reasonable doubt.  Additionally, the
24   trial court instructed the jury that closing arguments were not evidence.  The trial court
25   also instructed the jury on the proper meaning of reasonable doubt and the elements of the
26   charged offenses.  *Ortiz-Sandoval v. Gomez*, 81 F.3d 891, 898 (9th Cir. 1996) ("The

United States District Court
Northern District of California

1    arguments of counsel are generally accorded less weight by the jury than the court's

2    instructions and must be judged in the context of the entire argument and the

3    instructions.").  The jury is presumed to understand and follow these instructions.  Thus,

4    this Court concludes that the state court's denial of this claim was neither unreasonable nor

5    contrary to clearly established federal law.

6        **5.    Fourth Amendment**

7        Petitioner presents multiple Fourth Amendment claims.  He argues that the police

8    entered the 180 Restaurant without permission or a warrant; that the search of his car,

9    home, and business exceeded the scope of consent; that the police coerced Petitioner to

10   consent to a search of his cell phone; and that the police failed to inform Petitioner during

11   the police interview that Robertson had arrived at the police department.

12       In *Stone v. Powell*, 428 U.S. 465, 481-82, 494 (1976), the United States Supreme

13   Court barred federal habeas review of Fourth Amendment claims unless the state did not

14   provide an opportunity for full and fair litigation of those claims.  Even if the state courts'

15   determination of the Fourth Amendment issues is improper, it will not be remedied in

16   federal habeas corpus actions so long as the petitioner was provided a full and fair

17   opportunity to litigate the issue.  *See Locks v. Sumner*, 703 F.2d 403, 408 (9th Cir. 1983).

18   All *Stone v. Powell* requires is the initial opportunity for a fair hearing.  Such an

19   opportunity for a fair hearing forecloses this court's inquiry upon habeas petition into the

20   trial court's subsequent course of action, including whether or not the trial court made any

21   express findings of fact.  *See Caldwell v. Cupp*, 781 F.2d 714, 715 (9th Cir. 1986).  The

22   existence of a state procedure allowing an opportunity for full and fair litigation of Fourth

23   Amendment claims, rather than a defendant's actual use of those procedures, bars federal

24   habeas consideration of those claims.  *See Newman v. Wengler*, 790 F.3d 876, 880 (9th

25   Cir. 2015); *Gordon v. Duran*, 895 F.2d 610, 613-14 (9th Cir. 1990) (whether defendant

26   litigated Fourth Amendment claim in state court is irrelevant if he had opportunity to do so

27

28

United States District Court
Northern District of California

1   under California law).  California state procedure provides an opportunity for full litigation

2   of any Fourth Amendment claim.[6]  AEDPA did not abrogate or alter the *Stone v. Powell*

3   rule, which remains good law.  *Newman*, 790 F.3d. at 879.

4          Sixth Amendment claims based on incompetent representation by counsel with

5   respect to Fourth Amendment issues may be the basis for a habeas action and are not

6   barred by *Stone v. Powell*.  *See Kimmelman v. Morrison*, 477 U.S. 365, 373-83 (1986).

7   Here, Petitioner argues that Robertson (his trial counsel) and Greenberg (his appellate

8   counsel) rendered ineffective assistance by failing to investigate and raise the Fourth

9   Amendment claims.  *See* Cal. Penal Code § 1538.5.  Because Petitioner's ineffective

10  assistance claim as to Greenberg fails, for the reasons discussed above, the Court will

11  address whether Robertson was ineffective with respect to these claims.

12              **a.  Entry into the 180 Restaurant**

13         Petitioner went to the 180 Restaurant on March 14, 2008 after receiving a call from

14  Joey Battiato.  Dkt No. 59-17 at 106-07.  At the restaurant, Petitioner testified that he first

15  learned of Achilli's murder and called Los Gatos Police Officer Brian Paul to determine

16  what happened.  *Id.* at 107-08.  Officer Paul and his partner then arrived at the restaurant,

17  which was closed at the time.  *Id.*  After speaking with the officers, Petitioner volunteered

18  to go to the Los Gatos Police Station.  *Id.*  As Petitioner understood it, he was not being

19  arrested, was not a suspect, and was free to leave.  *Id.* at 108.

20         Robertson became involved in the case on the day of the homicide.  Dkt No. 57-10

21  at 11.  He met with Petitioner at the Los Gatos Police Station, where Petitioner told

22  Robertson that he had consented to a search of certain property.  *Id.*  At the time,

23  Robertson understood that the police had executed searches of Petitioner's car, home, and

---

[6] For a discussion of what constitutes an opportunity for full and fair litigation*, see Terrovona v. Kincheloe*, 912 F.2d 1176, 1178-79 (9th Cir. 1990), cert. denied, 499 U.S. 979 (1991).  Courts have found no opportunity for full and fair litigation in state court only in exceptional cases.  *See, e.g., Anderson v. Calderon*, 232 F.3d 1053, 1068 (9th Cir. 2000) (petitioner did not benefit from opportunity for full and fair litigation in California courts because Fourth Amendment claim at issue did not exist until years after petitioner's arrest and trials).

1  business. *Id.* Over the next several days, Robertson attempted to contact the lead

2  investigator to no avail. *Id.* Robertson then sent a letter to the police department

3  withdrawing any consents to search. *Id.*

4        Petitioner argues that Robertson should have moved to suppress because the police

5  entered the 180 Restaurant without consent or a warrant. The California Supreme Court's

6  denial of this claim could have reasonably been premised on Robertson's understanding

7  that Petitioner initiated the contact with the officers, willingly met with them at the

8  restaurant, consented to searches of certain property, and then volunteered to go with them

9  to the police station. Assuming arguendo that Petitioner did not consent to the officers'

10  entry into and search of the 180 Restaurant, there is nothing in the record to suggest that

11  the police seized any items from the restaurant that day. It would therefore have been

12  futile for Robertson to file a motion to suppress. *See Rupe*, 93 F.3d at 1444-45.

13             **b.  Search Exceeded Scope of Consent**

14        At the police station, Petitioner signed a consent form to search his vehicle, his

15  mother's house, and Pacific Blue Equity. Dkt No. 59-17 at 110. Petitioner testified that he

16  only consented to a search of those areas to locate a black computer bag. *Id.* at 110-12.

17  He argues that Robertson rendered ineffective assistance when he failed to move to

18  suppress the search as exceeding the scope of consent.

19        The California Supreme Court could have reasonably determined that it was

20  objectively reasonable for the officers to search for more than a black computer bag.

21  *Florida v. Jimeno*, 500 U.S. 248, 251 (1991)) (the standard for measuring the scope of

22  consent under the Fourth Amendment is that of objective reasonableness). As an initial

23  matter, the form that Petitioner signed consenting to the search was not limited to a black

24  computer bag. *See* Dkt No. 21-359 at 114. In addition, the transcript of the police

25  interview does not support Petitioner's contention that the scope of his consent was

26  limited. While he did consent to a search of the identified locations for the bag, he also

27  

28  

United States District Court
Northern District of California

gave the police permission to search his business to see if "there [is] anything [the police would] be able to look at?  Just so [the police] could say hey we checked it." *Id.* at 108. He consented to a search of his car for "guns, knives any of that good stuff." Dkt No. 57-8 at 105.  He then consented to a gun residue test, a saliva test, and a hair strand test. *Id.* at 104, 109, 112.  Indeed, Petitioner told the interviewing officers, "I'll do whatever you want," and he "[g]ave [the officers] whatever they needed[.]" *Id.* at 109, 114.  In the absence of an express or implied limitation to the scope of the search, the state's highest court could have reasonably determined that this evidence, coupled with Robertson's understanding that Petitioner had consented to the searches, would have rendered a motion to suppress futile because the typical reasonable person would have understood that Petitioner's consent was not limited in scope as he contends.

### c.  Coerced Consent

During the police interview on March 14, 2008, Sergeant Frisby asked Petitioner for his cell phone.  Dkt No. 57-8 at 122.  Sergeant Frisby said, "[I]f you don't want to give it to me that's your right then I'm gonna have to keep you and your cell phone here until I write a search warrant and get a judge to sign it so . . . we'd have to keep you here for a couple more hours." *Id.*  Petitioner responded, "I aint got no problem with" permitting the police to search the phone, handed the phone over, and provided his password to unlock it. *Id.* at 123.  Petitioner argues he was coerced to consent, rendering his consent involuntary.

When the subject of a search is not in custody, the state must show voluntary consent; voluntariness being a question of fact to be determined from all the circumstances. *Schneckloth v. Bustamonte*, 412 U.S. 218 (1973).  The determination whether consent to search is voluntary considers the need for the search and the requirement there be no express or implied coercion. *Id.* at 227.  In determining whether consent is "free and voluntary" rather than the result of coercion or duress, the Ninth Circuit considers factors such as whether compliance was sought versus ordered; any

United States District Court
Northern District of California

1    efforts to mislead; number of officers present; day search versus night search; and the

2    maturity and emotional condition of the person giving consent.  *United States v.*

3    *Alexander*, 2013 WL 1821101 at *6 (N.D. Cal. Apr. 30, 2013) (citing *United States v.*

4    *Brown*, 563 F.3d 410, 415 (9th Cir. 2010)); *see also United States v. Sierra–Hernandez*,

5    581 F.2d 760, 764 (9th Cir. 1978) (the number of officers present is an element

6    contributing to the totality of circumstances reviewed to determine whether consent was

7    freely and voluntarily given).

8         The California Supreme Court's denial of this claim could have reasonably been

9    premised on Sergeant Frisby's request for consent, the lack of an effort to mislead

10   Petitioner, and Petitioner's maturity and emotional condition.  The state court could have

11   also considered the repeated instances of Petitioner's willingness to cooperate with the

12   police, from volunteering to go to the police station; to consenting to the searches of his

13   home, vehicle, and business; to consenting to a gun residue test, a saliva test, and a hair

14   strand test; to his statements that he would do "whatever [the police] want."  Considering

15   these circumstances, Petitioner's consent to a search of his cell phone does not suggest

16   involuntariness or coercion but instead yet another example of his cooperativeness.  The

17   record also reveals that Sergeant Frisby did obtain a search warrant to look at the phone's

18   text messages and phone calls.  Dkt No. 59-12 at 85.  Thus, even if Petitioner's consent

19   was involuntary, the contents of the phone would not be subject to suppression because

20   they would have been admissible under the "independent source" exception to the "fruit of

21   the poisonous tree" doctrine.  *United States v. Ramirez-Sandoval*, 872 F.2d 1392, 1396

22   (9th Cir. 1989).

23            **d.  Robertson's Arrival at Police Station**

24        Petitioner claims that Robertson provided ineffective assistance of counsel by not

25   filing a motion to suppress after Sergeant Frisby failed to inform Petitioner during the

26   police interview that Robertson had arrived at the police station.  But Petitioner cites to no

27

1   Supreme Court authority in support of the proposition that the police have an affirmative

2   duty to inform an individual who is not in custody that his attorney has arrived.  Even in

3   the context of a custodial interrogation, of which this was not, "[e]vents occurring outside

4   of the presence of the suspect and entirely unknown to him surely can have no bearing on

5   the capacity to comprehend and knowingly relinquish a constitutional right."  *Moran v.*

6   *Burbine*, 475 U.S. 412, 422 (1986).  "[W]e have never read the Constitution to require that

7   the police supply a suspect with a flow of information to help him calibrate his self-interest

8   in deciding whether to speak or stand by his rights."  *Id.*  Similarly unavailing is

9   Petitioner's claim that he requested an attorney when Officer Paul first arrived at the 180

10   Restaurant on March 14, 2008.  Dkt No. 35-7 at 165.  The Supreme Court has "in fact

11   never held that a person can invoke his *Miranda* rights anticipatorily, in a context other

12   than 'custodial interrogation.' "  *McNeil v. Wisconsin*, 501 U.S. 171, 182 n.3 (1991).  In

13   the absence of relevant authority, the California Supreme Court's denial of this claim was

14   not contrary to, or an unreasonable application of, federal law.

15        **6.**    **Juror Misconduct**

16       Petitioner alleges that juror misconduct occurred when information was allegedly

17   leaked to the newspaper reporter and when juror numbers 7 and 8 "liked" the San Jose

18   Mercury News' Facebook page dedicated to the criminal trial.  Dkt No. 35-7 at 1-27.  He

19   raised this argument for the first time in the habeas petition filed with the California

20   Supreme Court, which summarily denied it in June 2018.

21       On October 25, 2010—the fourth day of jury deliberations—Estrada's attorney,

22   Charlie Gillan, asked the Court to issue an order directing all the attorneys to refrain from

23   communicating with the San Jose Mercury News reporter until after a verdict had been

24   returned.  Dkt No. 59-20 at 151.  This request was made after the newspaper identified the

25   jury foreman, published the content of one of the juror questions, and answered the

26   question with evidence that was not admitted to the jury.  *Id.* at 152.  Specifically, the

United States District Court
Northern District of California

newspaper referenced Miguel's redacted statement and suggested that the redacted portions related to Estrada. *Id.* at 160. Petitioner's counsel, Robertson, opposed Gillan's request based, in part, on Petitioner's position that the proceedings be "open and transparent." *Id.* at 153-54. Robertson argued that "the defense has the right to insist that the readback [of the juror questions] and the instructions and examination of the evidence occur in a public and open proceeding." *Id.* at 154-55. Robertson noted that the trial court repeatedly admonished the jurors for two months "to avoid the Internet, to not read the news. The Court has admonished that they're not to consider anything outside of the court proceedings. And I fully expect that they'll honor that request." *Id.* at 155. While the trial court agreed that the jury was expected to follow the court's admonitions, it observed that it would be impossible to limit third parties from contacting the members of the jury with extrinsic evidence that may compromise the verdict. *Id.* at 161-62. To that end, the trial court ordered all counsel to refrain from sharing details of the juror questions with any third parties. *Id.* at 163.

Two months after the verdict was returned, Petitioner's mother noticed that jurors 7 and 8 had "liked" the San Jose Mercury News' Facebook page dedicated to the Achilli trial. *See* Dkt No. 85 at 4. There is no indication in the record that these "likes" occurred during the trial.

### a. Legal Standards

The Sixth Amendment guarantees to the criminally accused a fair trial by a panel of impartial jurors. U.S. Const. amend. VI; *see Irwin v. Dowd*, 366 U.S. 717, 722 (1961). The right to trial by jury "necessarily implies at the very least that the 'evidence developed' against a defendant shall come from the witness stand in a public courtroom where there is full judicial protection of the defendant's right of confrontation, of cross-examination, and of counsel." *Turner v. Louisiana*, 379 U.S. 466, 472–73 (1965). "Even if only one juror is unduly biased or prejudiced, the defendant is denied his constitutional

1   right to an impartial jury." *Tinsley v. Borg*, 895 F.2d 520, 523–24 (9th Cir. 1990) (internal

2   quotation marks omitted).

3       The Constitution "does not require a new trial every time a juror has been placed in

4   a potentially compromising situation." *Smith v. Phillips*, 455 U.S. 209, 217 (1982).  "The

5   safeguards of juror impartiality, such as voir dire and protective instructions from the trial

6   judge, are not infallible; it is virtually impossible to shield jurors from every contact or

7   influence that might theoretically affect their vote." *Id.*  Due process therefore means "a

8   jury capable and willing to decide the case solely on the evidence before it, and a trial

9   judge ever watchful to prevent prejudicial occurrences and to determine the effect of such

10  occurrences when they happen." *Id.*

11      Evidence not presented at trial is deemed "extrinsic." *See Marino v. Vasquez*, 812

12  F.2d 499, 504 (9th Cir. 1987).  A jury's consideration of extrinsic evidence constitutes trial

13  error, not structural error. *Eslaminia v. White*, 136 F.3d 1234, 1237 n.1 (9th Cir. 1998).

14  Thus, on habeas review, the court must determine whether the error had a substantial and

15  injurious effect on the verdict. *Henry v. Ryan*, 720 F.3d 1073, 1085 (9th Cir. 2013).  Juror

16  misconduct generally does not warrant a new trial where "the extraneous information the

17  jury considered was not inherently inflammatory, nor had it already been excluded from

18  trial as unduly prejudicial." *Henry*, 720 F.3d at 1086.

19          **b.  Analysis**

20      Petitioner argues that the trial court erred by failing to question the San Jose

21  Mercury News reporter as to how she obtained the information posted on its Facebook

22  page and further failed to question the jurors to determine if they had accessed the

23  newspaper's postings about the trial.  Dkt No. 35-7 at 6.  In denying this request, the

24  California Supreme Court could have reasonably determined that the trial court was under

25  no obligation to hold a hearing on juror misconduct.  For one, there is no Supreme Court

26  authority requiring a trial court to hold a hearing in the absence of a request for one.  But

United States District Court
Northern District of California

even if a request had been made, Robertson made clear that he opposed any limits on the attorneys' communications with third parties and asked the trial court to do nothing. Moreover, at no point during the hearing on Gillan's request was it suggested that any of the jurors themselves were biased.  To the contrary, both the trial court and Robertson noted that the jury had been admonished multiple times to refrain from reading about or discussing the case with others, and they both agreed that the jury was expected to follow these admonishments.  As for the two jurors who "liked" the Facebook page dedicated to the Achilli trial, Petitioner's arguments are speculative as there is no indication that these "likes" occurred during the trial.  Thus, habeas relief is not warranted on this ground.

### 7.      Right to Counsel of Choice

On February 23, 2011, the trial court relieved Robertson as counsel of record due to a conflict and appointed Edward Sousa following a meeting in chambers at which Petitioner was not present.  Dkt No. 21-56 at 1-3.  Petitioner argues that this was done without his consent and without cause, thereby violating his right to counsel of choice.

The Sixth Amendment guarantees criminal defendants "reasonably effective assistance" of counsel throughout the criminal proceedings.  *Strickland v. Washington*, 466 U.S. 668, 687 (1984).  While the Sixth Amendment may "comprehend[ ]" a defendant's right to select and be represented by "one's preferred attorney," the "essential aim of the Amendment is to guarantee an effective advocate for each criminal defendant rather than to ensure that a defendant will inexorably be represented by the lawyer whom he prefers." *Wheat v. United States*, 486 U.S. 153, 159 (1988).  An indigent defendant "may not insist on representation by an attorney he cannot afford or who for other reasons declines to represent the defendant."  *Id.*  The California Supreme Court's denial of this claim could have reasonably been premised on the fact that Petitioner has no right to appointed counsel of choice.

Even so, Petitioner contends here that he would have waived any conflict. But a court is not required to accept the waiver. *Wheat*, *supra*, at 160. This is because the Sixth Amendment's presumption in favor of counsel of choice is not absolute. *Id.* It must be balanced against a court's independent interest "in ensuring that criminal trials are conducted within the ethical standards of the profession and that legal proceedings appear fair to all who observe them." *Id.* As to this, Robertson explained in a declaration filed in support of Petitioner's motion for a new trial that the conflict arose following his receipt of a letter written by Jesse Lema, a purported witness to Achilli's drug interactions. Dkt No. 57-10 at 12. Lema's letter included inside information that appeared credible to Robertson and that Robertson used to support a motion for a new trial. *Id.* Robertson later learned, however, that "everything in the letter is bullshit," according to Lema himself, who said that "Rosen would tear [him] to pieces" if he was put on the witness stand. *Id.* at 13. When Robertson asked for clarification, Lema responded that "Paul dictated to me what to write" in order to get a new trial. *Id.* Robertson immediately informed Petitioner that he would need to conflict out because of the letter, and Petitioner did not oppose the withdrawal at the time. *Id.* at 16. Soon thereafter, Robertson received a phone call telling him to be careful around his home and to "watch [his] back." *Id.* at 17. This led Robertson to conclude that he "had lost [his] ability to be impartial and to objectively look at the facts of the case in [o]rder to address a motion for a new trial." *Id.* at 18. With this declaration in the record, the California Supreme Court could have reasonably concluded that, even if Petitioner had waived the conflict, his Sixth Amendment rights were not violated considering the serious allegations made by Robertson.

### a.  Right to be Present at all Critical Stages

In a related argument, Petitioner claims that his absence from the February 23, 2011 meeting in chambers violated his right to be present at critical stages of the criminal proceeding.

United States District Court
Northern District of California

1    Under the Due Process Clause, a criminal defendant has a right to be present at any

2    stage of the criminal proceeding that is critical to its outcome if his presence would

3    contribute to the fairness or reliability of the procedure.  *Kentucky v. Stincer*, 482 U.S. 730,

4    745 (1987); *United States v. Gagnon*, 470 U.S. 522, 527 (1985).  A defendant must be

5    allowed to be present "to the extent that a fair and just hearing would be thwarted by his

6    absence."  *Stincer*, 482 U.S. at 745 (quoting *Snyder v. Massachusetts*, 291 U.S. 97, 108

7    (1934), overruled in part on other grounds by *Malloy v. Hogan*, 378 U.S. 1 (1964)).

8    However, "th[e] privilege of presence is not guaranteed 'when presence would be useless,

9    or the benefit but a shadow.' "  *Stincer*, 482 U.S. at 745 (quoting *Snyder*, 291 U.S. at 106-

10   07); *see also Gagnon*, 470 U.S. at 527 (defendants' absence did not violate the Due

11   Process Clause where their presence was not needed to "ensure fundamental fairness" and

12   they could not have added to or gained from being present at the conference).

13   The right to be present, like many other constitutional rights, may be waived.  *See*

14   *Gagnon*, 470 U.S. at 529; *Taylor v. United States*, 414 U.S. 17, 19-20 (1973).  The

15   defendant must personally waive his right to be present; waiver by counsel is insufficient.

16   *Turner v. Marshall*, 63 F.3d 807, 815 (9th Cir. 1995), overruled on other grounds in

17   *Tolbert v. Page*, 182 F.3d 67, 685 (9th Cir. 1999); *United States v. Kupau*, 781 F.2d 740,

18   743 (9th Cir. 1986); *see also Lugo v. Terhune*, 277 Fed. App'x. 714 (9th Cir. 2008).

19   The summary denial of this claim by the California Supreme Court could have

20   reasonably been premised on a determination that the meeting was not critical to the

21   outcome of the case and that Petitioner's presence was unnecessary.  For one, the trial had

22   ended four months prior.  It could thus be reasonably argued that, at this post-trial stage,

23   Petitioner's presence was unnecessary to contribute to the fairness or reliability of the

24   proceedings.  It is important to remember that by the time of the meeting, Robertson had

25   already filed a motion for a new trial premised, in part, on Jesse Lema's letter.  *See* Dkt

26   No. 57 at 120-27.  Following his meeting with Lema, Robertson filed a supplemental

27

28

declaration representing that the witness had recanted his statement.  Dkt No. 57 at 128-29.

He then informed both Petitioner and the trial court that he may need to conflict out.  Dkt

No. 57-10 at 15-16; Dkt No. 57-3 at 67.  During the portion of the discussion in chambers

regarding the conflict, which, according to the trial court, "lasted less than a minute,"

Robertson merely asked whether he should explain the conflict, to which the court

responded that it was unnecessary because it accepted Robertson's representation.  Dkt No.

57-3 at 68, 72.  Since Petitioner already knew of the conflict, his presence at the meeting

would have been unnecessary.  And finally, Robertson declared that Petitioner accepted

the withdrawal and declined to oppose it.  *Id.* at 16.  This is confirmed by the transcript of

the hearing immediately following the meeting in chambers.  There, Petitioner had the

opportunity to object; he did not do so.  Instead, his only request was to meet Edward

Sousa before the appointment.

Based on the foregoing, the Court thus concludes that the California Supreme

Court's denial of this claim was neither contrary to, nor an unreasonable application of,

federal law.

### 8.    Trial Counsel's Conflicts of Interest

Petitioner argues that his Sixth Amendment rights were violation by Robertson's

multiple conflicts of interest.  These relate to Robertson's (1) professional and personal

relationship with the prosecution witness, Nick Lezotte, (2) personal relationship with the

judge, (3) history of substance abuse and California bar investigations, (4) agreement with

a San Jose Mercury News reporter, (5) request for expert funds, and (6) failure to respond

to Petitioner's 2018 request for a declaration.

### a.  Legal Standards

The Sixth Amendment guarantee of assistance of counsel comprises two correlative

rights: the right to counsel of reasonable competence, *McMann v. Richardson*, 397 U.S.

759, 770-71 (1970), and the right to counsel's undivided loyalty, *Wood v. Georgia*, 450

United States District Court
Northern District of California

United States District Court
Northern District of California

U.S. 261, 271-72 (1981).  A criminal defendant accordingly is entitled under the Sixth Amendment to an effective attorney who can represent him competently <u>and</u> without conflicting interests.  *Garcia v. Bunnell*, 33 F.3d 1193, 1195 (9th Cir. 1994).  If counsel is prevented by a conflict of interest from asserting his or her client's contentions without fear or favor, the integrity of the adversary system is cast into doubt because counsel cannot play the role necessary to ensure that the trial is fair.  *See Strickland v. Washington*, 466 U.S. 668, 685 (1984).

An "actual conflict" is "a conflict that adversely affects counsel's performance" and not a "mere theoretical division of loyalties."  *Mickens v. Taylor*, 535 U.S. 162, 171-72 & n.5 (2002).  The "adverse effect" is shown if some plausible alternative defensive strategy or tactic might have been pursued but was not and the alternative defense was inherently in conflict with or not undertaken due to the attorney's other loyalties or interests.  *United States v. Wells*, 394 F.3d 725, 733 (9th Cir. 2005).

To show the conflict had an "adverse effect," the defendant need only show that it was "likely" that the conflict had "some effect on counsel's handling of particular aspects of the trial."  *United States v. Walter-Eze*, 869 F.3d 891, 901 (9th Cir. 2017) (internal quotations and citations omitted).  The strength of the prosecution's case is not relevant to this analysis.  *United States v. Mett*, 65 F.3d 1531, 1535 (9th Cir. 1995).  The central question in assessing a conflict's adverse effect is what the attorney was compelled to refrain from doing because of the conflict, such as putting on certain defenses and witnesses, not seeking a plea agreement, or not seeking a continuance.  *Walter-Eze*, 869 F.3d at 901 (citing cases).  The inquiry into whether a conflict adversely affected performance is fact-specific and does not rely on the characterization or type of conflict presented.  *Id.* at 13.

If a defendant can show that his counsel operated under an "actual conflict of interest" then prejudice is presumed.  *Cuyler v. Sullivan*, 446 U.S. 335, 350 (1980) (finding

actual conflict of interest arose from counsel's joint representation of codefendants). Prejudice should not be presumed where the "actual conflict is relegated to a single moment of the representation and resulted in a single identifiable decision that adversely affected the defendant." *Walter-Eze*, 869 F.3d at 906. In cases where there is no presumed prejudice from an "actual conflict of interest," petitioner must show prejudice under *Strickland*. *Walter-Eze*, 869 F.3d at 915 (finding no prejudice under *Strickland* arose from actual conflict of interest stemming from threat of sanctions and fine against defense counsel if he sought trial continuance).

Similarly, where there is only attenuated or potential conflict of interest, a petitioner may still attempt to show that such conflict resulted in the ineffective assistance of counsel, which requires a showing of actual unreasonableness of counsel's performance and resulting prejudice. *See Paradis v. Arave*, 130 F.3d 385, 391 n.5 (9th Cir. 1997); *Bonin v. Calderon*, 59 F.3d 815, 827 (9th Cir. 1995), *cert. denied*, 516 U.S. 1051 (1996).

To establish that a conflict of interest "adversely affected counsel's performance," petitioner need only show "that some effect on counsel's handling of particular aspects of the trial was 'likely.' " *Miskinis*, 966 F.2d at 1268 (citing *Mannhalt*, 847 F.2d at 583); *Lockhart v. Terhune*, 250 F.3d 1223, 1231 (9th Cir. 2001) (same; *Sanders*, 21 F.3d at 1452 (reviewing court "must examine the record to discern whether the attorney's behavior seems to have been influenced by the suggested conduct"). *But see Bragg*, 242 F.3d at 1087 (petitioner must demonstrate that conflict of interest "actually affected" the attorney's performance).

### b. Robertson's Relationship with Nick Lezotte

Petitioner first claims that his waiver to a potential conflict of interest as to Nick Lezotte was not made knowingly and intelligently.

The police interviewed Nick Lezotte on May 13, 2008 to discuss his "personal relationship" with Petitioner. Dkt No. 57 at 46. At the time, Lezotte also worked as a law

United States District Court
Northern District of California

clerk in Robertson's law office. *Id.* Lezotte told the police that he once drove by Tessa Donnelly's home at Petitioner's request. *Id.* Because this statement likely meant that Lezotte would be a prosecution witness, it was shared with Robertson, who agreed that Lezotte was a potential witness and, "in order to eliminate any conflict or appearance of conflict," stated that Lezotte would "not be providing any further services to [his] office." *Id.* at 49.

Subsequently, the prosecution filed a motion for Petitioner to waive his right to an attorney with a potential conflict of interest. Dkt No. 57-1 at 214-20. At the July 11, 2008 hearing on the motion, the trial court explained one of the many ways in which a potential conflict could arise with a former employee. *See* Dkt No. 57-1 at 233-41. In the court's hypothetical, there was a possibility that Robertson would not vigorously cross-examine Lezotte in this case to curry favor in the event Lezotte is required to appear as a witness in a potential malpractice action filed against Robertson in the future. Following discussion with the attorneys, the court had the following exchange with Petitioner:

> THE COURT: . . . Mr. Garcia, have you discussed the potential consequences of waiving your right to an attorney, the valid potential conflict of interest with your attorney, Mr. Robertson?
>
> MR. GARCIA: Yes.
>
> THE COURT: Mr. Garcia, this Court can appoint an independent attorney to speak to you with respect to your right to a lawyer without a potential conflict of interest. Would you like to speak to such a lawyer regarding the possible consequences of allowing Mr. Robertson to continue to represent you, despite his potential conflict of interest?
>
> MR. GARCIA: No. [¶]
>
> THE COURT: Mr. Garcia, do you understand that Mr. Robertson's prior employer/employee relationship with Mr. Nick [Lezotte] hypothetically might prevent him from vigorously cross-examining Mr. [Lezotte]?
>
> MR. GARCIA: Yes.
>
> THE COURT: Do you understand that neither this Court nor Mr. Robertson nor anyone, for that matter, can force you to

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

United States District Court
Northern District of California

> waive your right to an attorney without any potential conflicts of interest?
>
> MR. GARCIA:  Yes.
>
> THE COURT:  Mr. Garcia, do you understand that this Court will allow you to hire a new attorney if you wish to do so?
>
> MR. GARCIA:  Yes.
>
> THE COURT:    Mr. Garcia, understanding the potential consequences of allowing Mr. Robertson to continue to represent you, do you still wish to waive your right to an attorney without any potential conflicts of interest?
>
> MR. GARCIA:  Yes.

Dkt No. 57-1 at 241-42, 244-45.  Following this exchange, the trial court found as follows:

> . . . At this time the Court finds that Mr. Garcia has been advised of a potential conflict of interest between – potentially between his Counsel and a former employee; that Mr. Garcia knowingly, intelligently, understandably waives his right to counsel without any potential conflict of interest, wishes to have Mr. Robertson continue to represent him; and the Court finds no reason – no legal reason why Mr. Robertson at this time should not continue to represent him.

Dkt No. 57-1 at 245-46.

Here, Petitioner contends that his waiver was not made knowingly or intelligently "because the Trial Court failed to adequately safeguard Petitioner's constitutional right to the assistance of conflict-free counsel."  Dkt No. 35-7 at 200.  He argues that the trial court should have appointed him an attorney and should have gone through potential scenarios highlighting how the potential conflict would play out.

Trial courts may allow an attorney to proceed despite a conflict if the defendant makes a voluntary, knowing, and intelligent waiver.  *Garcia v. Bunnell*, 33 F.3d 1193, 1195 (9th Cir. 1994).  Whether a defendant made a valid waiver of his Sixth Amendment rights depends upon the particular facts and circumstances surrounding the case, including the background, experience and conduct of the accused.  *See Edwards v. Arizona*, 451 U.S. 477, 482 (1981).  In making such a determination, the court must indulge every reasonable

Case No. 16-05301 BLF (PR)
ORDER DEN. PET. FOR WRIT OF HABEAS CORPUS; DEN. CERTIFICATE OF APPEALABILITY

presumption against the waiver of fundamental rights.  *Lockhart*, 250 F.3d at 1232; *United States v. Allen*, 831 F.2d 1487, 1498 (9th Cir. 1987), *cert. denied*, 487 U.S. 1237 (1988)).  It should also treat with skepticism waivers that are obtained swiftly.  *Lockhart*, 250 F.3d at 1232.

For a waiver to be knowing and intelligent, the defendant must have been sufficiently informed of the consequences of his choice.  *Id.*; *Evans v. Raines*, 705 F.2d 1479, 1480 (9th Cir. 1983).  The defendant's choice to waive his Sixth Amendment rights must be made with eyes open.  *Lockhart*, 250 F.3d at 1233.  He must know about all the risks that are likely to develop.  *Id.*  A defendant's waiver of his attorney's conflict of interest is not knowing and intelligent, for example, when the defendant is not informed that the attorney represents someone who is implicated in the defendant's charged offense.  *Id.*; *see also Lewis v. Mayle*, 391 F.3d 989, 996-97 (9th Cir. 2004) (waiver invalid when defendant did not seek advice of outside counsel despite being advised to do so, had only a "cursory discussion" with the judge, and was not informed of counsel's continuing duty to former client and that charges on which counsel represented former client might be usable for impeachment); *Belmontes v. Brown*, 414 F.3d 1094, 1118 (9th Cir. 2005), *rev'd on other grounds*, 549 U.S. 7 (2007) (waiver invalid where defendant was not fully informed of counsel's prior representation of prosecution witness who was possible perpetrator of crime and where neither attorney nor court informed defendant that attorney owed continuing duty of loyalty to witness).  *But cf. United States v. Martinez*, 143 F.3d 1266, 1269-1270 (9th Cir. 1998) (a properly advised defendant is not free to intelligently and knowingly make or approve a tactical choice and later abandon it when it seems convenient; defendant's valid waiver of right to conflict-free counsel extends to foreseeable conflicts).  A waiver stating that no conflict exists cannot be an effective waiver of rights.  *United States v. Shwayder*, 312 F.3d 1109, 1117 (9th Cir. 2002) (finding waiver ineffective where defendant consented to representation by attorney who had previously represented

1   his codefendant, where waiver stated that no conflict existed), *amended*, 320 F.3d 889, 890

2   (9th Cir. 2003).  Changes in circumstances may also affect the validity of the waiver.  *Id.*

3   (finding waiver ineffective, where it was signed before the indictment was issued and well

4   before trial, so it could not have considered the actual scope of the case as it developed,

5   and where codefendant who formerly was represented by attorney changed his plea to

6   guilty during the trial).

7        It would have been reasonable for the state court to determine that Petitioner's

8   waiver was knowing and intelligent because he was offered an appointed attorney, which

9   he declined; he was offered an opportunity to speak with Robertson before answering any

10  questions, which he declined; and he was present when the trial court and the attorneys

11  were discussing the potential ramifications of the conflict, including the failure to

12  vigorously cross-examine Lezotte and the heightened chance of a conviction when

13  represented by an attorney with a conflict.

14       Thus, the California Supreme Court could have concluded, based on the record and

15  applicable law, that Petitioner's waiver was made knowingly and intelligently, consistent

16  with the holdings of the U.S. Supreme Court, and Petitioner has not established that no

17  fairminded jurist could concur with such a determination.

18                    **c.  Robertson's Relationship with the Trial Judge**

19       At the start of the July 11, 2008 hearing on the prosecution's motion for waiver, the

20  trial court disclosed to the parties that he had a personal relationship with Robertson:

21              I have known Mr. Robertson since law school.  We were law
                school classmates.  We occasionally socialized.  I was invited to
22              his 60th birthday.  Unfortunately, I wasn't able to attend.  I
                consider him to be a friend.  We have never had a business
23              relationship.  However, we were in the same building for a
                while, approximately twenty something – well, probably
24              twenty-five years ago.  [¶] I don't think that that causes a
                problem for me.  I think that I'll be able to rule based on the
25              merits of the case.  However, if either party has a concern, I'll
                recuse myself and send the matter back to Department 23 for
26              reassignment.

27  Case No. 16-05301 BLF (PR)

28  ORDER DEN. PET. FOR WRIT OF HABEAS CORPUS; DEN. CERTIFICATE OF APPEALABILITY

United States District Court
Northern District of California

1    Dkt No. 57-1 at 226-27.  Neither the prosecutor nor Robertson had a problem with this,

2    and Robertson stated that Petitioner did not, either.  *Id.* at 227.

3         Petitioner argues that he did not consent and had not even spoken with Robertson

4    about his personal relationship with the court.  He then suggests that, due to the length of

5    that relationship, the court knew but failed to disclose Robertson's history of substance

6    abuse.  Specifically, Petitioner states, "it cannot be said that the Honorable Eugene M.

7    Human did not know about Mr. Robertson's substance abuse issues."  Dkt No. 35-7 at 212.

8         The California Supreme Court's denial of this claim could have reasonably been

9    premised on the fact that the U.S. Supreme Court has never held that a friendship between

10   an attorney and a judge constitutes an actual conflict.  As for a potential conflict, the state

11   court could have also reasonably determined that Petitioner has not shown prejudice, and

12   his claim that the trial judge knew about Robertson's substance abuse is speculative, at

13   best.  Accordingly, habeas relief is not warranted on this ground.

14              **d.  Substance Abuse and California Bar Investigation**

15        Petitioner's mother declares that Chuck Cucco, the victim's alleged "best friend,"

16   told her that he and Robertson attended the same substance abuse meetings and that he had

17   Robertson's cell phone number stored in his phone.  Dkt No. 85 at 3.  Petitioner argues that

18   he was never informed of this information and that, had he known, he "would have **never**

19   retained Mr. Robertson."  Dkt No. 35-7 at 198 (emphasis in original).  Petitioner also

20   refers to a 2016 state bar complaint that he filed concerning Robertson's representation of

21   him.  The California Supreme Court may well have reasoned that there is no showing

22   whatsoever that Robertson's treatment for substance abuse had any bearing on his

23   representation of Petitioner.  *Bonin v. Calderon*, 59 F.3d 815, 838 (9th Cir. 1995)

24   (irrelevant whether attorney abused drugs before or during trial where his performance did

25   not fall below standard of objective reasonableness).  There is no evidence that it had any

26   impact on the reliability of the outcome or that Robertson was ever under the influence of

27

28

1   drugs while in court.  There is also no evidence that any strategic decisions made by the

2   defense was decided under the influence or as the result of substance use.

3          Considering the evidence in the record, the state court's determination that any

4   potential conflict of interest did not result in adverse performance is both reasonable and

5   not contrary to federal law.  *See* 28 U.S.C. § 2254(d)(1).  Accordingly, Petitioner is not

6   entitled to relief on this claim.

7                        **e.   Agreement with Mercury News Reporter**

8          In July 2010, Robertson entered into an agreement with a San Jose Mercury News

9   reporter.  Dkt No. 85-43 at 3.  Pursuant to the agreement, Robertson would share

10  information about Petitioner's defense, which would be held in confidence until the

11  Sunday before trial was scheduled to commence or sooner, if Robertson agreed.  *Id.*

12  Petitioner claims that he never approved this agreement and did not authorize the sharing

13  of attorney-client privileged information.  Dkt No. 35-7 at 235.  Once more, the California

14  Supreme Court could have reasonably determined that this did not amount to a conflict and

15  Petitioner had not shown that it affected Robertson's representation of him or that he

16  shared information protected by the attorney-client privilege.  Relief is therefore not

17  warranted here.

18                        **f.   Request for Expert Funds**

19         On September 13, 2010, Robertson filed a motion to obtain state assistance for

20  experts' fees.  Dkt No. 85-2 at 2-12.  In support, Robertson claimed that the funds provided

21  to him by Petitioner have been exhausted, and that neither Petitioner nor his family was

22  able to pay for an expert.  On September 15, the trial court authorized the provision of

23  $14,000 for the continued assistance of an investigator and an expert.  Dkt No. 85-2 at 17.

24  On September 16, Petitioner's parents gave Robertson a $3,000 check to pay for trial

25  transcripts.  Dkt No. 85 at 3 ¶ 19.

26

27  Case No. 16-05301 BLF (PR)

28  ORDER DEN. PET. FOR WRIT OF HABEAS CORPUS; DEN. CERTIFICATE OF APPEALABILITY

96

United States District Court
Northern District of California

Petitioner argues that Robertson made false representations to the court and his parents, and that this is another example of Robertson withholding and misrepresenting information.  In denying this claim, it would have been reasonable for the state court to conclude that Robertson's pursuit of funds from two different sources for two different purposes was not improper, and that his statement to the court that Petitioner's family "indicated that they are without further funds" was likely true when written considering they did not give him the $3,000 check until three days after he filed the motion.

### g.  Failure to Respond to a Request for a Declaration

Robertson was relieved as counsel of record in February 2011.  In 2018, Petitioner asked Robertson to draft a declaration in support of the habeas petition Petitioner intended to file in the California Supreme Court.  Robertson did not respond.  The state court may well have determined that this did not amount to a conflict affecting Robertson's performance between 2008 and 2011.

### 9.    Cumulative Error

In his final claim, Petitioner argues that the cumulative effect of the alleged constitutional errors discussed above violated his right to a fair trial.

"Under traditional due process principles, cumulative error warrants habeas relief only where the errors have so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Parle v. Runnels*, 505 F.3d 922, 927 (9th Cir. 2017) (internal quotation marks omitted); *see McDowell v. Calderon*, 107 F.3d 1351, 1368 (9th Cir.) (cumulative effect of errors may deprive habeas petitioner of due process right to fair trial), *amended*, 116 F.3d 364 (9th Cir. 1997), *vacated in part by* 130 F.3d 833, 835 (9th Cir. 1997) (en banc).  *See, e.g.*, *Alcala v. Woodford*, 334 F.3d 862, 893-95 (9th Cir. 2003) (reversing conviction where multiple constitutional errors hindered defendant's efforts to challenge every important element of proof offered by prosecution); *Thomas v. Hubbard*, 273 F.3d 1164, 1179-81 (9th Cir. 2002), *overruled on other grounds by Payton v.*

1    *Woodford*, 299 F.3d 815, 829 n.11 (9th Cir. 2002) (reversing conviction based on

2    cumulative prejudicial effect of (a) admission of triple hearsay statement providing only

3    evidence that defendant had motive and access to murder weapon; (b) prosecutorial

4    misconduct in disclosing to the jury that defendant had committed prior crime with use of

5    firearm; and (c) truncation of defense cross-examination of police officer, which prevented

6    defense from adducing evidence that someone else may have committed the crime and

7    evidence casting doubt on credibility of main prosecution witness); *United States v.*

8    *Frederick*, 78 F.3d 1370, 1381 (9th Cir. 1996) (prejudice resulting from cumulative effect

9    of improper vouching by prosecutor, improper comment by prosecutor about defense

10   counsel, and improper admission of evidence previously ruled inadmissible required

11   reversal even though each error evaluated alone might not have warranted reversal).

12         In *Parle*, the Ninth Circuit affirmed a finding of cumulative error where the trial

13   court committed multiple evidentiary errors that "went to the heart of the defense's case

14   and the only issue before the jury." *Parle*, 505 F.3d at 924, 934. The court explained that

15   "[a] unique and critical thread [ran] through the trial errors": all of the improperly excluded

16   evidence in petitioner's case supported his defense that he lacked the requisite state of

17   mind for first degree murder while all of the erroneously admitted evidence undermined

18   his defense and credibility and bolstered the State's case. *Id.* at 930. The court found there

19   was a "unique symmetry" of the evidentiary errors, which "starkly amplified" each other

20   and which bore a "direct relation to the sole issue contested at trial," i.e., petitioner's state

21   of mind at the time of the crime, rendering petitioner's defense " 'far less persuasive,'

22   infecting his trial with unfairness and depriving him of due process." *Id.* at 932-34

23   (citations omitted).

24         A cumulative error claim is "rarely successful," *Smith v. Wasden*, 747 F. App'x

25   471, 478 (9th Cir. 2018), and where there is no "symmetry of error," habeas relief will not

26   be granted.  *See Ybarra v. McDaniel*, 656 F.3d 984, 1001 (9th Cir. 2011).  In *Ybarra*, for

27   Case No. 16-05301 BLF (PR)

28   ORDER DEN. PET. FOR WRIT OF HABEAS CORPUS; DEN. CERTIFICATE OF APPEALABILITY

United States District Court
Northern District of California

1    instance, the Ninth Circuit concluded that the claimed errors regarding the composition of

2    the jury "did not amplify each other" and the claimed errors at sentencing did not have a

3    "synergistic effect."  Where "[t]he effect of the improper jury instruction was to focus the

4    jurors on the horrific nature of the murder; [and] the effect of the improper prosecutorial

5    statements was to focus the jurors on their role as community members," the combined

6    effect of the errors did not "infect [ ] the trial with unfairness" or render petitioner's

7    defense "far less persuasive than it might otherwise have been" such that it violated

8    petitioner's due process rights.  *Id.* (alteration in original) (citation omitted).

9        Cumulative error is more likely to be found prejudicial when the government's case

10   is weak.  *See id.*; *see, e.g.*, *United States v. Preston*, 873 F.3d 829, 846 (9th Cir. 2017)

11   (noting the government's "hinged almost entirely on [the victim's] testimony with "little

12   additional proof to corroborate his allegations"); *Thomas*, 273 F.3d. at 1180 (noting that

13   the only substantial evidence implicating the defendant was the uncorroborated testimony

14   of a person who had both a motive and an opportunity to commit the crime); *Walker v.*

15   *Engle*, 703 F.2d 959, 961-62, 968 (6th Cir.), *cert. denied*, 464 U.S. 951 (1983).  However,

16   where there is no single constitutional error existing, nothing can accumulate to the level

17   of a constitutional violation.  *See Hayes v. Ayers*, 632 F.3d 500, 524 (9th Cir. 2011);

18   *Demetrulias v. Davis*, 14 F.4th 898, 916 (2021); *Mancuso v. Olivarez*, 292 F.3d 939, 957

19   (9th Cir. 2002); *Fuller v. Roe*, 182 F.3d 699, 704 (9th Cir. 1999); *Rupe v. Wood*, 93 F.3d

20   1434, 1445 (9th Cir. 1996).  Similarly, there can be no cumulative error when there has not

21   been more than one error.  *United States v. Solorio*, 669 F.3d 943, 956 (9th Cir. 2012).

22       The Court finds that, in the absence of more than one error identified in this Order,

23   the state court's denial of Petitioner's cumulative error argument was neither contrary to,

24   nor involved an unreasonable application of, clearly established federal law, as determined

25   by the United States Supreme Court.  Petitioner is thus not entitled to habeas relief.

26

27

28

United States District Court
Northern District of California

## V.  CONCLUSION

After a careful review of the record and pertinent law, the Court concludes that the Second Amended Petition must be **DENIED**.

Further, a Certificate of Appealability is **DENIED**.  *See* Rule 11(a) of the Rules Governing Section 2254 Cases.  Petitioner has not made "a substantial showing of the denial of a constitutional right."  28 U.S.C. § 2253(c)(2).  Nor has Petitioner demonstrated that "reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong."  *Slack v. McDaniel*, 529 U.S. 473, 484 (2000).  Petitioner may not appeal the denial of a Certificate of Appealability in this Court but may seek a certificate from the Court of Appeals under Rule 22 of the Federal Rules of Appellate Procedure.  *See* Rule 11(a) of the Rules Governing Section 2254 Cases.

The Clerk shall terminate any pending motions, enter judgment in favor of Respondent, and close the file.

**IT IS SO ORDERED**.

Dated:_____April 14, 2023

BETH LABSON FREEMAN
United States District Judge